**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

DOREEN RAIMONDI,                                          :

                                                         :          Civil Action No.:

                                   Plaintiff,            :

                    v.                                   :

                                                         :          **COMPLAINT**

AVAYA INC., MATTHEW LEVESQUE and                         :

DAN PLUNKETT in their individual and                     :

professional capacities,                                 :          **Jury Trial Demanded**

                                   Defendants.           :

-------------------------------------------------------------------X

Plaintiff Doreen Raimondi ("Ms. Raimondi"), as and for her Complaint in this action against Defendant Avaya, Inc. ("Avaya" or the "Company"), Matthew Levesque and Dan Plunkett (together "Defendants") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Ms. Raimondi is a seasoned professional with decades of experience in sales and developing strategic partnerships who, throughout her career, was used to working with other professionals who treated her with respect.

2.      However, Ms. Raimondi's experience at Avaya was drastically different than anything that she had ever experienced.

3.      In December 2018, Ms. Raimondi joined Avaya to work under Mark Vella, Avaya's Vice President of Strategic Partnerships and Global Alliances.

4.      Ms. Raimondi worked wonderfully with Mr. Vella until he abruptly resigned in July 2019 to join another company.

5.      Shortly thereafter, Mr. Raimondi was assigned to work under Matthew Levesque, a Senior Director.

6.      In his LinkedIn profile, Mr. Levesque claims to be one to "foster inspiration and positivity in life, individuals, and the organization" – but this claim could not be farther from the truth.

7.      Rather than discuss work matters, Mr. Levesque would talk to Ms. Raimondi about the "sins" and "mistakes" that he made in his life.

8.      While Mr. Levesque did not go into detail about these sins and mistakes, Ms. Raimondi learned from reputable sources that Mr. Levesque was terminated from his prior employer for having sexually harassed female employees and for engaging in sexual conduct with a female work colleague in public that was caught on video and posted on the internet.

9.      Following an in-person team meeting where Mr. Levesque consistently interrupted Ms. Raimondi, and allowed others to do so as well, Ms. Raimondi complained to Avaya's Human Resources ("HR") about how uncomfortable she felt working with Mr. Levesque because of the way he treated her and the things that she learned about Mr. Levesque, which she shared with HR.

10.      HR purported to conduct a "confidential" investigation of Ms. Raimondi's complaint, but it was no secret to Mr. Levesque and others at the Company that Ms. Raimondi complained about him.

11.      As a result, Mr. Levesque's treatment of Ms. Raimondi became increasingly hostile and he began to set her up to fail by removing one of her reports, assigning her undesirable sales accounts and requiring her to focus on a three-year plan when her job and compensation structure required sales in the immediate term.

12.     While Ms. Raimondi had been a generally healthy person in her life, her health suddenly and drastically declined, and she developed serious medical issues because of Mr. Levesque's treatment and the related stress it caused her.

13.     Unfortunately, Ms. Raimondi's further complaints to HR about Mr. Levesque's treatment and her declining health fell on deaf ears.

14.     Mr. Levesque also was not sympathetic about Ms. Raimondi's health conditions and discouraged her from taking leave.

15.     By way of example only, Mr. Levesque called Ms. Raimondi while she was hospitalized and told her that if she is "not focused on [her] job, then [she] will lose it."

16.     Despite her serious medical issues and being set up to fail by Mr. Levesque, Ms. Raimondi refused to give up and go on a disability leave.

17.     Instead, she worked tirelessly to secure sales with existing business partners, as well as made progress developing new partnerships.

18.     However, these efforts did not matter, and ultimately, Mr. Levesque and his supervisor, Dan Plunket, Vice President of Sales, terminated Ms. Raimondi on March 23, 2020, as part of a purported reduction-in-force that resulted in only 8 employees being selected for termination out of a group of 300.

19.     Ms. Raimondi's selection for termination was not a rational business decision since, at the time of her termination, Ms. Raimondi had already generated $2.8 million in sales and reached 134% of her year-to-date quota.

