**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
DOREEN RAIMONDI,                                          :
                                                         :
                          Plaintiff,                     :     Civil Action No.: 20-cv-06566
                                                         :
            v.                                           :
                                                         :
AVAYA INC., MATTHEW LEVESQUE and DAN                     :
PLUNKETT in their individual and professional            :
capacities,                                              :
                                                         :
                          Defendants.                    :
----------------------------------------------------------------X

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Western District of New York ("Local Civil Rules") and the Individual Rules of this Court, Plaintiff Doreen Raimondi ("Plaintiff" or "Ms. Raimondi") submits the following response to the Statement of Undisputed Material Facts annexed to the Motion for Summary Judgment of Defendants Avaya Inc. ("Avaya" or the "Company"), Matthew Levesque and Dan Plunkett (together, "Defendants"). All statements admitted herein are admitted without prejudice and solely for the purpose of responding to Defendants' Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ("Def. 56.1") and responding to Defendants' Motion for Summary Judgement (Dkt. No. 42). All citations to exhibits ("Ex. __") in Plaintiff's responses are to the documents attached to the Declaration of Michael J. Willemin ("Willemin Decl.") in opposition to the instant motion submitted herewith, unless otherwise noted.

## PLAINTIFF DOREEN RAIMONDI'S RESPONSES

I. **DEFENDANTS' SECTION I**

1. Avaya hired Plaintiff to the position of Director System Integrator Alliances, on January 2, 2019. (Declaration of Glen P. Doherty, executed on March 28, 2022 ("Doherty Dec."), Exhibit 21).

   **Response to Paragraph 1:**

   - Admit.

2. Plaintiff's duties in this role were simple: sell Avaya products to and through system integrators (except IBM, which was assigned to others holding similar positions), especially system integrators that are not currently purchasing products from Avaya. (Doherty Dec., Exhibit 21; Exhibit 25, pp. 16, 21-22).

   **Response to Paragraph 2:**

   - Dispute the claim that Plaintiff's duties were simple, as that characterization is not supported by the evidence cited.

   - Dispute the claim that Plaintiff's duties were to sell "especially [to] system integrators that [were] not currently purchasing products from Avaya," as that claim is not supported by the evidence cited.

   - Admit that Plaintiff was never assigned to IBM, but dispute any inference that she could not have been assigned to IBM in her role, or that she lacked any specific knowledge or skills to be assigned to IBM, as any such inference is not supported by the evidence cited.

   - Admit that Plaintiff's duties included, but were not limited to, selling Avaya products to and through system integrators.

3. At the time of Plaintiff's hiring, she reported to Mark Vella ("Vella"). (Doherty Dec., Exhibit 1, p. 137; Exhibit 21).

   **Response to Paragraph 3:**

   - Admit.

4. Vella resigned in July 2019, and Plaintiff immediately contacted Plunkett (Vella's boss and her then current supervisor due to Vella's resignation) to express her interest in the open position. (Doherty Dec., Exhibit 25, pp. 124-125).

**Response to Paragraph 4:**

- Dispute. When Mr. Vella was fired, Ms. Raimondi asked whether
  she could move into a position in the Healthcare Group. She did not
  ask for, nor was she interested in, Mr. Vella's job. Ex. A at ¶3.

5.   Plunkett denied Plaintiff's request, advising that she lacked leadership experience.
     (Doherty Dec., Exhibit 25, pp. 124-125). Instead, Plunkett advanced the application of
     Levesque. (Doherty Dec., Exhibit 27, pp. 37-42).

**Response to Paragraph 5:**

- Dispute that Plunkett denied Plaintiff's request, as no request was
  ever made. See Plaintiff's Response to Defendants' Statement of
  Undisputed Facts ("Response to Def. 56.1") at ¶4.

- Admit that Plunkett advanced the application of Levesque.

6.   Plunkett and Levesque both worked for Cisco in 2004. There was no contact between
     Plunkett and Levesque for over a ten (10) year period, and they reacquainted over
     LinkedIn in 2019. (Doherty Dec., Exhibit 22, pp. 66-71; Exhibit 25, pp. 37-42).

**Response to Paragraph 6:**

- Dispute. Ex. B at 93:19-23.

7.   Plunkett currently holds the position of Global Vice President Sales. (Plunkett Affidavit,
     sworn to on March 21, 2022 ("Plunkett Aff."), ¶ 2).

**Response to Paragraph 7:**

- Admit

8.   At the time of Vella's resignation, Plunkett held the position of Senior Director of
     Alliances, Service Providers and System Integrators. (Doherty Dec., Exhibit 25, p. 9)

**Response to Paragraph 8:**

- Admit

9.   Levesque was hired by Avaya in August 2019 to the position of Senior Director Global
     System Integrators. (Doherty Dec., Exhibit 22, p. 17).

3

**Response to Paragraph 9:**

- Admit

10. In early September 2019, Plunkett and Levesque scheduled an in-person meeting in Denver, Colorado, with all employees in Plunkett's organization assigned to work with system integrators (including those dedicated to IBM). The meeting's design was to address a lack of sufficient revenue created by the group as a whole. (Doherty Dec., Exhibit 22, pp. 47, 48; Exhibit 25, p. 65).

**Response to Paragraph 10:**

- Dispute that the purpose of the meeting was to address a lack of sufficient revenue created by the group as a whole. Ex. B at 88:15-89:9.

- Admit the remaining assertions.

11. In addition to Plunkett and Levesque, the following employees were in attendance: Plaintiff; James Taylor, Dawn Medina, Anthony Rosselli and Benjamin Lee. (Doherty Dec., Exhibit 22, p. 28; Exhibit 25, p. 66).

**Response to Paragraph 11:**

- Admit.

12. On September 6, 2019, following the Denver meeting, Plaintiff sent Faye Tylee, Avaya's Head of Human Resources, an email requesting a "20 minute confidential phone call." (Doherty Dec., Exhibit 10 [AVAYA 3064]).

**Response to Paragraph 12:**

- Admit.

13. Plaintiff and Tylee spoke on September 6, 2019, and Plaintiff reported that she learned from a source outside Avaya that Levesque was fired from his prior job because of a video of him and his sister-in-law engaging in inappropriate behavior. (Doherty Dec., Exhibit 10 [AVAYA 3502]; Exhibit 33, pp. 24-45).

**Response to Paragraph 13:**

- Admit, but dispute any inference that Plaintiff's report was limited to the referenced video. See Statement of Additional Facts ("SAF") at ¶¶157-158. Further state that Plaintiff informed Ms. Tylee about

4

two videos, one of which had been removed from the internet.  <u>See</u> Def. 56.1 at ¶18.

14. Tylee followed-up this call with an email, dated September 6, 2019, advising Plaintiff that Avaya takes her report very seriously, that the Employee Assistance Program ("EAP") is available for her use, and that she would contact Plaintiff on Monday to discuss "next steps." (Doherty Dec., Exhibit 10 [AVAYA 3502]).

**<u>Response to Paragraph 14:</u>**

- Admit the contents of the email, but dispute any inference that Avaya actually took the report seriously.  <u>See</u> SAF at ¶¶163-169.

15. On September 7, 2019, Plaintiff sent Tylee an email stating that she also wished to "speak about the meeting in Denver which was part two of what happened." (Doherty Dec., Exhibit 10 [AVAYA 3502]).

**<u>Response to Paragraph 15:</u>**

- Admit.

16. Plaintiff and Tylee spoke on September 9, 2019, at which time Plaintiff continued with her complaint about the video and also reported that Levesque repeatedly interrupted her at the Denver meeting.  (Doherty Dec., Exhibit 33, pp. 44, 45, 53).

**<u>Response to Paragraph 16:</u>**

- Admit the contents of the email, but dispute any inference that Avaya actually took the report seriously.  <u>See</u> SAF at ¶¶163-169.

17. The call ended with Tylee advising Plaintiff that Human Resources would investigate her concerns.  (Doherty Dec., Exhibit 10 [AVAYA 3502]).

**<u>Response to Paragraph 17:</u>**

- Admit.

18. On September 8, 2019, Plaintiff sent Tylee a text message with a copy of a video link, along with the following text message:

> Faye, I was contacted by WOrld[sic] wide technology friends from ibm[sic] and a partner. He was fired immediately. It was a video on <u>barstools.com</u> having inappropriate outside of world wide technology with his sister in law. When you go to the site it has been taken down. This is all I see.

The other video has been locked.  I can't send it.  (Doherty Dec., Exhibit 10 [AVAYA 669]).

**Response to Paragraph 18:**

- Admit.

19.    Tylee responded to Plaintiff on September 8, 2019 by thanking her for her communication, and by telling her to enjoy herself on her upcoming vacation.  (Doherty Dec., Exhibit 10 [AVAYA 669]).

**Response to Paragraph 19:**

- Admit.

20.    On September 8, 2019, Plaintiff sent Tylee the following email:

> I sent you the one of the texts that was sent to me.  The other text will not forward since it was taken down from Barstools the sport site.  This is what was sent to me by people who know him.  But when you click on it there is nothing to see, I am too embarrassed and also feel that I should not call back the people who sent it to me to ask them if they can send me more data.  All I know is that they said immediately[sic] action was taken by WWT.  The video was taken in a parking lot with his sister in law on the property of WWT.  Again I feel awful coming to you with this information.  I feel like the victim and I am doing something wrong by speaking up.  But I just want to know what to do.
>
> Again my career at Avaya is very important to me.  I really feel that I trust you enormously but I feel very at risk that I even spoke up.  Avaya and Jim are committed to women and to workplace and I thought I should escalate as a manager when I see something.  I also want to be very successful and don't want to be in a chain of command that does not respect women.  Retaliation happens in many forms silently.  (Doherty Dec., Exhibit 10 [AVAYA 3120]).

**Response to Paragraph 20:**

- Admit.