20.     Ms. Raimondi also had a pipeline of over $30 million in sales.

21.     Despite her success, Ms. Raimondi should have seen the writing on the wall that she had no future at Avaya after she complained to HR and because of her declining health.

22.     Before Ms. Raimondi was terminated, Avaya hired a male Regional Sales Director as Ms. Raimondi's supervisor, and Ms. Raimondi was required to prepare him for meetings with prospective business partners that Ms. Raimondi scheduled the meetings for and would have normally attended herself.

23.     In addition, around the same time of Ms. Raimondi's termination, the Company hired a younger female for a position similar to the one held by Ms. Raimondi.

24.     Thus, Ms. Raimondi's termination was a calculated effort to retaliate against her for complaining about unlawful employment practices, and because she had serious health issues for which she needed to take protected leave to receive medical treatment.

## NATURE OF THE CLAIMS

25.     Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant' unlawful employment practices in violation of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA") and the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL").

## ADMINISTRATIVE PROCEDURES

26.     Plaintiff will be filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and will seek leave to file an Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 ("ADA"), following the EEOC's issuance of a Notice of Right to Sue.

27.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA.

29.     The Court has supplemental jurisdiction over Plaintiff's related claims arising under New York State law pursuant to 28 U.S.C. § 1367(a).

30.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

31.     Plaintiff Doreen Raimondi is a former employee of Avaya and is a resident of the State of New York.  Ms. Raimondi, at all relevant times herein, met the definition of an "employee" under all relevant statutes.

32.     Defendant Avaya, Inc. is a Delaware Corporation and its principal place of business is located at 4655 Great America Parkway Santa Clara, California, 95054.  At all relevant times Avaya met the definition of an "employer" under all relevant statutes.

33.     Defendant Matthew Levesque is a Senior Director at Avaya, Inc.  Mr. Levesque directly supervised Plaintiff at the time of her termination and participated in the unlawful discriminatory and retaliatory conduct to which Plaintiff was subjected.  At all relevant times, Mr. Levesque met the definition of an "employer," "covered employer" and/or "aider and abettor" under all relevant statutes.

34.     Defendant Dan Plunkett is the Vice President of Sales at Avaya, Inc.  Mr. Plunkett directly and indirectly supervised Plaintiff during her employment and participated in the unlawful discriminatory and retaliatory conduct to which Plaintiff was subjected.  At all

relevant times, Mr. Plunkett met the definition of an "employer," "covered employer" and/or

"aider and abettor" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.    BACKGROUND

35.    Ms. Raimondi is a distinguished professional with over 25 years of experience in

sales and developing strategic partnerships.

36.    Ms. Raimondi worked at IBM for over 20 years where she became a Senior

Director, Global Public Sector and Healthcare System Integrators, Alliances and Channels.

37.    In that role, Ms. Raimondi grew IBM's revenue from $200 million to $500

million over four years.

38.    Ms. Raimondi also worked at Verizon where she was responsible for partnering

with the largest healthcare organizations.

39.    During that time, Ms. Raimondi consistently exceeded her sales targets.

40.    In 2012, Ms. Raimondi obtained a position at Xerox where she helped drive $1

billion in sales to existing and new partners.

41.    In 2016, ATOS purchased Xerox's Information Technology Outsourcing division,

and Ms. Raimondi joined ATOS as the Head of Sales where she was responsible for worldwide

sales to Xerox.

42.    Ms. Raimondi successfully generated an additional $80 million in net revenue.

43.    In 2018, Mark Vella, Avaya's Vice President of Strategic Partnerships and Global

Alliances, called Ms. Raimondi after learning about her skills and qualifications from someone

working at the Company.

44.     Ms. Raimondi met with Mr. Vella several times to discuss potential roles at Avaya, but at the time he did not have the ability to hire her.

45.     A few months later, Mr. Vella contacted Ms. Raimondi and told her that he had a position available and formally interviewed Ms. Raimondi for the position.