21.    Avaya proceeded to immediately conduct a confidential investigation into Plaintiff's report.  In so doing, Tylee and Teresa Van De Brake, Avaya's Head of Human Resources for Americas, proceeded to interview every person in attendance at the Denver meeting.  (Doherty Dec., Exhibit 30; Exhibit 33, pp. 41, 42, 48, 50, 51, 58, 61, 62, 64, 65).

**Response to Paragraph 21:**

- Dispute.  Avaya failed to conduct any *bona fide* investigation.  Ex. C; Ex. D at 50:17-51-17, 58:14-59:6; Ex. E at 23:8-24:5, 26:7-17; Ex. K at 51:2-18, 112:18-25; <u>see</u> <u>also</u> SAF at ¶¶163-169.

- Dispute.  The "investigation" was not confidential.  Ex. B at 94:2-96:25, 157:18-158:15.  <u>See</u> <u>also</u> SAF at ¶¶159-161.

22.    They also obtained and reviewed the background investigation materials related to the hiring of Levesque.  (Doherty Dec., Exhibit 31; Exhibit 33, pp. 41, 42, 43, 48).

**Response to Paragraph 22:**

- Dispute.  Ms. Tylee emailed a third-party and stated her intent to ask Ms. Van De Brake to review the background investigation materials. However, Ms. Van De Brake testified that she conducted no investigation into Levesque's hiring and, when shown the email cited by Defendants, testified that still had no recollection of doing anything to investigate Levesque's hiring.  Ex. E at 25:3-26:17.

23.    Tylee and Van De Brake concluded there was an absence of any inappropriate behavior by Levesque at the meeting, noting that the other female in attendance (Medina) actually advised Plaintiff that her team's actions were "derailing the agenda and were making Plaintiff's team look bad."  (Doherty Dec., Exhibit 31).

**Response to Paragraph 23:**

- Dispute.  The evidence cited does not support the proposition in any way, and the cherry-picked statement mischaracterizes the interview of Dawn Medina, who stated during the interview that at the meeting, her male colleague, Tony Rosselli, "didn't want to accept what [she] was saying until it was said by a male."  Ex. C at AVAYA000304.  <u>See</u> <u>also</u> SAF at ¶¶165-169.

24.    Tylee and Van De Brake also confirmed the absence of any negative information contained in the background investigation conducted in connection with the hiring of Levesque. (Doherty Dec., Exhibit 33, p. 42).

**Response to Paragraph 24:**

- Dispute.  There was no review of the background investigation conducted in connection with the hiring of Levesque.  <u>See</u> Response to Def. 56.1 at ¶22.

25.   On September 23, 2019, following Plaintiff's return from vacation, Tylee and  Van De Brake held a call with Plaintiff to discuss the results of their investigation.  (Doherty Dec., Exhibit 30).

**Response to Paragraph 25:**

- Admit.

26.   They started the meeting by advising Plaintiff that they interviewed the entire group as part of a confidential investigation, and concluded the absence of any inappropriate behavior. (Doherty Dec., Exhibit 30).

**Response to Paragraph 26:**

- Admit that was stated but dispute its accuracy.  See Response to Def. 56.1 at ¶21.

27.   Plaintiff took issue with the results of the investigation, and immediately returned to a discussion about the video of Levesque taken before he accepted employment with Avaya. (Doherty Dec., Exhibit 30).

**Response to Paragraph 27:**

- Dispute the claim that Plaintiff "immediately returned to a discussion about the video of Levesque taken before he accepted employment with Avaya."  The cited notes do not support this proposition.  After being told of the results of the investigation, Plaintiff immediately reasserted that she had been treated chauvinistically.  Doherty Dec., Exhibit 30.  It was Ms. Tylee, and not Ms. Raimondi, that then brought up the video.  Id.

- Admit that Plaintiff took issue with the results of the investigation.

28.   Tylee and Van De Brake explained that nothing came up in Avaya's background check of Levesque, and that no one at the Denver meeting supported her allegations.  (Doherty Dec., Exhibit 30).

**Response to Paragraph 28:**

- Admit that was stated but dispute the accuracy of same.  See Response to Def. 56.1 at ¶¶22-23.

29.   Plaintiff then started to complain about Rosselli, alleging that he was out to get her job. (Doherty Dec., Exhibit 30).

**Response to Paragraph 29:**

- Dispute.  Ms. Raimondi told Human Resources ("HR") that Mr. Rosselli had previously wanted her position prior to Ms. Raimondi assuming the position.  Ex. A at ¶16.  By the time of the HR interview, that was no longer the case.  Id.

30. Plaintiff's rant about Rosselli eventually ended when Tylee and Van De Brake proposed certain coaching techniques that Plaintiff could use in connection with her supervision of Rosselli.  (Doherty Dec., Exhibit 30).

   **Response to Paragraph 30:**

- Dispute.  Nothing in the evidence cited even remotely suggests that Plaintiff "ranted" about anything, much less about Mr. Rosselli.  Further dispute that Raimondi was counseled with respect to supervising Mr. Rosselli.  Ex. A at ¶7.

31. Realizing that the attendees at the Denver meeting did not support her complaint about Levesque, and appreciating that Avaya was not going to react to something that allegedly happened at a prior employer and that which was not discovered during a background investigation, Plaintiff proposed a transfer of supervision from Levesque to either Dennis Kozak or Hardy Meyers.  (Doherty Dec., Exhibit 30).

   **Response to Paragraph 31:**

- Dispute.  Nothing in the evidence cited even remotely suggests that Plaintiff "realized that the attendees at the Denver meeting did not support her complaint about Levesque."  To the contrary, Plaintiff was told by her colleagues directly that they were not even asked about the substance of her complaint and were fearful for their jobs if they told the truth.  Ex. B at 94:2-96:25, 157:18-158:15.

- Admit that Avaya was not going to take any action in connection with Levesque's inappropriate discriminatory conduct, including, *inter alia*, the video.

- Admit that Plaintiff proposed a transfer.

- Dispute that Plaintiff's proposal was limited to a transfer to Messrs. Kozak and Hardy.  Ex. B at 66:10-19, 92:24-93:25, 174:22-175:15.

32. Plaintiff suggested that both individuals thought highly of her skill set, and that both would likely welcome her addition to their functions.  Tylee and Van De Brake agreed to contact Kozak and Meyers.  (Doherty Dec., Exhibit 30).

**Response to Paragraph 32:**

- Admit.

33. When contacted, however, Kozak and Meyers individuals reported a lack of opportunities, and such was reported to Plaintiff. (Doherty Dec., Exhibit 32; Exhibit 33, p. 68).

**Response to Paragraph 33:**

- Dispute. Hardy Meyers did not report a lack of opportunities. Ex. D at 56:6-13.

- Admit that Plaintiff was told she would not be permitted to transfer.

34. On October 31, 2019, Plaintiff and Levesque spoke to discuss Plaintiff's 3-Year Plan (something Levesque required of all his direct reports). (Doherty Dec., Exhibit 22, pp. 33- 37).

**Response to Paragraph 34:**

- Admit.

35. Plaintiff was unusually agitated, and opened the meeting by accusing Levesque of bullying her and referring to her as "a loser." (Doherty Dec., Exhibit 22, pp. 33-37).

**Response to Paragraph 35:**

- Dispute. Plaintiff was not "unusually agitated," nor did she "open the meeting by accusing Levesque of bullying her and referring to her as a loser." In reality, during the meeting Levesque called Plaintiff a "loser," after which Plaintiff said that he had no right to call her a loser. Ex. B at 182:4-183:7.

36. Plaintiff eventually regained her composure, and acknowledged the absence of any bullying or name calling by Levesque. (Doherty Dec., Exhibit 22, pp. 33-37).

**Response to Paragraph 36:**

- Dispute. Plaintiff maintained and continues to maintain that she was bullied and called names by Levesque during the meeting and throughout her employment. Ex. B at 182:4-186:8.

37. After the meeting, Plaintiff sent Levesque the following text message:

I won't let you down.  I promise.  Thank you for being honest.
(Doherty Dec., Exhibit 7).

**Response to Paragraph 37:**

- Admit.  But see SAF at ¶220.

38.   Plaintiff's behavior concerned Levesque, causing him to contact Van De Brake for
      guidance.  (Doherty Dec., Exhibit 22, pp. 86-90).

**Response to Paragraph 38:**

- Deny information sufficient to admit or deny whether Levesque was
  "concerned," and, more importantly, why.

- Admit that Levesque contacted Ms. Van De Brake for guidance.

39.   Van De Brake suggested that Levesque memorialize the call through an email to Plaintiff.
      (Doherty Dec., Exhibit 22, pp. 86-90).

**Response to Paragraph 39:**

- Admit.

40.   Levesque drafted such an email, and provided a copy to Van De Brake for her
      review.  (Doherty Dec., Exhibit 22, pp. 86-90).

**Response to Paragraph 40:**

- Admit.

41.   On November 1, 2019, Levesque sent Plaintiff an email summarizing their
      October 31, 2019 call.  The email provides in full as follows:

      I'm glad we got to connect this Thursday regarding your 3 yr plan.
      I wanted to reiterate a few points from our discussion.

      I was pretty taken back by the way you opened the meeting.  When
      you said I was bullying you, calling you a loser and that I should be
      careful about how I treat people based on everything I've been
      through– I was surprised.  As you acknowledged I've not called you
      any names or bullied you and I'm still not sure what you meant by
      "everything I've been through".  I am holding us to high
      performance standards and while I know we have a lot of ground

11

work to do in the SI space– we also need to generate sell through revenue for Avaya. Any sense of urgency or specific feedback about that is always about creating revenue. Nothing else.

I was glad to see that we turned the corner by the end of the conversation and that you were able to take some of the ideas and feedback on your plan. I was also happy to let you know where I am coming from in my communications at all times- which is to grow our people and our business. Like I said on the call, I don't have all the answers, and your feedback is welcome. I'm always happy to discuss things that are important to you. I also appreciate the nice text you sent me after the call and the follow up actions you are taking.