46.     Ms. Raimondi also interviewed with several other senior-level executives, including the Chief Operating Officer and Chief Information Officer.

47.     Avaya extended Ms. Raimondi a generous offer paying an approximately $190,000 salary and a bonus that would bring her total compensation to $300,000.

48.     Ms. Raimondi's role was to cultivate relationships and secure agreements with companies to resell Avaya's products to their customers.

49.     These relationships and agreements can take several months to over a year to form.

50.     In December 2018, Ms. Raimondi started working at Avaya.

51.     Ms. Raimondi worked well with Mr. Vella as they worked together to build strategic alliances and partnerships with companies to sell Avaya's information systems products.

52.     However, in July 2019, Mr. Vella abruptly resigned.

53.     Ms. Raimondi was assigned to work with temporary managers as she continued to pursue strategic partnerships.

54.     In August 2019, Dan Plunkett, then Vice President of Cloud Sales, hired Mr. Levesque and assigned him to be Ms. Raimondi's manager.  Mr. Levesque is a close friend of Mr. Plunkett.

## II.    MR. LEVESQUE WAS TERMINATED FROM HIS FORMER EMPLOYER FOR SEXUAL HARASSMENT, HOSTILE TREATMENT OF FEMALE EMPLOYEES AND ENGAGING IN PUBLIC SEX ACTS

55.    Shortly after Mr. Levesque was hired, Ms. Raimondi received a call from an Enterprise Account Manager at World Wide Technology, Inc. ("WWT") where Mr. Levesque used to work.

56.    Ms. Raimondi was told Mr. Levesque was terminated from WWT because he sexually harassed and had an affair with a female employee (even though he was married), and he was generally known to be hostile toward women.

57.    Ms. Raimondi was also told that Mr. Levesque was filmed on company property engaging in sexual acts and these videos were posted online.[1]

58.    Ms. Raimondi was aghast at what she learned and verified what she was told with two other people who knew Mr. Levesque.

59.    Ms. Raimondi's initial calls with Mr. Levesque, who lived in Arizona, further corroborated what she had learned about him.

60.    Instead of focusing on business, Mr. Levesque professed that he had made mistakes and needed forgiveness.

61.    Ms. Raimondi repeatedly tried to redirect the calls to business matters, but Mr. Levesque continued to talk about learning from his mistakes, needing forgiveness and brought up his divorce.

---

[1]    One of the videos, which is still accessible online, shows Mr. Levesque sticking his hand inside the back of female employee's pants and then having her sniff his hand. https://amp.barstoolsports.com/blog/1412869/guy-puts-his-hands-down-his-ladys-pants-and-thentakes-his-hand-and. The other video showing Mr. Levesque having sex with a female has been removed since Ms. Raimondi watched it because it contained salacious content.

62.     Ms. Raimondi asked James Taylor (Senior Director, System Integrator Solutions), who also reported to Mr. Levesque, if Mr. Levesque was talking to him about the same subjects.

63.     Mr. Taylor said he was not and the two talked only about business matters.

64.     In early September 2019, Ms. Raimondi traveled to Denver, Colorado for an in-person team meeting with Mr. Plunket, Mr. Levesque, Mr. Taylor, Mr. Taylor's direct report, Dawn Medina, and Ms. Raimondi's then-direct reports, Tony Rosselli and Benjamin Lee.

65.     At the meeting, Mr. Levesque repeatedly interrupted Ms. Raimondi when she started to present on what she had accomplished so far or to share her future business plans (even though the meeting was supposed to be a planning session).

66.     Mr. Rosselli also started to do the same.  At one point, Mr. Taylor made a comment that they should allow Ms. Raimondi to speak, but this did not help.

67.     Meanwhile, the other males in the meeting were not interrupted when they spoke, and Mr. Plunkett, who supervised Mr. Levesque, permitted this inappropriate conduct to occur.

68.     Mr. Levesque and Mr. Rosselli continued to interrupt Ms. Raimondi when she started to speak during team drinks and dinner after the meeting.