It's my hope that we can focus on trust and performance as we move forward. (Doherty Dec., Exhibit 6 [AVAYA 3879, 2880]).

**Response to Paragraph 41:**

- Admit that Levesque sent the email, but dispute that it was an accurate summary of the conversation. See Response to Def. 56.1 at ¶36.

42. Plaintiff responded to Levesque's email by identifying her successes at previous employers, advising that she has been ill for the past few weeks, expressing surprise to learn that her group was not performing as expected, and promising not to fail. (Doherty Dec., Exhibit 6 [AVAYA 2879, 2880]).

**Response to Paragraph 42:**

- Dispute that this paragraph accurately summarizes or characterizes the email and refer to the email itself for its full contents. See also SAF at ¶¶220.

43. Plaintiff did not correct Levesque's summary of their October 31, 2019 call (i.e., an absence of bullying or name calling). (Doherty Dec., Exhibit 6 [AVAYA 2879, 2880]).

**Response to Paragraph 43:**

- Dispute. Doherty Dec., Exhibit 6. See also SAF at ¶¶200.

44. On November 3, 2019, Plaintiff sent Levesque a text advising that she was in the hospital. (Doherty Dec., Exhibit 8 [AVAYA 2906]).

**Response to Paragraph 44:**

- Admit.

45. Levesque immediately replied to the text as follows:

> Don't worry about that.  Get better.  Let me know what you need taken care of.  I'll work with Ben and Dan to get it done.  No stress. (Doherty Dec., Exhibit 8 [AVAYA 2906).

**Response to Paragraph 45:**

- Admit.

46. The following day, Levesque sent Plaintiff a text asking how she was feeling. (Doherty Dec., Exhibit 8 [AVAYA 641]).

**Response to Paragraph 46:**

- Admit.

47. Plaintiff replied that she was not feeling well, and asked to schedule a call the following day.  (Doherty Dec., Exhibit 8 [AVAYA 641]).

**Response to Paragraph 47:**

- Admit.

48. Levesque agreed, and they talked on November 5, 2019.  (Doherty Dec., Exhibit 22, p. 38).

**Response to Paragraph 48:**

- Admit.

49. Plaintiff advised Levesque that her doctor wanted her to take some time off, and Levesque advised Plaintiff to contact Human Resources to initiate the leave process. (Doherty Dec., Exhibit 22, p. 38).
**Response to Paragraph 49:**

- Dispute.  Levesque told Ms. Raimondi that she could not go on leave because there was "too much work to do."  Ex. A at ¶18; Ex. F at PL000178.  Levesque further told Ms. Raimondi that she would be terminated if she took the leave.  Ex. B at 111:8-114:10, 115:7-22; Ex. F at PL000179.

50.   Plaintiff proceeded to send the following email to Van De Brake:

> I have been ill and in the hospital this weekend.  The Dr. wants me to take off some time to get healthy to do my job.  I have a letter from him.  Matt and I just spoke we did not know do I need to tell you or do anything with you if I have to take off this week and next?  (Doherty Dec., Exhibit 11 [AVAYA 2944]).

**Response to Paragraph 50:**

- Admit.

51.   Van De Brake immediately responded by advising Plaintiff that the benefits group would assist her, and even copied "Avaya HR Benefits" on her email to Plaintiff.  (Doherty Dec., Exhibit 11 [AVAYA 2944]).

**Response to Paragraph 51:**

- Admit, but dispute the characterization that the response was "immediate."

52.   Sedgwick (Avaya's third-party benefits vendor) immediately sent Plaintiff the requisite paperwork to initiate leave under a variety of programs, including information concerning the FMLA.  (Doherty Dec., Exhibit 12).

**Response to Paragraph 52:**

- Admit, but dispute the characterization that the response was "immediate."

53.   On November 5, 2019, Levesque sent Plaintiff the following email:

> Thanks for letting me know about your health this a.m.  I hope you get better fast and start feeling great again.  Let me know how it goes with Teresa.  (Doherty Dec., Exhibit 11 [AVAYA (no bates number)]).

**Response to Paragraph 53:**

- Admit.

54.   That same day, in response to this email, Plaintiff forwarded Levesque (and Van De Brake) a copy of the email she received from Avaya HR Benefits acknowledging her request to initiate leave.  (Doherty Dec., Exhibit 11 [AVAYA 2942]).

**Response to Paragraph 54:**

- Admit.

55.    On November 8, 2019, Plaintiff contacted Sedgwick and advised that she decided to withdraw her claim for short-term disability leave.  (Doherty Dec., Exhibit 12 [AVAYA 299]).

**Response to Paragraph 55:**

- Admit.

56.    Plaintiff used paid time off for the period November 6, 2019 through November 8, 2019. Plaintiff returned to work on November 11, 2019, and Sedgwick closed her claim. (Doherty Dec., Exhibit 12 [AVAYA 299]).

**Response to Paragraph 56:**

- Admit.

57.    In early December 2019, Plunkett moved Levesque from his current position to a lateral position supervising service providers.  (Doherty Dec., Exhibit 22, pp. 26, 27, 29, 30).

**Response to Paragraph 57:**

- Admit.

58.    At this time, there was a lack of new revenue originating from sales to system integrators, and Levesque was tasked by Plunkett with growing the service provider side of the business.  (Doherty Dec., Exhibit 22, pp. 24-27).

**Response to Paragraph 58:**

- Dispute that there was a lack of new revenue originating from sales to system integrators.  At the time of her termination, Ms. Raimondi, who was selling to system integrators, was performing at 138% of goal, had closed $2,800,000 in sales and had a $25,000,000 pipeline of potential business.  Ex. B at 119:4-23, 212:16-213:12; Ex. G (demonstrating that Ms. Raimondi was meeting plan half-way through fiscal 2019).

- Deny information or knowledge as to whether Levesque was tasked with growing the service provider side of the business.

59.   As a result of this move, Levesque no longer supervised Plaintiff.  (Doherty Dec., Exhibit 22, pp. 24-27).

**Response to Paragraph 59:**

   • Admit.

60.   Eric Serrahn replaced Levesque as supervisor of Plunkett's system integrator group. (Doherty Dec., Exhibit 22, pp. 29, 30).

**Response to Paragraph 60:**

   • Admit.

61.   Following Levesque's transfer, he was asked to conduct reviews of his former reports, including Plaintiff, because of Serrahn's very brief tenure as supervisor.  (Doherty Dec., Exhibit 19; Exhibit 22, pp. 75, 78).

**Response to Paragraph 61:**

   • Admit.

62.   Thus, Levesque conducted Plaintiff's review via teleconference in December 2019. Serrahn attended the review as Plaintiff's new supervisor, but he did not participate in it. (Doherty Dec., Exhibit 1, p. 121).

**Response to Paragraph 62:**

   • Admit.

63.   Levesque's review was positive, assigning three (3) or four (4) stars (out of five (5)) throughout the document.  (Doherty Dec., Exhibit 1, p. 202; Exhibit 19).

**Response to Paragraph 63:**

   • Admit that the written portion of the review was positive.

64.   Plaintiff rated herself a five (5) in every category, and provided significant comments throughout the written review.  (Doherty Dec., Exhibit 19).

**Response to Paragraph 64:**

   • Dispute that Plaintiff rated herself a five (5) in every category. Doherty Dec., Exhibit 19.

16

- Admit that Plaintiff provided comments throughout the review.

65. Significantly, she did not raise a single issue related to the denial of leave, unlawful employment practices, or any inappropriate behavior by Levesque or Plunkett. (Doherty Dec., Exhibit 19).

   **Response to Paragraph 65:**

   - Admit that Plaintiff did not raise the denial of leave (though she did cite her health), unlawful employment practices or inappropriate behavior by Levesque or Plunkett, but dispute that this fact is "significant."

66. This review was the very last interaction between Levesque and Plaintiff. (Doherty Dec., Exhibit 22, p. 27, 29).

   **Response to Paragraph 66:**

   - Admit.

67. In February 2020, at the direction of his supervisor, Plunkett identified Plaintiff and six (6) other employees in his group for termination, as being non-essential and/or non-performing. (Plunkett Aff., ¶ 4).

   **Response to Paragraph 67:**

   - Admit that Plunkett identified Plaintiff and six (6) other employees in his group for termination.

   - Dispute that Plaintiff was either non-essential or non-performing. Ex. B at 119:4-23, 212:16-213:12; Ex. G (demonstrating that Ms. Raimondi was meeting plan half-way through fiscal 2019.  See also SAF at ¶¶117-223 (establishing that Plaintiff was selected for termination because of her protected complaints and disabilities).

68. The decision to terminate Plaintiff was based on Plunkett's determination to eliminate all sales positions in his group related to cultivation of business developed within the system integrators positions, except those assigned to IBM. (Plunkett Aff., ¶ 8; Doherty Dec., Exhibit 27).

   **Response to Paragraph 68:**

   - Dispute.   Plaintiff was selected for termination as a result of disability discrimination and retaliation.  See SAF at ¶¶ ¶¶ 117-223

(establishing that Plaintiff was selected for termination because of her protected complaints and disabilities).

69.   Such positions were not producing sufficient results.  (Doherty Dec., Exhibit 25, p. 123).

**Response to Paragraph 69:**

- Dispute.  Ex. B at 119:4-23, 212:16-213:12; Ex. G (demonstrating that Ms. Raimondi was meeting plan half-way through fiscal 2019).  See also SAF at ¶¶117-223 (establishing that Plaintiff was selected for termination because of her protected complaints and disabilities).

70.   As of March 2020, Plaintiff and Lee were the only two (2) individuals working with system integrators (outside of IBM).  (Plunkett Aff., ¶ 8).