69.     At one point, Ms. Raimondi became so frustrated that she just decided to stop even trying to talk in front of them.

70.     Afterward, Ms. Raimondi became upset because she had never in her career been treated in such a disrespectful manner.

71.     Others at the meeting told Ms. Raimondi it was very noticeable that Mr. Levesque was treating her differently.

### III.   MS. RAIMONDI COMPLAINED TO HR ABOUT HER TREATMENT AT THE MEETING AND MR. LEVESQUE'S SORDID EMPLOYMENT HISTORY

72.    Shortly after returning to New York, Ms. Raimondi spoke to Faye Tylee, Global Head of HR, and Teresa Van De Brake, Americas Head of HR.

73.    Ms. Raimondi complained about how Mr. Levesque and Mr. Rosselli had treated her during the meeting, and how they would cut her off from speaking, but not the other males in the room.

74.    Ms. Raimondi also shared what she had learned about how Mr. Levesque had been previously terminated for sexual harassment, hostility toward women and public sexual acts that were filmed and posted online.

75.    Ms. Raimondi said she felt uncomfortable continuing to work under Mr. Levesque given his sordid employment history, his treatment of her at the meeting and his constant conversations about needing forgiveness for his mistakes.

76.    Ms. Raimondi asked to be transferred to another team.

77.    Ms. Tylee said that HR would investigate her claims, and Ms. Raimondi was assured that the investigation would be private and that she would not be retaliated against.

78.    HR subsequently interviewed everyone present at the meeting.  Although the investigation was supposed to be confidential, Ms. Raimondi received calls from both those who were interviewed and others who learned about the investigation.

79.    Mr. Taylor, Mr. Rosselli and Mr. Lee told Ms. Raimondi that HR did not directly ask them about Mr. Levesque's or Mr. Rosselli's treatment of Ms. Raimondi during the meeting.

80.    Rather, HR inquired if there was an agenda for the meeting and asked vague, general questions about how the meeting went and if they thought it was productive.

81.     They all explained that they did not really understand the purpose of the HR interviews.

82.     About a week later, Ms. Tylee and Ms. Van De Brake called Ms. Raimondi and told her that they finished the investigation.

83.     Ms. Tylee said that they did not find anything wrong with the meeting.

84.     Ms. Tylee also said that she could not corroborate what she shared about Mr. Levesque's past misconduct.

85.     Thus, nothing was done to address Ms. Raimondi's complaints to HR.

## IV.     MS. RAIMONDI EXPERIENCES A SERIES OR RETALIATORY ACTS FOLLOWING HER HR COMPLAINT

86.     Within two weeks of HR concluding its investigation, Mr. Levesque told Ms. Raimondi that there was a compensation change from a performance-based bonus to a straight sales commission structure.

87.     Mr. Levesque also explained that if she did not meet at least a significant portion of her target sales quota of $4.8 million (around 60%), then she would not receive any commissions regardless of the number of strategic partnerships she created.

88.     Importantly, a sales commission compensation structure did not align with Ms. Raimondi's objective to create new strategic partnerships with companies to sell Avaya's products.

89.     These partnerships can take months or even years to create because of a lengthy contracting process, as well as legal or tax hurdles for companies operating in foreign countries.

90.     For example, Mr. Taylor was assigned only to work on the IBM account that had a contract that took 18 months to form.

91.     Separately, 90% of the companies assigned to Ms. Raimondi with existing contracts to sell to were in foreign countries that Mr. Plunkett and Mr. Levesque did not receive sales credit for since they covered only U.S. companies.

92.     As a result, Mr. Levesque did not once join a phone call or video meeting with a prospective business partner that he was invited to, nor did he respond to emails for help.

93.     Mr. Rosselli was also moved to another part of the Company without any explanation.  This further made it difficult for Ms. Raimondi to generate sales.

94.     The interactions that Mr. Levesque would have with Ms. Raimondi were not helpful.

95.     Mr. Levesque instructed Ms. Raimondi to create a three-year plan and refused to discuss Ms. Raimondi's immediate goals or business matters when she brought them up.