**Response to Paragraph 70:**

- Dispute.  Ex. B at 123:8-124:18, 217:16-218:2; Ex. H at 90:15-23; Ex. I.

71.   As a result of this reduction in force, both Plaintiff and Lee were selected for termination, and were in fact terminated on March 23, 2020.  (Plunkett Aff., ¶ 8).

**Response to Paragraph 71:**

- Admit that Plaintiff was terminated, but dispute that her termination was as a result of a reduction in force.  See Response to ¶¶ 68.

72.   To date, neither Plaintiff nor Lee have been replaced.  (Plunkett Aff., ¶ 10).

**Response to Paragraph 72:**

- Dispute.  Ex. B at 123:8-124:18, 217:16-218:2; Ex. I.

73.   On the morning of March 23, 2020, Plaintiff noticed that a meeting was placed on her Outlook calendar for later that day with the following subject:  "Turnover Call."  (Doherty Dec., Exhibit 1, p. 209).

**Response to Paragraph 73:**

- Admit.

74.   A short time later, Plaintiff received a call from Lee (her sole direct report), advising that he was just terminated.  (Doherty Dec., Exhibit 1, p. 210).

**Response to Paragraph 74:**

- Admit.

75.   Following discovery of the "Turnover" meeting, and following notification from Lee, Plaintiff sent an email to Van De Brake and Serrahn, advising them of her intention to go out on disability leave.  (Doherty Dec., Exhibit 17).

**Response to Paragraph 75:**

- Admit.

76.   She also called Tylee and left a similar message.  (Doherty Dec., Exhibit 36).

**Response to Paragraph 76:**

- Admit.

77.   Avaya proceeded with Plaintiff's previously scheduled termination meeting later that day (Doherty Dec., Exhibit 37).

**Response to Paragraph 77:**

- Admit.

78.   Plaintiff commenced this action in August 2020, having apparently chosen to forego the administrative remedies available to her before the Equal Employment Opportunity Commission.  (Doherty Dec., Exhibit 3, ¶ 26).

**Response to Paragraph 78:**

- Admit

79.   In her unverified complaint, Plaintiff goes to great lengths to describe, in detail, the accusation that she learned from former colleagues (outside of Avaya) that Levesque had – at some time prior to working with Plaintiff - allegedly been terminated from his previous employment because he had "sexually harassed" a female employee, "had an affair" with this un-named individual, and "was generally known to be hostile towards women." (Doherty Dec., Exhibit 3 ¶ 26).

**Response to Paragraph 79:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

80. Plaintiff then goes on to assert that there were multiple videos on-line showing Levesque "engaging in sexual acts" while at his previous employment, including one video "showing Mr. Levesque having sex with a female." (Doherty Dec., Exhibit 3, ¶ 57).

**Response to Paragraph 80:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

81. Plaintiff's complaint next alleges that, while at the Denver meeting, Plaintiff was repeatedly interrupted by Levesque when trying to speak, and that "she had never in her career been treated in such a disrespectful manner." (Doherty Dec., Exhibit 3, ¶ 70).

**Response to Paragraph 81:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

82. Plaintiff outlines the fact that she lodged a complaint with Human Resources (HR), outlining her awareness of Levesque's "sordid employment history," "hostility toward women and public sexual acts that were filed and posted online." (Doherty Dec., Exhibit 3, ¶¶ 74, 75).

**Response to Paragraph 82:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

83. Plaintiff next alleges that, after HR completed its investigation, Levesque advised Plaintiff that Avaya was undergoing a compensation change, from a performance-based bonus to a commission structure. (Doherty Dec., Exhibit 3, ¶ 86).

**Response to Paragraph 83:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

84. Plaintiff alleges that this change "did not align with [Plaintiff's] objective to create new strategic partnerships" (Doherty Dec., Exhibit 3, ¶ 88), and that Levesque's interactions with Plaintiff "were not helpful." (Doherty Dec., Exhibit 3, ¶ 94).

**Response to Paragraph 84:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

85. Plaintiff alleges that Levesque was aware of her prior complaint to HR, and that he thereafter "trashed" her performance and called has a "loser." (Doherty Dec., Exhibit 3, ¶¶ 98, 102, 103).

**Response to Paragraph 85:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

86. Plaintiff next alleges that, in November 2019, she reported to HR that Levesque was aware of her prior complaint, and that she also reported to HR that she was undergoing one or more "medical conditions and stress resulting from her continuing to work under Mr. Levesque." (Doherty Dec., Exhibit 3, ¶¶ 111, 113).

**Response to Paragraph 86:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

87. Plaintiff alleges that, in January 2020, Levesque participated in her performance review and that his unspecified "derogatory comments . . . unfairly prejudiced" the other supervisor who participated in the review. (Doherty Dec., Exhibit 3, ¶ 116).

**Response to Paragraph 87:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

88. According to Plaintiff, the above events caused her to "develop[] serious medical conditions and severe emotional distress". (Doherty Dec., Exhibit 3, ¶ 121).

**Response to Paragraph 88:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

89. Plaintiff alleges that she was thereafter hospitalized on two occasions – one for various "colon issues" and the second because she developed pneumonia. (Doherty Dec., Exhibit 3, ¶ 125).

**Response to Paragraph 89:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

90.   Plaintiff alleges that Levesque thereafter made comments to Plaintiff that "made it clear that he did not care about [Plaintiff's] health." (Doherty Dec., Exhibit 3, ¶ 130).

**Response to Paragraph 90:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

91.   Plaintiff alleges that, in November 2019, she "contemplated . . . applying for short term disability but decided not to follow through with the application based upon comments from Mr. Levesque." (Doherty Dec., Exhibit 3, ¶ 134).

**Response to Paragraph 91:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

92.   Finally, plaintiff's complaint alleges that she was terminated some four (4) months later. (Doherty Dec., Exhibit 3, ¶¶ 141-152).

**Response to Paragraph 92:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

93.   Plaintiff's Complaint asserts three claims, as follows:     (1) retaliation and/or interference in violation of the FMLA, (2) discrimination in violation of NYSHRL  and (3) retaliation in violation of the NYSHRL.

**Response to Paragraph 93:**

- Plaintiff refers to the Complaint for a complete and accurate description of her allegations.

94.   Notwithstanding open-ended allegations of age and sex discrimination in her Complaint, when asked to provide a detailed statement in which Defendants violated the NYSHR, Plaintiff's Interrogatory Response made no mention of disparate treatment based on sex or age. (Doherty Dec., Exhibit 4, Interrogatory No. 18).

**Response to Paragraph 94:**

- Dispute.  The response states specifically that Plaintiff experienced conduct that she believed "violated the anti-discrimination laws," including, *inter alia*, "***differential treatment she experienced compared to her male peers*** and the prior sexual affair and harassment that Plaintiff learned about Defendant Levesque." (Emphasis added).  The response also refers to the Complaint, which contains substantial allegations of discrimination on the basis of sex. Doherty Dec., Exhibit 4, Interrogatory No. 18.

95.   When specifically asked at deposition whether she is claiming discrimination based on age, she replied in the negative.  (Doherty Dec., Exhibit Doherty Dec., Exhibit 1, p. 74, 232).

**Response to Paragraph 95:**

- Admit.

96.   When specifically asked at deposition to explain how Defendants discriminated against her based on sex, she repeatedly referred to alleged instances of retaliation following her complaint to Human Resources.  (Doherty Dec., Exhibit 1, pp. 72, 169, 180, 182, 184, 196, 199, 202).

**Response to Paragraph 96:**

- Dispute.  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 69:5-21, 75:4-10, 85:12-86:11, 88:18-89:10, 89:11-90:7, 90:10-91:5, 91:22-92:5.

- Further state that Defendants' citations are remarkably disingenuous.  Ms. Raimondi was not asked how Defendants discriminated against her on pages 169, 180, 182, 184, 196, 199 or 202 of her deposition.  On page 72, defense counsel cut off Ms. Raimondi as she tried to answer his question, and then withdrew the question.

97.   At deposition, Plaintiff deviated in a major way from the allegations contained in her Complaint.  Instead of explaining her allegation that Levesque would talk about "sins" and "mistakes" (Doherty Dec., Exhibit 2, ¶ 7), she went off script and changed the narrative to Levesque repeatedly asking her if she would be willing to sin with her. (Doherty Dec., Exhibit 1, pp. 67, 173).

**Response to Paragraph 97:**

- Admit that Ms. Raimondi testified that Levesque asked her if she would sin with him.  Further state that Ms. Raimondi testified that

23

Levesque would talk about "sins" and "mistakes."  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10.

- Dispute that this testimony in any way deviates from the allegations in the Complaint.

98. When asked if she was claiming sexual harassment in her lawsuit, Plaintiff expressly stated that she was <u>not</u> claiming sexual harassment.  (Doherty Dec., Exhibit 1, pp. 59, 72).

**Response to Paragraph 98:**

- Admit.

99. Plaintiff's Complaint alleges the existence of two (2) videos of Levesque taken before Levesque was employed by Avaya and posted on certain internet sites, one of which shows Levesque "having sex with a female." (Doherty Dec., Exhibit 3, ¶ 57, f. 1).

**Response to Paragraph 99:**

- Admit.

100. The Complaint continues to assert that plaintiff actually "watched" the "live sex" video before it was "removed" from the internet "because it contained salacious content." (Doherty Dec., Exhibit 3, ¶ 57, f. 1).

**Response to Paragraph 100:**

- Admit.

101. When asked about the two (2) videos at deposition, Plaintiff reluctantly admitted that there is only <u>one</u> video, but that it may have been on multiple websites.  (Doherty Dec., Exhibit 1, pp. 81, 290; Exhibit 40, No. 4).