96.     However, Mr. Levesque continued to talk about making mistakes and needing forgiveness.

97.      During one virtual meeting, Mr. Levesque asked Ms. Raimondi whether she had done things at the Company that she needed forgiveness for – and prodded some more by asking if she did anything to upset him or Mr. Plunket.

98.     After Ms. Raimondi denied doing anything, Mr. Levesque told Ms. Raimondi that he knew she complained to HR and relayed information about his private life.

99.     The fact that Mr. Levesque knew that Ms. Raimondi complained to HR is not surprising because Ms. Raimondi also learned from two colleagues outside her department, Jennifer Dudley, an Account Executive in Marketing, and Arthur Provato, Head of U.S. Cloud Sales and Solutions, that they knew that Ms. Raimondi had complained to HR.

100.    Both colleagues also warned Ms. Raimondi that she would be blackballed within the Company and set up to fail because of her complaint and recommended that she start looking for another job.

101.    Unfortunately, Ms. Raimondi did not heed her colleagues' warnings, which turned out to be true.

102.    On November 1, 2019, Ms. Raimondi presented her three-year plan to Mr. Levesque.  Mr. Levesque trashed the three-year plan even though those whom Ms. Raimondi shared it with had given her very positive feedback.

103.    Mr. Levesque also called Ms. Raimondi a "loser."  Ms. Raimondi responded that she was not a loser and that she would not have been as successful in her career by being a loser.

104.    Mr. Levesque then backtracked on his comment and said that he was trying to say that they are both losers if they could not be successful.

105.    Ms. Raimondi said that they had only recently started working together and were only a month into the fiscal year, so it did not make sense that he would refer to her as a loser.

106.    Ms. Raimondi also told Mr. Levesque that he should not be bullying her and calling her a loser then or at any point.

107.    Ms. Raimondi further told Mr. Levesque that she wanted him to stop talking about forgiveness and asking her what mistakes she may have made and whether forgiveness was needed from her.

108.    Mr. Levesque then became visibly upset and asked Ms. Raimondi what she knew about his personal life.  Ms. Raimondi told him she knew nothing and then refocused the conversation back to business matters.

109.    The following day, Mr. Levesque emailed Ms. Raimondi claiming that he was surprised by her statements during the meeting and tried to spin his criticisms of her as him holding them both to high-performance standards.

110.    Ms. Raimondi decided to respond positively to his email to avoid further confrontation and retaliation and wrote that she would not fail, had been dealing with health issues (detailed below) and that she was focused on performance as well.

## V.    MS. RAIMONDI'S ADDITIONAL HR COMPLAINTS WERE FUTILE

111.    After the November 1, 2019, meeting with Mr. Levesque, Ms. Raimondi called Ms. Van De Brake to relay that she knew Mr. Levesque found out about her HR complaint, and that she believed he was retaliating against her for making it.

112.    Ms. Van De Brake did not believe Ms. Raimondi and reassured her that that the Company had a no-retaliation policy.

113.    Later in November 2019, Ms. Raimondi called Ms. Van De Brake again to let her know about her medical conditions and stress resulting from continuing to work under Mr. Levesque and once again asked again if she could be moved.

114.    Ms. Van De Brake did not ask for details about how she was being treated or inquire about her health, but coldly provided Ms. Raimondi with a phone number for information about disability benefits.

115.    In January 2020, Ms. Raimondi called Ms. Van De Brake to complain that Mr. Levesque performed her appraisal in front of Eric Serrahn, a Senior Director whom Mr. Levesque and Mr. Plunkett recently hired to manage Ms. Raimondi instead of Mr. Levesque who was being promoted despite his retaliation against Ms. Raimondi.

116.    Ms. Raimondi complained that Mr. Levesque's derogatory comments at the appraisal unfairly prejudiced how Mr. Serrahn would judge her performance.[2]

117.    Ms. Raimondi also explained that she learned that Mr. Levesque and Mr. Plunkett were joking before the meeting about including Mr. Serrahn on the appraisal meeting.