**Response to Paragraph 101:**

- Dispute.  During the deposition, Plaintiff was repeatedly asked how many videos she had *viewed*, not how many she had been told about. Doherty Dec., Exhibit 1, pp. 81 (Q: "How many videos – different videos – of Mr. Levesque have you viewed?" A: "One"), 290.  The same was true in the Request for Admissions.  Doherty Dec., Exhibit 40, No. 4.  Plaintiff repeatedly and candidly testified that she had viewed only one video. Doherty Dec., Exhibit 1, pp. 81, Exhibit 40, No. 4.  However, Plaintiff had been *told* about two videos, which is

24

completely consistent with the contemporaneous documentary evidence and communications to and by Avaya's HR team. Ex. A at ¶4; see also Def. 56.1 at ¶18; Doherty Dec., Ex. 30 at AVAYA000308.

102. When asked why her Complaint mentions a video of Levesque "having sex with a female," Plaintiff awkwardly explained that she imagined that Levesque and the unidentified woman had sex before the one (1) and only video was taken. (Doherty Dec., Exhibit 1, pp. 77- 84).

**Response to Paragraph 102:**

- Dispute.  Ex. B at 82:3-85:11; see also Response to Def. 56.1 at ¶101.

103. Plaintiff expressed absolutely no concern for the fact that she participated in the filing of a document with this Court that contained a blatantly false allegation. (Doherty Dec., Exhibit 1, pp. 77-84).

**Response to Paragraph 103:**

- Dispute.  The cited testimony does not in any way support this claim. See also Responses to ¶100-101.

104. At deposition, Plaintiff tried her best to support the allegations set forth in her Complaint. When asked for documentary support, however, her response was always the same: it mostly happened over the phone and there were no witnesses. (Doherty Dec., Exhibit 1, pp. 70, 130, 115, 158, 174).

**Response to Paragraph 104:**

- Dispute.  While much of the discrimination was, of course, not reduced to writing, the record is replete with documentary evidence supporting Ms. Raimondi's claims.  See SAF at ¶¶ 134-135, 140, 152, 161, 163, 165-169, 194, 199, 201, 203-204, 208, 213, 216, 218, 221-223.

105. Significantly, the few documents produced by Plaintiff in discovery that arguably support her claims were revealed at deposition to be fake documents -- documents that Plaintiff initially claimed were submitted to Defendants, but when confronted with Avaya's records showing the actual versions sent (and responded to by Avaya officials), Plaintiff conceded the documents were never sent to Avaya. (Doherty Dec., Exhibit 1, pp. 250-264; 315-326; Exhibits 6 [compare PL 135 to PL 141, 142 and AVAYA 2879, 2880], 11 [compare PL 49 to PL 51 and AVAYA 2944]).

**Response to Paragraph 105:**

- Dispute.  No "fake documents" were produced.  The documents referenced were draft documents.  Ex. A at ¶25.

106.   When confronted with documentary evidence that negated her allegations, Plaintiff accused Defendants of holding back documents, while at the same time blaming Defendants for <u>her</u> failure to preserve and produce any documents supportive of her case. (Doherty Dec., Exhibit 1, pp. 70, 113, 188; Exhibit 2, pp. 27).

**Response to Paragraph 106:**

- Dispute.  The cited testimony does not in any way support this claim.

107.   Plaintiff did not produce a single text message sent to anyone at Avaya (Doherty Dec., Exhibit 1, p. 118), but Defendants produced every text message ever sent from and to Plaintiff.  (Doherty Dec., Exhibits 7, 8, 18).

**Response to Paragraph 107:**

- Admit that Plaintiff did not produce text messages because she was no longer in possession of them, as she explained at her deposition.

- Dispute that Defendants produced every text message ever sent from and to Plaintiff.  Defendants cite to no evidence to support the claim that the text messages produced constitute every text message ever sent from and to Plaintiff.

108.   In her Complaint, Plaintiff purports to assert three claims, as follows:  (1) retaliation and/or interference in violation of the FMLA, (2) discrimination in violation of the NYSHRL and (3) retaliation in violation of the NYSHRL.  (Doherty Dec., Exhibit 3).

**Response to Paragraph 108:**

- Admit.

109.   Plaintiff's Complaint contains a number of factual allegations that appear to have no connection to her claims.  In an effort to better identify the contours of these claims, Defendants propounded a set of interrogatories seeking "a complete, specific and detailed statement of the manner in which it will be alleged, as set forth in the Complaint, that Defendants violated the FMLA [and NYSHRL]".  (Doherty Dec., Exhibit 4, Interrogatory No. 17 and 18).

**Response to Paragraph 109:**

- Dispute.  All of the factual allegations in the complaint are directly connected to Plaintiff's claims.  Dkt. No. 1.

- Admit the content of the Interrogatory.

110.   With respect to the contours of her FMLA claim, Plaintiff's Interrogatory Response specifies that "Plaintiff alleges that Defendants terminated her employment because she was hospitalized and took leave protected by the FMLA and because her serious medical condition likely would have required additional leave." (Doherty Dec., Exhibit 4, Interrogatory No. 18).

**Response to Paragraph 110:**

- Refer to the Interrogatory response for a complete and accurate description of the response.  Doherty Dec., Exhibit 4, Interrogatory No. 18.

111.   With respect to her claims under the NYSHRL, Plaintiff's interrogatory response identifies two parallel legal theories, as follows:

First, Plaintiff particularizes a claim of retaliation as follows:

> "Plaintiff alleges that Defendants altered the terms and conditions of her employment and terminated Plaintiff because she complained about or opposed conduct that she reasonably believed violated the anti-discrimination laws, including the differential treatment she experienced compared to her male peers and the prior sexual affair that Plaintiff learned about Defendant Levesque." (Doherty Dec., Exhibit 4, Interrogatory No. 18).

Next, Plaintiff asserts a discriminatory discharge:

> "Plaintiff further alleges that Defendant terminated her because she suffered from a disability that affected one or more of her major life activities, including the ability to sleep, concentrate, defecate, or perceived Plaintiff to be disabled because of her health issues or because she inquired about her disability leave." (Doherty Dec., Exhibit 4, Interrogatory No. 18).

**Response to Paragraph 111:**

- Refer to the Interrogatory response for a complete and accurate description of the response.  Doherty Dec., Exhibit 4, Interrogatory No. 18.

112.   In her Complaint, Plaintiff asserts that, "[a] few days before her termination, [she] again inquired about taking [FMLA] disability leave and was told she would receive the forms to fill out." (Doherty Dec., Exhibit 3, ¶ 135).

**Response to Paragraph 112:**

- Admit.

113.   At deposition however, she admitted the falsity of this allegation, admitting that she advanced her second request for FMLA leave on March 23, 2020 (her termination date), following her discovery earlier in the day that a meeting appeared in her calendar for that day, with a subject identified as "Turnover Call," and following notification from her sole direct report (Lee) that he had just been terminated. (Doherty Dec., Exhibit 1, pp. 209, 210; Exhibit 2, pp. 29-34; Exhibit 17).

**Response to Paragraph 113:**

- Dispute.  Plaintiff testified that she *made* her second request for leave on March 23, 2020.  She had regularly discussed the need for leave and inquired about leave prior to that date.  Ex. A at ¶23.

114.   In her Response to Request for Admissions, Plaintiff similarly admitted the falsity of her assertion that she requested leave days before her termination. (Doherty Dec., Exhibit 38, Response No. 7).

**Response to Paragraph 114:**

- Dispute.  The Request for Admission asks about the timing of the actual request for leave, which Plaintiff admits was made on March 23, 2020.  See Response to Def. 56.1 at ¶ 113.

115.   The only adverse action at issue in this litigation is the termination of Plaintiff, which took place on March 23, 2020.  However, in December 2019, Levesque was transferred to another area of the business, so that he no longer supervised Plaintiff. (Doherty Dec., Exhibit 22, pp. 24, 26, 27, 29, 30, 117).

**Response to Paragraph 115:**

- Dispute any inference that Plaintiff is not alleging a hostile work environment.

116.   His last contact with Plaintiff was in December 2019, at which time he was asked to conduct Plaintiff's performance evaluation -- an evaluation that rated Plaintiff quite favorably. (Doherty Dec., Exhibit 19; Exhibit 22, pp. 75, 78, 117).

**Response to Paragraph 116:**

- Admit that Levesque's last contact with Plaintiff was in December 2019 and that the **written** portion of the review rated Plaintiff favorably.

117. Levesque did not participate in the decision to terminate Plaintiff, did not even know that Plaintiff was being terminated, and did not learn that Plaintiff had been terminated until well after the termination took place. (Doherty Dec., Exhibit 22, pp. 116, 117).

**Response to Paragraph 117:**

- Dispute. There is ample evidence that Levesque was involved in the decision to terminate Ms. Raimondi. He repeatedly threatened her job, including during the year-end review held shortly before her termination, during which he said, "we should just get rid of you." Ex. B at 119:24-121:9. For the same reason, there is ample evidence that Levesque's conduct ultimately influenced the decision to terminate Ms. Raimondi.

118. The decision to terminate Plaintiff was based on his decision to eliminate all sales positions in his group related to cultivation of business development within the system integrators positions, except those assigned to IBM. (Plunkett Aff., ¶ 8).

**Response to Paragraph 118:**

- Dispute. See Response to Def. 56.1 at ¶68; Ex. I; SAF at ¶¶117-223 (establishing that many non-IBM Systems Integrators remained employed, and continue to remain employed, and that Plaintiff was selected for termination because of her protected complaints and disabilities).

119. As of March 2020, Plaintiff and Lee were the only two (2) individuals working with system integrators (outside of IBM). (Plunkett Aff., ¶ 7).

**Response to Paragraph 119:**

- Dispute. See Response to ¶ 70. Ex. I; SAF at ¶¶210-211, 214-215, 222-223.

120. As a result of this reduction-in-force, both Plaintiff and Lee were terminated. (Plunkett Aff., ¶ 8; Doherty Dec., Exhibit 27).