118.    Ms. Van De Brake responded by claiming that if it were a turnover meeting then it would have been appropriate for Mr. Serrahn to attend.

119.    However, Ms. Raimondi told Ms. Van De Brake that the meeting was not a turnover meeting and the meeting subject was "appraisal."  Ms. Van De Brake merely responded "okay" and did not seem to care, so Ms. Raimondi ended the call.

## VI.    MS. RAIMONDI DEVELOPS SERIOUS MEDICAL CONDITIONS AND SEVERE EMOTIONAL DISTRESS

120.    Ms. Raimondi does not have a history of medical illness or depression.

121.    However, following the meeting in Denver, Colorado and because of her treatment at work, Ms. Raimondi developed serious medical conditions and severe emotional distress.

122.    The stress caused Ms. Raimondi's colon to stop functioning and required her to go to weekly physical therapy and receive enemas to be able to go to the bathroom.

---

[2]    Mr. Levesque's criticisms were both disrespectful and unfounded.  Mr. Levesque told Ms. Raimondi that she was a "non-performer" in two areas and that her career at IBM and Harvard education did not tell him that she had great skills.  Mr. Levesque also brought up once again the fact that she had missed a couple of calls, which Ms. Raimondi explained again were only missed because she was in the hospital with pneumonia.  In her written response to the appraisal, Ms. Raimondi complained that Mr. Levesque had only been her manager for three months but had evaluated her for the whole year, and that he did not know or ask Ms. Raimondi about her work during the first nine months, and never participated in any meetings or conference calls with customers to be able to evaluate her work.

123.    Ms. Raimondi also developed Fibromyalgia-like symptoms and a compromised immune system that led to an outbreak of shingles.

124.    Ms. Raimondi started grinding her teeth and now wears a retainer every day because she developed temporomandibular, or TMJ, in her jaw and facial muscles.

125.    Ms. Raimondi was hospitalized twice – one time because of her colon issues and the other because she developed pneumonia.

126.    During a hospital visit due to her pneumonia, Mr. Levesque called Ms. Raimondi because she had missed two calls.

127.    Ms. Raimondi explained that she missed the calls because she was in the hospital with pneumonia.

128.    Without even asking how she was doing, Mr. Levesque responded, "I do not give a shit where you are, you need to return the calls."

129.    Mr. Levesque also threated, "if you are not focused on your job, then you will lose it."

130.    Mr. Levesque's response made clear that he did not care about Ms. Raimondi's health.

131.    Ms. Raimondi also started seeing a psychologist on a weekly basis.

132.    Ms. Raimondi was diagnosed with Post-Traumatic Stress Disorder and prescribed several medications to treat her depression, anxiety, insomnia and uncontrollable shaking.

133.    Ms. Raimondi continues to seek medical treatment for these physical and psychological conditions.

134.    Around November 2019, Ms. Raimondi contemplated and started applying for short term disability but decided not to follow through with the application based on comments from Mr. Levesque.

135.    A few days before her termination, Ms. Raimondi again inquired about taking disability leave and was told she would receive the forms to fill out.

136.    Ms. Raimondi also informed Mr. Serrahn that she had called the disability number and explained to him that she had been sick for the last several months and may need to take time off to figure out what was wrong.

137.    Despite the serious medical conditions and stress, Ms. Raimondi refused to fail in her position and worked to secure sales with existing business partners, as well as made progress developing new partnerships.

138.    At the time of her termination, Ms. Raimondi had already generated $2.8 million in sales and reached 134% of her year-to-date quota.

139.    Ms. Raimondi had also just reached an agreement with Tech Mahindra Limited to sell Avaya's products, was close to completing an agreement with Infosys, Inc. and had made significant progress on agreements with Tata Consultancy Services, Accenture and Nippon Telegraph and Telephone Corporation.