**Response to Paragraph 20:**

- Dispute.  <u>See</u> Response to ¶ 71.

121.   They have not been replaced.  (Plunkett Aff., ¶ 10).

**Response to Paragraph 121:**

- Dispute.  <u>See</u> Response to ¶ 72; Ex. I; SAF at ¶¶210-211, 214-215, 222-223.

122.   As set forth in her Complaint, Plaintiff alleges that Levesque called her a "loser" during one conversation (of which there is an abundance of documentary evidence to the contrary). (Doherty Dec., Exhibit 6, 7).

**Response to Paragraph 122:**

- Dispute.  The Complaint does allege that Levesque called her a "loser" during a particular conversation, but does not allege that said conversation was the only one in which he called her a loser. Moreover, there is no "documentary evidence" to the contrary, and the documents cited by Defendants do not contradict the allegations in the Complaint.

123.   Plaintiff's Complaint also alleges that Levesque changed her compensation plan. (Doherty Dec., Exhibit 3, ¶ 86).

**Response to Paragraph 123:**

- Admit.

124.   At deposition, however, she admitted that the alleged changes were entirely consistent with the terms of her offer letter, which she simply did not understand at the time of her hire. (Doherty Dec., Exhibit 1, p. 138; Exhibit 21).

**Response to Paragraph 124:**

- Dispute.  The cited evidence does not support the claim in this paragraph and Ms. Raimondi testified about the specifics of the changes to her compensation plan.  Ex. B at 163:24-165:7.

125.   Plaintiff's Complaint also alleges that Levesque moved Rosselli from her group. (Doherty Dec., Exhibit 3, ¶93).

**Response to Paragraph 125:**

- Dispute.  The Complaint alleges that Mr. Rosselli was moved from Plaintiff's group.  It does not allege that Levesque moved him from the group.

126.   Levesque lacked authority to make such a move (Doherty Dec., Exhibit 22, p. 28), and Plaintiff testified at deposition that Rosselli's transfer had no impact on her compensation, performance or ability to perform her job.  (Doherty Dec., Exhibit 1, p. 169; Exhibit 21).

**Response to Paragraph 126:**

- Deny that information is sufficient to admit or deny whether Levesque  lacked authority to make such a move.

- Dispute.   The cited evidence does not in any way support the contention that Mr. Rosselli's transfer had no impact on Ms. Raimondi's compensation, performance or ability to perform her job.  See Doherty Dec., Exhibit 1, p. 169 ("Well, I had two people working for me, so he was responsible for Accenture and certain accounts.  So when you take that person away from me, then I had to figure out how I was going to do business").

127.   Plaintiff's Complaint also alleges inappropriate behavior regarding Levesque's demand that she create a 3-year plan.  (Doherty Dec., Exhibit 3, ¶¶ 11, 95).

**Response to Paragraph 127:**

- Admit.

128.   Levesque requested his entire group to prepare such a plan.  (Doherty Dec., Exhibit 1, p. 170).

**Response to Paragraph 128:**

- Admit, but Levesque did not engage in inappropriate behavior in connection with the three-year plans of his other team members. Doherty Dec., Exhibit 1, p. 170-171.

129.   Plaintiff's Complaint also alleges that Levesque engaged in inappropriate behavior in connection with her performance review.  (Doherty Dec., Exhibit 3, ¶ 115).

**Response to Paragraph 129:**

- Admit.

130. At deposition, however, Plaintiff admitted the review was positive.  (Doherty Dec., Exhibit 1, p. 202).

**Response to Paragraph 130:**

- Dispute.  The written portion of the review was positive.  However, the review itself was extremely harassing.  Doherty Dec., Exhibit 1, p. 120, 202-203 ("Even though he appraised me highly, it wasn't a high rating, but he said, in front of Mr. Sheran -- he went into this whole thing, that he didn't care I had worked for IBM, he didn't care about my Who's Who, and a female executive, he didn't care I went to Harvard.  He just went through this whole same attack about my -- he didn't care how much I knew about healthcare.  It wasn't relevant to the performance, but he went on about all my accomplishments in front of my new manager, which was totally inappropriate and very embarrassing, and I felt ridiculed" . . . "At that point, he said to me . . . we should get rid of you.")

131. Finally, Plaintiff's Complaint alleges that she heard from a third-party that Levesque, Plunkett and Serrahn laughed about her review.  (Doherty Dec., Exhibit 3, ¶ 117).

**Response to Paragraph 131:**

- Admit.

132. Plaintiff did not witness the alleged "laughing," and regardless, is contrary to the written review, which was positive.  (Doherty Dec., Exhibit 19).

**Response to Paragraph 132:**

- Admit that Plaintiff did not witness the alleged "laughing."

- Dispute that the laughing would have been contrary to the review.  See Response to Def. 56.1 at ¶ 130.

133. Plunkett had no knowledge of Plaintiff having made a report to HR in September 2019.  (Doherty Dec., Exhibit 25, p. 74)

**Response to Paragraph 133:**

- Dispute.  The whole reason Ms. Raimondi went to HR in September 2019 is because Plunkett had ignored her prior complaints to him. Ex. B at 91:12-93:25, 93:19-23, 174:22-176:9.  Given that Ms. Raimondi had complained to Plunkett just prior to the HR complaint, and HR interviewed Mr. Plunkett in connection with its "investigation" into Ms. Raimondi's complaint, it is inconceivable that Plunkett would not have known that Ms. Raimondi made the complaint.  Moreover, one of Ms. Raimondi's colleagues, Jennifer Dudley, expressed to her that Mr. Plunkett was "pissed" that Ms. Raimondi had filed an HR complaint, and that her (Ms. Raimondi's) "career was over."  Ex. A at ¶14; Ex. F at PL000167.  In addition, Ms. Raimondi's entire team, as well as Levesque, knew that she made the complaint – it is therefore not credible that Plunkett would not have known.  Ex. B at 94:2-96:25, 157:18-158:15.  Finally, Plunkett's retaliation against Ms. Raimondi subsequent to the complaint further evidences his knowledge.  Id. at 102:8-105:16.

## ADDITIONAL MATERIAL AND DISPUTED ISSUES OF FACT

In addition to the disputed facts set forth above, Plaintiff Doreen Raimondi further sets

forth the additional material disputed facts.

## I.      BACKGOUND AND PERFORMANCE

134.    During her employment, Ms. Raimondi excelled, far exceeding her goals and receiving a positive review in connection with her only performance review at the Company.  Ex. B at 119:4-23, 212:16-213:12; Ex. J.

135.    At the time of her termination, Ms. Raimondi was performing at 138% of goal, had closed $2,800,000 in sales and had a $25,000,000 pipeline of potential business.  Ex. B at 119:4-23, 212:16-213:12; Ex. G (demonstrating that Ms. Raimondi was meeting plan half-way through fiscal 2019).

## II.     DISCRIMINATION

136.    Shortly after Avaya hired Levesque, Ms. Raimondi learned that he had been separated from his previous employer after he engaged in inappropriate sexual misconduct, some of which was caught on camera.  Ex. B at 75:20-76:24.

137.    After learning about this information, Ms. Raimondi searched for and viewed a video of Levesque that was posted online.  Ex. B at 80:8-18.  In the video, Mr. Levesque can be seen sticking his hand down the back of his female coworkers' (and sister in laws') pants

and then removing his hand and putting it in front of the woman's nose.  Id. at 80:8-18; Id. at 62:11-13.

138.   Although the video has since been removed from the internet, it was described on one site as follows: "In the video above, you see a man with his hand securely planted in the rectum of his lady-friend.  After getting a good ol' scratch in, he pulls his hand out and places his fingers right underneath her nose."  *See* https://www.therockstationz93.com/2018/11/25/watch-this-guy-scratch-his-ladys-butt-and-let-her-smell-it-video/ (last viewed May 16, 2022).

139.   During his deposition, Levesque claimed that he was forthcoming about the aforementioned video during the hiring process; namely, that he told Plunkett about it. Ex. K at 71:16-72:4.

140.   Plunkett, however, denied that he was aware of the video at the time of Levesque's hire both during his HR interview, and again at his deposition.  Ex. C at AVAYA000307; Ex. H at 48:20-23.

141.   In early September 2019, Levesque held a meeting with his new team in Denver, Colorado.  Ex. B at 85:12-86:11.  The meeting was attended by Levesque, Plunkett, Ms. Raimondi and her two direct reports, Ben Lee and Tony Rosselli, a colleague, James Taylor, and his direct report, Dawn Medina.  Id.

142.   The purpose of the meeting was to introduce Levesque to the work of the team and various strategy issues.  Ex. B at 88:18-89:10.  Prior to the meeting Levesque asked the team to be prepared to present on their accounts, statuses, revenues, challenges, etc.  Ex. A at ¶5.  Ms. Raimondi sent out the agenda, and Levesque agreed to it and asked her to be prepared to speak first.  Id.

143.   When Ms. Raimondi got up to present at the meeting, she was repeatedly interrupted and ignored by Levesque and Plunkett, and both men would speak only with her male direct report, Mr. Rosselli.  Ex. B at 89:11-90:7.

144.   The experience was so hostile that Ms. Raimondi broke down in tears during the meeting. Ex. B at 90:10-91:5.

145.   Even Ms. Raimondi's colleagues were made uncomfortable by the hostility, as both Ms. Medina and Mr. Lee pleaded with Levesque and Plunkett to permit Ms. Raimondi to speak.  Ex. B at 90:10-91:5.

146.   Neither Levesque nor Plunkett treated any of the men in the meeting in the same manner in which they treated Ms. Raimondi.  Ex. A at ¶6.

147.   While employed by Avaya, Ms. Raimondi also was subjected to various inappropriate gender-based acts of misconduct by Levesque.  Among other things, Levesque would

constantly harass Ms. Raimondi by discussing with her the concept of "sinning," and, in particular, sinning with women.  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10.