140.    In all, Ms. Raimondi had a total pipeline of over $30 million in U.S. and international sales.

## VII.    MS. RAIMONDI IS UNLAWFULLY TERMINATED

141.    On March 23, 2020, Ms. Raimondi received a phone call from an HR Advisor, Robyn Brower, and Mr. Serrahn.

142.    Ms. Brower told Ms. Raimondi that she was being terminated because her position was being eliminated.

143.    Mr. Serrahn started to say that he knew Ms. Raimondi had done such a good job, but Ms. Brower interjected and asked Mr. Serrahn to please get off the call.

144.    The Company's claim that Ms. Raimondi's position was eliminated is not credible.

145.    The Company's Chief Executive Officer, Jim Chirico, has repeatedly stressed on earnings calls and at Avaya Engage 2020 the importance of creating new partnerships, alliances and channels to grow Avaya's business.

146.    In addition, Ms. Raimondi generated millions of dollars in sales for the company and was on target to far exceed her sales quota (with more than $30 million in her pipeline).

147.    It makes no sense that the Company would terminate a successful employee, especially at a time when Avaya's business is likely to grow with the transformation of remote working and collaboration.

148.    Ms. Raimondi was one of only eight employees terminated out of almost 300 in the selected group considered for termination.

149.    As such, Ms. Raimondi was clearly not terminated as part of any major restructuring or because of the impact of the current public health crisis.

150.    While we are aware that Mr. Taylor was also terminated at the same time, Mr. Plunkett had recently hired Yada Sok (the two of whom are rumored to be having an affair) to work on the IBM account with Mr. Taylor.

151.    Ms. Sok remains at the Company with Mr. Taylor's direct report.

152.     In addition, before her termination, Ms. Raimondi was required to prepare Mr. Serrahn to attend a conference to meet with her prospective business partners because she, for some unexplained reason, was not allowed to attend, but Ms. Sok, a recently hired employee, was allowed to attend.

153.     This apparent transition of responsibilities supports that Mr. Serrahn, who remains at the Company, was hired with the intent to take over Ms. Raimondi's work once she was terminated, or to help transition Ms. Raimondi's work to someone else hired to fill her role including Amy Smith, who Ms. Raimondi learned started working at Avaya as a Vice President of Alliances shortly after her termination.

## FIRST CAUSE OF ACTION
### (Retaliation and/or Interference in Violation of the FMLA)
*Against All Defendants*

154.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

155.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA since she worked least 1,250 hours in the 12-month period preceding her termination and reported to an office that employed more than 50 employees.

156.     By the actions described above, among others, Defendants have retaliated and/or interfered with Plaintiffs' rights under the FMLA to take leave to care for her serious medical condition.

157.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

158.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

159.    By the actions described above, among others, Defendant has discriminated against Plaintiff on the basis of her gender, actual or perceived disability and age in violation of the NYSHRL by denying her the same benefits, terms and conditions of employment.

160.    To the extent that Defendants Levesque and Plunkett are not individually liable as Plaintiff's employer, they are liable under the NYSHRL because they aided and abetted the unlawful discriminatory conduct.

161.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages.

162.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

163.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is further entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

164.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

165.    By the actions described above, among others, Defendant has retaliated against Plaintiff based on her protected activities in violation of the NYSHRL by engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts, including terminating Plaintiff's employment.

166.    To the extent that Defendants Levesque and Plunkett are not individually liable as Plaintiff's employer, they are liable under the NYSHRL because they aided and abetted the unlawful retaliatory conduct.

167.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages.

168.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

169.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is further entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York;

B.      An injunction and order permanently restraining Defendant and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 4, 2020
    New York, New York                          Respectfully submitted,

                                                **WIGDOR LLP**

                                                By: _____
                                                    Michael J. Willemin
                                                    Bryan L. Arbeit

                                                85 Fifth Avenue
                                                New York, NY 10003
                                                Telephone: (212) 257-6800
                                                Facsimile: (212) 257-6845
                                                mwillemin@wigdorlaw.com
                                                barbeit@wigdorlaw.com

                                                *Attorneys for Plaintiff*