148.   Levesque asked Ms. Raimondi whether she was "willing to sin with him."  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10.

149.   Levesque offered up the fact that he was headed to Sedona, Arizona, to get help in overcoming his "weakness of sinning."  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10.

150.   Levesque often brought this topic up in the context of discussing his divorce, which of course raised the specter of affairs and further hammered home the sexual nature of these conversations.  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10

151.   Levesque's apparent obsession with discussing sinning with Ms. Raimondi was so severe that he often would not even discuss work with her, instead turning the conversation to the topic of sinning.  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10

152.   Levesque did not discuss sinning with Ms. Raimondi's male colleagues.  Ex. B at 69:5-21; Ex. H at 49:6-11; Ex. C.

153.   In addition, Levesque made various comments about Ms. Raimondi's dress, insinuating that she should wear less clothing at work.  Ex. B at 62:2-63:10, 64:11-17, 67:10-23, 75:4-10.  Indeed, he specifically stated that she should "show her body more." Id. at 91:22-92:5.

## III.   MS. RAIMONDI COMPLAINS ABOUT UNLAWFUL DISCRIMINATION

154.   During the meeting in Denver, Ms. Raimondi complained directly to Plunkett regarding Levesque's discriminatory behavior.  Ex. B at 93:19-23.

155.   In response, Plunkett failed to take any remedial action whatsoever; instead, he merely stated that he and Levesque had been best friends for 20 years.  Ex. B at 93:19-23.

156.   Given Plunkett's failure to address Ms. Raimondi's complaints, she escalated her complaints to HR.  Ex. B at 91:12-93:25; 174:22-176:9.

157.   In September 2019, Ms. Raimondi spoke with Faye Tylee and reported: (i) the repeated inappropriate conversations regarding sinning; (ii) Levesque's efforts to get Ms. Raimondi to show her body more; (iii) the inappropriate sexual video that got Levesque terminated from his prior employer; (iv) the discriminatory treatment suffered in Denver; and (v) Levesque's refusal to discuss work related matters with Ms. Raimondi.  Ex. B at 91:12-93:25; 174:22-176:9.

158.   Ms. Raimondi also asked to be moved out from under Levesque.  Ex. B at 91:12-93:25; 174:22-176:9.

159.   Ms. Tylee promised to conduct a confidential investigation, but within days Ms. Raimondi received multiple calls from colleagues about the investigation.  Ex. B at 94:2-96:25.

160.   Ms. Raimondi's colleagues expressed fear that if they responded to HR's questions accurately, they might lose their jobs.  Ex. B at 94:2-96:25, 157:18-158:15.

161.   One of Ms. Raimondi's colleagues expressed to her that Mr. Plunkett was "pissed" that Ms. Raimondi had filed an HR complaint, and that her (Ms. Raimondi's) "career was over."  Ex. A at ¶14; Ex. F at PL000167.  This conversation was documented contemporaneously in Ms. Raimondi's journal.  Id.

162.   In a subsequent conversation, Levesque himself told Ms. Raimondi that he knew she reported him to HR and that she was a "loser."  Ex. A at ¶15.

163.   HR did not even investigate the vast majority of the complaints made by Ms. Raimondi, including, *inter alia*, (i) never asking Levesque about the video; (ii) never asking Levesque or anyone else about his comments that Ms. Raimondi should dress in a way that shows more of her body; (iii) never asking Levesque or anyone else about the comments he made regarding sinning, his divorce and having Ms. Raimondi sin with him; and (iv) never asking anyone whether Levesque and Plunkett had inappropriately refused to permit Ms. Raimondi to speak during the Denver meeting.  Ex. C; Ex. D at 50:17-51-17, 58:14-59:6; Ex. E at 23:8-24:5, 26:7-17; Ex. K at 51:2-18, 112:18-25.

164.   Instead, HR framed the questions intentionally in a way designed to elicit responses that would victim shame Ms. Raimondi, such as repeatedly asking the witnesses whether Ms. Raimondi had gone "off script" at the Denver meeting, as if that could possibly justify Levesque's and Plunkett's abusive behavior.  Ex. B at 157:15-158:15.

165.   During her interview with HR, Ms. Medina stated that there were times when Mr. Rosselli "didn't want to accept what [she] was saying until it was said by a male."  Ex. C at AVAYA000304.

166.   Moreover, Levesque himself admitted that Mr. Rosselli, who was Ms. Raimondi's male subordinate, regularly spoke over her.  Ex. C at AVAYA000305.

167.   Despite these assertions, HR never even bothered to speak with Mr. Rosselli about his behavior.  Ex. D at 64:3-22.

168.   In conclusion, HR stated that the company "did not care" about Levesque's prior misconduct and would not bother speaking to his prior employer to gather more details.  Ex. B at 161:17-162:14; Ex. F at PL000167.

169.  HR shifted the burden of the investigation by asking Ms. Raimondi whether *she* would call Levesque's prior employer to obtain more details about his misconduct.  Ex. B at 161:17-162:14; Ex. F at PL000167.

## IV.    MS. RAIMONDI SUFFERS IMMEDIATE RETALIATION

170.  Ms. Raimondi's request for a transfer was denied, despite the fact that it would have been very easy to move her into a comparable role elsewhere in the organization.  Ex. B at 105:17-107:16.

171.  Indeed, at the time, the company going through major transformations, including the development of a new client success and channels/partners organization that would have made a transition seamless.  Ex. B at 105:17-107:16; Ex. A at ¶10.  In addition, multiple suitable roles were open, including in the healthcare, marketing and federal spaces.  Ex. A at ¶10.

172.  Also at that time, Avaya hired someone for a role that could have been filled by Ms. Raimondi.  Ex. B at 105:17-107:16.  In fact, the woman hired needed significant assistance from Ms. Raimondi to learn the role.  Ex. B at 105:17-107:16.

173.  Shortly after Ms. Raimondi was told that she could not be transferred out from under Levesque, her male now-colleague, Mr. Rosselli, was given the exact transfer that Ms. Raimondi had requested.  Ex. B at 97:16-98:10.

174.  Plunkett could make recommendations and influence reassignment decisions.  Ex. H at 32:21-33:4.

175.  No one ever even asked Plunkett whether Ms. Raimondi could be transferred, as he also testified that he was unaware of any effort to transfer her.  Ex. H at 74:13-17.

176.  After her HR complaint, Avaya cut Ms. Raimondi's team in half by removing Mr. Rosselli from her and leaving her with only one direct report.  Ex. B at 97:10-99:9.

177.  Mr. Rosselli did not even want to be transferred, yet he was transferred even though Ms. Raimondi wanted to be transferred but was told she could not be transferred.  Ex. A at ¶11.

178.  Moreover, the position Mr. Rosselli was transferred into – working with AT&T in another group – would have been much better suited for Ms. Raimondi, as she had worked at Verizon, a Systems Provider, like AT&T, for four years.  Ex. A at ¶12.

179.  After her HR complaint, Ms. Raimondi was assigned unrealistic quotas on a new set of accounts that were largely international in nature.  Ex. B at 100:6-101:23; 165:14-167:23.

180.  During his deposition, Plunkett testified that Mr. Rosselli was moved because his soon-to-be-supervisor, Roger saell, specifically requested that Mr. Rosselli be transferred

under him.  Ex. H at 90:2-91:15, 125:22-126:13.  This is how Plunkett explained the fact that Ms. Raimondi was terminated, whereas Mr. Rosselli was not.  Id.

181.   This testimony was false.  Ex. A at ¶13.  Mr. Rosselli did not want to be transferred and Mr. Mitchell **did not** request to work with Mr. Rosselli.  Id. at ¶13.  To the contrary, as recently on May 19, 2022, Mr. Mitchell admitted during a telephone call with Ms. Raimondi that he did not ask to work with Mr. Rosselli.  Id. at ¶13.  According to Mr. Mitchell, he had an open position on his team and Plunkett "wanted to give Tony the position."  This is despite the fact that it was known that he had poor performance and often swore at people.  Id. at ¶13.

182.   These assignments were an issue for many reasons, including, *inter alia*, (i) Ms. Raimondi had no travel budget; (ii) there was little interest in the accounts from the senior leadership because they would not get paid on international revenues, which led to a complete lack of support for Ms. Raimondi; (iii) there were no contract vehicles with the accounts such that business with them would even be reasonably feasible; and (iv) these accounts had never done business with Avaya.  Ex. B at 100:6-101:23; 165:14-167:23.

183.   Even Levesque admitted that the accounts were assigned to Ms. Raimondi because "nobody [else] want[ed]" them.  Ex. B at 100:6-101:23; 165:14-167:23.

184.   Moreover, an HR individual responsible for compensation also conceded that the accounts were essentially dead on arrival, to which Levesque responded, "I don't care, this is what I want to do."  Ex. B at 100:6-101:23; 165:14-167:23.

185.   After her HR complaint, both Plunkett and Levesque often completely ignored Ms. Raimondi's emails, text messages and calls, including when she was requesting assistance with respect to bringing in new business.  Ex. B at 102:8-105:16.

186.   Plunkett and Levesque also refused to attend meetings and calls with Ms. Raimondi that were designed to achieve the same goal, and further forced her to cancel business meetings and excluded her from important business development events.  Ex. B at 102:8-105:16.  By way of example, Ms. Raimondi was asked to cancel a meeting with the Chief Executive Officer of Accenture and was prohibited from attending Avaya's largest partner event.  Ex. A at ¶9.

187.   This started after Ms. Raimondi's HR complaint and continued (particularly as it related to Plunkett) to the day of her termination.  Ex. B at 102:8-105:16.

188.   When Ms. Raimondi did get face time with Levesque after her HR complaint, he used those opportunities to yell and scream at her and call her a "loser."  Ex. B at 102:8-105:16.

189.   Levesque also gratuitously ridiculed Ms. Raimondi by mocking her prior work experience because she had received awards and a certification from Harvard.  Ex. B at 102:8-105:16.

190.   In or around January 2020, Levesque was rewarded for his unlawful behavior with a promotion.  Ex. B at 200:18-201:12.

**V.   MS. RAIMONDI ENGAGES IN FURTHER PROTECTED ACTIVITY AND SUFFERS DISABILITY DISCRIMINATION**

191.   In the months following her initial HR complaint, Ms. Raimondi made multiple additional complaints to HR, including, *inter alia*, about the retaliation she suffered as described above.  Ex. B at 107:25-110:4, 98:14-99:9, 189:25-190:15.

192.   Ms. Raimondi also complained about the fact that the organization transferred Mr. Rosselli – an underperformer who was not making his numbers – after telling her that she would not be permitted to transfer.  Ex. B at 107:25-110:4, 98:14-99:9, 189:25-190:15; Ex. A at ¶17.

193.   In response to her complaints, HR suggested that Levesque "deserved a second chance," but demonstrated no concern whatsoever when Ms. Raimondi replied by asserting that she should be permitted to work in a safe working environment.  Ex. B at 107:25-110:4.

194.   Meanwhile, as a result of the unlawful treatment Ms. Raimondi suffered while employed by Avaya, beginning in approximately September 2019 she began to experience significant medical issues, including, *inter alia*: (i) rashes that required medication and surgery to remove; (ii) increased anxiety and depression; (iii) insomnia; (iv) inability to make bowel movements and colon pain that required hospitalization; (v) damage to her immune system resulting in constant infections and pneumonia; and (vi) TMJ.  Ex. B at 28:7-13, 29:3-31:5.  During this litigation, Plaintiff produced almost 2,500 pages of medical records documenting these ailments, among others.  Willemin Decl., at ¶ 14.

195.   After Ms. Raimondi missed a telephone call because she was hospitalized while traveling for work, Levesque responded by screaming and yelling at her.  Ex. B at 111:8-114:10, 115:7-22.

196.   Levesque was aware that Ms. Raimondi was in the hospital at the time.  Ex. B at 205:12-206:12.

197.   When Ms. Raimondi would inform Levesque about something to do with her medical condition, he would either express apathy or, worse, accuse Ms. Raimondi of "being weak" or "being a baby."  Ex. B at 111:8-114:10, 115:7-22; Ex. A at ¶19.

198.   On one occasion, Levesque even criticized Ms. Raimondi because she needed to be hospitalized (again), telling her that if she was "not focused on [her] job, then [she] will lose it."  Ex. A at ¶10.

199.   On October 31, 2019, Ms. Raimondi and Levesque had a meeting that was later recapped by the two in an email chain that was forwarded to Plunkett. Ex. L. The emails describe the fact that Ms. Raimondi complained that Levesque has subjected her to bullying and called her a loser. Id. The emails also describe the fact that at the time Ms. Raimondi was "quite ill[,] in and out of the doctor['s] office, urgent care and the hospital over the last 3-4 weeks." Id.

200.   These emails were forwarded to Plunkett, who took no action after receiving these emails, was unaware of whether HR took any action and never followed up with HR to determine whether any action was taken. Ex. H at 81:20-82:17.

201.   In or around October or November 2019, Ms. Raimondi complained to HR that she was becoming increasingly ill because of Mr. Levesque's "harassment." Ex. A at ¶21; Ex. F at PL000177.

202.   When Ms. Raimondi told Levesque that she needed to take leave in connection with her illness, he forbade her from doing so. Ex. B at 111:8-114:10, 115:7-22.

203.   Levesque told Ms. Raimondi that she could not go on leave because there was "too much work to do." Ex. A at ¶18; Ex. F at PL000178.

204.   Levesque further told Ms. Raimondi that she would be terminated if she took the leave. Ex. B at 111:8-114:10, 115:7-22, 206:18-207:19; Ex. F at PL000179.

205.   As a result of Levesque's conduct, Ms. Raimondi ultimately cancelled her leave request. Ex. B at 206:18-207:19.

206.   This was not the only time that Levesque discouraged Ms. Raimondi from taking leave; indeed, he did so three or four times. Ex. B at 111:8-114:10, 115:7-22.

207.   Throughout the beginning of 2020, Ms. Raimondi continued to need to take leave. Ex. A at ¶22. But for Levesque's conduct, Ms. Raimondi would have attempted to take leave in January and/or February 2020. Id. at ¶22.

208.   Plunkett was well aware of Ms. Raimondi's health issues and that she required hospitalization. Ex. B at 130:9-131:4; Ex. H at 75:2-6; SAF ¶¶ 199-200.

209.   Ms. Raimondi had specifically complained to Mr. Plunkett that Levesque's behavior was the cause of her health problems, and yet his only response was to suggest that Levesque deserved a second chance. Ex. B at 227:22-228:8

## VI.   MS. RAIMONDI IS TERMINATED FOR PRETEXTUAL REASONS

210.   The reason that Avaya has proffered for Ms. Raimondi's termination – namely, that all Systems Integrators, other than those working for IBM, were subject to a reduction in

force ("RIF") – is false.  In reality, many, many Systems Integrators, including within Plunkett's organization, were not terminated.  Specifically,

Q:     Okay, but weren't -- as part of the reduction in force, weren't all system integrators terminated, except for those working for IBM?

A:     No.  There was a group that Eric Rossman (phonetic) had, which was systems integrators. There was a group that Fadi had, Fadi Fazul (phonetic). There was a group that Jerry Rubino had, that were systems integrators. There was a group in the channels organization, that Dennis was responsible for, that had systems integrators. In federal, they had just hired someone, that they wanted to take me to take the job for, that had systems integrators. And then, throughout the sales organization, there were people that had Unysis, Cognizant, other companies that were considered integrators.  Avaya does 60 percent of their business through integrators and partners. They don't do business directly. So it was -- there were integrators all over the place.

Q:     Okay. So, ma'am, but these integrators you've identified, they were not within the control of Dan Plunkett; is that correct?

A:     Yes, they were.

Q:     They were under Dan Plunkett.

A:     Yes. Yes, some of them were under Dan Plunkett, so that's a false statement.

Ex. B at 123:8-124:18.

211.   Ms. Raimondi's position was not in fact eliminated, and her colleagues, including Amy Smith, took over her responsibilities.  Ex. B at 217:16-218:2.

212.   Ms. Raimondi's background would have made it very easy for the Company to find her a new role, as it did for her lesser qualified male comparator, Mr. Rosselli.  Ex. B at 119:4-23, 313:7-25.

213.   Through the first quarter of fiscal year 2021 (the last period for which we have data), Mr. Rosselli was at only 1.1% of goal.  Ex. G.

214.   Mr. Rosselli, who was a Systems Integrator, performed similar work after being transferred.  Ex. H at 90:15-23.

215.   Mr. Rosselli was also promoted to a Director Level position at the time of his transfer, meaning that Mr. Rosselli and Ms. Raimondi were the ***only two*** Director Level non-IBM

Systems Integrators that were considered for termination when Ms. Raimondi was terminated. Ex. A at ¶24. The only other non-IBM Systems Integrator in the group, Ben Lee, was a junior level employee. Id. at ¶24.

216. There were at least three employees within Plunkett's organization that were rated as "low relative contributors" for FY 2019, whereas Ms. Raimondi was rated as a "successful relative contributor." Ex. M. Yet, Ms. Raimondi was terminated instead of these low performers. Doherty Dec., Exhibit 26.

217. Ms. Raimondi had 30 years of experience working with IBM. Ex. B at 126:12-127:6.

## VII. AVAYA'S PATTERN AND PRACTICE OF DISCRIMINATION IN CONNECTION WITH LEAVE REQUESTS

218. One of the two individuals who was responsible for fielding and investigating Ms. Raimondi's complaints was Ms. Van De Brake. In a 2019 lawsuit filed against Avaya and Ms. Van De Brake, the plaintiff, Mary Geary, alleged that she suffered discrimination and retaliation in connection with two leaves that she took under the FMLA, including, *inter alia*, (i) interference with FMLA rights when Ms. Geary was told by HR that she was only permitted to take a six month leave when the law permits twelve; (ii) receiving a significantly reduced bonus in retaliation for taking leave; and (iii) being unlawfully fired while she was on her second FMLA leave. Ex. N.

## VIII. MISCELLANEOUS

219. Ms. Raimondi was not aware that she was going to be terminated when *she* inquired about disability leave in March 2020. Ex. B at 209:10-211:15. She believed that the meeting was her weekly call with her supervisor. Ex. O at 29:12-30:6.

220. Ms. Raimondi sent several civil and/or non-confrontational emails to Levesque because she wanted to keep the relationship on an even keel and feared retaliation. Ex. B at 264:23-267:12; Ex. O at 43:17-44:11.

## IX. MATTHEW VOSS

221. Matthew Voss, a former Regional Sales Leader at Avaya and a disinterested witness in this case, has submitted a sworn declaration in connection with this opposition. Ex. I.

222. Mr. Voss has personal knowledge that Avaya continued to employ non-IBM Systems Integrators well after Ms. Raimondi was terminated. Ex. I.

223. In addition, on May 18, 2022, Mr. Voss spoke with a current employee of Avaya who confirmed that the Company ***continues, to this day,*** to employ non-IBM Systems Integrators. Ex. I. In other words, Plunkett and every other Avaya witness lied under oath with respect to the purported basis for Ms. Raimondi's termination. Ex. I.

Dated:  June 7, 2022
          New York, New York                    Respectfully submitted,

                                                **WIGDOR LLP**

                                                By:  _____
                                                        Michael J. Willemin

                                                85 Fifth Avenue
                                                New York, NY 10003
                                                Telephone: (212) 257-6800
                                                Facsimile: (212) 257-6845
                                                mwillemin@wigdorlaw.com

                                                *Counsel for Plaintiff*