# APPENDIX

2014 WL 4439530
United States District Court,
E.D. New York.

Heather BROWN, Plaintiff,

v.

OMEGA MOULDING
COMPANY LTD., Defendant.

No. 13–CV–5397 (SJF)(ARL).
|
Signed Sept. 9, 2014.

**Attorneys and Law Firms**

Raymond Nardo, Attorney At Law, Mineola, NY, for Plaintiff.

Alan B. Pearl, Brian Jeffrey Shenker, Alan B. Pearl & Associates, P.C., Syosset, NY, for Defendant.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

*1 On September 27, 2013, plaintiff Heather Brown ("plaintiff") commenced this action against defendant Omega Moulding Company Ltd. ("defendant") pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq. Defendant now moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Factual Background[1]

On or about March 5, 2012, plaintiff began working for defendant in "Order Entry." (Complaint ["Compl."], ¶ 13).

Plaintiff alleges that "[o]n or about February 6, 2013, [her] son * * * was in stomach pain[,] * * * contracted the flu and a strep infection[,][and] * * * was also constipated." (Compl., ¶ 17). As a result, plaintiff missed four (4) days of work, i.e., February 6, February 25, March 11 and March 18, 2013. (Id.) According to plaintiff, she furnished a doctor's note to defendant regarding those absences. (Compl., ¶ 18).

Plaintiff alleges that "[o]n or about March 15, [her] daughter * * * contracted a serious health condition and suffered from a stomach flu." (Compl., ¶ 19). As a result, plaintiff was absent from work from March 15, 2013 through March 22, 2003. (Compl., ¶ 20). According to plaintiff, she furnished a doctor's note to defendant about those absences as well. (Compl., ¶ 21).

On March 22, 2013, defendant terminated plaintiff's employment. (Compl., ¶ 22; Kohler Aff., ¶ 5).

B. Procedural History

On September 27, 2013, plaintiff commenced this action against defendant pursuant to the FMLA. Plaintiff alleges that defendant (1) "never provided notice to [her] that her league was designated or covered by the FMLA [,]" (Compl., ¶ 23); (2) "never permitted [her] to take leave under the FMLA [,]" (Compl., ¶ 24); (3) "terminated [her employment], though she was entitled to 12 weeks of leave under the FMLA[,]" (Compl., ¶ 25); and (4) "willfully, unlawfully, and intentionally, denied [her] leave under the FMLA and terminated her [employment], in violation of the FMLA[,]" (Compl., ¶ 26). Plaintiff seeks an award of "backpay, lost earnings, lost life and health insurance, pre-judgment interest, liquidated damages, compensatory damages, punitive damages, and reasonable attorneys' fees and costs * * *." (Compl. at 3).

Defendant now moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

II. Discussion

A. Standard of Review

The standard of review on a motion made pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted

unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868.

**\*2** "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ." *Twombly,* 550 U.S. 544, 127 S.Ct. at 1959, 167 L.Ed.2d 929.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P.,* 737 F.3d 166, 176 (2d Cir.2013); *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.; see also Ruston v. Town Board for Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120–1 (2d Cir.2010); *see also Matson v. Board of Education of City School District of New York,* 631 F.3d 57, 63 (2d Cir.2011) ( "While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation." (internal quotations and citation omitted)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937, 173 L.Ed.2d 868.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002); *see also ASARCO LLC v. Goodwin,* 756 F.3d 191, 198 (2d Cir.2014). None of the documents that defendant submits in support of its motion to dismiss are properly considered by the Court on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although plaintiff may have had actual notice of all of those documents and the information contained therein, they are not "integral" to the complaint because she has not "relied upon [any of] th[o]se documents in framing the complaint." *Chambers,* 282 F.3d at 153; *see also Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 156 (2d Cir.2006) ("[A] necessary prerequisite for th[e] exception [allowing courts to consider materials 'integral' to the complaint] is that the plaintiff rely on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." (quotations, alterations and citation omitted)). Accordingly, the Court has not considered any of the documents submitted by either party on this motion.[2]

**B. The FMLA**

**\*3** "In order to survive a motion to dismiss, a plaintiff must show that (1) he is an eligible employee under the FMLA, as defined in 29 U.S.C. § 2611(2); (2) defendant is an employer under the FMLA, as defined in 29 U.S.C. § 2611(4); (3) he was entitled to leave under the FMLA, as defined in 29 U.S.C. § 2612(a)(1); and (4) defendant engaged in some prohibited act, as defined in 29 U.S.C. § 2615." *Spurlock v. NYNEX,* 949 F.Supp. 1022, 1033 (W.D.N.Y.1996); *see also* 29 U.S.C. § 2617(a)(1) ("Any employer who violates section 2615 \* \* \* shall be liable to any eligible employee affected-(A) for damages \* \* \* [as provided therein]; and (B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion."); *Penberg v. Healthbridge Management,* 823 F.Supp.2d 166, 178 (E.D.N.Y.2011) ( "In order to establish a prima facie case of interference with plaintiff's exercise of FMLA rights, plaintiff must establish that: 1) he is an eligible employee; 2) defendant qualifies as an employer under the FMLA; 3) plaintiff was entitled

to take leave under the FMLA; 4) plaintiff gave notice to defendants of his intention to take leave; and 5) defendants denied plaintiff the benefit to which he was entitled under the FMLA."); *Roberts v. Ground Handling, Inc.,* 499 F.Supp.2d 340, 351 (S.D.N.Y.2007) (accord). For purposes of this motion, the second factor, i.e., defendant's status as an employer under the FMLA, is not in dispute. As is relevant here, the FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

1. Eligible Employee
"The FMLA * * * applies only to employees who have worked for the employer for at least one year and provided 1,250 hours of service within the last 12 months, § 2611(2) (A).["3] *Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 739, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); *see also Woodford v. Community Action of Greene County, Inc.,* 268 F.3d 51, 54 (2d Cir.2001); 29 C.F.R. § 825.110(a) ("An eligible employee is an employee of a covered employer who: (1) Has been employed by the employer for at least 12 months, and (2) Has been employed for at least 1,250 hours of service during the 12–month period immediately preceding the commencement of the leave * * *.") "The determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least twelve months *must be made as of the date the FMLA leave is to start.*" 29 C.F.R. § 825.110(d) (emphasis added); *see also Porter v. Potter,* No. 07 Civ. 0124, 2010 WL 9047894, at * 4, *aff'd,* 484 F. App'x 589 (2d Cir. June 5, 2012); *Stoler v. Institute for Integrative Nutrition,* No. 13 Civ. 1275, 2013 WL 6068598, at * 9 (S.D.N.Y. Nov.18, 2013); *Roberts,* 499 F.Supp.2d at 351.

*4 "Eligibility is a threshold issue, and it is insufficient for Plaintiff to merely assert in a conclusory manner that he is eligible without stating any facts that relate to the definition of an eligible employee." *Smith v. Westchester County,* 769 F.Supp.2d 448, 465 (S.D.N.Y.2011) (quotations, brackets and citation omitted); *see also Bernadotte v. New York Hospital Medical Center of Queens,* No. 13–cv–965, 2014 WL 808013, at * 3 (E.D.N.Y. Feb.28, 2014); *Bakeer v. Nippon Cargo Airlines, Co., Ltd.,* No. 09–cv–3374, 2011 WL 3625103, at * 40 (E.D.N.Y. July 25, 2011), *report and recommendation adopted by* 2011 WL 3625083 (E.D.N.Y. Aug.12, 2011).

Although the complaint conclusorily alleges that plaintiff "worked for [defendant] for more than one year before her termination[ ] * * * [and] for more than 1,250 hours per year in the year preceding her termination [,]" (Compl., ¶¶ 9–10), the factual allegations in the complaint indicate that plaintiff started working for defendant "on or about March 5, 2012," (Compl., ¶ 13), but seeks FMLA leave starting on February 6, 2013, less than one (1) year later. (Compl., ¶ 17). Moreover, there are no factual allegations in the complaint from which it may reasonably be inferred that plaintiff worked for more than one thousand two hundred fifty (1,250) hours in the year preceding the date on which she first sought FMLA leave.[4] Since the allegations in the complaint are insufficient to show that plaintiff was an eligible employee under the FMLA, the complaint fails to state a plausible claim for relief. Accordingly, defendant's motion seeking dismissal of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's complaint is dismissed in its entirety for failure to state a claim for relief.

2. Entitlement to FMLA Leave
In addition, the allegations in the complaint are insufficient to show that plaintiff was entitled to leave under the FMLA. Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period * * * [i]n order to care for * * * a son, [or] daughter * * * of the employee, if such * * * son, [or] daughter * * * has a serious health condition." 29 U .S.C. § 2612(a)(1)(C). The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves-(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also* 29 C.F.R. § 825.113. For an illness to qualify as a "serious health condition" under the latter definition, the employee or covered family member must have (1) been incapacitated, i.e., unable "to work, attend school or perform other regular activities due to the serious health condition, treatment therefore [sic], or recovery therefrom," 29 C.F.R. § 825.113(b), "for more than three consecutive, full calendar days[,]" 29 C.F.R. § 825.115(a); and (2) received treatment (a) "two or more times, within 30 days of the first day of incapacity, * * *, by a health care provider * * * [,]" 29 C.F.R. § 825.115(a)(1), or (b) "by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider[,]" 29 C.F.R. § 825.115(a)(2). *See Rankin v. Seagate Technologies, Inc.,* 246 F.3d 1145, 1148 (8 th Cir.2001) ("To meet the requirements

of the objective test [for what constitutes a 'serious health condition'], [the plaintiff] was required to prove (1) that she had a period of incapacity requiring absence from work, (2) that this period of incapacity exceeded three days, and (3) that she received continuing treatment by ... a health care provider within the period." (quotations and citation omitted); *Roberto v. Human Development Association,* 4 F.Supp.2d 154, 158 (E.D.N.Y.1998) (holding that in order for an illness to qualify as a "serious health condition," the employee or covered family member must have been "1) incapacitated * * *; 2) seen once by a doctor; and 3) prescribed a course of medication, such as an antibiotic * * *."); *Boyce v. New York City Mission Society,* 963 F.Supp. 290, 299 (S.D.N.Y.1997) (accord). "A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave." 29 C.F.R. § 825.113(c).

**\*5** The FMLA "was 'not intended to cover short-term conditions for which treatment and recovery are very brief." *Martyszenko v. Safeway, Inc.,* 120 F.3d 120, 123 (8 th Cir.1997) (quoting S.Rep. No. 103–3, at 28); *see also Miller v. AT & T Corp.,* 250 F.3d 820, 834 (4 th Cir.2001) (accord); *Michaels v. Norton Healthcare, Inc.,* No. 3:10–cv–383–JDM, 2014 WL 3418925, at * 2 (W.D.Ky. July 14, 2014) ("[A]s the legislative history of the FMLA makes clear, 'routine, commonplace illnesses of short duration' simply are not covered by the statute." (citing S.Rep. No. 103–3, at 28 (1993), *reprinted in* 1993 U.S.Code Cong. & Admin. 3, 30)). Thus, the FMLA's implementing regulations provide, in relevant part, that "[o]rdinarily, unless complications arise, the common cold, the flu, * * * [and] upset stomach * * * are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave." 29 C.F.R. § 825.113(d). In addition, strep throat and stomach viruses are common childhood illnesses that ordinarily do not qualify as serious health conditions under the FMLA. *See, e.g. Michaels,* 2014 WL 3418925, at * 2 (finding that step throat and "vomiting and diarrhea * * * likely due to a virus" did not qualify as serious health conditions under the FMLA). Moreover, since "constipation by itself meets none of the definitions of a serious health condition in the [FMLA] regulation * * * [it] is not a serious health condition under FMLA." *Davis v. Pacific Saw and Knife Co.,* Civil No. 08–676–HU, 2009 WL 936471, at * 7 (D.Or. Apr.6, 2009).

Nonetheless, courts have interpreted Section 825.113(d) "as indicating merely that common ailments such as the flu normally will not qualify for FMLA leave because they generally will not satisfy the regulatory criteria for a serious health condition[;]" *Miller,* 250 F.3d at 832, not as "automatically exclud[ing] the flu from coverage under the FMLA." *Id.; see also Rankin,* 246 F.3d at 1147 ("[A]lthough conditions like the common cold or the flu will not routinely satisfy the requirements of a 'serious health condition,' absences resulting from such illnesses are protected under FMLA when the regulatory tests are met.") "Where absences are not attributable to a 'serious health condition,' however, FMLA is not implicated and does not protect an employee against disciplinary action based upon such absences." *Rankin,* 246 F.3d at 1147–48.

The complaint alleges: (1) that plaintiff missed four (4), non-consecutive days of work between February 6, 2013 and March 18, 2013,[5] to care for her son because he had stomach pains, the flu, strep and constipation, (Compl., ¶ 17); and (2) that plaintiff missed one (1) week of work, i.e., from March 15, 2013 until March 22, 2013, to care for her daughter because she had a "stomach flu," (Compl., ¶ 19). As pleaded, none of those conditions qualify as a "serious health condition" under the FMLA, particularly absent any factual allegations from which it may reasonably be inferred, *inter alia,* that plaintiff's son was incapacitated for more than three (3) consecutive days as a result thereof, or that plaintiff's daughter received treatment from a health care provider two (2) or more times, or one (1) time and was prescribed a course of medication for her condition. Since the allegations in the complaint are insufficient to show that plaintiff was entitled to leave under the FMLA, the complaint fails to state a plausible claim for relief. Accordingly, defendant's motion seeking dismissal of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's complaint is dismissed in its entirety for failure to state a claim for relief.

**B. Leave to Amend**

**\*6** Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires." However, leave to amend is not required where a proposed amendment would be futile, *see Grullon,* 720 F.3d at 140; *Anderson News, L.L.C. v. American Media, Inc.,* 680 F.3d 162, 185 (2d Cir.2012). *cert. denied sub nom Curtis Circulation Co. v. Anerson News, L.L.C.,* —— U.S.

——, 133 S.Ct. 846, 184 L.Ed.2d 655 (2013), i.e., "if the amended complaint would not contain enough allegations of fact to state a claim for relief that is plausible on its face." *MetLife Investors USA Ins. Co. v. Zeidman,* 734 F.Supp.2d 304, 311 (E.D.N.Y.2010), *aff'd,* 442 Fed. Appx. 589 (2d Cir. Sept.19, 2011) (quotations and citation omitted); *see also Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.,* 889 F.Supp.2d 453, 459 (S.D.N.Y.2012). Leave to amend may also properly be denied for: ' "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [and] undue prejudice to the opposing party by virtue of allowance of the amendment * * *." ' *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222. 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)1: *see also TechnoMarine SA v. Giftports, Inc.,* —— F.3d ——, 2014 WL 3408570, at * 9 (2d Cir. July 15, 2014).

Since plaintiff may be able to assert factual allegations sufficient to show, *inter alia,* that she was an eligible employee under the FMLA, i.e., that she was employed by defendant for at least twelve (12) months and one thousand two hundred fifty (1,250) hours of service, *as of the date her FMLA leave would begin*[6] and that she was entitled to FMLA leave, i.e., that her children had "serious health conditions" within the meaning of the FMLA and its implementing regulations, her request for leave to amend her complaint, (Brief on Behalf of Plaintiff in Opposition to Defendant's Motions [sic] to Dismiss at 7 n. 2), is granted,

*provided that any amended complaint is served and filed on or before October 9, 2014,* or her complaint will be deemed dismissed in its entirety with prejudice. Plaintiff is reminded, however, of the representations made to the Court by presenting a pleading under Rule 11(b) of the Federal Rules of Civil Procedure, *e.g.,* that the claims "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," Fed.R.Civ.P. 11(b) (2), and that "the factual contentions have evidentiary support," Fed.R.Civ.P. 11(b)(3), and of the Court's authority to impose sanctions for a violation of that rule. *See* Fed.R.Civ.P. 11(c).

### III. Conclusion

For the reasons set forth above, defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted, the complaint is dismissed in its entirety, and plaintiff's application for leave to amend the complaint is granted *provided that any amended complaint is served and filed on or before October 9, 2014,* or the complaint will be deemed dismissed in its entirety with prejudice.

**\*7** SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4439530, 2014 Wage & Hour Cas.2d (BNA) 249,713

---

Footnotes

1   The facts are taken from the complaint and are assumed to be true for purposes of this motion only. They do not constitute findings of fact by the Court.

2   Although Rule 12(d) of the Federal Rules of Civil Procedure authorizes a court to treat a motion under Rule 12(b)(6) that presents matters outside the pleadings as one for summary judgment under Rule 56 if all parties are "given a reasonable opportunity to present all the material that is pertinent to the motion," Fed.R.Civ.P. 12(d), defendant's motion can be decided without consideration of those documents. Therefore, there is no reason to delay resolution of this motion to provide plaintiff with notice of a conversion to summary judgment and an opportunity to respond.

3   Section 2611(2)(A) of Title 29 of the United States Code provides: "[t]he term 'eligible employee' means an employee who has been employed-(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12–month period."

4   Besides being wholly conclusory, plaintiff's allegation that she worked "for more than 1,250 hours per year in the year preceding her termination[,]" (Compl., ¶ 10), is insufficient because the relevant twelve (12)-month period is measured from "the date the FMLA leave is to start," 29 C.F.R. § 825.110(d), not the date of plaintiff's termination.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-06566-FPG-MWP   Document 56   Filed 07/26/22   Page 7 of 88

2014 Wage & Hour Cas.2d (BNA) 249,713

---

5    Although plaintiff alleges that she also missed a fifth day of work on March 26, 2013, (Compl., ¶ 17), it is undisputed that her employment with defendant was terminated prior to that date, i.e., on March 22, 2013. (Compl., ¶ 22).

6    A "request[ ] [for FMLA leave] made by an ineligible employee for leave that would begin when she still would have been ineligible[ ] is not protected by the FMLA." *Walker v. Elmore County Board of Education,* 379 F.3d 1249, 1253 (11 th Cir.2004).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 4243419
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bryan CASLER-TYRRELL; Julie Casler-Tyrrell; and David Casler-Tyrrell, Plaintiffs,

v.

AUBURN COMMUNITY HOSPITAL;
Althea Suslik, FNP; Paul Koenig, M.D.;
and Eastern Finger Lakes Emergency
Medical Care, PLLC, Defendants.

5:18-CV-0892 (GTS/ML)
|
Signed 09/17/2021

**Attorneys and Law Firms**

POWERS & SANTOLA, LLP, Counsel for Plaintiffs, 100 Great Oaks Blvd., Suite 123, Albany, NY 12203, OF COUNSEL: DANIEL R. SANTOLA, ESQ., LAURA M. JORDAN, ESQ., KELLY WOLFORD, ESQ.

THORN, GERSHON, TYMANN & BONANNI, Counsel for Defendant Auburn C.H., 5 Wembley Court, P.O. Box 15054, Albany, NY 12205, OF COUNSEL: ALICIA M. DODGE, ESQ., PAUL D. JURELLER, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Counsel for Defendant Suslik, 250 South Clinton Street, Suite 600, Syracuse, NY 13202-1252, OF COUNSEL: MICHAEL P. RINGWOOD, ESQ.

SUGARMAN LAW FIRM, LLP, Counsel for Defendant Koenig, 211 West Jefferson Street, Syracuse, NY 13202, OF COUNSEL: JEFFREY M. NARUS, ESQ., ZACHARY M. MATTISON, ESQ.

AMDURSKY, PELKY, FENNELL & WALLEN, P.C., Counsel for Defendant EFLEMC, 26 East Oneida Street, Oswego, NY 13126, OF COUNSEL: TIMOTHY J. FENNELL, ESQ.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this medical malpractice action filed by Bryan Casler-Tyrrell, Julie Casler-Tyrrell, and David Casler-Tyrrell ("Plaintiffs") against Auburn Community Hospital ("Auburn C.H."), Althea Suslik, FNP, Paul Koenig, M.D., and Eastern Finger Lakes Emergency Medical Care, PLLC ("EFLEMC") ("Defendants"), are the following motions: (1) Defendant Auburn C.H.'s motion for partial summary judgment; (2) Defendant Koenig's motion for summary judgment; (3) Plaintiffs' cross-motion for summary judgment against Defendant Auburn C.H.; and (4) Plaintiffs' cross-motion to allow Plaintiffs' expert Dr. Tibbles provide certain opinions related to Defendant Koenig's liability. (Dkt. Nos. 57, 58, 59, 60.) For the reasons set forth below, Defendant Auburn C.H's motion is granted, Defendant Koenig's motion is granted, Plaintiffs' cross-motion for summary judgment against Defendant Auburn C.H. is denied, and Plaintiff's cross-motion related to Dr. Tibbles' testimony is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs' Amended Complaint**

Generally, in their Amended Complaint, Plaintiffs assert the following three claims against all Defendants: (1) a claim of medical malpractice in that Defendants were negligent and departed from good and accepted medical practices when treating Plaintiff Bryan Casler-Tyrrell; (2) a claim of failure to obtain informed consent for treatment in that Defendants failed to advise Plaintiffs of the risks or possibilities of permanent injury that could result from the medical treatment that was rendered, to the extent that a reasonably prudent person would not have consented to the provided treatment (or lack thereof) had he been fully informed; and (3) a claim for loss of services and recovery of medical expenses incurred related to Plaintiff Bryan Casler-Tyrrell's treatment, brought by his parents Plaintiffs Julie and David Casler-Tyrrell. (Dkt. No. 19 [Pls.' Am. Compl.].)

**B. Undisputed Material Facts on Defendant Auburn C.H.'s Motion for Summary Judgment**

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant Auburn C.H. in its Statement of Material Facts and either admitted by Plaintiffs or denied without appropriate evidentiary support in their response thereto. (*Compare* Dkt. No. 57, Attach. 17 [Def. Auburn C.H.'s Rule 56.1 Statement] *with* Dkt. No. 59, Attach. 19 [Pls.' Rule 56.1 Resp.].)

1. On February 18, 2017, Plaintiff Bryan Casler-Tyrrell presented to Skaneateles Urgent Care with complaints of lower back and hip pain that had been present for two days.

2. Plaintiff Bryan Casler-Tyrrell was seen for an assessment by mid-level provider Defendant Suslik (a Family Nurse Practitioner), who issued orders for a urine dipstick, abdominal x-ray, and urine culture.

3. The results from the urine dipstick and abdominal x-ray were available prior to Plaintiff Bryan Casler-Tyrrell's discharge from the Urgent Care, but the urine culture was sent out for interpretation and the results for that culture were not available at the time of discharge.

*2  4. Plaintiff Bryan Casler-Tyrrell was discharged home that day with a diagnosis of acute cystitis and back pain.

5. Plaintiff Bryan Casler-Tyrrell was instructed to take the antibiotic Bactrim twice daily for ten days.

6. Plaintiff Bryan Casler-Tyrrell was also instructed to follow up with his primary care provider in seven-to-ten days for repeat urine testing.

7. On February 22, 2017, Plaintiff Julie Casler-Tyrrell called Skaneateles Urgent Care to obtain the results of her son's urine culture.

8. During that phone call, Nurse Practitioner Tina Finlayson told Plaintiff Julie Casler-Tyrrell that the urine culture results were negative and that Plaintiff Bryan Casler-Tyrrell should discontinue the prescribed Bactrim.

9. Also on February 22, 2017, supervising physician Defendant Koenig signed off on the documentation regarding Plaintiff Bryan Casler-Tyrrell's treatment at Skaneateles Urgent Care.

10. On the morning of February 25, 2017, Plaintiff Bryan Casler-Tyrrell began experiencing mental status changes while a passenger in a vehicle on the New York State Thruway.

11. Plaintiff Bryan Casler-Tyrrell was taken by ambulance to Clifton Springs Hospital, where he was diagnosed with bacterial meningitis.

12. Plaintiff Bryan Casler-Tyrrell was then transferred from Clifton Springs Hospital to Upstate Medical Center in Syracuse, New York, for treatment of his meningitis; he remained hospitalized at Upstate Medical Center until April 12, 2017.

13. Plaintiffs allege that all Defendants failed to timely diagnose and treat Plaintiff Bryan Casler-Tyrrell during his visit on February 18, 2017, for an underlying infection that ultimately escalated into meningitis, and that all Defendants failed to properly monitor or provide ongoing appropriate treatment for Plaintiff Bryan Casler-Tyrrell following his discharge from Skaneateles Urgent Care.

14. Plaintiffs also allege that Defendant Auburn C.H. is vicariously liable for the actions of Defendants EFLEMC, Suslik, and Koenig.

15. Defendant Auburn C.H. entered into a written Urgent Care Centers Service Agreement with Defendant EFLEMC in May 2013, in which Defendant Auburn C.H. retained Defendant EFLEMC to provide all medical services, including staffing of mid-level providers and attending physicians at two Urgent Care Centers, including Skaneateles Urgent Care.

16. This Urgent Care Centers Service Agreement was amended effective June 1, 2016, through July 29, 2017.

17. Defendants Suslik and Koenig are not employees of Defendant Auburn C.H.

18. Non-party individuals Patsy Iannolo, M.D., and Nurse Practitioner Finlayson are also not employees of Defendant Auburn C.H.

19. Plaintiffs disclosed four medical experts concerning Defendants' liability: (a) Nurse Practitioner Diane Meehan, Ph.D., F.N.P.; (b) emergency medicine physician Carrie Tibbles, M.D.; (c) neurosurgeon Jason Sheehan, M.D.; and (d) infectious disease physician Alan Sanders, M.D.

20. These expert reports do not contain any independent criticisms against Defendant Auburn C.H. specifically, or provide any expert opinion as to alleged deviations from the standard of care that proximately caused Plaintiffs' alleged injuries by Defendant Auburn C.H. specifically.[1]

**C. Undisputed Material Facts on Plaintiffs' Cross-Motion for Summary Judgment Against Defendant Auburn C.H.**

**\*3** Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Plaintiffs in their Statement of Material Facts and either admitted by Defendant Auburn C.H. or denied without appropriate evidentiary support in its response thereto. (*Compare* Dkt. No. 59, Attach. 20 [Pls.' Rule 56.1 Statement] *with* Dkt. No. 61, Attach. 2 [Def. Auburn C.H.'s Rule 56.1 Resp.].)

1. Defendant Auburn C.H. operated the Skaneateles Urgent Care and entered into a contract with Defendant EFLEMC, under which Defendant EFLEMC was to provide medical services to the patients who presented at that Urgent Care.[2]

2. Defendant Auburn C.H. required that Defendant EFLEMC provide physician oversight of the mid-level providers who treated patients at Skaneateles Urgent Care.

3. The contract required that Defendant EFLEMC provide physician review of "all patient charts in accordance with regulatory requirements and in a manner sufficient to permit [Defendant Auburn C.H.] to bill, code, and collect payments for such services from patients and third-party payors."[3]

4. Defendant Auburn C.H. paid Defendant EFLEMC a flat rate per each patient visit to the Skaneateles Urgent Care for the attending physician signing off on the patient's chart.[4]

5. Defendant Auburn C.H. was responsible for billing the patients and/or the patients' responsible insurer or governmental entitlement program for the services provided by Defendant EFLEMC at the Skaneateles Urgent Care.

6. The contract provided that Defendant EFLEMC was to be compensated by Defendant Auburn C.H. at a given hourly rate for the medical services performed at Skaneateles Urgent Care by mid-level providers.

7. Under the contract, Defendant EFLEMC agreed that it would fully adopt and utilize Defendant Auburn C.H.'s approved information systems, including those pertaining to electronic health records, in accordance with Defendant Auburn C.H.'s policies and procedures.

8. The patients' medical records of treatment at Skaneateles Urgent Care remain the property of Defendant Auburn C.H.

9. All of the individual documents related to Plaintiff Bryan Casler-Tyrrell's visit to Skaneateles Urgent Care on February 18, 2017, have printed on them either the words "Auburn Community Hospital" or the initials "ACH."[5]

**\*4** 10. Plaintiff Bryan Casler-Tyrrell's medical records from his visit to Skaneateles Urgent Care on February 18, 2017, do not include any reference to, or identification of, Defendant EFLEMC as the provider of the care.

11. The pamphlets entitled "Back Pain, Adult," "Urinary Tract Infection," and "Discharge Instruction Summary" that were provided to Plaintiff Bryan Casler-Tyrrell and his mother upon discharge from Skaneateles Urgent Care on February 18, 2017, all contain the notation "Auburn Community Hospital" on their respective first pages.

12. There is no indication in the pamphlet entitled "Discharge Instructions Summary" that any services on that date were provided by or through Defendant EFLEMC.

13. Plaintiffs were not given any written or verbal information to indicate that the services provided at Skaneateles Urgent Care were being provided by or through Defendant EFLEMC.[6]

14. Plaintiff Julie Casler-Tyrrell did not see any identification tags on the individuals at Skaneateles Urgent Care on February 18, 2017, that contradicted her assumption that the individuals treating her son were employees of, or under control of, Defendant Auburn C.H.[7]

15. At no time up to and including February 22, 2017, did Plaintiff Julie Casler-Tyrrell think or believe that the medical or other providers at Skaneateles Urgent Care were not employed by the hospital.[8]

**D. Undisputed Material Facts on Defendant Koenig's Motion for Summary Judgment**

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant Koenig in his Statement of Material Facts and either admitted by Plaintiffs or denied without appropriate evidentiary support in their response thereto. (*Compare* Dkt. No. 58, Attach. 21 [Def. Koenig's Rule 56.1 Statement] *with* Dkt. No. 60, Attach. 20 [Pls.' Rule 56.1 Resp.].)[9]

### Treatment Timeline

*5 1. Plaintiff Bryan Casler-Tyrrell presented to Skaneateles Urgent Care on February 18, 2017, at approximately 8:45am.

2. Plaintiff Bryan Casler-Tyrrell's complaints on presentation were low back pain and bilateral hip pain.

3. After being triaged by a registered nurse, Plaintiff Bryan Casler-Tyrrell was seen and evaluated by Defendant Suslik.

4. Plaintiff Bryan Casler-Tyrrell advised Defendant Suslik that his pain had been present for two days and was an 8/10 in intensity.

5. He reported shoveling snow earlier in the week before the onset of symptoms.

6. The pain had been worse the previous night, but was somewhat relieved by a heating pad and over-the-counter pain medication.

7. He denied any known fever, chills, headache, neck pain, or fatigue.

8. Plaintiff Bryan Casler-Tyrrell's medical history was significant for scoliosis and associated spinal fusion surgery in 2013.

9. Plaintiff Bryan Casler-Tyrrell was then seen and examined by Defendant Suslik.

10. His vital signs included a temperature of 100.8F, blood pressure of 141/82, pulse of 125, and respiration of 20.

11. On physical examination, he had a normal head and neck examination with full range of motion in his neck and no cervical spine tenderness.

12. His hip and leg examination was also within normal limits, and Defendant Suslik noted that there was a scar from past surgery on his lower spinal column.

13. Notably, he had no noted neurological symptoms.

14. Following the physical examination, Defendant Suslik formed a differential diagnosis that included urinary tract infection, pyelonephritis, and kidney stones.

15. Defendant Suslik ordered tests, including a urine dipstick, urine culture, and abdominal x-ray.

16. The urine dipstick showed trace leukocytes, protein, and blood.

17. The abdominal x-ray was normal.

18. Skaneateles Urgent Care did not have the capacity to analyze a urine culture, so Plaintiff Bryan Casler-Tyrrell's urine culture was sent to Defendant Auburn C.H.'s lab for analysis.

19. Defendant Suslik also ordered a Toradol shot for Plaintiff Bryan Casler-Tyrrell's alleged pain.

20. After obtaining the results of the urine dipstick and x-ray, Defendant Suslik diagnosed Plaintiff Bryan Casler-Tyrrell with acute cystitis and back pain, and she prescribed the antibiotic Bactrim.

21. Plaintiffs were told to call in two or three days to obtain the urine culture results, to schedule a follow-up appointment with his primary care physician in seven-to-ten days, and to go to the emergency room if his condition worsened.

22. Defendant Koenig did not see Plaintiff Bryan Casler-Tyrrell at any time.

23. The urine culture results were returned on February 20, 2017, and showed few colonies of mixed growth that were consistent with skin flora, but were otherwise negative.

24. These results were reported to Plaintiff Julie Casler-Tyrrell along with an instruction to discontinue Bactrim.

25. On February 25, 2017, Plaintiff was a passenger in a vehicle driving back to Syracuse from Georgia when he became confused, febrile, and tachycardic, and started seizing.

### Defendant Koenig's Role

26. Defendant Koenig was, and remains, the medical director for Skaneateles Urgent Care.

**\*6** 27. In his role as medical director, Defendant Koenig is required to review and sign off on all charts created by midlevel providers, including nurse practitioners.

28. This review is, in part, to determine if a chart is complete and whether the resulted labs were followed up on, if required.[10]

29. If the chart is complete, Defendant Koenig signs it so that Defendant Auburn C.H. can bill for the visit.

30. If the chart is not complete or labs have not been followed up on, Defendant Koenig will speak with the treatment providers.

31. In this instance, Defendant Koenig reviewed Defendant Suslik's chart for Plaintiff Bryan Casler-Tyrrell.

32. Defendant Koenig determined that Defendant Suslik's chart contained the necessary documentation and that the urine culture had been appropriately addressed.[11]

33. He therefore signed the chart on February 22, 2017.

### Plaintiffs' Expert Disclosure

34. On or about December 13, 2019, Plaintiffs served their expert disclosure pursuant to Fed. R. Civ. P. 26(a)(2).

35. This disclosure was more than 400 pages in length and identified seven expert witnesses Plaintiffs intended to call at trial.

36. Plaintiffs' liability experts, Carrie Tibbles, M.D., Alan Sanders, M.D., and Jason Sheehan, M.D., were each deposed.

37. Each of these three experts admitted that their respective expert reports did not state that Defendant Koenig in particular deviated from the standard of care.

**\*7** 38. After repeatedly admitting during her deposition that her expert report did not state that Defendant Koenig had deviated from the standard of care, Dr. Tibbles then testified that Defendant Koenig's care was substandard because he failed to take the opportunity when reviewing Plaintiff Bryan

Casler-Tyrrell's chart to address the alleged substandard care provided by Defendant Suslik.

39. Dr. Tibbles admitted that this opinion was not contained in her report.[12]

40. Further, Dr. Tibbles also admitted that she had not reviewed any of the deposition testimony in this case, including the depositions of Defendant Koenig, Defendant Suslik, or Dr. Iannolo, before her deposition.

41. All of Plaintiffs' experts admitted that Plaintiff did not have meningitis on February 18, 2017.

### Defendant Koenig's Expert Report

42. Stephen Schultz, M.D., a board-certified family medicine physician, opined that Defendant Koenig did not deviate from the standard of care regarding Plaintiff Bryan Casler-Tyrrell's treatment.

43. Dr. Schultz opined that Defendant Koenig appropriately reviewed the chart prepared by Defendant Suslik related to Plaintiff Bryan Casler-Tyrrell's treatment in his capacity as medical director for Skaneateles Urgent Care.

44. Dr. Schultz opined that the procedure used by Defendant Koenig to review midlevel and physician extender charts was consistent with the standard of care.

45. Dr. Schultz opined that it was proper to review that chart for completeness and to make sure that labs were followed up on before signing the chart.

46. Dr. Schultz further opined that Defendant Koenig properly performed this review.

47. Dr. Schultz opined that Defendant Koenig was not reviewing the chart as a treating physician, given that Defendant Koenig had never seen or treated Plaintiff Bryan Casler-Tyrrell.

48. Dr. Schultz opined that Defendant Koenig reviewed Defendant Suslik's chart to ensure that the necessary documentation was present, including the urine culture results.

49. Dr. Schultz opined that Defendant Suslik's chart was complete, and thus it was appropriate for Defendant Koenig to sign it.

50. In addition, Dr. Schultz opined that the standard of care did not require Defendant Koenig to provide additional follow-up care or to order additional testing after he reviewed the chart.

51. Dr. Schultz opined that the determination of what tests a particular patient needs should be made by the treating providers.

52. Dr. Shultz opined that Defendant Koenig was not Plaintiff Bryan Casler-Tyrrell's treating provider, and thus the standard of care did not require that he order any additional tests to look for infection.

53. Similarly, Dr. Schultz opined that Defendant Koenig did not need to provide additional follow-up treatment after seeing the negative urine culture results.

54. Plaintiff had already been advised by Defendant Suslik to follow up with his primary care physician, and to go to the emergency room if he experienced any worsening in his symptoms.

*8 55. Dr. Schultz opined that this instruction was the standard of care, and thus Defendant Koenig was not required to provide any additional follow-up treatment.

56. Like Plaintiffs' experts, Dr. Schultz agreed that Defendant Koenig did not err in failing to diagnose Plaintiff Bryan Casler-Tyrrell with meningitis on February 18, 2017.

57. Dr. Schultz listed the symptoms of meningitis, which include headache, stiff neck, high sudden fever, confusion, photosensitivity, nausea, and vomiting.

58. Plaintiff had none of these symptoms when he presented to Skaneateles Urgent Care on February 18, 2017; he denied headache, stiff neck and nausea, there was no evidence of photosensitivity or confusion, and his neurological exam was normal.

59. Dr. Schultz opined that, because none of the symptoms of meningitis were present or documented in the chart, Defendant Koenig could not have departed from acceptable medical standards by failing to diagnose Plaintiff Bryan Casler-Tyrrell with meningitis on February 18, 2017.

60. Dr. Schultz opined that Defendant Koenig was not a cause of Plaintiff Bryan Casler-Tyrrell's injuries or damages.

61. Dr. Schultz opined that Defendant Koenig did not see Plaintiff Bryan Casler-Tyrrell or provide any treatment to him, and was not responsible for determining any diagnoses.

62. Dr. Schultz opined that, since Defendant Koenig did not see Plaintiff Bryan Casler-Tyrrell and had no duty to examine or treat him, any alleged improper examination or failure to diagnose by Defendant Koenig could not be the cause of Plaintiff Bryan Casler-Tyrrell's injuries.

63. Moreover, Dr. Schultz opined that the symptoms reported by Plaintiff Bryan Casler-Tyrrell on February 18, 2017, were nonspecific and did not support a diagnosis of meningitis.

64. Plaintiff Bryan Casler-Tyrrell did not show any signs or symptoms of meningitis until February 25, 2017, three days after Defendant Koenig reviewed the chart.

65. In addition, Dr. Schultz opined that the treatment Defendant Koenig would have rendered if he had concerns after reviewing the chart would have been to follow up with his primary care physician and to go to the emergency room if his condition worsened.

66. Dr. Schultz opined that this was the same treatment and instructions that were provided to Plaintiff Bryan Casler-Tyrrell by Defendant Suslik.

67. Therefore, Dr. Schultz opined that Defendant Koenig could not have caused Plaintiff Bryan Casler-Tyrrell's injuries, given that Plaintiff Bryan Casler-Tyrrell had already been provided the proper instructions to receive follow-up care when he was discharged.

**F. Parties' Briefing on Defendant Auburn C.H.'s Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment Against Defendant Auburn C.H.**

**1. Defendant Auburn C.H.'s Memorandum of Law**

Generally, in its motion for summary judgment, Defendant Auburn C.H. argues that the Court should dismiss any claim of independent or direct liability against it because

Plaintiffs have not asserted any basis for direct or independent liability against it, but rather have asserted only a basis for vicarious liability against it (i.e., based on the actions of the other Defendants). (Dkt. No. 57, Attach. 16, at 4-10 [Def. Auburn C.H.'s Mem. of Law].) More specifically, Defendant Auburn C.H. argues that, although it owns Skaneateles Urgent Care, its contract with Defendant EFLEMC shows that (a) Defendant EFLEMC is an independent entity that is responsible for all of the care provided at that location, (b) none of the employees of Defendant EFLEMC who worked at Skaneateles Urgent Care are employees of Defendant Auburn C.H., and (c) all of the alleged actions were committed by employees of Defendant EFLEMC. (*Id.*) Additionally, Defendant Auburn C.H. argues that the contract indemnifies it from any damages resulting from the actions of Defendant EFLEMC and its employees, and that none of the expert witnesses have opined that Defendant Auburn C.H. itself deviated from any standard of care or caused Plaintiffs' injuries. (*Id.*)

### 2. Plaintiffs' Opposition Memorandum of Law and Cross-Motion

**\*9** Generally, in their response to Defendant Auburn C.H.'s motion and their cross-motion for summary judgment, Plaintiffs make three arguments. (Dkt. No. 59, Attach 18, at 9-16 [Pls.' Opp'n Mem. of Law].) First, Plaintiffs argue that Defendant Auburn C.H. cannot escape liability because it had a non-delegable duty under New York law to provide acceptable standards of care at its urgent care facilities, even if it contracted another entity to actually perform the services at those facilities. (*Id.* at 9-12.)

Second, Plaintiffs argue that Defendant Auburn C.H. should be estopped from claiming it is not responsible for the negligent acts of the co-Defendants because, even if Defendant EFLEMC is considered an independent contractor, Defendant Auburn C.H. can be held liable where, as here, a patient sought medical care at the hospital as opposed to from any particular physician, and apparent or ostensible agency existed. (*Id.* at 12-14.)

Third, Plaintiffs argue that Defendant Auburn C.H. is vicariously liable for the actions of its co-Defendants based on a doctrine under New York law that holds hospitals liable for the actions of individuals they hire to staff hospital facilities. (*Id.* at 15-16.)

### 3. Defendant Auburn C.H.'s Reply Memorandum of Law and Opposition to Plaintiffs' Cross-Motion

Generally, in its reply and opposition, Defendant Auburn C.H. makes three arguments. (Dkt. No. 61, at 4-13 [Def. Auburn C.H.'s Reply Mem. of Law].) First, Defendant Auburn C.H. argues that Plaintiffs have not opposed the substance of its motion for summary judgment (which was that there is no evidence of independent or direct negligence by Defendant Auburn C.H.) and therefore have not articulated a basis for the Court to deny its motion. (*Id.* at 4-5.)

Second, Defendant Auburn C.H. argues that there is no basis for Plaintiffs' argument that Defendant Auburn C.H. had a non-delegable duty because the cases cited by Plaintiffs in support of their argument involve different factual circumstances, and there is more apposite case law that indicates that a hospital is not liable for the torts of independent providers. (*Id.* at 5-6.)

Third, Defendant Auburn C.H. argues that there is an insufficient basis to find, as a matter of law, that it is vicariously liable for the actions of its co-Defendants. (*Id.* at 7-13.) More specifically, Defendant Auburn C.H. argues that the New York common law doctrine cited by Plaintiffs does not apply in this case due to the fact that Plaintiffs sought care at an urgent care center, not the hospital's emergency room (which was also open at the relevant time, but at which Plaintiffs chose not to seek care). (*Id.*) Defendant Auburn C.H. also argues that liability is not the strict liability that Plaintiffs assert, but rather liability is contingent on the level of supervision and control the hospital exercised over the entity or individual providing the care (among other factors related to assessing an agency relationship), and contingent on some appearance that the physician or other provider is acting as the hospital's agent, something that is not present in this case. (*Id.*) Finally, Defendant Auburn C.H. argues that the contract between it and Defendant EFLEMC does not establish vicarious liability as a matter of law, and all of the evidence shows that it was in fact Defendant EFLEMC that managed Skaneateles Urgent Care, and employed, supervised and controlled the providers who worked there. (*Id.*)

### G. Parties' Briefing on Defendant Koenig's Motion for Summary Judgment and Plaintiffs' Cross-Motion Against Defendant Koenig

## 1. Defendant Koenig's Memorandum of Law

*10 Generally, in his motion for summary judgment, Defendant Koenig makes four arguments. (Dkt. No. 58, Attach. 22, at 6-15 [Def. Koenig's Mem. of Law].) First, Defendant Koenig argues that the evidence does not sufficiently support a finding that he deviated from the standard of care because his expert, Dr. Schultz, opined as follows: (a) he met the standard of care as the medical director of Skaneateles Urgent Care by reviewing the chart for completeness; (b) he did not fail to diagnose meningitis because there was no evidence that Plaintiff Bryan Casler-Tyrrell had meningitis on February 18, 2017; and (c) the applicable standard of care for a non-treating, non-examining physician medical director did not include an obligation to provide follow-up testing or care, and the only follow-up testing or care that would have been provided under the circumstances would have been to tell Plaintiffs to follow-up with a treating physician or the emergency room if his symptoms worsened. (Id. at 6-11.)

Second Defendant Koenig argues that Plaintiffs have not shown that he was the cause of Plaintiff Bryan Casler-Tyrrell's injuries because (a) he did not treat Plaintiff Bryan Casler-Tyrrell, but merely reviewed his chart, and (b) the only follow-up testing or care he could have provided was to instruct Plaintiffs to follow-up with a treating physician or go to the emergency room if his symptoms worsened, and that instruction was indeed provided to Plaintiffs upon discharge from Skaneateles Urgent Care on February 18, 2017. (Id. at 11-12.)

Third, Defendant Koenig argues that Plaintiffs cannot create a genuine dispute of fact as to their claims against him because they have not provided any expert opinions related to his responsibilities to Plaintiffs or the standard of care applicable to him as a non-treating, non-examining medical director. (Id. at 12-15.) More specifically, Defendant Koenig argues that the only expert source who mentioned Dr. Koenig or his liability was Dr. Tibbles, but that opinion was disclosed for the first time in her deposition, was not disclosed in her initial expert report, was not based on an evidentiary foundation because she had not reviewed Dr. Koenig's deposition testimony at the time of her deposition, and was not included in a timely-served supplemental expert report. (Id.) Defendant Koenig therefore argues that Dr. Tibbles' opinion about his liability exceeds the scope of her expert

report and lacks foundation, and should not be admitted for consideration. (Id.)

Fourth, Defendant Koenig argues that any alleged violations of New York statutes cited by Plaintiffs in their Amended Complaint or their Answers to Interrogatories cannot impose liability on Defendant Koenig because those statutes apply to hospitals or facilities, and not to individual providers. (Id. at 15.)

## 2. Plaintiffs' Opposition Memorandum of Law and Cross-Motion

Generally, in their opposition and cross-motion, Plaintiffs make four arguments. (Dkt. No. 60, Attach. 19, at 6-18 [Pls.' Opp'n Mem. of Law].) First, Plaintiffs argue that the evidence shows that Defendant Koenig had a duty to review the care provided by the midlevel providers to ensure that it met the accepted standard of care because (a) the contract between Defendant Auburn C.H. and Defendant EFLEMC required such oversight, (b) Defendant Koenig himself has attested and testified that his review involves a determination of whether a patient received appropriate medical care and that he had on many occasions made suggestions about further or different care he thought was warranted after reviewing charts, (c) Dr. Iannolo also testified that the chart review involves assessing more than mere completeness, and (d) Dr. Schultz's opinion is inconsistent with the evidence that he purports to rely on and should therefore not be afforded much weight. (Id. at 6-9.)

Second, Plaintiffs argue that Defendant Koenig's failure to advise Plaintiff Bryan Casler-Tyrrell to seek immediate follow-up medical care after reviewing his chart was a substantial factor in Plaintiff Bryan Casler-Tyrrell's injuries. (Id. at 9-12.) More specifically, Plaintiffs argue that (a) all of the expert reports indicate that there was no basis for a diagnosis of urinary tract infection, that his vital signs were indicative of an infectious process, and that he was known during the time of treatment to have spinal hardware, yet Defendant Suslik failed to consider any other type of bacterial infection, did not document her back examination in detail, and did not order any blood work, and (b) given that it is undisputed that Defendant Koenig claims to have reviewed the entirety of Plaintiff Bryan Casler-Tyrrell's chart, a reasonable factfinder could conclude that his review should have alerted him to the existence of an infectious process that had not been adequately assessed or treated. (Id.)

**\*11** Third, Plaintiffs argue that Dr. Tibbles' expert opinion creates a genuine dispute of material fact as to whether Defendant Koenig deviated from the standard of care, and that Defendant Koenig cannot claim that this opinion is a surprise, given that it was clearly laid out at her deposition and his counsel had an opportunity to question her about that opinion. (*Id.* at 13.)

Fourth, Plaintiffs argue that they should be permitted to present Dr. Tibbles' opinions about Defendant Koenig's liability to the jury even though they failed to submit a timely supplemental expert report regarding those opinions because their violation of the Federal Rules of Civil Procedure was merely technical, substantially justified, and harmless to Defendant Koenig. (*Id.* at 14-18.) More specifically, Plaintiffs argue that (a) the violation was justified because the effects of the COVID-19 pandemic on Dr. Tibbles' practice caused a significant delay in obtaining the transcript of her deposition and a supplemental expert report, and (b) Defendant Koenig is not prejudiced by its introduction given that (i) Dr. Tibbles' opinions in the supplemental expert report are identical to those she expressed at her deposition, and (ii) Defendant Koenig and his counsel were present at that deposition and were able to question her about her opinions. (*Id.*)

**3. Defendant Koenig's Reply Memorandum of Law and Opposition to Plaintiffs' Cross-Motion**

Generally, in reply to Plaintiffs' opposition and in response to Plaintiffs' cross-motion, Defendant Koenig makes three arguments. (Dkt. No. 62, at 5-20 [Def. Koenig's Reply Mem. of Law].) First, Defendant Koenig argues that the Court should preclude Plaintiffs from using Dr. Tibble's undisclosed deposition opinions and supplemental expert report because there is no justification for Plaintiffs' failure to make a timely disclosure of that evidence. (*Id.* at 5-13.) More specifically, Defendant Koenig argues that Plaintiffs were aware of a need to supplement in July 2020 (when the deposition was conducted and it was clear she had testified beyond the scope of her initial expert opinion), but failed to provide any indication that they intended to file a supplemental expert report (and, indeed, expressed that they did not intend to supplement) until after the discovery deadline had passed and Defendant Koenig had filed his motion for summary judgment. (*Id.*) Defendant Koenig further argues that the evidence available (including Plaintiffs' counsel's own declarations) shows that they did not request that Dr. Tibbles supplement her expert opinion until

October 2020, which was after discovery had already closed. (*Id.*) Defendant Koenig argues that the failure to disclose is prejudicial to him because he did not have an opportunity to ask questions based on these new opinions and he prepared his motion for summary judgment under the impression that no supplemental expert report was forthcoming. (*Id.*) Defendant Koenig argues that exclusion of this evidence is the appropriate remedy because (a) there is no reasonable explanation for the failure to make a timely disclosure and indeed there is a suggestion of bad faith in Plaintiffs' delay, (b) the undisclosed opinions are prejudicial and Defendant Koenig has had no opportunity to test them through adequate questioning, and (c) there is no possibility of a continuance in this matter given the length of time this case has been pending and the fact that the Court has expressed that no further extensions of discovery will be granted. (*Id.*)

**\*12** Second, Defendant Koenig argues that Plaintiffs have abandoned their claims about statutory violations, that he should have ordered certain further tests or imaging, and that he failed to properly examine Plaintiff Bryan Casler-Tyrrell because they have not made any counter-arguments and have not addressed the expert opinion evidence that supports Defendant Koenig's position on those issues. (*Id.* at 13-14.)

Third, Defendant Koenig argues that Plaintiffs have failed to raise a genuine dispute of material fact related to their claims against Defendant Koenig because (a) their experts have not defined the standard of care that was applicable to him as a non-treating, non-examining medical director, (b) there is no evidence that Defendant Koenig reviewed the patient charts for anything other than billing purposes, and (c) even if Dr. Tibbles' supplemental expert opinions are deemed admissible despite their untimely disclosure, her conclusions lack an evidentiary foundation, her assumptions are contradicted by the other evidence, and she does not actually opine that Defendant Koenig was a substantial cause of Plaintiff Bryan Casler-Tyrrell's injuries or how different appropriate care or instructions from Defendant Koenig would have caused a different outcome. (*Id.* at 14-21.)

**II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT**
Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable

jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[13] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[14]

**\*13** Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.).[15] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules.[16]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[17]– even where the non-movant was proceeding *pro se*.[18]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[19] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III. ANALYSIS

### A. Whether Defendant Auburn C.H. Is Entitled to Summary Judgment as to any Claims Against It Based on Direct or Vicarious Liability

**\*14** After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant Auburn C.H.'s memoranda of law. *See, supra,* Part I.C.1 and 3. To those reasons, the Court adds the following analysis.

### 1. Direct Liability

As an initial matter, the Court notes that Defendant Auburn C.H. has not moved for complete dismissal of the claims against it in its summary judgment motion; rather, it has moved for summary judgment only as to the claims against it that are based on a theory of direct liability. (Dkt. No. 57, Attach. 16, at 7 [Def. Auburn C.H.'s Mem. of Law].) Specifically, Defendant Auburn C.H. argues that the alleged deficient treatment and warnings were provided by Defendant EFLEMC and its employees, not Defendant Auburn C.H.,

and thus there is no basis for finding direct liability against Defendant Auburn C.H. (Dkt. No. 57, Attach. 16, at 7-9 [Def. Auburn C.H.'s Mem. of Law].) Plaintiffs counter that Defendant Auburn C.H. is directly liable because, even if Defendant EFLEMC were to be found to be an independent contractor, the duty to provide medical care meeting acceptable standards is non-delegable and thus any deviation from the standard of acceptable care by the co-Defendants would render Defendant Auburn C.H. directly liable for Plaintiffs' resulting injuries. (Dkt. No. 59, Attach. 18, at 5, 9-12 [Pls.' Opp'n Mem. of Law].)

However, whether a defendant is liable for the acts of an independent contractor due to the existence of a nondelegable duty is an issue of vicarious liability, not direct liability. *See Dziedzic v. Wirth*, 79 N.Y.S.3d 822, 823, 162 A.D.3d 1749 (N.Y. App. Div. 4th Dept. 2018) ("A party may be *vicariously* liable for the negligence of an independent contractor in performing non-delegable duties ... arising out of some relation toward the public or the particular plaintiff.") (emphasis added) (internal quotation marks omitted). The Court therefore agrees with Defendant Auburn C.H. that Plaintiffs have failed to provide any real opposition to the actual substance of Defendant Auburn C.H.'s motion for partial summary judgment. Additionally, the Court has not found any admissible record evidence to support the existence of a basis for imposing direct liability on Defendant Auburn C.H. in this matter. Notably, it is undisputed that all of the sources who were involved in Plaintiff Bryan Casler-Tyrrell's treatment on February 18, 2017, were employees of Defendant EFLEMC and not employees of Defendant Auburn C.H., and that Defendant EFLEMC is an independent entity from Defendant Auburn C.H. Moreover, no evidence has been proffered to show that Defendant Auburn C.H. in any way directed, influenced, or was involved in the actions of Defendants EFLEMC, Suslik, or Koenig related to the treatment Plaintiff Bryan Casler-Tyrrell received. As a result, the Court finds that Plaintiffs have not created a genuine dispute of material fact as to whether Defendant Auburn C.H. committed acts which would make it directly liable for the alleged injuries sustained by Plaintiffs. Defendant Auburn C.H.'s motion for partial summary judgment as to any asserted claims of direct liability is therefore granted.

## 2. Vicarious Liability

Although Defendant Auburn C.H. has not moved for summary judgment on any claims of vicarious liability,

Plaintiffs have filed a cross-motion for summary judgment seeking a finding that Defendant Auburn C.H. is vicariously liable as a matter of law. (Dkt. No. 59, Attach. 18 [Pls.' Opp'n Mem. of Law].) They argue that three bases exist for finding the existence of vicarious liability: (1) even if Defendant EFLEMC was an independent contractor, the duty to provide an acceptable standard of care is a nondelegable duty under New York law; (2) Defendant Auburn C.H. should be estopped from asserting it is not liable for the actions of Defendant EFLEMC because of the existence of apparent or ostensible agency; and (3) under the doctrine in *Mduba v. Benedictine Hosp.*, 52 A.D.2d 450, 384 N.Y.S.2d 527 (N.Y. App. Div. 3rd Dept. 1976), Defendant Auburn C.H. is liable for the actions of Defendant EFLEMC and its employees because it contracted with Defendant EFLEMC to staff Skaneateles Urgent Care, and Plaintiffs sought care from the urgent care facility itself rather than from any specific physician at the urgent care facility. (*Id.*)

**\*15** "The general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts," subject to a host of exceptions. *Kleeman v. Rheingold*, 81 N.Y.2d 270, 598 N.Y.S.2d 149, 152, 614 N.E.2d 712 (N.Y. 1993); *see Garofolo v. New York*, 135 A.D.3d 1108, 1109 (N.Y. App. Div. 3rd Dep't 2016) ("Traditionally, a hospital or medical facility is liable only for the medical malpractice of its employees and not that of independently contracted doctors."). These exceptions generally fall into three categories: (1) where there is negligence by the employer when selecting, instructing, or supervising the contractor; (2) where the work involved is especially or inherently dangerous; and (3) where the employer has a specific nondelegable duty. *Kleeman*, 598 N.Y.S.2d at 152, 614 N.E.2d 712.

### a. The Relationship Between Defendant Auburn C.H. and Defendant EFLEMC

As an initial matter, the Court finds that there is at least a genuine dispute of material fact as to whether Defendant EFLEMC was an independent contractor rather than an employee.

Under New York law, "[c]ontrol of the method and means by which the work is to be done is the critical factor in determining whether one is an independent contractor or an employee for the purposes of tort liability," and "[f]actors

relevant to assessing control include whether a worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule." *Sanabria v. Aguero-Borges*, 117 A.D.3d 1024, 1025, 986 N.Y.S.2d 553 (N.Y. App. Div. 2d Dep't 2014). Although "the existence of a contract designating a person as an independent contractor is not dispositive, it is a factor to be considered. *Sanabria*, 117 A.D.3d at 1026, 986 N.Y.S.2d 553. Additionally, "the mere retention of general supervisory powers over an independent contractor cannot form a basis for the imposition of liability against the principal." *Goodwin v. Comcast Corp.*, 42 A.D.3d 322, 323, 840 N.Y.S.2d 781 (N.Y. App. Div. 1st Dep't 2007).

"The issue of an employer/employee relationship 'usually presents a question of fact, but when the evidence in the record on the issue of control is undisputed, the matter may properly be determined by the court as a matter of law.' " *Tesillo v. Emergency Physician Assocs., Inc.*, 376 F. Supp. 2d 327, 333 (W.D.N.Y. 2005) (quoting *Berger v. Dykstra*, 203 A.D.2d 754, 610 N.Y.S.2d 401 [1994]). As a result, "the issue of control is an issue of material fact because it is determinative, and if the extent of control is disputed, the issue should be submitted to the jury." *Tesillo*, 376 F. Supp. 2d at 333 (citing *Felice v. St. Agnes Hosp.*, 65 A.D.2d 388, 396, 411 N.Y.S.2d 901 [1978]).

Here, it is not apparent that Plaintiffs specifically dispute that Defendant EFLEMC is an independent contractor rather than an employee of Defendant Auburn C.H. Rather, Plaintiffs' primary argument is that Defendant Auburn C.H. cannot avail itself of any independent contractor defense because (a) it had a non-delegable duty to provide medical care in accordance with the legal standard of care, and (b) Skaneateles Urgent Care held itself out to the community as an entity of Defendant Auburn C.H. (Dkt. No. 59, Attach. 18 [Pls.' Opp'n Mem. of Law].) Because neither Defendant Auburn C.H. nor Plaintiffs have requested summary judgment on the issue of whether Defendant EFLEMC was an independent contractor of Defendant Auburn C.H. as a matter of law, the Court declines to reach that issue here. Instead, the Court assumes for the purposes of this motion (but without deciding, as discussed) that the relationship between those two Defendants is that of an independent contractor, and thus will determine whether any of the bases raised by Plaintiffs for asserting vicarious liability over an independent contractor are applicable here.

**b. The Existence of a Nondelegable Duty**

**\*16** Although there is no clearly defined criteria for identifying which duties are nondelegable, "[t]he most cited formulation is that a duty will be deemed nondelegable when the responsibility is so important to the community that the employer should not be permitted to transfer it to another." *Kleeman*, 598 N.Y.S.2d at 152-53, 614 N.E.2d 712 (internal quotation marks omitted).

Plaintiffs argue that Defendant Auburn C.H. had a non-delegable duty to ensure that the care provided at Skaneateles Urgent Care met the generally accepted standards of professional practice based on 10 N.Y.C.R.R. §§ 405.2(f)(1) and (h), N.Y. Pub. Health L. § 2803-a, and public policy considerations. (Dkt. No. 59, Attach. 18, at 9-12 [Pls.' Opp'n Mem. of Law].)

Pursuant to 10 N.Y.C.R.R. §§ 405.2, "[t]he established operator [of a hospital] shall be legally responsible for the quality of patient care services," and the governing body of the hospital must require that "every patient of the hospital, whether an inpatient, emergency services patient, or outpatient, shall be provided care that meets generally acceptable standards of professional practice." 10 N.Y.C.R.R. §§ 405.2(a), (f)(1). This regulation also provides that "[t]he governing body [of the hospital] shall be responsible for services furnished *in the hospital* whether or not they are furnished by outside entities under contracts." 10 N.Y.C.R.R. § 405.2(h) (emphasis added).

Notably, these regulations all apply to care provided to patients by the hospital or received at the hospital. Plaintiffs' argument is, for all intents and purposes, premised on the assumption that Skaneateles Urgent Care is indistinguishable from the hospital itself, in the same way that a hospital's emergency department is indistinguishable from the hospital. Defendant Auburn C.H. argues at least implicitly that Skaneateles Urgent Care is separate from the hospital. Because the above-referenced regulations indicate that a hospital has a nondelegable duty for services provided within the hospital itself, one relevant question regarding the existence of a nondelegable statutory duty is whether Skaneateles Urgent Care can be defined as part of the hospital itself. Another relevant question is whether Skaneateles Urgent Care is considered an "outpatient" service of the hospital such that patients of Skaneateles Urgent Care are considered patients of Defendant Auburn C.H. However,

there is a genuine dispute of material fact between the parties as to whether services furnished at Skaneateles Urgent Care would qualify as services furnished by Defendant Auburn C.H. or "in the hospital," given the parties' disagreement about the degree of control Defendant Auburn C.H. exercised over Defendant EFLEMC's operation of Skaneateles Urgent Care.

As to whether there is a nondelegable duty based on public policy considerations, the Court notes that Plaintiffs have not provided the Court with citations to any New York case law recognizing such specific duty. However, even if Plaintiffs had done so, there would remain a genuine dispute of material fact related to the extent to which Defendant Auburn C.H. controlled the various operations and patient care at Skaneateles Urgent Care (and whether patients at Skaneateles Urgent Care were in fact patients of Defendant Auburn C.H.) that would preclude the Court from finding that any such applicable duty existed under the circumstances of this case. As a result, the Court finds that summary judgment in Plaintiff's favor is not warranted on the basis of an alleged nondelegable duty of a hospital to provide adequate care to its patients.

### c. *Mduba* Doctrine and Agency by Estoppel

*17 Similarly, based on the evidence presented with the motions, the Court declines to find, as a matter of law, that Defendant Auburn C.H. is vicariously liable under either the principles of agency by estoppel or the *Mduba* doctrine. In *Mduba*, the New York Supreme Court Appellate Division Third Department found that the defendant hospital could be held liable for a physician's negligence (even if he was an independent contractor) where that physician operated the hospital's emergency room and the hospital held itself out to the public as an institution that provided doctors, staff, and facilities for emergency treatment, regardless of the terms of the contract between the hospital and the physician. *Mduba*, 384 N.Y.S.2d at 453-54. In other words, "a hospital may be held vicariously liable for the acts of independent physicians if the patient enters the hospital through the emergency room and seeks treatment from the hospital, not from a particular physician." *Goffredo v. St. Luke's Cornwall Hosp.*, 142 N.Y.S.2d 597, 598 (N.Y. App. Div. 2d Dep't. 2021) (finding summary judgment should have been granted as to vicarious liability where the plaintiff demonstrated that she was brought to the hospital's emergency room, did not request

care by a particular physician, and was assigned the relevant independent physician).

Somewhat similarly, New York courts recognize the doctrine of agency by estoppel, such that "a hospital or entity ... may be vicariously liable for the medical malpractice of independent contractors in certain circumstances based on a theory of 'agency or control in fact, or apparent or ostensible agency.' " *Garofolo*, 135 A.D.3d at 1109 (quoting *Kavanaugh v. Nussbaum*, 71 N.Y.2d 535, 547, 528 N.Y.S.2d 8, 523 N.E.2d 284 [1988]). The existence of ostensible agency depends on "whether the plaintiff could have reasonably believed, based upon all of the surrounding circumstances, that the treating physician was provided by the defendant ... or was otherwise acting on the defendant's behalf"; "words and conduct" on the part of the defendant "that give rise to the appearance and belief that the doctors were acting on its behalf" are "essential to such a claim." *Garofolo*, 135 A.D.3d at 1109-10 (citing *Hallock v. State of New York*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 [1984]; *Soltis v. State of New York*, 172 A.D.2d 919, 920, 568 N.Y.S.2d 470 [1991]). However, the use of hospital letterhead for reports, the failure to affirmatively state that the physician is not an employee of the hospital, and the presence of the physician on a hospital website are not generally sufficient, in and of themselves, to establish ostensible agency; rather, there must have been some "misleading conduct upon which [the plaintiff] reasonably relied when they decided to accept medical services from [the physician]." *King v. Mitchell*, 31 A.D.3d 958, 819 N.Y.S.2d 169 (N.Y. App. Div. 3rd Dep't. 2006). Indeed, "the plaintiff must reasonably rely on the appearance of authority, based on some misleading words or conduct by the principle, not the agent[, and] the plaintiff must accept the services of the agent in reliance upon the perceived relationship between the agent and the principle, and not on reliance on the agent's skill." *Loaiza v. Lam*, 107 A.D.3d 951, 968 N.Y.S.2d 548, 549-50 (N.Y. App. Div. 2d Dep't. 2013). "Apparent/ostensible agency has been applied to hold a medical facility responsible for the malpractice of a physician providing services there, despite the physician's status as an independent contractor, where medical care was sought by a patient from the facility rather than from a particular physician." *Sanchez v. Master*, 82 N.Y.S.3d 836, 839, 61 Misc.3d 246 (N.Y. Supr. Ct. Bronx Cnty. 2018) (citing *Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72, 499 N.Y.S.2d 904, 490 N.E.2d 823 [N.Y. 1986]).

Defendant Auburn C.H. argues that these doctrines do not apply because Plaintiff Bryan Casler-Tyrrell sought care from an urgent care facility, not from Defendant Auburn C.H.'s

emergency room, relying on generic information related to the types of services that urgent care facilities typically provide compared with the services that an emergency room typically provides. (Dkt. No. 61, Attach. 1, at 7-8 [Def. Auburn C.H.'s Reply Mem. of Law].) However, although Defendant Auburn C.H. is correct that *Mduba* and other such cases overwhelmingly involve care at a hospital's emergency room, its argument ignores the practical legal underpinnings of the doctrines. As discussed above, the doctrine is intended to hold a hospital vicariously liable where the patient in question sought care from the hospital as an entity (as opposed to from a specific physician) and was admitted as a patient of the hospital. Given that neither party has presented case law indicating that the *Mduba* principle could not be logically extended to facilities owned and operated by a hospital but staffed by independent contractors or non-employees (but in which the patient is still considered a patient of the hospital itself), the Court is skeptical that *Mduba* can apply only to emergency rooms. However, even if *Mduba* is limited to formal emergency rooms physically attached to a hospital, there is a genuine dispute of material fact as to whether ostensible agency existed in this case, and such doctrine has not been limited solely to emergency rooms by courts discussing or applying it.

**\*18** Specifically, to establish ostensible agency, a plaintiff must show (1) that the principle engaged in misleading words or conduct, and (2) that the plaintiff accepted the agent's services and submitted to the agent's care in reliance on a belief that the agent was an employee of the principal. *Sampson v. Contillo*, 55 A.D.3d 588, 590, 865 N.Y.S.2d 634 (N.Y. App. Div. 2d Dep't 2008). In making the determination of ostensible agency, "a court should consider all 'attendant circumstances ... to determine whether the patient could properly have believed that the physician was provided by the hospital.' " *Sampson*, 55 A.D.3d at 590, 865 N.Y.S.2d 634.

Although Skaneateles Urgent Care was not physically attached to or located near Defendant Auburn C.H.'s hospital, the parties have provided evidence from which a reasonable factfinder could conclude that it acted as an extension of sorts of the hospital itself for the provision of certain urgent care services (regardless of whether the providers of those services were employees or independent contractors of Defendant Auburn C.H.). The contract between Defendant Auburn C.H. and Defendant EFLEMC states that Defendant Auburn C.H. "operates" Skaneateles Urgent Care (which provides "urgent medical services" to Cayuga County and the surrounding areas) and further shows that Defendant EFLEMC and

its employees retained to staff Skaneateles Urgent Care are subject to not insubstantial direction and oversight by Defendant Auburn C.H. in terms of their duties, as well as that any personnel that are not supplied by Defendant EFLEMC will be employees or contractors of Defendant Auburn C.H. (Dkt. No. 57, Attach. 3, at 2-5.) Additionally, Defendant Auburn C.H. remains responsible for all billing of patients for services performed at Skaneateles Urgent Care and retains ownership of all medical records for patients treated there, and Skaneateles Urgent Care is required to use Defendant Auburn C.H.'s approved information systems. (*Id.* at 7-8.) Defendant Auburn C.H. also provides the space required for urgent care services (but reserves the right to itself use any of that space without consulting Defendant EFLEMC), the medical and office equipment for providing the urgent care services, and all utility and maintenance services for the provision of urgent care and related services. (*Id.* at 6.) The medical records related to the visit on February 18, 2017, consistently and prominently include the words "Auburn Community Hospital" and the hospital's logo and/ or address, including on the patient information sheets related to generic information about back pain and urinary tract infections. (Dkt. No. 59, Attach. 4.) Neither party makes any argument or has provided any evidence that Plaintiff Bryan Casler-Tyrrell went to Skaneateles Urgent Care with the intention of seeking care from a specific physician or mid-level medical provider as opposed to from the facility in general. In her affidavit, Plaintiff Julie Casler-Tyrrell stated that she brought Plaintiff Bryan Casler-Tyrrell to Skaneateles Urgent Care "to be treated by the Hospital," and that she believed, based upon "prior experience, ... the information that the Hospital provided to the community at large, ... prior discharge instructions and information, ... pamphlets and literature available at the Clinic as well as the manner in which the Hospital publicly presented itself" that the individuals working at Skaneateles Urgent Care were employees of Defendant Auburn C.H. (Dkt. No. 59, Attach. 14 [Julie Casler-Tyrrell Aff.].)

From all of the above evidence, a reasonable factfinder could conclude that employees of Defendant EFLEMC, working at Skaneateles Urgent Care, were the ostensible or apparent agents of Defendant Auburn C.H. However, because the relevant evidence could also reasonably be interpreted as insufficiently showing "misleading words or conduct" specifically by Defendant Auburn C.H. (as opposed to Defendant EFLEMC), the Court finds that it would be inappropriate to find that Defendant Auburn C.H. is vicariously liable for the actions of Defendant EFLEMC and

its employees as a matter of law. Such factual determinations are the province of the jury. As a result, Plaintiffs' motion for summary judgment on its claim of vicarious liability against Defendant Auburn C.H. is denied.

### A. Whether the Court Should Exclude Opinions of Dr. Tibbles that Are Beyond the Scope of Her Initial Expert Report

**\*19** After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant Koenig's memoranda of law. *See, supra*, Part I.G.1. and 3. To those reasons, the Court adds the following analysis.

Rule 26 of the Federal Rules of Civil Procedure requires that parties disclose the identities of any witness they may present at trial, and that expert witnesses, as part of those disclosures, must provide a written report that contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts and data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2). After an expert and his or her written report have been disclosed, such must be supplemented or corrected "in a timely manner if the party learns in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." Fed. R. Civ. P. 26(e)(1). "[T]he party's duty to supplement extends both to information included in the report and to information given during the expert's deposition," and "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under [Fed. R. Civ. P. 26 (a)(3)] are due." Fed. R. Civ. P. 26(e)(2).

On October 17, 2019, the Court granted a request for extension of the discovery deadlines, pursuant to which Plaintiffs were required to disclose their expert reports by December 15, 2019, responsive expert reports were required to be disclosed by January 15, 2020,[20] rebuttal expert reports were due to be disclosed by March 1, 2020, expert depositions were to be completed by April 1, 2020, and all discovery was to be completed by April 1, 2020. (Dkt. No. 55 [Text Order filed Oct. 17, 2019].) The Court noted that these revised deadlines were "firm and final." (*Id.*) However, on March 20, 2020, the Court granted a request to extend the deadlines as follows due to the COVID-19 pandemic: (a) expert depositions to be completed by July 3, 2020; (b) all discovery to be completed by July 3, 2020; and (c) dispositive motions to be filed by August 17, 2020. (Dkt. No. 51 [Text

Order filed Mar. 20, 2020].) The Court further extended these deadlines *sua sponte* to September 18, 2020, for the completion of expert depositions, September 18, 2020, for the completion of all discovery, and November 2, 2020, for the filing of dispositive motions. (Dkt. No. 56 [Text Order filed Aug. 11, 2020].)

The deposition of Dr. Tibbles was conducted on July 13, 2020. (Dkt. No. 60, Attach. 6 [Tibbles Dep.].) Plaintiffs' counsel's affirmation indicates that his office sent a copy of the deposition transcript and the supplemental expert report to Dr. Tibbles for her signature on both on October 13, 2020. (Dkt. No. 60, at ¶¶ 15-16 [Santola Aff.].) However, he had not received either back from Dr. Tibbles as of November 4, 2020. (Dkt. No. 60, at ¶ 17 [Santola Aff.].) On that date, his office sent another copy of the supplemental expert report to Dr. Tibbles for signature, and it eventually received the signed supplemental expert report and deposition signature page on November 13, 2020, which it "immediately" sent to Defendants. (Dkt. No. 60, at ¶¶ 17 [Santola Aff.].)

**\*20** Thus, based on the admissible record evidence, including Plaintiffs' counsel's own admissions, Plaintiffs' attempt to supplement Dr. Tibbles' expert report was untimely. Plaintiffs first argue that (a) because pretrial disclosures are not yet due under Fed. R. Civ. P. 26(a)(3), their supplementation was timely, and (b) even if the Court finds the formal supplementation was untimely, the supplemental opinions should be deemed to have been disclosed because Defendant Koenig was aware of them based on his presence at Dr. Tibbles' deposition.

As to Plaintiffs' argument that their supplemental disclosure is timely because pretrial disclosures are not yet due under Fed. R. Civ. P. 26(a)(3), Plaintiffs ignore the Court's scheduling order related to expert disclosures and discovery. Specifically, Fed. R. Civ. P. 26(a)(3) states that pretrial disclosures must be made at least 30 days before trial, "[u]nless the court orders otherwise." Fed. R. Civ. P. 26(a) (3). Rule 26.3 of this Court's Local Rules requires that the parties make disclosures of expert witnesses, including expert reports, "before the completion of discovery in accordance with the deadlines contained in the Uniform Pretrial Scheduling Order or any other Court order." N.D.N.Y. L.R. 26.3. As discussed above, the Court set specific deadlines for disclosure of expert reports, expert depositions, and all discovery, the latest of which expired on September 18, 2020. Thus, the Court's scheduling order required Plaintiffs to provide any supplement to Dr. Tibbles' expert report

by that date. *See Engler v. MTD Prods., Inc.*, 304 F.R.D. 349, 356 (N.D.N.Y. 2015) (Hummel, M.J.) (finding that expert supplemental disclosure was untimely where it was submitted four months after the discovery deadline that was agreed to by the parties and imposed by the Court). Because it is undisputed that the signed supplemental report was not provided to Defendants until November 13, 2020, the supplemental report was not timely disclosed.

Nor is the Court convinced that Dr. Tibbles' deposition testimony constituted a disclosure in and of itself simply because Defendant Koenig and his counsel were present at the deposition. Specifically, even if Defendant Koenig was aware that Dr. Tibbles testified at her deposition that she believed that Defendant Koenig's action of signing off on "substandard care" by Defendant Suslik was itself substandard care, her supplemental report contains additional opinions beyond what was disclosed even at the deposition, namely her opinion that his performance was substandard for failing "to take prompt action in personally contacting the patient or his parents or directing others to contact the patient or his family and advise them Bryan needed to be urgently examined at an emergency department or by his family physician." (Dkt. No. 60, Attach. 11, at 2 [Tibbles Suppl. Report].) Rather, she merely testified that there were "subsequent opportunities" in which he could have remedied the care, but she did not state anything about these specific ways in which she now opines he could have remedied that care. (Dkt. No. 58, Attach. 18, at 8-9 [Tibbles Dep.].) As a result, the Court cannot reasonably find that Defendant Koenig was aware of the full content of the supplemental expert report by virtue of attending the deposition, and Plaintiffs therefore had a requirement to make a timely supplementation.

Additionally, the Court is not convinced that Dr. Tibbles' supplemental expert report is, in fact, a supplement as opposed to a new opinion. *See Engler*, 304 F.R.D. at 356 (noting that "an expert report that discloses new opinions is in no way a mere supplement to a prior report"); *Coene v. 3M Co.*, 303 F.R.D. 32, 42 (W.D.N.Y. 2014) (noting that "[t]o interpret Rule 26[e]'s supplementation provisions more broadly, particularly by permitting supplementation whenever a party seeks to bolster its expert, would wreak havoc on docket control and amount to unlimited expert opinion preparation") (internal quotation marks and citations omitted); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 06-CV-1352, 2009 WL 5873112, at *3 (D. Conn. Feb. 23, 2009) ("Plaintiff's duty to supplement its initial expert report does not arise when plaintiff seeks to bolster its earlier submission,

but rather, arises 'only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders the information previously provided in an initial report inaccurate or misleading because it was incomplete.' "). Dr. Tibbles makes clear in her deposition testimony that she did not render any opinions about Defendant Koenig's involvement in her initial expert report because she was asked to provide an opinion about the standard of care provided at Skaneateles Urgent Care on February 18, 2017, and was never asked to comment on Defendant Koenig's liability or standard of care in the report. (Dkt. No. 60, Attach. 6, at 40-41, 143-44, 150-52 [Tibbles Dep.].) If, as she readily admits, the scope of her opinion was primarily limited to the care provided by Defendant Suslik as the individual physically examining and diagnosing Plaintiff Bryan Casler-Tyrrell on February 18, 2017, it is difficult to see how the addition of opinions about whether Defendant Koenig's review of the medical chart days later violated the standard of care was because her initial expert report was "incomplete or incorrect." (Dkt. No. 60, Attach. 6, at 39 [Tibbles Dep.] [stating that her initial expert report primarily related to Defendant Suslik's in-person assessment and the choices made and care provided during the treatment visit on February 18, 2017], 1501-52 [stating that her deposition was the first time she had been asked to opine on whether Defendant Koenig's signing of the chart was below the standard of care]); *see Gyllenhammer v. American Nat'l Red Cross*, 15-CV-1143, 2018 WL 1956426, at *4-5 (N.D.N.Y. Jan. 23, 2018) (Sannes, J.) (finding that the expert's "supplemental" report contained new opinions and was actually a rebuttal report that attempted to bolster the original report rather than correct the original report or disclose newly discovered evidence); *Coene*, 303 F.R.D. at 43 (finding that the expert's second report was a new opinion rather than a supplemental opinion because it was not based on previously unknown information, but rather merely a "follow up" in light of questioning by defendant about current studies that were available at the time of her initial report, and it presented potential new causes for the plaintiff's injuries that were not posited in the original report). The Court therefore finds that Dr. Tibbles' subsequent expert report related to Defendant Koenig's liability was not properly or timely disclosed on this alternative basis.

**\*21** Plaintiffs argue that, despite the untimeliness, the Court should allow Dr. Tibbles' testimony and opinions regarding Defendant Koenig to be admitted for the purposes of both summary judgment and trial because (a) the delays and hardships imposed by the COVID-19 pandemic constitute a substantial justification for the untimely supplementation,

and (b) Defendant Koenig would not be prejudiced by its admission because he was fully aware of the supplemental opinion due to Dr. Tibbles' deposition testimony and he had the ability to question her about that supplemental opinion at that deposition. (Dkt. No. 60, at ¶¶ 6-9 [Santola Aff.].) The Court rejects both of these arguments. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26[a] or [e], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing or at a trial, unless the failure was substantially justified or is harmless.").

As to whether substantial justification for the untimeliness exists, the Court agrees with Defendant Koenig that Plaintiffs' arguments are not wholly reflective of the full landscape of the facts. Despite the fact that the Court set the extended deadline for all discovery as September 18, 2020, Plaintiffs admit they did not even attempt to have Dr. Tibbles sign the supplemental expert report until October 13, 2020, nearly a month after that deadline had passed. Plaintiffs appear to argue that the delay was due to not receiving the original or a hard copy of Dr. Tibbles' deposition transcript; however, Plaintiffs do not indicate whether they had made any previous attempt to contact Dr. Tibbles or whoever was in possession of the transcript in August or September, nor do they assert that they informed Defendants that they were having difficulty obtaining that transcript until October 7, 2020, after the discovery deadline had already passed. (Dkt. No. 60, at ¶¶12-14 [Santola Aff.].) Because there is no admissible record evidence that Plaintiffs made any attempt to obtain Dr. Tibbles' signed deposition transcript or supplemental expert report at any time before the Court-imposed discovery deadline had passed, the Court disagrees that the effects of the COVID-19 pandemic on Dr. Tibbles' schedule is, by itself, a substantial justification for not providing Dr. Tibbles' supplemental expert report to Defendants until November 13, 2020. Additionally, given that the Court had already extended the discovery deadlines twice because of the impact of the COVID-19 pandemic, Plaintiffs' asserted justification was already accounted for by the scheduling order that provided the parties an additional six months to conduct discovery. Given the clear deadline and Plaintiffs' apparent failure to actively pursue documents from its own expert (or to request a further extension from this Court), there is no basis for finding that there was any question that Plaintiffs were required to submit the supplemental expert report by the discovery deadline. *See Engler*, 304 F.R.D. at 355 ("Substantial justification means justification to a degree that could satisfy a reasonable person that parties could differ

as to whether the party was required to comply with the disclosure request.").

Additionally, contrary to Plaintiffs' argument, allowing Plaintiffs to present Dr. Tibbles' supplemental opinions about Defendant Koenig's liability would be prejudicial to Defendant Koenig. As Defendant Koenig argues, Dr. Tibbles' supplemental opinion is the only opinion that is directly related to the issue of Defendant Koenig's liability, and thus it would obviously be to his detriment to have it admitted. Although Plaintiffs argue that Defendant Koenig had a full opportunity to question Dr. Tibbles at the deposition, this argument ignores two undisputed facts. First, at the time of that deposition testimony, Dr. Tibbles had not read the transcripts for depositions of Defendant Koenig or any other relevant individual, and thus it is not clear how that impacted the questions Defendant Koenig asked her (or the answers she provided), notwithstanding any indication that Dr. Tibbles later stated to Plaintiffs that none of those depositions changed her opinions or testimony. (Dkt. No. 62, Attach. 2, at 1.) Second, as discussed above, Dr. Tibbles' supplemental expert report contains specifications about the ways in which Defendant Koenig should have acted to meet the standard of care that were not presented in her deposition testimony. Given that these specifications were not raised at the deposition, there was no way Defendant Koenig could have challenged them or questioned Dr. Tibbles about that portion of her supplemental opinion. Plaintiffs' failure to properly disclose the full and specific extent of what constitutes Dr. Tibbles' expert testimony that Plaintiffs wish to present at trial therefore prevented Defendant Koenig from having a full and fair opportunity to develop the evidence related to that testimony, including the basis of Dr. Tibbles' opinion.

**\*22** Because Plaintiffs have not shown a substantial justification and because the admission of Dr. Tibbles' supplemental expert report (and the opinions expressed therein that are beyond the scope of her original expert report) would unfairly prejudice Defendant Koenig, the Court finds that sanctions are appropriate. In determining whether preclusion of the relevant testimony is warranted, the Court has considered four factors: "(1) the explanation for failure to comply with a discovery order, (2) the importance of the new evidence, (3) the prejudice suffered by the opposing party as a result of having to meet the new evidence, and (4) the possibility of a continuance." *In re Omeprazole Patent Litig.*, 2002 WL 287785, at \*5 (S.D.N.Y. Feb. 27, 2002) (citing

*Softel Inc. v. Dragon Medical & Scientific Comm., Inc.*, 118 F.3d 955, 962 [2d Cir. 1997]).

As already discussed, Plaintiffs' explanation for failing to provide the supplemental expert report before the deadlines was insufficient due to Plaintiffs' failure to explain why they did not seek to get the signed report from Dr. Tibbles before the discovery deadline. Although the Court recognizes that this evidence is certainly important to Plaintiffs' claims against Defendant Koenig, that factor does not outweigh the prejudice to Defendant Koenig if that evidence is admitted now. Indeed, for the Court to consider this evidence as part of its summary judgment analysis would in effect foreclose Defendant Koenig an opportunity to defend against that opinion in a meaningful way, given that the supplemental report was not provided to him until after he filed his motion for summary judgment. However, to delay decision on the pending motions for summary judgment in order to allow admission of Dr. Tibbles' supplemental report would require further extensions of the discovery deadlines, additional briefing by both parties, and further delay in the ultimate resolution of this litigation (which has been pending since July 31, 2018). Although there is no conclusive evidence of bad faith on the part of Plaintiffs in their untimely provision of the supplemental report, there is also not a sufficient explanation that would justify further delaying these proceedings. The Court therefore finds that preclusion of Dr. Tibbles' opinions related to Defendant Koenig (or any other matter not disclosed in her initial expert report) as expressed in her supplemental expert report is warranted.

### C. Whether Defendant Koenig Is Entitled to Summary Judgment on the Claims Against Him

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant Koenig's memoranda of law. *See, supra,* Part I.C.1 and 3. To those reasons, the Court adds the following analysis.

Defendant Koenig argues that he is entitled to summary judgment because (1) he has established both that he did not deviate from the governing standard of care and that he was not the proximate cause of Plaintiffs' injuries, and (2) without Dr. Tibbles' supplemental opinions, Plaintiffs has not provided expert proof with which to raise a triable issue of fact as to Defendant Koenig's liability. (Dkt. No. 58, Attach. 22, at 8-15 [Def. Koenig Mem. of Law]; Dkt. No. 62, at 13-17 [Def. Koenig's Reply Mem. of Law].)

"Under New York law, the 'essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury.' " *Doane v. United States*, 369 F. Supp. 3d 422, 446 (N.D.N.Y. 2019) (Hurd, J.) (quoting *DiMitri v. Monsouri*, 302 A.D.2d 420, 421, 754 N.Y.S.2d 674 [N.Y. App. Div. 1st Dep't 2003]). When moving for summary judgment, the defendant must "make a prima facie showing that [he] 'did not depart from good and accepted medical practices or that departure did not proximately cause plaintiff's injuries.' " *Doane*, 369 F. Supp. 3d at 446 (quoting *Ducasse v. N.Y.C. Health & Hosps. Corp.*, 148 A.D.3d 434, 435 [N.Y. App. Div. 1st Dep't 2017]).

**\*23** In support of his motion, Defendant Koenig submitted a declaration from expert witness Stephen Schultz, M.D., in which Dr. Schultz opined the following: (a) Defendant Koenig complied with the standard of care by reviewing Plaintiff Bryan Casler-Tyrrell's medical chart for completeness and to make sure all labs were followed up with; (b) the review procedure followed by Defendant Koenig for his chart reviews is also consistent with the standard of care; (c) there was no information in the medical chart that would make it a breach of the standard of care for Defendant Koenig to have failed to diagnose meningitis; (d) Defendant Koenig was not required to order additional testing under the circumstances because he did not personally treat Plaintiff Bryan Casler-Tyrrell; (e) the standard of care did not require Defendant Koenig to provide additional follow-up or treatment because Defendant Suslik had already advised Plaintiffs to follow up with his primary care doctor or go to the emergency room if symptoms worsened; and (f) Defendant Koenig was not a cause of Plaintiffs' injuries because he did not treat Plaintiff Bryan Casler-Tyrrell, Plaintiff Bryan Casler-Tyrrell did not exhibit symptoms of meningitis until days after Defendant Koenig reviewed his chart, and Defendant Koenig would not have provided any different follow-up instructions to Plaintiffs than the ones that were indeed provided to Plaintiffs by Defendant Suslik. (Dkt. No. 58, Attach. 15.)

In response, Plaintiffs argue that Dr. Schultz's opinion about Defendant Koenig's review process and role (i.e., that he reviewed charts merely for completeness and billing purposes) is inconsistent with Defendant Koenig's own deposition testimony and other evidence. (Dkt. No. 60, Attach. 19, at 8-9 [Pls.' Opp'n Mem. of Law].) However, Plaintiffs' disagreement with Dr. Schultz's interpretation of the evidence he reviewed is a credibility issue. Plaintiffs

have not argued that Dr. Schultz's opinions lack foundation, merely that they disagree with his conclusion based on their own interpretation of the evidence. Nor is the Court convinced that Dr. Schultz's interpretation of the evidence is so removed from the evidence he considered as to be lacking a proper or reliable foundation such that there would be concerns about its admissibility. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 76 (S.D.N.Y. 2015) (noting that, although "[d]istrict courts are charged with acting as gatekeepers to exclude invalid and unreliable expert testimony and are given broad discretion to make such determination," they should consider only "the admissibility of expert evidence rather than its weight or credibility," because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (internal quotation marks and alterations omitted). If Plaintiffs believe Dr. Schultz's opinion is incorrect, the proper way to challenge it is through presentation of contrary expert testimony or other evidence, and cross-examination. As a result, the Court has no basis for finding that Dr. Schultz's opinion is insufficient at this stage to meet Defendant Koenig's burden to make a prima facie showing that he is not liable for Plaintiffs' injuries.

Generally, "summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." *Doane*, 369 F. Supp. 3d at 446 (quoting *DiGeronimo v. Fuchs*, 101 A.D.3d 933, 936, 957 N.Y.S.2d 167 [N.Y. App. Div. 2d Dep't 2012]). However, to rebut a defendant's prima facie showing, the plaintiff " 'must submit evidentiary facts or materials,' typically through expert testimony, and 'demonstrate the existence of a triable issue of fact.' " *Doane*, 369 F. Supp. 3d at 447 (quoting *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324, 508 N.Y.S.2d 923, 501 N.E.2d 572 [N.Y. 1986]); *see Junger v. Singh*, 393 F. Supp. 3d 313, 321 (W.D.N.Y. 2019) ("To survive summary judgment, a medical malpractice plaintiff 'must present expert testimony' and 'the expert's opinion must demonstrate the requisite nexus between the malpractice allegedly committed and the harm suffered.' ") (quoting *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 [2d Cir. 2018]).

As discussed above in Part III.B. of this Decision and Order, Dr. Tibbles' opinions contained within the supplemental expert report (which relate to Defendant Koenig in particular) will not be admitted due to Plaintiffs' failure to make a timely disclosure of those opinions. Given that this supplemental

opinion was the only expert opinion offered regarding Defendant Koenig's culpability in Plaintiff Bryan Casler-Tyrrell's injuries and that the questions involved in the claims against Defendant Koenig (i.e., whether he deviated from the standard of care in his assessment of Plaintiff Bryan Casler-Tyrrell's treatment or otherwise failed to order additional treatment or recognize that a serious infection was present) are out of the competence of a lay jury to decide without expert testimony, Plaintiffs have failed to offer necessary expert testimony rebutting Defendant Koenig's prima facie showing. *See I.M. v. United States*, 362 F. Supp. 3d 161, 190-91 (S.D.N.Y. 2019) ("It is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.") (*Sitts v. United States*, 811 F.2d 736, 741 [2d Cir. 1987]); *Foley v. United States*, 294 F. Supp. 3d 83, 96 (W.D.N.Y. 2018) (recognizing that "the medical malpractice case in which no expert testimony is required is rare").

**\*24** As a result, Plaintiffs have not created a genuine dispute of material fact, and Defendant Koenig's motion for summary judgment on the claims against him must therefore be granted.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Auburn C.H.'s motion for partial summary judgment (Dkt. No. 57) is **GRANTED**; and it is further

**ORDERED** that Defendant Koenig's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' cross-motion to admit the untimely supplemental expert report from Dr. Tibbles (Dkt. No. 60) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment against Defendant Auburn C.H. (Dkt. No. 59) is **DENIED**; and it is further

**ORDERED** that any claims for direct liability against Defendant Auburn C.H. are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiffs' claims against Defendant Koenig are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff is directed to forward a written settlement demand to defendants no later than **September 24, 2021,** and the parties are directed to thereafter engage in meaningful settlement negotiations. The parties are directed to jointly file, on or **October 22, 2021,** regarding their settlement discussions and if a settlement conference would be beneficial or a jury trial date should be scheduled.

**All Citations**

Slip Copy, 2021 WL 4243419

## Footnotes

1    Plaintiffs deny this asserted fact as to the expert reports from Dr. Tibbles and Dr. Sanders, asserting that the expert reports and/or depositions of these physicians criticize the care and treatment that Plaintiff Bryan Casler-Tyrrell received at "Auburn Community Hospital's Skaneateles Urgent Care Center." (Dkt. No. 59, Attach. 19, at ¶¶ 22-23, 26-27 [Pls.' Rule 56.1 Resp.].) However, although these expert sources do opine regarding the standard of care provided by Defendant Suslik and/or Defendant Koenig and others at Skaneateles Urgent Care, neither of these sources opines that Defendant Auburn C.H. specifically was directly involved in the actions at that Urgent Care. As discussed previously, it is undisputed that Defendants Suslik and Koenig were not employees of Defendant Auburn C.H. (in the sense that they were instead employees of Defendant EFLEMC, an independent entity with which Defendant Auburn C.H. had contracted to provide services at Skaneateles Urgent Care). Thus, the fact that these sources opined about the propriety of the care rendered at Skaneateles Urgent Care does not, in and of itself, constitute an opinion about whether Defendant Auburn C.H. was directly involved in the actions opined to be deviations from the standard of care and/or the proximate cause of Plaintiff Bryan Casler-Tyrrell's injuries. Whether Defendant Auburn C.H. is vicariously liable for the other Defendants' actions is beyond the scope of the asserted fact.

2    Defendant Auburn C.H. denies that it "operated" the Skaneateles Urgent Care. (Dkt. No. 61, Attach. 2, at ¶ 1 [Def. C.H.'s Rule 56.1 Resp.].) However, the contract cited by Plaintiffs specifically states that "WHEREAS, Hospital owns and operates a general hospital in Auburn, New York, and *operates* two Urgent Care Centers located at 303 Grant Avenue, Auburn, New York 13021, and 803 Genesee Street (Route 20), Skaneateles, New York 13152 ...." (Dkt. No. 59, Attach. 1, at 1 [emphasis added].) As a result, the evidence cited by Plaintiffs supports the asserted fact and Defendant Auburn C.H. has not provided any evidence to create a genuine dispute of material fact as to the use of the word "operates." This asserted fact is therefore deemed admitted.

3    The Court has altered the asserted fact to more accurately reflect the specific requirement in the cited contract provision. (Dkt. No. 59, Attach. 1, at 3.) This asserted fact is deemed admitted in its amended form.

4    The Court has altered the asserted fact to more accurately reflect the cited deposition testimony. (Dkt. No. 59, Attach. 8, at 69 [Iannolo Dep.].) This asserted fact is deemed admitted in its amended form.

5    The parties disagree regarding which specific pages include (or do not include) what notations about Auburn Community Hospital. However, the Court's review of the cited medical records reveals that, although a notation of the Hospital is not present on every single page of those records, it is present on every individual document (i.e., there are two pages on which neither notation is present, but those pages are part of a multiple-page document where other pages within that document contain a notation. The Court has therefore altered the asserted fact to purport with the evidence.

6    Defendant Auburn C.H. denies an unspecified portion of this fact, arguing that it is a legal conclusion and not an assertion of fact. (Dkt. No. 61, Attach. 2, at ¶ 17 [Def. Auburn C.H.'s Rule 56.1 Resp.].) However, the asserted fact is supported by the cited evidence (as Defendant Auburn C.H. itself acknowledges). (*Id.*) The Court finds that the asserted fact is indeed a fact and not merely a legal conclusion, because it indicates what Plaintiffs believed about the treatment and the information they had (or did not have) in coming to that belief. The asserted fact is therefore deemed admitted.

7    Defendant Auburn C.H. denies this asserted fact, stating only that the cited evidence does not state the exact asserted fact, but providing no contrary evidence. (Dkt. No. 61, Attach. 2, at ¶ 18 [Def. Auburn C.H.'s Rule 56.1 Resp.].) Because the asserted fact is supported by the record evidence, this fact is deemed admitted.

8    The Court has modified the remaining two asserted facts because, as argued by Defendant Auburn C.H., the cited evidence does not support the asserted fact. Specifically, the cited evidence supports that Plaintiff Julie Casler-Tyrrell had no reason to believe that the care was being provided by anyone other than Defendant Auburn C.H., but it does not support that the entire community of the county itself harbored a similar belief. As a result, the modified asserted fact is deemed admitted given that Defendant Auburn C.H. has presented no evidence to contradict the cited evidence.

9    **The Court notes that Plaintiffs submitted a separate Statement of Material Facts "in opposition to Defendant Koenig's motion for judgment and [in support of] Plaintiffs' motion permitting Plaintiffs the use of Dr. Tibbles' deposition testimony." (Dkt. No. 60, Attach. 21.) However, that separate Statement of Material Facts is not part of their response to Defendant Koenig's Statement of Material Facts (which is found at Dkt. No. 60, Attach. 20). Furthermore, Plaintiffs' cross-motion is not one for summary judgment (and therefore does not require a Statement of Material Facts). Rather, Plaintiff's separate Statement of Material Facts appears to merely assert additional material facts that Plaintiffs wish to bring to the attention of the Court. The Court has therefore omitted a recitation of these asserted facts in this Decision and Order, but will still consider them as part of its analysis (to the extent that they are based on admissible evidence) when determining whether there exists a genuine dispute of material fact.**

10   Although Plaintiffs do not dispute that Defendant Koenig's review was for these purposes, they dispute that the review was solely for these purposes and not also to determine whether the provided care was medically appropriate. (Dkt. No. 60, Attach. 20, at ¶ 29 [Pls.' Rule 56.1 Resp.].) Notably, in deposition testimony cited by Plaintiffs in support of their partial denial, Dr. Iannolo testified that Defendant Koenig "would review them for the completeness of the documentation, the appropriateness of treatment for diagnosis provided, and he would review them to see if there was any other outstanding tests that might need to be followed up on." (Dkt. No. 60, Attach. 8, at 59-60 [Iannolo Dep.].) Defendant Koenig's own deposition testimony is likewise somewhat unclear as to whether he reviewed the appropriateness of the medical care provided (and if so, to what extent). (Dkt. No. 58, Attach. 11, at 24-26, 51-52, 54, 58-60 [Koenig Dep.].) Thus, Plaintiffs have provided evidence to show that there is a genuine dispute of material fact as to precisely what assessment Defendant Koenig performed when he reviewed Plaintiff Bryan Casler-Tyrrell's patient chart.

11   Plaintiffs admit the asserted fact but deny that the chart contained the necessary documentation. (Dkt. No. 60, Attach. 20, at ¶ 33 [Pls.' Rule 56.1 Resp.].) However, the evidence cited by Plaintiffs does not support that any documentation regarding the care that actually provided was missing; rather, it reflects testimony that Defendants failed to conduct certain tests or provide additional medical care. Additionally, nothing in the cited testimony contradicts Defendant Koenig's evidence that he personally found that the chart contained the necessary documentation. This fact is therefore deemed admitted.

12   Plaintiffs deny that Dr. Tibbles' expert report does not state that Defendant Koenig deviated from the standard of care, or that her testimony at the deposition was the first time she expressed an opinion about Dr. Koenig. (Dkt. No. 60, Attach. 20, at ¶¶ 40-41 [Pls.' Rule 56.1 Resp.].) However, Plaintiffs' denial is contradicted by Dr. Tibbles' own deposition testimony, and by their subsequent admission of asserted fact no. 39. (Dkt. No. 58, Attach. 18, at 4, 6-10 [Tibbles Dep.].) These facts are all therefore deemed admitted.

13   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

14   Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

15   *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

16   *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

17     Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

18     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

19     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

20     The deadline for responsive expert disclosure for Defendant Koenig was subsequently extended to January 31, 2020, by request. (Dkt. No. 48 [Text Order filed Jan. 13, 2020].)

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 9482090
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Blanca CENTENO, Plaintiff,

v.

75 LENOX REALTY LLC/J.K.
Management Corp., Defendants.

14 CV 1916 (DLI)(LB)
|
Signed 02/01/2017

**Attorneys and Law Firms**

Rebekah R. Diller, Benjamin N. Cardozo School of Law,
Toby Golick, Cardozo Bet Tzedek Legal Services, New York,
NY, for Plaintiff.

Leon I. Behar, Leon I. Behar, P.C., New York, NY, for
Defendants.

**REPORT AND RECOMMENDATION**

LOIS BLOOM, United States Magistrate Judge

**\*1** Plaintiff, Blanca Centeno, brings this action pursuant
to Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000(e), *et seq.* ("Title VII"), the Age Discrimination in
Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621,
*et seq*, the Family and Medical Leave Act ("FMLA"), 29
U.S.C. §§ 2601, *et seq*, the Fair Labor Standards Act of 1938
("FLSA"), 29 U.S.C. § 201, *et seq*, and the New York State
Human Rights Law ("NYSHRL"), N.Y. Exex. L. § 290, *et
seq.* Plaintiff's amended complaint alleges that defendants,
75 Lenox Realty LLC ("75 Lenox") and J.K. Management
Corporation ("J.K. Management"), discriminated against her
based on her age and gender, denied her rights under the
FMLA, and retaliated against her for her complaints of
discrimination, for requesting leave under the FMLA, and
for a prior FLSA lawsuit. In addition, plaintiff alleges that
defendants breached their contract by failing to pay her her
vacation time she was owed upon her termination.

Defendants move for summary judgment on the grounds that:
J.K. Management is not a proper party; that defendants are
not covered by the applicable federal and state employment

statutes; that plaintiff's claims are precluded; and that
defendants had a legitimate, non-discriminatory, and non-
retaliatory reason for terminating Ms. Centeno's employment.
Plaintiff moves for partial summary judgment on the grounds
that J.K. Management is a proper defendant and defendants
are employers subject to the specific federal and state
employment laws relied on herein. The Honorable Dora L.
Irizzary referred the parties' motions to me for a Report and
Recommendation in accordance with 28 U.S.C § 636(b). For
the reasons set forth below, defendants' motion for summary
judgment should be granted in part and denied in part;
plaintiff's cross-motion for partial summary judgment should
likewise be granted in part and denied in part.

**BACKGROUND**[1]

**I. Factual History**

**a. J.K. Management Corporation and 75 Lenox, LLC**

**\*2** J.K. Management, which is owned by Jacob Kempler, is
a company that manages 19 residential buildings in Brooklyn,
the Bronx, and Manhattan. (Defs' 56.1 at ¶¶ 1, 5; Pl's 56.1 at
¶¶ 8, 9.) J.K. Management is located at 303 Beverley Road
in Brooklyn, New York. (See Esther Jenkelowitz Deposition
("Jenkelowitz Dep."), annexed to Diller Decl. as Exhibit
B ("Ex. B.") at 5:13-15.) ) The Jacob Kempler Family
Partnership is the principal owner of 16 of the 19 buildings
managed by J.K. Management.[2] (Pl.'s 56.1 at ¶ 12.) 75 Lenox,
LLC is the legal entity that owns an eighty-one unit apartment
building located at 75 Lenox Road in Brooklyn, New York.
(See Jenkelowitz Dep., Diller Decl., Ex. B at 12:22-13:9;
22:14-15; see also Chart No. 2, Building Ownership Chart
("Building Chart"), annexed to Diller Decl. as Exhibit C ("Ex.
C.") ) 75 Lenox is one of the 16 buildings owned by the
Jacob Kempler Family Partnership that is managed by J.K.
Management. (Id.)

Although J.K. Management is a separate legal entity from the
19 buildings it manages, including 75 Lenox, Jacob Kempler,
J.K. Management's president, owner, sole shareholder, and
director, has an ownership interest in all 19 buildings. (See
Defs' 56.1 at ¶¶ 1-2; Pl's 56.1 at ¶¶ 8-9; Defendants' Verified
Responses and Objections to Plaintiff's First Set of Document
Requests and Interrogatories ("Defs' Discovery Responses"),
annexed to Diller Decl. as Exhibit A ("Ex. A"); see also
Cooperative Offering Plans for 303 Beverly Road, 224

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed.Supp. (2017)

Case 6:20-cv-06566-FRG-MWP  Document 56-6  Filed 07/26/22  Page 31 of 88

Highland Boulevard, and 100 Ocean Parkway, annexed to Declaration of Jake Lader ("Lader Decl."), as Exhibits A, B, and C.) ) J.K. Management oversees the hiring and firing of the employees working at each building,[3] the payroll for all personnel in the buildings, the accounts for the buildings' bills, and the communications with the buildings' tenants. (Pl's 56.1 at ¶ 11.)

In 2012 and 2013, J.K. Management employed between two and three individuals to work at 75 Lenox, including Blanca Centeno and Jose Reyes. (See Spreadsheet No. 6, Full-time and Part-time Employee Lists for J.K. Management, ("2012-13 Employee Lists"), annexed to Diller Decl. as Exhibit C ("Ex. C"); see also Defs' 56.1 at ¶¶ 9-10.) ) In 2012, J.K. Management employed 16 employees, 4 full-time employees, and 12 part-time employees.[4] (See 2012-13 Employee Lists, Diller Decl., at Ex. C; see also Pl's 56.1 at ¶ 16; Defs' 56.1 at ¶ 12.) In 2013, J.K. Management employed 18 employees, including 4 full-time employees, and 14 part-time employees. (See 2012-13 Employee Lists, Diller Decl., at Ex. C; see also Pl's 56.1 at ¶ 16; Defs' 56.1 at ¶ 12.) In 2012, the total number of employees employed in buildings managed by J.K. Management totaled 61, including 35 full-time employees and 26 part-time employees. (See 2012-13 Employee Lists, Diller Decl., at Ex. C; Defs' 56.1 at ¶ 12.) In 2013, J.K. Management employed 67 employees in the buildings they managed, including 37 full-time employees and 30 part-time employees. (See 2012-13 Employee Lists, Diller Decl., at Ex. C; Defs' 56.1 at ¶ 12.)

**b. Blanca Centeno's Employment History**

**i. 1992-2011**

**\*3** Plaintiff Blanca Centeno ("Centeno") was born in 1957 and married Jose Reyes ("Reyes") in 1977. (Affidavit of Blanca Centeno ("Centeno Aff.") at ¶ 2.) In June of 1992, Reyes was hired to be the superintendent at 75 Lenox Road. (Id. at ¶ 4.) On October 15, 1992, Centeno was hired by defendants to work as a porter at 75 Lenox Road. (Defs' 56.1 at ¶ 20; Pl's 56.1 at ¶ 1.) As a porter, Centeno maintained the building's cleanliness; her responsibilities included taking out the garbage, removing snow, and sweeping and mopping the building's common areas. (Pl's 56.1 at ¶ 2; Defs' 56.1 at ¶ 21.)

Throughout her employment at 75 Lenox, Centeno was supervised by individuals employed by J.K. Management,

including property manager Jacob Schwartz. (Pl's 56. at ¶ 4.) From the beginning of plaintiff's employment until 2011, the property at 75 Lenox was "always in decent condition[.]" (See Jacob Schwartz Affidavit ("Schwartz Aff.") at ¶ 16.) From 1992 to 2011, plaintiff received an annual Christmas bonus, typically between $200 and $300. (Centeno Deposition ("Centeno Dep."), annexed to Diller Decl. as Exhibit E ("Ex. E") at 23:16-24:5.) The bonuses were discretionary and awarded based upon plaintiff's job performance. (See Ludmila Esther Jenkelowitz Affidavit ("Jenkelowitz Aff.") at ¶ 93.)

**ii. 2012-2013**

In 2012, plaintiff alleges her relationship with defendants changed after she filed a federal wage and hour lawsuit against the defendants. Subsequent to resolving the lawsuit, plaintiff did not receive a Christmas bonus, was not given leave under the Family Medical Leave Act, and was ultimately terminated from her position as a porter.

On June 8, 2012, plaintiff, who was represented by counsel, filed a prior complaint in this District against 75 Lenox Realty, LLC and Jacob Kempler alleging various wage and hour violations under the Fair Labor Standards Act and the New York Labor Law. (See Complaint, at Docket Entry No. 1, Blanca Centeno v. 75 Lenox Realty LLC, No. 12 CV 2892 (JBW)(JO); see also Confidential Settlement Agreement and General Release ("Settlement Agreement"), annexed to Behar Aff., as Exhibit F ("Ex. F.") ) In late 2012, the parties reached an agreement to settle the prior matter. In December of 2012, Centeno voluntarily dismissed the prior lawsuit and signed a general release in exchange for defendants' payment of $12,500 to plaintiff. (Defs' 56.1 at ¶ 49; Settlement Agreement, Behar Aff. at Ex. F.) In the same month that plaintiff settled the prior lawsuit, plaintiff did not receive a Christmas bonus for the first time since she had been employed by defendants.[5] (See Schwartz Aff. at ¶ 16; Jenkelowitz Aff. at ¶ 93.)

In February 2013, Jose Reyes became ill.[6] (Defs' 56.1 at ¶ 25; Centeno Dep., Diller Decl, Ex. E at 10:10-25.) During this time, Centeno and Reyes were divorced.[7] (Centeno Aff. at ¶¶ 2, 10, 36.) Plaintiff alleges that, in April of 2013, she spoke with the property manager, Jacob Schwartz, and office manager, Esther Jenkelowitz, and requested a leave of absence in order to take care of Reyes. (See Centeno

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 32 of 88

Aff. at ¶¶ 25, 26.) Plaintiff also alleges that during her conversation with Jenkelowitz she stated that she knew her rights, and that "there is a law and that [Jenkelowitz] could not fire me." (Id. at ¶ 24.) On a separate occasion, plaintiff spoke with Jenkelowitz about her position and Jenkelowitz told her "Come on, Blanca, you are not a young person. Your husband is not going to recover. Come on, you cannot handle the building. You are a woman. You cannot handle the building." (Id. at ¶ 28; Centeno Dep., Diller Decl., Ex. E at 41:7-16.) Defendants dispute the substance of plaintiff's conversation with Jenkelowitz and assert that, instead of seeking leave to care for Reyes, plaintiff asked to be fired in order to qualify for a drug program. (Schwartz Aff. at ¶ 25; Jenkelowitz Aff. at ¶¶ 27, 60.) The record is unclear as to whether plaintiff took time off from her job while Reyes was sick. (See Jenkelowitz Aff. at ¶ 33 ("during the few months that Mr. Reyes was ill, and plaintiff allegedly attended to him and missed work as a result, Plaintiff was paid in full ... even though she was unable to devote time to her job and perform her tasks."); but see Centeno Aff. at ¶ 30 (plaintiff continued to do her job and maintained the building throughout Reyes' illness) ).

*4  During this time, defendants assert that the condition of the building deteriorated as plaintiff failed to properly perform her job requirements. (See Schwartz Aff. at ¶¶ 16, 22; Jenkelowitz Aff. at ¶ 54.) In fact, defendants submit that management received many tenant complaints and that the building received a number of building code violations. (See Jenkelowitz Aff. at ¶ 54; Schwartz Aff. at ¶ 22; see also Tenant Statements, annexed to Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment ("Defs' Reply") as Exhibit B ("Ex. B.") ) Defendants allege that as plaintiff's job performance deteriorated, Schwartz warned her several times and instructed her regarding how she had to improve. (See Schwartz Aff. at ¶ 22.) Plaintiff disputes defendants' assertions and alleges that the building's violations were unrelated to cleanliness and, in support, several tenant declarations are provided attesting to the condition of the building while Centeno was employed. (See Building Registration Summary Report for 75 Lenox Road, ("Violations List"), annexed to Diller Decl. as Ex. C; see also Tenant Declarations, (ECF Nos. 64-69.) ) Plaintiff further alleges that during this time period, J.K. Management changed the locks in the building, prevented plaintiff from accessing the supplies necessary for her to do her job, and sent a man to do plaintiff's job. (Centeno Aff. at ¶ 30.)

By letter dated June 24, 2013, defendants terminated plaintiff's employment with J.K. Management at 75 Lenox. (See June 24th Termination Letter ("Termination Letter"), annexed to Behar Aff., as Exhibit E ("Ex. E.") ) The letter, written on J.K. Management letterhead and signed by Jacob Kempler, informed plaintiff that due to "the unacceptable condition of the building" her employment would be terminated on June 30, 2013. (See id.) Upon her termination, plaintiff did not receive her two weeks of annual vacation that she alleges she was owed under her oral contract with defendants. (Centeno Aff. at ¶ 11.)

### c. Centeno's New York State Division of Human Rights Complaint

Prior to her termination, and as a result of what plaintiff believed was discrimination, on June 19, 2013, plaintiff filed a Complaint with the New York State Division of Human Rights ("NYSDHR").[8] (See Defs' 56.1 at ¶ 30; NYSDHR Complaint, annexed to Behar Aff. as Exhibit D ("Ex. D.") ) The NYSDHR Complaint listed 75 Lenox Realty Corporation, LLC as the Respondent.[9] (See NYSDHR Complaint and Order, Behar Aff. at Ex. D.) The NYSDHR Complaint specifically alleged that plaintiff was terminated and "discriminated against because of her age (56 years) and sex (female)." (NYSDHR Determination and Order after Investigation ("Determination and Order"), annexed to Behar Aff. as Ex. D.) ) By Notice dated July 3, 2013, the NYSDHR informed Jacob Kempler of plaintiff's Complaint. (Defs' 56.1 at ¶ 31.)

In investigating the NYSDHR Complaint, the NYSDHR spoke with Centeno and Jenkelowitz, and reviewed various documents, including defendants' payroll records. (See Jenkelowitz Dep., Diller Decl., Ex. B at 63-65; Centeno Aff. at ¶ 35.) On December 13, 2013, the NYSDHR issued a Determination and Order dismissing plaintiff's NYSDHR Complaint in its entirety. In doing so, the NYSDHR found "NO PROBABLE CAUSE to believe that the respondent has engaged in or is engaging in the unlawful discriminatory practice complained of [by Centeno]." (See Determination and Order, Behar Aff., Ex. D (emphasis in original) ). By Dismissal and Notice of Rights mailed on February 4, 2014, the EEOC adopted the NYSDHR's findings. (Dismissal and Notice of Rights, annexed to Behar Aff. as Ex. D.)

## II. Procedural History

On March 25, 2014, plaintiff, proceeding *pro se*, filed her complaint against "75 Lenox Realty LLC c/o J.K. Management Corp" alleging employment discrimination based on her age and gender. (Complaint, ECF No. 1.) The summons and complaint were served on "75 Lenox Realty LLC c/o J.K. Management Corp." at 303 Beverly Road, Brooklyn, New York. (ECF No. 8.) Defendant 75 Lenox Realty LLC answered the complaint and in its Third Affirmative Defense stated that "75 Lenox Realty LLC c/o J.K. Management Corp." is an improper party and that "Plaintiff likely intended to plead against 75 Lenox Realty, LLC." (Answer to Original Complaint, ECF No. 6.) On August 20, 2014, plaintiff requested *pro bono* counsel. (ECF No. 26.) The Court granted plaintiff's request and on October 14, 2014, Toby Golick of the Bet Tzedek Legal Services Clinic at the Benjamin N. Cardozo School of Law, filed a notice of appearance on plaintiff's behalf. (ECF No. 28.)

**\*5** On August 31, 2015, the parties filed a Stipulation Permitting Amendment of the Complaint. (ECF No. 44.) On the same day, plaintiff filed the Amended Complaint which listed the defendants as "75 Lenox Realty, LLC/J.K. Management Corp." (ECF No. 45.) On September 21, 2015, defendant 75 Lenox Realty, LLC answered the Amended Complaint. (ECF No. 46.) In its answer, defendant 75 Lenox Realty, LLC noted that "the only proper party to this action is 75 Lenox Realty LLC" and that plaintiff improperly named "75 Realty/JK Management Corp." as defendants. Id. In its Third Affirmative Defense, defendant 75 Lenox Realty, LLC stated that "plaintiff failed to name a proper party to the Complaint as stipulated" and that plaintiff "deviated from the Stipulation ... by changing the caption of the case." Id.

The parties conducted discovery and now cross-move for summary judgment. (ECF Nos. 56-72.) The Honorable Dora L. Irizarry referred the parties' motions to me for a Report and Recommendation in accordance with 28 U.S.C § 636(b).

## STANDARD OF REVIEW

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it is one that "might affect the outcome

of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also Baker v. Home Depot, 445 F.3d 541, 543 (2d Cir. 2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

However, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

## DISCUSSION

### I. J.K. Management is a Proper Party

#### a. The Amended Complaint Properly Named J.K. Management

Defendants allege that J.K. Management is not a proper party to this action as plaintiff failed to name J.K. Management in her original complaint and plaintiff's counsel improperly added J.K. Management in the Amended Complaint. (See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs' Memorandum") at p. 6.) Specifically, defendants submit that even though the parties signed a Stipulation consenting to the filing of an Amended Complaint, plaintiff's counsel neglected to inform defendants' counsel that the Amended Complaint and the caption would change to affirmatively include J.K. Management as a separate defendant. (Id.) In support of their position, defendants attach the Stipulation, the Amended Complaint, and an e-mail exchange between counsel regarding the Amended Complaint. (See Behar Decl., Exhibit A ("Ex. A.") )

Upon my careful review of the record, I find that defendants' position is without merit.

**\*6** By e-mail dated August 20, 2015, plaintiff's counsel informed defendants' counsel that plaintiff sought to file an Amended Complaint and attached the Amended Complaint to the e-mail. (Id.) The Amended Complaint clarified and clearly presented the claims previously asserted in plaintiff's *pro se* complaint. Although the Amended Complaint changed the caption from "75 Lenox Realty LLC c/o J.K. Management Corp." to "75 Lenox Realty, LLC/J.K. Management Corp.", the body of the Amended Complaint made clear that plaintiff's claims were alleged against two defendants: 75 Lenox and J.K. Management.[10] (Amended Complaint, ECF No. 46, at ¶¶ 3, 6.)

Defendants now ask this Court to find that plaintiff misrepresented the identity of the defendants in the Amended Complaint because the caption included on the Stipulation reflected the caption from the original complaint rather than the caption from the proposed Amended Complaint. Defendants' argument cannot be credited.[11] The Stipulation properly included the caption as reflected in the original complaint as, at the time the Stipulation was filed, the Amended Complaint was not the operative pleading. However, even if the Court were to find that the caption was misleading, "the caption itself is normally not determinative of the identity of the parties." Nationwide Mut. Ins. Co. v. Kauman, 896 F. Supp. 104, 109 (E.D.N.Y. 1995) (citations omitted). In determining parties, "the court should be guided by whether a reasonably knowledgeable layperson could conclude from the circumstances, that he or she had been made a party to the lawsuit." Id. Here, the Amended Complaint, which was provided to defendants' counsel prior to his endorsement of the Stipulation, made clear that J.K. Management was added as a defendant.

Defendants' counsel may have failed to diligently review the Amended Complaint prior to signing the Stipulation. However, J.K. Management was properly named as a defendant herein. Moreover, the Court finds that J.K. Management and 75 Lenox should be considered a single-employer. (See infra Part III.) Accordingly, the Court should find that J.K. Management is a proper party to the instant lawsuit.[12]

**b. Plaintiff's Failure to Name J.K. Management in Her NYSDHR Complaint Does Not Bar Plaintiff's Title VII and ADEA Claims**

Defendants also assert that J.K. Management should be dismissed for plaintiff's failure to name J.K. Management in her Complaint with the NYSDHR and EEOC. (Defs' Memorandum at p. 7.) The Second Circuit has held that "[a] prerequisite to commencing a Title VII action against a defendant is the filing with the EEOC or authorized state agency of a complaint naming the defendant." Johnson v. Palma, 931 F.2d 203, 209 (2d Cir. 1991). Dismissal is warranted for failure to name a party as a respondent in an EEOC charge. See France v. Touro Coll., No. 14 CV 4613 (NGG) (CLP), 2016 WL 1105400, at \*4 (E.D.N.Y. Feb. 16, 2016), report and recommendation adopted sub nom., 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016). However, the Second Circuit has "taken a 'flexible stance in interpreting Title VII's procedural provisions,' so as not to frustrate Title VII's remedial goals." Johnson, 931 F.2d at 209 (quoting Egelston v. State University College at Geneseo, 535 F.2d 752, 754-55 (2d Cir. 1976) ).

**\*7** The exception to the general rule that a defendant must be named in the EEOC complaint is known as the 'identity of interest exception.' See Johnson 931 F.2d at 209-10. The Second Circuit, in analyzing the 'identity of interest exception' considers four factors:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence in the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; and 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241-42 (2d Cir. 1995) (citing Johnson, 931 F.2d at 209-10). Although defendants argue that plaintiff fails to meet the four factors, factors two, three, and four weigh heavily in plaintiff's favor. Id.

First, the interests of J.K. Management and 75 Lenox are identical. As clearly explained in J.K. Management's letter responding to Centeno's NYSDHR Complaint, "75 Lenox ... owns the apartment building" while "J.K. Management has been engaged ... to provide building management services, which includes the hiring of ... porters" and is also responsible "to ensure that the buildings are maintained in accordance with local laws and ordinances...." (J.K. Management Letter, annexed to Behar Aff. at Ex. D.) Second, J.K. Management suffered no prejudice as a result of Centeno's failure to properly name J.K. Management in the NYSDHR Complaint. Although the NYSDHR Complaint failed to explicitly name J.K. Management, the NYSDHR Complaint sufficiently identified J.K. Management to put J.K. Management on notice. (See NYSDHR Complaint, Behar Aff., at Ex. D.) The NYSDHR Complaint listed the address of 75 Lenox Realty Corporation LLC as 303 Beverly Road, Brooklyn, New York, which is the address for J.K. Management. (Id.) In addition, the NYSDHR Complaint listed the name of J.K. Management's office manager, Esther Jenkelowitz, as an individual who discriminated against Centeno.[13] (Id.) Further, defendant's letter response to plaintiff's NYSDHR Complaint was filed on behalf of both 75 Lenox Realty and J.K. Management. (See J.K. Management Letter, annexed to Behar Aff. at Ex. D.) The letter, which was written on J.K. Management letterhead, referred to J.K. Management several times and stated that "it is JK Management's contention that [Centeno's] claims are patently false." (Id.) Finally, as explained by plaintiff's counsel, J.K. Management represented to plaintiff that its relationship to plaintiff was through 75 Lenox Realty and not J.K. Management. (See Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment [corrected version] ("Pl's Memorandum") at p. 10 (citing Centeno Aff. at ¶¶ 33-34.) )

*8 As plaintiff's NYSDHR Complaint alleged that both 75 Lenox Realty and J.K. Management discriminated against her, plaintiff's claims are not barred for failing to explicitly name J.K. Management in her NYSDHR Complaint under the 'identity of interest exception'. See France, 2016 WL 1105400, at *5.

## II. Plaintiff's Claims Are Not Barred by Collateral Estoppel

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.' " Wyly v. Weiss, 697 F.3d 131,

140 (2d Cir. 2012) (quoting Taylor v. Sturgell, 553 U.S. 880, 892 (2008) ). "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984); see also 28 U.S.C. § 1738 (Judicial proceedings of any state court "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."); Colon v. Coughlin, 58 F.3d 865, 869 n.2 (2d Cir. 1995) ("We give a prior state court decision the same preclusive effect that the courts of that state would give to it.") (citations omitted). In the instant action, "[w]e apply the preclusion law of New York[.]" Evans v. Ottimo, 469 F.3d 278, 281 (2d Cir. 2006) (citing Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985) ).

"The 'fundamental notion' of the doctrine of collateral estoppel, or issue preclusion, 'is that an *issue of law or fact* actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the parties or their privies.' " Ali v. Mukasey, 529 F.3d 478, 489 (2d Cir. 2008) (quoting United States v. Alcan Aluminum Corp., 990 F.3d 711, 718-19 (2d Cir. 1993) (emphasis in original) ); see also Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, n.5 (1979) ("Under the doctrine of collateral estoppel ... the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.") Preclusive effect is afforded so long as: "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." Vargas v. City of New York, 377 F.3d 200, 205-206 (2d Cir. 2004). "The party seeking to assert preclusion bears the burden of proving identity of issue, while the adverse party bears the burden of proving the absence of a full and fair opportunity to litigate the issue." Skates v. Inc. Vill. of Freeport, No. 15 CV 136 (SJF)(AYS), 2016 WL 1459659, at *21 (E.D.N.Y. Jan. 28, 2016), report and recommendation adopted, 2016 WL 1452391 (E.D.N.Y. Apr. 12, 2016) (citing Basak v. New York State Dep't of Health, 9 F. Supp. 3d 383, 394 (S.D.N.Y. 2014) ).

Defendants assert that because the NYSDHR dismissed plaintiff's NYSDHR Complaint she is now precluded from pursuing her claims in federal court.[14] Plaintiff submits that she did not have a full and fair opportunity to litigate her claims and therefore, the NYSDHR finding of "No

Probable Cause" should not preclude the instant action. The parties do not dispute that the issues in question in plaintiff's NYSDHR Complaint are sufficiently identical for purposes of preclusion. Rather, the parties dispute whether plaintiff had a full and fair opportunity to litigate the issues in the context of the NYSDHR proceedings.

**\*9** "In the context of proceedings before the NYSDHR, the court considers the informality of the forum, whether or not there was a hearing allowing cross-examination of witnesses, access to discovery and, perhaps, most importantly, whether plaintiff was represented by counsel or appeared *pro se.*" Skates, 2016 WL 145969 at \*13 (citations omitted). Although the determination is fact intensive and no factor is dispositive of preclusion, in cases where "plaintiff proceeded *pro se* before the administrative agency, courts have refused to find a full and fair opportunity to litigate and preclusion has been denied." Id. at \*14 (citing Kosakow, 274 F.3d at 735-36; Basak, 9 F. Supp. 3d at 398-99). Defendants submit that the investigation by the NYSDHR was sufficient and cite to Benson v. North Shore-Long Isl. Jewish Health Sys., 482 F. Supp. 2d 320, 328 (E.D.N.Y. 2007), in support of their position. However, in Benson, in finding that plaintiff had a full and fair opportunity to litigate, the Court relied on the fact that plaintiff had "competent counsel representing her throughout the [NYSDHR] proceeding." Id. Here, due to the lack of a hearing and the fact that plaintiff was proceeding *pro se,* defendants' motion for summary judgment on the basis of collateral estoppel should be denied.

### III.  J.K. Management and 75 Lenox Should be Considered a Single Employer
Defendants assert that 75 Lenox does not qualify as an employer under Title VII, the ADEA, the FMLA, and the NYSHRL because it does not meet the statutory thresholds for the minimum number of employees. Plaintiff submits that J.K. Management and 75 Lenox should be considered a single employer and that their employees should be aggregated to reach the employee minimums required under the laws. The Court agrees with plaintiff.

### a. Single Employer Doctrine[15]

"To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal

acts of the other." Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000). "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise....' " Arculeo v. On-Site Sales & Marketing, LLC, 425 F.3d 193, 198 (2d Cir. 2005) (quoting Clinton's Ditch Cooperative Co. v. NLRB, 778 F.2d 132, 137 (2d Cir. 1985) ) (explaining that two separate corporations under common ownership and management may be deemed to constitute a single enterprise.) "There is well-established authority under this theory that, ... an employee, who is technically employed on the books of one entity[ ] [may] [ ] be deemed to be part of a larger 'single employer' entity." Id. (citing Cook, 69 F.3d at 1240).

The Second Circuit has adopted the following four-part test to determine whether two companies exist as a single-employer: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." Id. "[N]o one factor is determinative ... [however,] control of labor relations is the central concern." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996) (citations omitted). Although 75 Lenox and J.K. Management are separate legal entities, based upon the instant record, J.K. Management and 75 Lenox are a single-employer. All four factors weigh in favor of finding defendants as a single-employer. J.K. Management handles all of the operations and business aspects of 75 Lenox, including payroll, finances, and the running of the building. In addition, J.K. Management controls the personnel decisions, including the hiring and firing of 75 Lenox employees, and 75 Lenox employees report directly to J.K. Management. Given J.K. Management's control over 75 Lenox, as well as the many similar ownership interests of Jacob Kempler, it is clear that defendants should be considered a single employer under Second Circuit law. See e.g., Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc., No. 14 CV 5269 (ARR), 2016 WL 5092588, at \* \*15-17 (E.D.N.Y. Sept. 19, 2016); Coley v. Vannguard Urban Improvement Ass'n, Inc., No. 12 CV 5565 (PKC), 2016 WL 4179942, at \*5 (E.D.N.Y. Aug. 5, 2016); Echevarria v. Insight Med., P.C., 72 F. Supp. 3d 442, 462 (S.D.N.Y. 2014); Ghaffar v. Willoughby 99 Cent, Inc., No. 09 CV 509 (JG), 2010 WL 3420642, at \* \*2-3 (E.D.N.Y. Aug. 27, 2010).

**\*10** Defendants argue that the single-employer doctrine is only applicable to corporate structures involving a parent company and a wholly owned subsidiary. In support, defendants cite to the Seventh Circuit's decision in Papa v. Katy Industries, Inc., 166 F.3d 937 (7th Cir. 1999). However,

Case 6:20-cv-06566-FPG-MWP    Document 56-6    Filed 07/26/22    Page 37 of 88

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

although the Seventh Circuit did not find single-employer liability, defendants misconstrue Papa. In Papa, the Court explained that the purpose of the employee threshold is "to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail" Id. at 940. Notwithstanding this reasoning, Papa noted that exceptions exist, including where "an enterprise might split itself up into a number of corporations, each with fewer than the statutory minimum number of employees for the express purpose of avoiding liability under the discrimination laws."[16] Id. at 941. Papa made clear that "[t]he privilege of separate incorporation is not intended to allow enterprises to duck their statutory duties." Id. Further, courts in this Circuit have applied the single-employer doctrine in situations outside of the parent-subsidiary context. See Parker v. Columbia Pictures Industries, 204 F.3d at 331, 341-42; U.S. v. New York State Dept. of Motor Vehicles, 82 F. Supp. 2d 42, 53 (E.D.N.Y. 2000) ("The principle that animates the [single employer] doctrine is not limited to the technical relation of parent to subsidiary corporation" (citation omitted) ); see also Strohl v. Brite Adventure Ctr., Inc., No. 08 CV 259 (RML), 2009 WL 2824585, at *4 (E.D.N.Y. Aug. 28, 2009) (quoting Arcuelo, 425 F.3d at 198) ("It should be noted, however, that the cases defendants cite [ ]all concern what are essentially parent corporations and their subsidiaries, but integrated employment can just as well occur in the context of 'separate corporations under common ownership and management' "); E.E.O.C. v. Everdry Mktg. & Mgmt., Inc., No. 01 CV 6329 (CJS), 2005 WL 231056, at *6 (W.D.N.Y. Jan. 31, 2005).

The record evidence here is clear that J.K. Management and 75 Lenox should be considered a single-employer for the purposes of the discrimination laws. Defendants' motion for summary judgment on this ground should therefore be denied and plaintiff's cross-motion for summary judgment should be granted.

**b. Aggregation under the Single Employer Doctrine**

Even though the single employer doctrine applies to J.K. Management and 75 Lenox, there is still a question as to whether their employees should be aggregated for purposes of the employee thresholds set forth under Title VII, the ADEA, FMLA, and NYSHRL.

Defendants assert that the Court should not aggregate employees as the Second Circuit has never allowed aggregation to meet statutory thresholds. In Arcuelo, the Second Circuit confirmed that the Court "has as yet taken no position on whether aggregation is appropriate in either the single or joint employer context for the purposes of determining whether the Title VII threshold is met." 425 F.3d at 199. However, the Court did note that several "[d]istrict court opinions in [the] Circuit have allowed aggregation." Id. at 198 (emphasis in original) (explaining the district courts' logic that "all the employees of the constituent entities are employees of the overarching integrated entity, and all of those employees may be aggregated to determine whether [the single entity] employs" the statutory minimum.) As explained in Ayala v. Metro One Sec. Systems, Inc., "[w]here a plaintiff establishes that the single employer doctrine applies, the employees of the nominally separate entities comprising a single integrated enterprise may be aggregated to satisfy the [ ] employee requirement." No. 11 CV 233 (JG) (ALC), 2011 WL 1486559, at *8 (E.D.N.Y. Apr. 19, 2011) (citing Laurin v Pokoik, No. 02 Civ. 1938 (LMM), 2004 WL 513999, at *4 (S.D.N.Y. Mar. 15, 2004) (internal citations omitted) ).

Here, J.K. Management and 75 Lenox operate as a single entity and the Court should aggregate the number of their employees as if they are a single employer. Accordingly, defendants' motion on this issue should be denied and plaintiff's cross-motion should be granted.

**c. Employee Thresholds under Title VII, ADEA, FMLA, and NYSHRL**

Title VII, which creates a cause of action against employers that engage in discriminatory acts, defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees...." 42 U.S.C. § 200e(b).[17] The ADEA and FMLA definition is identical, except that the ADEA requires twenty or more employees, 29 U.S.C. § 630(b), while FMLA requires fifty or more employees, 29 C.F.R. § 825.104(a). Under the New York State Human Rights Law, an employer is defined as having at least four employees. N.Y. Exec. Law § 292.

 **\*11** Here, in 2012 and 2013, 75 Lenox employed between two and three individuals while J.K. Management employed between 16 and 18 employees.[18] Therefore, in aggregating the number of employees under the single-employer theory,

in 2012 and 2013, the single enterprise of 75 Lenox and J.K. Management employed between 18 and 21 employees. Accordingly, plaintiff meets the statutory minimum threshold under Title VII, ADEA,[19] and the NYSHRL and plaintiff's motion for summary judgment on this issue should be granted.

However, plaintiff cannot meet the statutory threshold under the FMLA. In order to meet the required 50 person threshold, plaintiff argues that the Court should aggregate the total number of employees employed at all 19 buildings under the J.K. Management umbrella. Plaintiff's logic is straightforward. "J.K. Management runs an integrated enterprise of LLCs and coops" and the Court should find that J.K. Management is a single-enterprise not just with 75 Lenox, but with the 18 additional buildings and LLCs. (Pl.'s Memorandum at p. 13-14.) Defendants, once again, cite to the Seventh Circuit's decision in Papa, and argue that the buildings are all separate entities and should be treated as such. (Defs' Reply at p. 6.) As explained supra in Part III(a), the corporate structure of J.K. Management and the 16 LLCs,[20] all partially owned by Jacob Kempler, cannot avoid the statutory requirements of the anti-discrimination laws. The record shows that J.K. Management handles personnel, payroll, legal concerns, building violations, and tenant issues for the 16 buildings. (See Jenkelowitz Dep., Diller Decl. at Ex. C, at 7-11.) However, on the instant record, the Court cannot find that the relationship between J.K. Management and all of the 16 buildings is one of a single-employer. The buildings are separate legal entities and the record is limited as to how each individual building is operated. Accordingly, on the instant record and in the light most favorable to the non-movant, there are disputed issues of fact as to whether J.K. Management and the 16 buildings organized as LLCs should be considered as a single-employer.[21] See e.g. Rokuson v. Century Empire Szechuan Restaurant, Inc., No. 12 CV 1615 (WFK), 2015 WL 1542350 (E.D.N.Y. Mar. 31, 2015) (finding that there are genuine disputes of material facts as to whether a single-employer relationship existed between several Chinese restaurants owned by the same corporate entity); but see Ghaffar, 2010 WL 3420642, at * *2-3 (E.D.N.Y. Aug. 27, 2010) (aggregating the employees of six separate stores under the single employer doctrine).

**\*12** Accordingly, the Court should find that plaintiff meets the statutory minimum thresholds under Title VII, the ADEA, and NYSHRL.[22] Therefore, the Court should deny defendants' motion for summary judgment and grant plaintiff's cross-motion for summary judgment finding

that defendants are subject to liability as an employer under these statutes. However, the Court should deny both plaintiff and defendants' cross-motions for summary judgment regarding whether defendants employ the requisite number of employees to qualify as an employer under the FMLA.[23]

## IV. *Prima Facie* Case of Discrimination

### a. Title VII and ADEA Standard

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006). Under the ADEA, it is "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001). The framework for establishing a *prima facie* case of discrimination under Title VII and the ADEA are the same. See Terry v. Ashcroft, 336 F.3d 128, 137–38 (2d Cir. 2003); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Roge, 257 F.3d at 168.

A plaintiff establishes a *prima facie* case of discrimination by showing that: (i) the plaintiff was a member of the protected class; (ii) plaintiff was qualified for the job; (iii) plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Terry, 336 F.3d at 137-38 (citations omitted). A plaintiff's burden to establish a *prima facie* case of discrimination is *de minimis*. See Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001); see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (plaintiff's burden "is not onerous"). If plaintiff succeeds in establishing a *prima facie* case, a presumption of discrimination arises and "the burden of production shifts to the employer 'to articulate some legitimate, non-discriminatory reason' " for the adverse employment action. Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996) ). If defendants offer such a reason, then the burden shifts back and remains with plaintiff to provide evidence that defendants' proffered reason

was pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Patterson, 375 F.3d at 221.

Under the ADEA, on summary judgment, plaintiff must present "facts, which 'taken in [her] favor, suffice to ... [show that] a triable issue [exists] as to whether [her] age was a 'but' for' cause of [her] termination.' " Delaney v. Bank of Am. Corp., 766 F.3d 163, 168 (2d Cir. 2014) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) ). "The condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employers['] *only* consideration, but rather that the adverse employment action[ ] *would not have occurred without it.*" Id. (quoting Fagan v. U.S. Carpet Installation, Inc., 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (emphasis in original) ). "For Title VII claims, 'the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, [must be] sufficient to sustain a reasonable finding that [her] dismissal was motivated at least in part by ... discrimination.' " Campbell v. N.Y. City Transit Auth., 93 F. Supp. 3d 148, 166 (E.D.N.Y. 2015), motion for relief from judgment denied, No. 11 CV 2827 (MKB), 2015 WL 7455842 (E.D.N.Y. Nov. 23, 2015), aff'd, No. 15 CV 1103, 2016 WL 6069229 (2d Cir. Oct. 17, 2016) (citing Adamczyk v. N.Y. Dep't of Corr. Servs., 474 Fed.Appx. 23, 25 (2d Cir. 2012) (additional quotations and citations omitted) ).

*13 As plaintiff is a woman who was 56 years old at the time she was fired, defendants concede that plaintiff satisfies the first and third prongs necessary to establish a *prima facie* case of discrimination. However, defendants argue that plaintiff cannot establish the second and fourth prongs of her *prima facie* case, that she was qualified for the position and that the circumstances surrounding her termination do not give rise to an inference of discrimination.

**b. Qualified Employee**

Defendants argue that plaintiff was not qualified for her position because "plaintiff has absolutely no licenses or other indications of her qualification to work as a porter." (Defs' Memorandum at p. 16.) Specifically, defendants cite to plaintiff's deposition where plaintiff states that she does not have a plumber's license or an electrician's license. (Centeno Dep., Diller Decl., Ex. E at 22:21-23:6.) Defendants' allegation that plaintiff lacked the qualifications for a job she held for over 20 years is belied by the record. Plaintiff was employed by defendants as a porter, not as a plumber or an

electrician. Although defendants do not suggest that a 'porter license' exists, it seems that defendants expect this Court to find that a porter is unqualified to maintain the cleanliness of a building without a plumbing license and/or an electrician's license. This argument has absolutely no merit.

To be considered a qualified employee, plaintiff must only show that she "possesses the basic skills necessary for performance of [the] job. Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks omitted). Courts have found that a plaintiff can show qualification for the job based on their time in the position. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001), as amended (June 6, 2001) (explaining that plaintiff, who had performed the job for seven years, was qualified). Here, as explained by Jacob Schwartz, defendants' building manager, the "[p]orter's job usually is to sweep the building, make sure the building is clean at all times, sweep the buildings maybe two times a week, [ ] mop the building, [and], make sure the garbage is out ... [i]t's general, general cleaning." (Schwartz Dep., Diller Decl., Ex. D at 19:7-21.) From 1992 to 2011, plaintiff did just that. (See id. at 23:3-25 (explaining that the building was kept in good condition until 2012); see also Schwartz Aff. at ¶ 16). Accordingly, the Court finds that plaintiff was qualified for the position.

**c. Inference of Discrimination**

Various circumstances may give rise to an inference of discrimination, including, but not limited to:

> the employer's criticism of the plaintiff's performance in [ ] degrading terms [based on the employee's protected characteristic]; or its invidious comments about others in the employee's protected group; or the more favorable treatment of [similarly situated] employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) ).

Here, Centeno alleges that Esther Jenkelowitz, defendants' office manager, told plaintiff that she was being fired because she could not handle the demands of the job due to her gender. In fact, in her deposition, Jenkelowitz testified that the demands of the job make it difficult "[f]or a woman to do." (Jekelowtiz Dep., Diller Decl., Ex. C at 60:22.) Here,

Case 6:20-cv-06566-FPG-MWP    Document 56-6    Filed 07/26/22    Page 40 of 88

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

given plaintiff's minimal burden, Centeno satisfies the fourth McDonnell Douglas element, and has established a *prima facie* case of discrimination.

### d. Legitimate, Non-Discriminatory Reason

**\*14**  The burden now shifts to the defendants to provide a legitimate, nondiscriminatory reason for Centeno's discharge. Defendants assert that they fired plaintiff because of her poor work performance, specifically, the uncleanliness of the building. Defendants allege that they warned plaintiff several times regarding the cleanliness of the building and the dereliction of her duties. "Because poor job performance constitutes a legitimate, non-discriminatory reason, Defendants have satisfied their burden[.]" E.E.O.C. v. Town of Huntington, No. 05 CV 4559 (DRH)(WDW), 2008 WL 361136, at \*7 (E.D.N.Y. Feb. 8, 2008) (citing Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001), as amended (Apr. 20, 2001) ).

### e. Pretext

The crux of this case, like most discrimination lawsuits, is whether the asserted legitimate, nondiscriminatory reason was pretext for discrimination. Construing the evidence in the light most favorable to plaintiff, the Court finds that there is a sufficient basis in the record for a trier of fact to question defendants' reason for terminating plaintiff and to find that defendants' reason was a pretext for discrimination.

In support of defendants' legitimate, nondiscriminatory reason that plaintiff was terminated due to her poor job performance, defendants cite to building code violations, tenant complaints, warnings from supervisors, and plaintiff's own testimony. However, as plaintiff points out, defendants have failed to produce any admissible evidence, other than testimony from defendants' employees, to support defendants' claim of plaintiff's poor performance. As such, defendants' motion for summary judgment should be denied as material issues of fact exist as to whether defendants' termination was based on her age and/or her gender.

First, defendants submit that 75 Lenox was issued many building code violations relating to the cleanliness of the building due to plaintiff's poor performance. (See Jenkelowitz Aff. at ¶ 54; Schwartz Aff. at ¶ 22). However, upon review of the building code violations, it appears that most, if not all, of the code violations, from January 1, 2013 to June 30, 2013, relate to the building's condition (i.e. painting, structural, and vermin) which is not the porter's responsibility. (See Violations List, Diller Decl., Ex. C). Second, defendants assert that many tenants complained about the cleanliness of the building.[24] (See Jenkelowitz Aff. at ¶ 54; Schwartz Aff. at ¶ 22; see also Tenant Statements, Defs' Reply, Ex. B.) However, defendants have only submitted unsworn inadmissible statements by several tenants,[25] while plaintiff attaches six tenant declarations sworn to under penalty of perjury that Centeno was an excellent porter who maintained the cleanliness of the building.[26] (See Tenant Declarations, (ECF Nos. 64-69) ). Third, defendants allege that they issued plaintiff warnings regarding the uncleanliness of the building. (See Schwartz Dep, Diller Decl., Ex. D at 34-36.) However, the warnings were only given orally and defendants have no record, outside of their testimony, that such warnings were given.

**\*15**  Finally, defendants claim that plaintiff's own testimony makes clear that "she was not fired because of her age or gender[.]" (Defs' Memorandum at p. 18 (emphasis in original) ). Defendants cite to the following deposition testimony:

Q: So why do you think they fired you?

A: Because they don't want me there. They want to put their people. They told me that "We want our people in the building." I asked him, "Who is your people? What are you talking about?"

Q: Who said that?

A: The administrator, Esther.

Q: Esther. Why do you think she said that or allegedly said that?

A: Because maybe she can put the people from her nationality or maybe she wants the people.

Centeno Dep., Diller Decl, Ex. E at 20:23-21:12. However, defendants fail to address plaintiff's testimony immediately preceding the portion they quote:

Q: Why do you think they fired you?

A: For many reasons. They say I am a woman. I am too old. "Come on, Blanca, you can't handle with the building." I say I have the experience, but they say no.[ ]

Case 6:20-cv-06566-FPG-MWP  Document 56-6  Filed 07/26/22  Page 41 of 88

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

Id. at 19: 13-18. It is clear from review of plaintiff's full testimony, and taking the facts in the light most favorable to the non-movant, there are material issues of fact in dispute whether the legitimate, non-discriminatory reason for plaintiff's termination was pretext for discrimination.[27]

The Court cannot resolve the question of whether the asserted legitimate, nondiscriminatory reason here was pretext for discrimination. "It is well-established that stray remarks, even if made by a decision maker, without more, do not constitute sufficient evidence to make out a case of discrimination." E.E.O.C. v. Town of Huntington, No. 05 CV 4559 (DRH), 2008 WL 361136, at *7 (E.D.N.Y. Feb. 8, 2008) (citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ). However, where other indicia of discrimination exist, "the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Danzer, 151 F.3d at 56. Here, given the record evidence that can be considered[28] and the factual disputes concerning plaintiff's termination, defendants' motion for summary judgment should be denied.

**V. Retaliation**

Defendants also move for summary judgment on plaintiff's claims for retaliation under Title VII, the ADEA, FLSA, and FMLA.

To establish a *prima facie* case of retaliation, plaintiff must show that (1) she participated in a protected activity known to the defendant; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir. 2008); Kessler v. Westchester Cnty. Dep't Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006). Retaliation claims are evaluated under the McDonnell Douglas burden-shifting framework discussed *supra* Part IV. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) ("[A] retaliation claim follows the familiar burden-shifting framework developed to evaluate allegations of disparate treatment."); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) ("The allocation of burdens of proof in retaliation cases follows the general rule enunciated by the Supreme Court in McDonnell Douglas Corp....." (citation omitted) ).

**a. Title VII/ADEA**

**\*16** Defendants argue that plaintiff cannot establish a *prima facie* case of retaliation as defendants did not become aware of plaintiff's NYSDHR Complaint until July 3, 2013, which was four days after plaintiff was terminated. (Defs' Memorandum at p. 20.) As such, defendants assert that plaintiff cannot establish that defendants were aware of her 'protected activity' prior to her termination. However, the 'protected activity' that plaintiff alleges defendants retaliated against her for was not the filing of her NYSDHR Complaint; rather, plaintiff alleges that the 'protected activity' was plaintiff's oral complaints to Jenkelowitz regarding plaintiff's rights.[29] (Pl.'s Memorandum at p. 21.) On reply, defendants dispute that any such conversation occurred and that plaintiff fails to meet her evidentiary burden. (Defs' Reply at p. 9.)

Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (citations omitted). This includes oral complaints of discrimination. See Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 463 (S.D.N.Y. 2013) (where the Court found plaintiff's oral complaints of discrimination to be activity protected under the ADEA) (citing Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990); Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014) (under Title VII, protected activity includes informal complaints regarding discriminatory conduct); see also Greathouse v. JHS Security Inc., 784 F.3d 105, 115–16 (2d Cir. 2015) (where the Second Circuit found oral complaints to a supervisor as protected activity under FLSA) ). Here, plaintiff's oral complaints to Jenkelowitz constitute protected activity.

As defendants provide no additional substantive analysis, the Court cannot find that defendants are entitled to summary judgment on plaintiff's Title VII and ADEA retaliation claims. (See Defs' Memorandum at p. 19-20.) Plaintiff has established a *prima facie* case for retaliation and that there is an issue of fact with respect to pretext.[30] Accordingly, and for the same reasons as outlined *supra* part IV, defendants' motion for summary judgment on this issue should be denied.

**b. FLSA**

The FLSA states that "it shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter[.]" 29 U.S.C. 215(a)(3); see also Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010) (explaining that the filing of the FLSA lawsuit is protected activity under the statute). An FLSA relation claim is analyzed under the same McDonnell Douglas burden shifting framework. Mullins, 626 F.3d at 53.

**\*17** Here, plaintiff sufficiently sets forth a *prima facie* case for retaliation under the FLSA. Plaintiff filed a complaint alleging claims under the FLSA, reached a settlement agreement, and now alleges that she was denied a Christmas bonus and fired because of that complaint and settlement. Due to the close proximity between the settlement, the bonus denial, and her subsequent termination, plaintiff establishes a causal link between the adverse actions and her FLSA action. Defendants assert that plaintiff's termination and their failure to provide her a Christmas bonus were not in retaliation for the lawsuit but due to plaintiff's poor work performance. However, as discussed supra Part IV, plaintiff has questioned the validity of defendants' assertions regarding plaintiff's allegedly poor work performance. In addition, plaintiff notes that Jenkelowitz specifically stated that several employees, including Mr. Kempler, Mr. Schwartz, and herself, felt that Centeno's filing of the FLSA complaint "was very wrong and [ ] was a lie."[31] (Jenkelowitz Dep., Diller Aff., Ex. B at 58:13-19.) Accordingly, at the summary judgment stage, plaintiff has met her burden to demonstrate that there is a material issue of fact in dispute regarding whether it is "more likely than not [that] discrimination was the real reason for the employer[s'] actions." See Mullins, 626 F.3d at 53-54

In addition, and separate and apart from whether plaintiff has set forth an FLSA retaliation claim, defendants assert that the General Release, signed as a part of plaintiff's settlement in her prior FLSA action, bars plaintiff's retaliation claim. The release provides that "CLAIMANT fully, finally, irrevocably, and forever release[s] and discharges COMPANY, ... from any and all claims causes of actions or complaints with CLAIMANT has or may have against COMPANY, whether asserted in this action or not." (Settlement Agreement, Behar Aff., Ex F at ¶ 2.) The Court rejects defendants' contention that the prior settlement agreement bars plaintiff's retaliation claim. The release bars claims arising out of separate, pre-existent events that could have been, but were not, raised in the FLSA action. However, the release could not bar plaintiff

from bringing claims against defendants that had not yet happened when the release was signed. Here, the retaliation alleged by plaintiff did not occur until after the settlement. Accordingly, plaintiff's retaliation claim is not barred by the release. "Construing it otherwise would risk conferring an indefinite prospective immunity on the release[.]" Info. Superhighway, Inc. v. Talk Am., Inc., 274 F. Supp. 2d 466, 471 (S.D.N.Y. 2003) (explaining that "courts have held general releases inapplicable to conduct subsequent to the execution of the release") (collecting cases) ).

### c. FMLA

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). "The Second Circuit recognizes two claims under the FMLA: (i) interference with FMLA rights, and (ii) retaliation for exercising FMLA rights." Museu v. Heart Share Human Services of New York, No. 12 CV 1851 (DLI), 2014 WL 1277006, at \*3 (E.D.N.Y. Mar. 27, 2014) (citations omitted). Here, plaintiff concedes that she was not entitled to leave under the Family Medical Leave Act as, at the time of her request, she was no longer married to Jose Reyes. (Pl.'s Memorandum at p. 23.) Therefore, plaintiff proceeds only on her FMLA retaliation claim and not on her claim for interference.

To evaluate a retaliation claim under FMLA, courts use the McDonnel Douglas burden-shifting analysis. See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). In addition, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she exercised rights protected under the FMLA; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. See Higgins v. NYP Holdings. Inc., 836 F. Supp. 182, 194–95 (S.D.N.Y. 2011) (citing Potenza, 365 F.3d at 168) (additional citations omitted) ). The first prong requires plaintiff to establish that she is an eligible employee who qualifies to take leave under the FMLA. Penberg v. Healthbridge Management, 823 F. Supp. 2d 166, 178 (E.D.N. Y 2011) (citing 29 U.S.C. § 2612(a)(1) ).

**\*18** At issue here is whether plaintiff can bring an FMLA retaliation claim where she is ineligible for leave under the FMLA. Plaintiff asserts that her retaliation claim stands as

Case 6:20-cv-06566-FPG-MWP    Document 56-6    Filed 07/26/22    Page 43 of 88

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

"the retaliation doctrine protects employees' rights to apply for FMLA relief and does not require the employee to ultimately be entitled to relief." (Pl.'s Memorandum at p. 23-24.) Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period ... (C) in order to care for the spouse ... of the employee ... if such spouse ... has a serious health condition." 26 U.S.C. 2612 (a)(1)(C). The Second Circuit has not addressed whether an employee, who is not eligible under the FMLA, can establish a claim for FMLA retaliation. In support of her contention that she can establish a claim, plaintiff cites to Pereda v. Brookdale Senior Living Cmtys., Inc., where the 11th Circuit allowed an FMLA retaliation claim to proceed where plaintiff had applied for FMLA leave prior to her eligibility under the statute. 666 F.3d 1269, 1276 (11th Cir. 2012). However, even if this Court were bound by the 11th Circuit's holding, Pereda is easily distinguished from the instant matter. In Pereda, plaintiff, who was pregnant but had yet to give birth, was terminated after she requested maternity leave under the FMLA. Id. The district court denied plaintiff's claim and found that because plaintiff had not yet given birth to her child, she was not entitled to FMLA protection at the time she requested leave. Id. The 11th Circuit, in reversing the district court's decision, held that a retaliation claim could proceed in such a scenario and referred to the predicament as a "pre-eligible request for post eligible leave." Id. Importantly, Pereda does not stand for the proposition that an ineligible employee who will never be eligible for FMLA leave may assert a claim for FMLA retaliation.[32]

The instant matter is more similar to Walker v Elmore Cnty Board of Educ., where the 11th Circuit held that "[t]here can be no doubt that the request—made by an ineligible employee for leave that would begin when she would still have been ineligible—is not protected by the FMLA."[33] 379 F.3d 1249, 1253 (11th Cir. 2004). In Walker, the Court specifically held that FMLA "does not protect an attempt to exercise a right that is not provided by FMLA[.]"[34] Id. Accordingly, and even if the statutory threshold for the number of employees required under the FMLA is met, defendants' motion for summary judgment should be granted on plaintiff's FMLA retaliation claim. Plaintiff cannot show, given the fact that she was divorced from Reyes, that she would have been eligible for leave under the FMLA. See e.g. Brown v. Omega Moulding Co., Ltd., No. 13 CV 5397 (SJF), 2014 WL 4439530, at *6, n.6 (E.D.N.Y. Sept. 9, 2014) (where the Court, in reliance on Walker, granted plaintiff leave to amend to assert allegations showing that she was an eligible employee

under the FMLA as plaintiff's retaliation claim would fail if she was an ineligible employee under the FMLA); see also Basden v. Prof'l Transp., Inc., 714 F.3d 1034, 1039 (7th Cir. 2013) (finding that the Court should not extend FMLA rights to non-eligible employees); but see McArdle v. Town of Dracut/Dracut Pub. Sch., 732 F.3d 29, 36 (1st Cir. 2013) (collecting cases) (finding that "the case law is both split and not fully developed").

Accordingly, defendants' motion for summary judgment on plaintiff's FMLA claim should be granted.

## VI. Breach of Contract

Plaintiff alleges that defendants violated her contractual rights when, at the time of her termination, defendants failed to pay plaintiff for the two weeks of paid vacation she was owed under their oral employment agreement.

Under New York law, "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." Benson, 482 F.Supp.2d at 331 (quoting Sabetay v. Sterling Drug, Inc., 69 N.Y. 2d 329, 514 N.Y.S.2d 209, 211 (1987) ). "The terms of an at-will employee's employment may be modified at any time." Id. (quoting Kempf v. Mitsui Plastics, No. 96 Civ. 1106 (HB), 1996 WL 673812, at * 6 (S.D.N.Y. Nov. 20, 1996) ). Here, plaintiff cannot dispute that she was an at-will employee; therefore, and without a written agreement, she cannot proceed on a breach of contract theory. See id.; see also Parker v. BJ's Wholesale Club, Inc., No. 13 CV 6065 (JS), 2015 WL 1247066, at *4 (E.D.N.Y. Mar. 18, 2015). Even if plaintiff were able to prove that she was not an at-will employee, plaintiff has submitted no admissible evidence to show that plaintiff was entitled to two-weeks of annual vacation and thus, defendants' motion for summary judgment should be granted on plaintiff's breach of contract claim.

## VII. Plaintiff's State Law Claims Are Barred by the Election of Remedies Doctrine

*19  Under the NYSHRL, "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction ... unless such person had filed a complaint hereunder or with any local commission on human rights." N.Y. Exec. Law § 297(9). Thus, once a plaintiff brings a claim before the NYSDHR, he may appeal only to the Supreme Court of the State of New York.[35] N.Y. Exec. Law § 298; see also York v. Ass'n of the Bar, 286 F.3d 122, 127 (2d Cir. 2002)

(under NYSHRL, claims "once brought before the NYSHDR, may not be brought again as a plenary action in another court"). The election of remedies doctrine applies even if the NYSDHR Complaint was brought *pro se*.[36] Wiercinski v. Mangia 57, Inc., No. 09 CV 4413 (ILG), 2010 WL 2681168, at *2 (E.D.N.Y. July 2, 2010) (finding election remedies applicable "even when the complainant is uncounseled and ignorant of the effects of the election of an administrative forum.").

"[C]ourts interpret the scope of claims precluded by the election of remedies broadly;" plaintiff must allege "a different set of facts" from those alleged in his NYSHDR complaint, to obtain review in this Court. Jackson v. N.Y. State Dep't of Labor, 709 F. Supp. 2d 218, 225 n.3 (S.D.N.Y. 2010); Higgins v. NYP Holdings, Inc., 836 F. Supp. 2d 182, 189 (S.D.N.Y. 2011) (noting that plaintiff's claims are barred under the election of remedies doctrine if "they are based on the same operative events he presented to the [NY]SDHR"). Here, not including retaliation, plaintiff alleges exactly the same factual claims as set forth in her NYSDHR Complaint and there "is no doubt that election of remedies bars all claims arising from the facts set forth" in plaintiff's NYSDHR complaint. Skates v. Inc. Vill. of Freeport, No. 15 CV 136 (SJF)(AYS), 2016 WL 1459659, at *21 (E.D.N.Y. Jan. 28, 2016), report and recommendation adopted, 2016 WL 1452391 (E.D.N.Y. Apr. 12, 2016). However, where plaintiff's "termination is nothing more than 'the culmination' of an employer's allegedly unlawful practice, the claim that such termination was retaliatory is nonetheless barred" by the election of remedies. Id. (quoting Ulysse v. FreshDirect, LLC, No. 14 CV 3556 (PKC), 2015 WL 5692938, at *2 (E.D.N.Y. Sept. 28, 2015) ).

***20** Accordingly, defendants' motion for summary judgment should be granted as to plaintiff's claims under the New York State Human Rights Law.

## CONCLUSION

Accordingly, it is respectfully recommended that defendants' motion for summary judgment as well as plaintiff's cross-motion for summary judgment should be granted in part and denied in part. The Court respectfully recommends that defendants' motion for summary judgment regarding plaintiff's claims for FMLA retaliation, breach of contract, and claims arising under the NYSHRL should be granted. The Court should deny defendants' motion for summary judgment and grant plaintiff's cross-motion for summary judgment on the grounds that J.K. Management is a proper party, J.K. Management and 75 Lenox are a single-employer, and that defendants qualify as an 'employer' under Title VII and the ADEA. As there are material issues of fact in dispute which require a trial, the Court should deny defendants' motion for summary judgment with respect to plaintiff's discrimination claims under Title VII and the ADEA as well as plaintiff's retaliation claims under Title VII, the ADEA, and the FLSA.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9482090

---

Footnotes

1     Upon a careful review of the record, the facts are taken from the undisputed assertions set forth in Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment Pursuant to Local Civil Rule 56.1 ("Defs' 56.1") [Docket Entry No. 56-3], the affidavit of Leon I. Behar in support of defendants' motion for summary judgment ("Behar Aff.") [Docket Entry No. 58] and the exhibits attached thereto, the additional affidavits in support of defendants' motion for summary judgment [Docket Entry Nos. 56-1, 56-2, 71], Plaintiff's Statement Pursuant to Local Civil Rule 56.1 in

Case 6:20-cv-06566-EPG-MWP   Document 56-6   Filed 07/26/22   Page 45 of 88

Centeno v. 75 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

Opposition to Defendants' Motion for Summary Judgment ("Pl's 56.1") [Docket Entry No. 60], the declaration of Rebekah Diller in Support of Plaintiff's Cross–Motion for Partial Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Diller Decl.") [Docket Entry No. 61] and the exhibits attached thereto, the additional affidavits in support of plaintiff's cross-motion for summary judgment [Docket Entry Nos. 62-69]. Unless otherwise noted, each fact is either undisputed or not contradicted by evidence in the record. As to each motion, the Court construes the facts in the light most favorable to the non-moving party. See Capobianco v. City of New York, 422 F.3d 47, 50 (2d Cir. 2005).

2    The three other buildings are housing cooperatives ("co-ops") with a different ownership structure. (Pl's 56.1 at ¶¶ 12, 13.)

3    For the three co-op buildings, the respective board of directors for each building oversees the hiring and firing of employees. (Pl's 56.1 at ¶ 13.)

4    There are slight discrepancies between the excel spreadsheets listing the employees and the New York State Wage Reports. (Compare 2012-13 Employee Lists, Diller Decl., at Ex. C with New York State Wage Reports, Diller Decl., at Exhibit G ("Ex. G") (where the employee lists range from 13 to 17 employees throughout the 2012-2013 time period). This discrepancy is likely due to personnel actions between reports. Notwithstanding these discrepancies, the parties do not dispute that J.K. Management employed 16 individuals in 2012, 4 full-time and 12 part-time. (Pl's 56.1 at ¶ 16; Defs' 56.1 at ¶ 12).

5    The parties dispute the reason that plaintiff did not receive a Christmas bonus. While plaintiff alleges that she was denied a Christmas bonus in retaliation for her FLSA lawsuit and settlement, defendants assert that she was not given a bonus because of the condition of the building as well as plaintiff's poor job performance. (Schwartz Aff. at ¶ 16; Jenkelowitz Aff. at ¶ 93.)

6    Jose Reyes died on August 4, 2013. (Defs' 56.1 at ¶ 25.)

7    It is not clear from the record when Centeno and Reyes divorced. Nor is it clear whether Centeno and Reyes were living together at the time Reyes became ill. However, it is undisputed that during the relevant time period, Centeno and Reyes were not married.

8    The NYSDHR Complaint authorized the NYSDHR to accept her Complaint on behalf of the Equal Employment Opportunity Commission ("EEOC"). (See Defs' 56.1 at ¶ 30.)

9    The NYSDHR Complaint listed the address for 75 Lenox as 303 Beverly Road, the address for J.K. Management. The NYSDHR Complaint also listed the name of J.K. Management's office manager, Esther Jenkelowitz. (Id.)

10    Plaintiff could have obviated this as an issue by listing 75 Lenox and J.K. Management instead of "75 Lenox Realty, LLC/ J.K. Management Corp." in the caption.

11    Defendants' position is disingenuous. The answer to the original pro se complaint on behalf of 75 Lenox, stated that "plaintiff likely intended to plead against 75 Lenox" and not J.K. Management. (ECF No. 6, at ¶ 6.) Thus, J.K. Management was clearly on notice that plaintiff had filed this lawsuit against it. As evidenced by defendants' arguments on summary judgment, from defendants' perspective, J.K. Management is not plaintiff's employer. However, and notwithstanding defense counsel's belief, the Amended Complaint named both 75 Lenox and J.K. Management as defendants.

12    Pursuant to Federal Rule of Civil Procedure 60(a), the Clerk of Court is directed to correct the docket sheet to reflect J.K. Management as a party in this action. If this Report and Recommendation is adopted, defendant J.K. Management shall file its answer to the Amended Complaint within 14 days.

13    Specifically, the NYSDHR Complaint lists "Ester (I don't know last name), Administrator" as the individual who discriminated against plaintiff. (See NYSDHR Complaint and Order, Behar Aff. at Ex. D.)

14    To the extent that defendants assert that plaintiff's Title VII and ADEA claims are barred by the NYSDHR decision, "defendants argument ... suffers from a fundamental misunderstanding of [28 U.S.C. § 1738], for the proceedings at issue here were not conducted by a state court, but rather by a state agency, because plaintiff never sought judicial review of the NYSDHR determination in state court." Wagner v. County of Nassau, No. 07 CV 4042 (JBF), 2009 WL

2824699, at * 7 (Aug. 28, 2009) (emphasis in original) (citing Univ of Tenn. v. Elliott, 478 U.S. 788, 796 (1986) ); see also Kosakow v. New Rochelle Radiology Assoc., P.C., 274 F.3d 706, 728 (2d Cir. 2001) (explaining that because "§ 1738 only requires that federal courts give full faith and credit to decisions of state courts, and has no application to the decisions of state administrative agencies ... [c]onsequently, unreviewed decisions of state administrative agencies will not bar a subsequent de novo trial under Title VII in federal court."); see also Astoria Fed. Sav. & Loan Ass'n. v. Solomino, 501 U.S. 104 (1991) (where the Court applied the same analysis in Elliot in finding that the ADEA "carries an implication that the federal courts should recognize no preclusion by state administrative findings with respect to age-discrimination claims.").

15    Defendants refer to the 'single employer doctrine' and the 'joint employer doctrine' as if they are one in the same. However, they are, in fact, distinct doctrines. See Arcuelo v. On-Site Sales & Marketing, LLC, 425 F.3d 193, 198 (2d Cir. 2005) (explaining that a 'single employer' relationship exists when two entities are part and parcel of a "single integrated enterprise" while "[i]n a 'joint employer' relationship, in contrast, there is no single integrated enterprise.") (quotation omitted) ). Here, the 'single employer' doctrine applies.

16    The Court in Papa also delineated two additional exceptions: the typical parent-subsidiary relationship and a scenario where a parent company actually directs the discriminatory act. Id.

17    Under Title VII and the ADEA, the employer must also be "engaged in an industry affecting commerce." 42 U.S.C. § 200e(b); 29 U.S.C. § 630(b). Commerce is defined as "trade, traffic, commerce, transportation, transmission, or communication among the several States; ...." 42 U.S.C. § 200e(g). An industry affecting commerce means "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce.... and further includes any governmental industry, business, or activity." 42 U.S.C. § 200e(h). Defendants assert that the management of 'local' residential apartment buildings does not qualify as an industry affecting commerce. However, "[t]he rental of real estate is unquestionably such an activity." Russell v. U.S., 471 U.S. 858, 862 (1985).

18    The parties refer to the employees as part-time or full-time employees; however, such distinction is not relevant; rather, courts may apply the 'payroll method' in determining employment. Walters v. Metropolitan Educational Enterprises, 519 U.S. 202, 210 (1997) ("We think that the payroll method represents the fair reading of the statutory language, which sets as the criterion the number of employees that the employer 'has' for each working day"). The record does not include and the parties do not appear to dispute the number of working days for defendants' employees. Defendants simply provide excel spreadsheets listing the employees as part-time and full-time. Accordingly, the Court treats the part-time and full-time employees as employees under the relevant statutory frameworks.

19    Defendants admit that, in 2013, 75 Lenox and J.K. Management employed at least 20 individuals combined. Therefore, based on the record, and under the ADEA, defendants meet the statutory threshold of 20 employees in 2013 but not in 2012. However, under the ADEA, the term 'employer' "means a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[ ]". 29 U.S.C. § 630(b). As the allegations alleged by plaintiff under the ADEA occurred in 2013, infra Part IV, the Court can look to 2013 or 2012 to determine whether the statutory minimum is met. Here, the statutory minimum is met as defendants admit that 75 Lenox and J.K. Management employed at least 20 individuals in 2013. See e.g. Weber v. George Cook, Ltd., 563 F. Supp. 598, 599 (S.D.N.Y. 1983) (citing Zimmerman v. North American Signal Company, 704 F.2d 347 (7th Cir. 1983) (explaining that "such an interpretation is consistent with the purposes of the statute").

20    Excluding the three co-op buildings, J.K. Management controls and operates 16 buildings/LLCs, including 75 Lenox. (See Jenkelowitz Dep., Diller Decl. at Ex. C, at 7-11.)

21    The Court excludes the co-ops from its analysis as it is unclear whether the co-ops can be considered a part of an integrated enterprise.

22    As discussed infra Part VII, defendants' motion for summary judgment regarding plaintiff's NYSHRL claims should be granted on other grounds.

23    As discussed infra Part V, defendants' motion for summary judgment regarding plaintiff's FMLA claims should be granted on other grounds.

Centeno v. 732 Lenox Realty LLC, Not Reported in Fed. Supp. (2017)

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 47 of 88

24    Defendants also allege that plaintiff admitted in her deposition that she received complaints from tenants about the cleanliness of the building. (Defs' Memorandum at p. 18 (citing Centeno Dep., Diller Decl., Ex. E at 30.) ) However, defendants mischaracterize plaintiff's deposition testimony. Although plaintiff does state that she received complaints from tenants, she further explained that the complaints related to when "[the tenants] owe[d] money to the landlord" or when "the City marshal or the clerk drop[ed] [off] letters." (Id. at 30:14-25.)

25    Defendants also attach, to their reply, a "Survey of Residents" which appears to be a spreadsheet that includes several tenants' signatures underneath the sentence: "[t]he building maintenance and cleanliness has improved since Ms. Blanca Centeno has been replaced." (See Defs' Reply, Ex B.)

26    Defendants assert that the tenant declarations provided by plaintiff are suspicious as they are unsworn and "all of [the] tenants either have or had housing court cases or private grievances against defendants, or have a *guardian ad litem* caring for them, and are therefore biased and/or not credible witnesses[.]" (Reply Affidavit in Opposition to Plaintiff's Cross-Motion and in Further Support of Defendants' Motion, ("Jenkelowitz Reply Aff.") at ¶ 27.) Defendants are incorrect in that the declarations submitted by plaintiff are sworn to under penalty of perjury, 28 U.S.C. § 1746, whereas defendants' tenant declarations are undated and unsworn. This dispute further highlights that plaintiff's discrimination and retaliation claims should be decided at trial, not on the instant motion for summary judgment. (See Jenkelowitz Reply Aff. at ¶¶ 27-45.)

27    Defendants assert that J.K. Management employs several female workers as well as individuals over the age of 40. (Defs' Memorandum at 18-19.) Defendants also assert that there are two female porters employed at buildings managed by J.K. Management. (Id. at 19.) Although these facts may be relevant to a jury's determination of whether defendant engaged in discrimination, given the totality of the record, they are not sufficient to grant defendants' motion for summary judgment.

28    Defendants' unsworn testimony cannot be considered by the Court. See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65 (2d Cir. 1999) (explaining that a "district court should disregard an unsworn letter in ruling on a summary judgment motion" but that a declaration pursuant to 28 U.S.C. § 1746 may be considered) (collecting cases).

29    To the extent that plaintiff is alleging retaliation based on her NYSDHR Complaint, defendants' motion for summary judgment should be granted as plaintiff cannot show that defendants knew of the NYSDHR Complaint prior to plaintiff's termination. (See Defs' 56.1 at ¶ 31.)

30    Plaintiff was terminated within 1-2 months of plaintiff's complaints to Jenkelowitz. As such, "plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (citations omitted); see also Cunningham v. Consol. Edison Inc., No. 03 CV 3522 (CPS), 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) ("[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line." (collecting cases) ). Although "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage ... a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other evidence ... to defeat summary judgment." Kwan v. Andalez Group, LLC, 737 F.3d 834, 847 (2d Cir. 2013) (internal citations omitted).

31    The Court notes that Jenkelowitz also testified that although people were aware of plaintiff's FLSA settlement, "nobody was angry." (Id. at 59:4-11.)

32    In fact, the 11th Circuit, in reversing the District Court's decision, concluded that the District Court cited decisions which were distinguishable, including Hills v. Wal-Mart Stores, Inc., No. 98 Civ. 23197, 2010 WL 1839268, at *7-8 (S.D. Fla. May 6, 2010), where the Court dismissed plaintiff's FMLA retaliation claim as plaintiff was not an eligible employee at the time of the request or when FMLA leave was to commence. Pereda, 666 F.3d 1269, 1276 at n.6.

33    Here, and unlike in Pereda, Centeno was ineligible for FMLA at the time of her request for leave to take care of Reyes and would not have been eligible at the time she would have taken a leave of absence from work.

34    <u>Pereda</u> did not alter the holding in <u>Walker</u>; rather, the Court answered the question specifically left open by <u>Walker</u>: "whether the FMLA protects a pre-eligibility request for post-eligibility maternity leave." <u>Pereda</u>, 666 F.3d at 1272 (citing <u>Walker</u> 379 F.3d at 1253).

35    Courts recognize "two exceptions to the election of remedies doctrine: (1) a complaint filed with the Commission or Division dismissed for administrative convenience; and (2) a complaint filed with the Commission or Division by the EEOC pursuant to the Title VII requirement that all complaints filed directly with the EEOC be referred to the local agency." <u>Alston v. Microsoft Corp.</u>, No. 08 Civ. 3547 (DC), 2009 WL 1116360, at *4 (S.D.N.Y. 2009) (citations omitted). Based on the record, neither of these exceptions apply. Plaintiff filed her complaint directly with the NYSDHR and her complaint was dismissed after an investigation.

36    Plaintiff asserts that the election of remedies doctrine only applies if plaintiff had a full and fair opportunity to litigate her claims at the NYSDHR. (<u>See</u> Pl.'s Memorandum at p. 7). In support, plaintiff cites to <u>Kosakow</u>. 274 F.3d at 706, and <u>Lloyd</u>, No. 03 Civ. 7557 (BSJ), 2004 WL 2093468 (S.D.N.Y. Sept 17, 2004). However, in both cases, the courts did not address election of remedies; rather, they addressed whether collateral estoppel precluded plaintiff from litigating in federal court. <u>See</u> <u>DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.</u>, 11 F. Supp. 3d 387, 392, n.3 (E.D.N.Y. 2014) (where the Court rejected plaintiff's reliance on <u>Kosakow</u> and <u>Lloyd</u> by explaining that the cases dealt with collateral estoppel and did not hold that an exception to the election of remedies exists based upon whether plaintiff had a full and fair opportunity to litigate her claims). The election of remedies doctrine is distinct from collateral estoppel as the determination of whether plaintiff's claims are barred due to the election of remedies turns solely on the filing of the administrative complaint and not whether plaintiff had a full and fair opportunity to litigate. <u>See</u> e.g. <u>Wiercinski</u>, 2010 WL 278116, at *3 (where the Court analyzed the preclusion doctrine and election of remedies separately).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3932354
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Deborah **KAMROWSKI**, Plaintiff,
v.
**MORRISON** MANAGEMENT
**SPECIALIST**, Defendant.

No.
**05**
–CV–
**9234**
(KMK).
|
**Sept. 29, 2010.**

West KeySummary

1    **Civil Rights** ⬤━ Motive or intent; pretext
     **Civil Rights** ⬤━ Sex discrimination

Employee was not discriminated against by
employer based on gender when it terminated
her and therefore employer was not liable under
Title VII. Employee claimed that her supervisor,
who was responsible for her termination, evinced
bias against women because he referred to two
female employees as "fat ass" and "dumb as a
door knob." However, while the comments used
to refer to the employees were rude, they were
gender-neutral and did not show a disdain for the
individuals based on their gender. Furthermore,
the supervisor was the same person that hired the
employee, making it unlikely that he would fire
her based on gender. Civil Rights Act of 1964, §
701, 42 U.S.C.A. § 2000e et seq.

14 Cases that cite this headnote

**Attorneys and Law Firms**

Deborah **Kamrowski**, Florida, NY, pro se.

Andrew Paul Marks, Esq., Littler Mendelson, P.C., New York,
NY, for Defendant.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiff Deborah **Kamrowski**, proceeding pro se, brings
this action against her former employer, Defendant **Morrison**
Management Specialist ("**Morrison** or Defendant"), alleging
discrimination and retaliation in violation of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
("Title VII"), and discrimination in violation of the Americans
with Disabilities Act, 42 U.S.C. § 12112 *et seq.* ("ADA").[1]
Defendant moves for summary judgment on all of Plaintiff's
claims. For the reasons set forth below, Defendant's motion
is granted.

*I. Background*

   *A. Factual Background*
Plaintiff is a white female who suffers from dyslexia and
attention deficit disorder. Defendant is a "provide[r of] food,
nutrition[,] and dining services to the health and hospitals
industry." (Def.'s Local Rule 56.1 Statement of Undisputed
Facts ("Def.'s 56.1 Stmt.") ¶ 1.)[2] Catskills Regional Medical
Center ("CRMC"), a hospital and nursing facility in Sullivan,
New York, is one of Defendant's clients. (Def.'s 56.1 Stmt.
¶ 2.) Plaintiff was employed by Defendant as a Clinical
Nutrition Manager at CRMC from November 2002 until
she was terminated in November 2003. (Affirmation/Aff. of
Deborah **Kamrowski**, Pl.'s Statement of Undisputed Facts
("Pl.'s Stmt.") ¶ 137; Def.'s 56.1 Stmt. ¶ 5.)[3] Plaintiff's
direct supervisor during her employment was Brad Chandler,
Defendant's Director of Food and Nutrition. (Def.'s 56.1 Stmt.
¶ 7.) Sherri Reynolds was an employee of CRMC, who served
as Mr. Chandler's administrative assistant. (*Id.* ¶ 10.) Matt
Shoemaker was **Morrison's** Assistant Director of Food and
Nutrition (*Id.* ¶ 8), and Jeanne Hanslmaier was the Production
Manager, (*Id.* ¶ 9). Kim Kelly and Carol Parkerson were
supervisors in **Morrison's** Food Services Department, and
Rob Finelli and Pam Garnett served as Regional Managers.
(Aff. of Brad Chandler ("Chandler Aff.") ¶ 6.) Barbara Lutz
was a die titian with many years of experience at CRMC. (Aff.
of Barbara Pritchard nee Lutz ("Lutz Aff.") ¶ 1.)[4]

### 1. Alleged Retaliation

Plaintiff alleges that she was retaliated against for reporting "mismanagement" because she reported numerous food and sanitation concerns to management. For example, Plaintiff claims that she was retaliated against for reporting that Defendant was not "using the recipe" for "classic purees" (Pl.'s Stmt. 1227), experiencing a "food shortage" (*id.* ¶¶ 243–45), keeping food "as old as two weeks" in the walk-in fridge (*Id.* ¶ 240), and serving old food to patients, (*id.;* Affirmation/Aff. of Gladys Reeves ("Reeves Aff.") ¶¶ 10, 27). Plaintiff also alleges that she reported such incidents as serving "macaroni [and] cheese because it [did not] smell bad regardless of being [two] weeks old" (Pl.'s Stmt. ¶ 322), "[u]sing the steam table to hold the food [for] three hours" (*Id.* ¶ 324), and finding a "hair that is normally found on a mop in an egg salad sandwich," a "[l]ive roach on a dome lid," and a "[f]inger nail in the rice," (*Id.* ¶ 325). Plaintiff also alleges that on one occasion, a "dented can of peaches was opened and placed" at another employee's work station, and that "the peaches were left for him to use and that he [would] probably be terminated." (*Id.* ¶ 7, 97–98.) Plaintiff was concerned that the peaches were "dripping with syrup that had leaked out" and that "[t]here is no antidote for botulism," so she called infection control. (*Id.* ¶ 199; Tr. of Pl.'s Dep. ("Tr.") 219.)[5] However, Plaintiff admits that the peaches were thrown out and that no patient ever became ill, and that she did not know if the peaches actually had botulism. (Tr. 219.)[6]

**\*2** Plaintiff also alleges that she was retaliated against for "living the anti-discrimination laws" and "following the anti-discrimination laws." (Pl.'s Stmt. ¶ 172.) Plaintiff alleges that "the first evidence of unfair treatment" was when she "witnessed" an African American employee's flu, but the employee was suspended for being absent even though she was ill. (*Id.* ¶ 175; Tr. 197.) Plaintiff does not allege that she told Mr. Chandler or any other supervisor that this suspension was racially motivated, stating in her deposition that she felt that the employee was suspended for "no reason" because she had the flu. (Tr. 197–98.) Similarly, Plaintiff alleges that another African American employee was suspended for being absent when "[m]anagement was aware" that she went to a funeral, without alleging that Plaintiff reported any racial discrimination related to the suspension. (Pl.'s Stmt. ¶ 174; Tr. 197–98.)

Plaintiff further alleges that she told Mr. Chandler that Ms. Hanslmaier did not "like black people" because Plaintiff had been told this by other people. (Tr. 410; Pl.'s Stmt. ¶ 166.)

Plaintiff could not specify when she informed Mr. Chandler that Ms. Hanslmaier did not like African Americans, stating that it occurred "anywhere from March." (Tr. 409.) At that time, Plaintiff told Mr. Chandler about an incident involving Wendy McDonald, an African American employee, who became upset when a kitchen worker splashed water in her face. (*Id.* at 410–11; Pl.'s Stmt. ¶ 181 .)[7] Plaintiff also alleges that, in March 2003, she told Mr. Chandler that another supervisor had informed her that the supervisor had been told by another employee that a kitchen worker, who was an employee of CRMC, called another kitchen worker (who was also a CRMC employee) a Spanish word that translated to "little nigger." (Tr. 383–86.) Plaintiff also lists several other incidents that she believes involved racial discrimination, such as African Americans getting poor schedules or Ms. Hanslmaier throwing coffee at an African American employee, but she does not allege that she reported any of these incidents to Mr. Chandler or to other supervisors. (Pl .'s Stmt. ¶¶ 177–78, 191–96.) Mr. Chandler did not take any disciplinary action against Plaintiff in March 2003, when she allegedly reported the kitchen worker incident. (Tr. 391.)

### 2. Conflicts Between Plaintiff and Coworkers and Supervisors

The Parties agree that there was conflict between Plaintiff and some of her co-workers and supervisors, but they disagree as to who was at fault. Plaintiff alleges that she was frequently treated uncivilly both by her managers and her co-workers. Plaintiff complains that fellow employees "spoke rudely about [her] all the time." (Pl.'s Stmt. ¶ 66.) In particular, Plaintiff felt that Ms. Hanslmaier treated her poorly. According to Plaintiff, Ms. Hanslmaier gossiped about Plaintiff (*id.* ¶¶ 157, 161), told Mr. Chandler that Plaintiff was "[c]rass" (Am. Compl. Ex. 24, at 2), and harassed Plaintiff by throwing papers, an empty container, and other things at her, (Pl.'s Stmt. ¶ 381; Am. Compl. Ex. 24, at 6). She alleges that other co-workers cursed at her (Pl.'s Stmt. ¶¶ 287, 321), and that one employee left "[h]and cream on [her] chair four times," (*id.* ¶ 380).

**\*3** Defendant concedes that "[i]t is undeniable that Plaintiff did not get along with her supervisors and many of her co-workers" (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 1), contending that Plaintiff "criticized everyone around her," frequently accusing her co-workers of assorted forms of misconduct, (*id.* 6). Defendant has submitted affidavits of Ms. Hanslmaier, Ms. Pritchard, and Stacey Hollenbeck, three individuals employed at CRMC

at the same time as Plaintiff, who stated that Plaintiff was "very polarizing" (Lutz Aff. ¶ 4), and that Plaintiff generated conflicts at work and "meddled in other employees' business," (Aff. of Jeanne Hanslmaier ("Hanslmaier Aff.") ¶ 5; Aff. of Stacey Hollenbeck ("Hollenbeck Aff.") ¶ 2).

Plaintiff also complains of uncivil behavior by Mr. Chandler, her supervisor. The evidence shows that Mr. Chandler did, on occasion, use inappropriate language (Decl. of Denise Swedish ("Swedish Aff.") ¶ 7; id. Ex. C), and Plaintiff alleges that he did so in her presence. For example, Plaintiff claims that Mr. Chandler also, at least on one occasion, "stated [she] was gross" because she had sores on her legs from her psoriasis. (Am.Compl.Supp.4.) Defendant agrees that Mr. Chandler and Plaintiff had a difficult time communicating with one another "from the outset of her employment" (Chandler Aff. ¶ 7), but Defendant faults Plaintiff for "undermin[ing][Mr.] Chandler by complaining publicly about his job performance and attributing all deficiencies to his management," (Lutz Aff. ¶ 5).

### 3. Disciplinary Action
On June 27, 2003, Mr. Chandler issued a warning letter to Plaintiff informing her of management's concerns about her performance. (Chandler Aff. Ex. G, at 1.) The letter addressed, among other things, management's perception that Plaintiff "exacerbate[d]" confrontations with subordinates, reported complaints about "unit concerns that are by nature handled within the unit" to managers outside the unit, communicated with employees about grievances with their managers, and conversed with employees about unsubstantiated rumors. (Id. at 1–2.) In addition, the letter expressed concern that Plaintiff was not completing her work and instructed Plaintiff to create a schedule to allow her to "catch-up on both patient care duties and [a] management ... [p]rogram." (Id. at 2 (internal quotation marks omitted).) The warning letter instructed Plaintiff to attend a one-day seminar entitled "[h]ow to handle people with Tact and Skill" by August 2003. (Id.) Mr. Chandler discussed the warning letter with Plaintiff and advised her that she must show satisfactory improvement or employment action would be taken. (Id. at 3.)

On **September** 4, 2003, Mr. Chandler e-mailed Denise Swedish, Defendant's Field Human Resources Manager, to discuss his concerns about Plaintiff's lack of improvement and his intention to issue her a final warning. (Chandler Aff. ¶ 13.) As part of the **September** 4, 2003 e-mail, Mr. Chandler sent Ms. Swedish a draft of "a final 30 days letter to be issued to" Plaintiff, asking Ms. Swedish to "advise [him] on content

and procedure." (Id. Ex. H.) On **September** 8, 2003, Ms. Swedish provided Mr. Chandler with edits to the thirty-day warning letter and suggestions for reviewing the letter with Plaintiff, including going "through the final warning" with her, describing what needs improvement, and explaining that "[i]f expectations are not met in 30 days, termination will result." (Id.)

**\*4** On **September**, 26, 2003, after several consultations with Ms. Swedish, Mr. Chandler notified Plaintiff by letter that she was being offered "a final 30–day opportunity to become a positive, working member of the management team." (Id. Ex. I, at 1.) The letter stated that Plaintiff's performance would be monitored for thirty days, and that if she had not improved by October 27, 2003, further disciplinary action, including termination, could result. (Id.)

### 4. Plaintiff's Allegations of Sexual Harassment
In July 2003, soon after Mr. Chandler's initial warning to Plaintiff, Plaintiff reported to Rob Finelli, Defendant's Regional Director of Operations, that Mr. Shoemaker, the Assistant Director of Food and Nutrition Services, had engaged in sexually harassing conduct. (Affirmation/Aff of Pl. ("Pl.'s Aff.") 1–2; Pl.'s Stmt. ¶ 354.) Plaintiff allegedly learned of Mr. Shoemaker's conduct from Corrina Banks, a hospital employee, and from Ms. Reeves. (PL's Stmt. ¶¶ 338–40; Reeves Aff. ¶ 25.) According to Plaintiff, Ms. Reeves notified her that she had overheard Ms. Hanslmaier and Mr. Shoemaker discussing "cucumber sex" and that she or another employee witnessed Ms. Hanslmaier "swipe[ ] a piece of paper up between his legs." (PL's Stmt. ¶ 352.) Ms. Banks told Plaintiff that on another occasion, Mr. Shoemaker told Ms. Banks that she "could get on the table and be the dessert." (PL's Resps. and Opp'n for Mot. of Summ. J. ("Pl.'s Ex.") Ex. E, at unnumbered page 72.)[8] Plaintiff never actually witnessed any of Mr. Shoemaker's inappropriate comments or actions (Tr. 149), but she felt that the repeated reports of Mr. Shoemaker's conduct began to "interfer[e] with [her] ability to get [her] work done," (PL's Stmt. 1354).

After Plaintiff reported Mr. Shoemaker's conduct to Mr. Finelli, she alleges that he "ignore[d]" the harassment, "hid[ ] ... [Mr.] Shoemaker's prior inappropriate sexual behavior," and "[wrote her] up for reporting" the harassment. (Id. ¶ 123.) Plaintiff has presented no evidence to support her claim that she was written up for reporting the harassment, but Ms. Reeves, in a sworn affidavit, stated that Mr. Finelli "coerced [P]laintiff twice to keep quiet about the

Kamrowski v. Morrison Management Specialist, Not Reported in F.Supp.2d (2010)

sexual harassment," though neither Ms. Reeves nor Plaintiff provided specifics about this claim. (Reeves Aff. ¶ 24.)

On **September** 22, 2003, after Mr. Chandler and Ms. Swedish decided to issue a final 30–day warning but prior to the issuance of the letter to Plaintiff, Plaintiff contacted Diane Toomey, Defendant's Human Resources Administrator, and complained about unspecified harassment in the workplace. (Swedish Aff. ¶ 3; *id.* Ex. A.) On **September** 23, 2003, Plaintiff contacted Ms. Swedish and complained that Mr. Chandler's June 2003 warning was harassment because it was preventing her from doing her job. (*Id.* ¶ 4.) A few days later, on **September** 25, 2003, Plaintiff submitted a written complaint to Ms. Swedish regarding alleged harassment by Mr. Chandler and Mr. Shoemaker. (*Id.* ¶ 5; *id.* Ex. B.) Plaintiff does not claim that Mr. Chandler sexually harassed her; indeed, Plaintiff stated in her deposition that she "didn't say [Chandler] was [a] sexual harass[er]," but "said he was a harasser ." (Tr. 151.) However, Plaintiff accuses Mr. Chandler of referring to female employees in "derogatory" terms (Am. Compl. Ex. 24, at 5), calling two of her co-workers "fat ass" (Pl.'s Stmt. ¶ 289), and "dumb as a door knob," (*Id.* ¶ 302).

### 5. Other Gender–Based Discrimination Claims

**\*5** Plaintiff also complains that she was discriminated against by Mr. Chandler based on her gender because he withheld information regarding career development programs from her, ostensibly because he did not want women to advance in the workplace. (Tr. 115–18, 133–35.) Plaintiff admits, however, that the only person whom Mr. Chandler allegedly informed of these programs was Ms. Hanslmaier, a female employee. (*Id.* at 117–18.)

Plaintiff also alleges that she was not promoted based on her gender. Though Plaintiff advised Mr. Chandler in March 2003 of her interest in a promotion to Assistant Director, the position was not vacant at the time, as the then-current Assistant Director was only out on a leave of absence. (*Id.* at 133–34.) A new individual was not placed in that position because the Assistant Director returned from his leave of absence. (*Id.* at 135.) Subsequently, Plaintiff did not request a promotion to a specific available position. (*Id.*)

Plaintiff claims that other female employees were not promoted. (Pl.'s Stmt. ¶ 89; Reeves Aff. ¶ 24.) She contends that she heard from other employees that Mr. Chandler stated that he "wanted a man for the position." (Pl.'s Stmt. ¶ 292.)

Plaintiff has produced no direct evidence to support this claim.

### 6. Plaintiff's Dyslexia and Attention Deficit Disorder

Plaintiff has dyslexia and attention deficit disorder. Plaintiff claims that she notified Mr. Chandler of her dyslexia on at least two or three occasions during her employment, including as far back as November 2002. (Tr. 87–90.) However, the record reveals that Plaintiff's physician, Dr. John Lucas, notified Defendant on October 14, 2003 (after Plaintiff had been issued the final 30–day warning letter) that she "suffer[ed] from a developmental reading disability and requires additional time for reading and writing assignments." (Swedish Aff. Ex. E.) Plaintiff notified Ms. Swedish and Mr. Chandler on November 3, 2003 that "the only accommodation" [she] need[ed][wa]s to have important information proof read ...." (*Id.* Ex. F; Am. Compl. Ex. 20, at 9.) In her deposition, Plaintiff repeated her assertion that the only accommodation she required because of her learning disabilities was help with typing and proofreading. (Tr. 96.) Plaintiff claims her request for an accommodation in the form of assistance from a co-worker was denied. (Pl.'s Stmt. ¶ 416.)

### 7. Termination and Investigation into Plaintiff's Complaints

Thirty-days following the issuance of the **September** 26, 2003 final warning, on October 27, 2003, Plaintiff was suspended pending an investigation to determine whether her performance had improved. (Chandler Aff. ¶ 16.) In Mr. Chandler's view, "[i]t had not" because Plaintiff "followed the wrong chain-of-command, challenged management decisions publicly, focused on concerns outside the scope of her position, failed to complete assignments in a timely manner[,] and was unable to get along with or work harmoniously with co-workers and members of management." (*Id.*) "For these reasons, [her] employment ... was terminated effective November 14, 2003." (*Id.*)

**\*6** Ms. Swedish notified Plaintiff on December 8, 2003 of the outcome of her investigation into Plaintiff's **September** 26, 2003 complaint of harassment. Ms. Swedish concluded that Mr. Shoemaker had made inappropriate gestures and comments in the workplace, and, as a result, he was terminated. (Swedish Aff. ¶ 7.) Ms. Swedish determined that Mr. Chandler had not engaged in any discriminatory or harassing activity, but found that he had failed to appropriately address employee relation concerns and used inappropriate language in the workplace. (*Id.*) Based on Ms.

Swedish's findings, Defendant issued Mr. Chandler a written warning, stating that he should follow up on conflicts between employees and maintain professionalism in the workplace. (*Id.; id.* Ex. C.) Ms. Swedish notified Plaintiff that she found no evidence to support Plaintiff's allegations that she had been harassed or discriminated against by Mr. Chandler, or that she was retaliated against. (*id.* ¶¶ 7–8; *id.* Ex. D.)

Subsequently, on December 17, 2003, Plaintiff wrote to Tony Leggio, an employee of Defendant, renewing her grievances regarding her employment and termination. (Am.Compl.Ex.6.) Plaintiff's letter prompted a further review of Plaintiff s employment and termination by Glenn Davenport, Defendant's President. (*Id.*) Following his review, Mr. Davenport notified Plaintiff on January 12, 2004 that Defendant was fully closing all investigations prompted by Plaintiff's complaints about her employment and termination. (*Id.*)

### B. Procedural Background

Plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR") on January 22, 2004, charging Defendant with retaliation and unlawful discrimination based on her gender and her disability under the ADA, Title VII, and the New York State Human Rights Law. (Affirmation of Andrew P. Marks ("Marks Aff") Ex. D.) On March 29, 2005, after an investigation, the SDHR concluded that there was no probable cause "to support the allegations of the complaint." (*Id.* Ex. E, at unnumbered page 4.) On September 6, 2005, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the SDHR with respect to the ADA and Title VII claims and closed Plaintiff's case. (*Id.* Ex. F.)

Plaintiff, proceeding pro se, filed an initial complaint in this case on October 31, 2005, and an Amended Complaint on November 28, 2005. This case was originally assigned to the Honorable Colleen McMahon, and was transferred to this Court on August 6, 2007.

### II. Discussion

#### A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett, All* U.S.

317, 322–23 (1986). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,* 432 F.3d 428, 433 (2d Cir.2005).

**\*7** "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.' " *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994)). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.; see also Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.... [T]rial courts should not treat discrimination differently from other ultimate questions of fact." (internal citation and quotation marks omitted)).

Finally, the Court is mindful that "[t]he submissions of a pro se party should be held to less stringent standards than formal pleadings drafted by lawyers." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F.Supp.2d 567, 577 (**S.D.N.Y.**2008) (internal quotation marks omitted); *see also Salahuddin v. Coughlin*, 999 F.Supp. 526, 535 (S.D.N.Y.1998). Therefore, courts must read a pro se litigant's submissions liberally, interpreting them "to raise the strongest arguments that they suggest." *Graham,* 89 F.3d at 79 (internal quotation marks omitted). This does not, however, "relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (internal quotation marks omitted); *see also Monterroso,* 591 F.Supp.2d at 577 (noting that "proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment" (internal quotation marks omitted)).

### B. ADA Claims

**\*8** Plaintiff claims that she is disabled within the meaning of the ADA in that she is dyslexic and suffers from attention deficit disorder. She claims that Defendant discriminated against her on this basis and failed to accommodate her needs. Defendant seeks summary judgment dismissing the ADA claims on the grounds that Plaintiff is not disabled within the meaning of the ADA. (Def.'s Mem. 19.)

For purposes of the ADA, disability with respect to an individual means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or © being regarded as having such an impairment." 42 U.S.C. § 12102(2). Defendant does not dispute that Plaintiff s learning disability constitutes an "impairment" under the ADA. Indeed, this is the position of the EEOC, to which the Court defers. *See* 29 C.F.R. § 1630.2(h) (defining mental impairment as including "learning disabilities"); *see generally Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001) ("Because the [EEOC] is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms."). Rather, Defendant argues that Plaintiff has not produced evidence suggesting that the nature of her dyslexia and attention deficit disorder "substantially limits one or more ... major life activities," as required by the ADA. 42 U.S.C. § 12102(2)(A).

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v.*

*Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).[9] A plaintiff must "also ... demonstrate that the impairment [substantially] limits a major life activity," *id.,* which means that the impairment either leaves the person " 'unable to perform a major life activity that the average person in the general population can perform,' " or " 'significantly restrict[s] ... the condition, manner or duration under which [she] can perform a particular major life activity,' " *id.* (quoting 29 C.F.R. § 1630.2(j) (internal brackets omitted)). Major life activities generally are "those activities that are of central importance to daily life," *id.* at 197, such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," *Bragdon v. Abbott,* 524 U.S. 624, 638–39, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (internal quotation marks omitted); *see also* 45 C.F.R. § 84.3(j)(2)(ii). The Second Circuit also has held that "reading" constitutes a major life activity. *See Bartlett v. N.Y. State Bd. of Law Exam'rs,* 226 F.3d 69, 80 (2d Cir.2000). To determine whether an individual has shown "a significant restriction" to a major life activity, courts "should focus on the effect of that impairment on plaintiff's life." *Bartlett v. N.Y. StateBd. of Law Exam'rs,* No. 93–CV–4986, 2001 **WL** 930792, at \*30 (**S.D.N.Y.** Aug.15, 2001) (*"Bartlett II"* ) (internal citations, quotation marks, and brackets omitted). Courts may take into account "the mitigating measures [a] plaintiff uses that affect her ability to" participate in the major life activity. *Id.,* 2001 **WL** 930792, at \*35.

**\*9** Here, Plaintiff has failed to raise a genuine issue of material fact regarding whether her dyslexia or attention deficit disorder substantially impaired a major life activity, including both her abilities to read and work. The evidence is undisputed that Plaintiff's dyslexia and attention deficit disorder require that she receive "additional time for reading and writing assignments" (Swedish Aff. Ex. E), as well as assistance with typing and proofreading, (Tr. 96). Yet, "[c]ompleting work at a slower pace due to dyslexia does not ordinarily qualify as a disability under the ADA." *Teachout v. N.Y.C. Dep't of Educ.,* No. 04–CV–945, 2006 **WL** 452022, at \*5 (**S.D.N.Y.** Feb. 22, 2006) (holding that the evidence in the record did not support a conclusion that plaintiff's dyslexia substantially limited a major life activity, despite evidence that because of his dyslexia, the plaintiff needed more time to complete tasks, became "stressed out" easily, and made spelling mistakes that "necessitate[d] double-checking"); *see also Stubbs v. Regents of Univ. of Cal.,* No. **CIV.** S–06–1, 2007 **WL** 1532148, at \*9 (E.D.Cal. May 25, 2007) (finding that the plaintiff's dyslexia did not substantially limit his ability to read when he "admitted that

he could read the newspaper"); *Montgomery v. Chertoff,* No. 03–CV–5387, 2007 **WL** 1233551, at *9 (E.D.N.Y. Apr.25, 2007) (finding that the plaintiff's attention deficit hyperactivity disorder did not substantially limit her ability to write despite her assertions that she had a "hard time communicating and [wa]s slower at writing and learning new things than others"); *Frank v. Plaza Constr. Corp.,* 186 F.Supp.2d 420, 434–35 (S.D.N.Y.2002) (holding that the evidence was insufficient to demonstrate a substantial limitation on a major life activity where the plaintiff presented evidence that her dyslexia created difficulties with reading and writing, which made her perform tasks slowly). Evidence of more significant burdens on a person's ability to read could constitute a substantial limitation on a major life activity. *See, e.g., Bartlett II,* 2001 **WL** 930792, at *35 (finding that the plaintiff was substantially limited in her ability to read where she required significant "coping strategies [to] assist her with reading," including "using her fingers or a card to move from line to line, using an index card with a hole cut out when reading more difficult text, re-reading text multiple times, subvocalizing (*i.e.,* sounding out words), and highlighting important words in the text ... at the cost of speed and cognitive energy" (footnote omitted)). Here, however, the undisputed evidence shows that Plaintiff was capable of performing "work functions ... with only modest accommodations or adjustments in schedule," and that "[s]uch minor inhibitions on the speed with which tasks can be performed, while inconvenient, do not amount to a disability." *Teachout,* 2006 **WL** 452022, at *5 n .6. Accordingly, there is insufficient evidence to support Plaintiff's claim that her dyslexia or her attention deficit disorder constitute disabilities within the meaning of the ADA.

*\*10* Moreover, Plaintiff has not presented *any* evidence suggesting that Defendant regarded her as having a disability within the meaning of the ADA. "A 'regarded as' claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability." *Capobianco v. City of New York,* 422 F.3d 47, 57 (2d Cir.2005) (internal quotation marks omitted). "It is not enough that the employer perceive the employee as somehow disabled; the employer must regard the employee as disabled within the meaning of the ADA, i.e., having an impairment that substantially limits a major life activity." *Id.* (internal quotation marks omitted); *see also Levine v. Smithtown Cent. Sch. Dist.,* 565 F.Supp.2d 407, 426 (E.D.N.Y.2008) (same). A defendant may regard a plaintiff as disabled when "either (1) the defendant mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) the defendant mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Teachout,* 2006 **WL** 452022, at *8 (internal quotation marks omitted).

Here, Plaintiff asserts that she told Mr. Chandler that she had dyslexia and needed help proofreading the menus, but she does not allege that Mr. Chandler viewed her disability as impairing a major life activity *at all.* (Tr. 87–91.) To the contrary, Plaintiff admits that the only accommodation she requested was help with proofreading (*id.* at 93, 96), and the record shows that Mr. Chandler informed Ms. Swedish and Ms. Garnett that the only accommodation Plaintiff needed was "proofreading on long written reports" and that Plaintiff did not need extra time for assignments as long as her workload was not "heavy," (Chandler Aff. Ex. J) (internal quotations omitted). Indeed, Plaintiff admits that she did not receive any criticism from Defendant regarding her proofreading or the menus. (Tr. 97–98.) Additionally, the Court notes that Plaintiff did not submit a doctor's note regarding her disabilities or request any accommodations prior to October 14, 2003, after Mr. Chandler issued Plaintiff the initial June 2003 warning and the final 30–day warning. As a result, Plaintiff has not raised a genuine issue of fact regarding whether Defendant mistakenly believed that she had a substantially limiting impairment or believed that her non-limiting impairments substantially limited a major life activity. *See Teachout,* 2006 **WL** 452022, at *9 (finding that defendant did not regard plaintiff as disabled when its letter granting him an accommodation did not suggest that it was "mistaken with respect to the impairment" or to "the extent to which [his] impairment would limit him"); *Spychalsky v. Sullivan,* No. 01–CV–958, 2003 **WL** 22071602, at *10 (E.D.N.Y. Aug.29, 2003) (finding that defendant did not regard plaintiff as disabled within the meaning of the ADA because defendant's recognition of plaintiff's spelling problems did not suggest that it believed his learning disability substantially limited a major life activity).

*\*11* Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's ADA claims is granted.

### C. Title VII Claims

Plaintiff alleges three claims of employment discrimination based on an adverse action by Defendant under Title VII:(1) failure to train; (2) failure to promote; and (3) discriminatory termination. Plaintiff also alleges that she was subjected to a hostile working environment and that she was

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 56 of 88

retaliated against for voicing concerns about racial and gender discrimination.

*1. Discrimination Based on Adverse Employment Action*
Title VII claims are subject to the familiar burden-shifting framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Holcomb,* 521 F.3d at 138 (applying burden-shifting in Title VII context). Under this framework, Plaintiff must first establish a prima facie case of discrimination. *See id.* Plaintiff's burden at this stage is minimal. *See McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001). If Plaintiff satisfies her initial burden, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. *See Patterson v. Cnty. of Oneida,* 375 F.3d 206, 221 (2d Cir.2004). "If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

To establish a prima facie case of discrimination based on discrete adverse employment actions, Plaintiff must introduce evidence showing that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb,* 521 F.3d at 138; *see also Bryant v. Verizon Commcns, Inc.,* 550 F.Supp.2d 513, 534 (**S.D.N.Y**.2008) (same).

Here, it is undisputed that Plaintiff, a woman, is a member of a protected class under Title VII. In addition, Plaintiff has produced evidence sufficient to show that she was qualified for her position. *See Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.2001) (holding that a "plaintiff must show only that [s]he possesses the basic skills necessary for performance of the job," noting that where "the employer has already hired the employee, the inference of minimal qualification is not difficult to draw" (internal quotation marks and brackets omitted)). Accordingly, the Court's inquiry focuses on whether Plaintiff has presented evidence to support the two remaining elements necessary to establish a prima facie case of discrimination.

*a. Failure to Train*

Plaintiff alleges that Mr. Chandler, her supervisor, withheld information from her regarding career-development programs because of her gender. (Tr. 115–18.) "A plaintiff alleging unequal access to training under Title VII must demonstrate that the employer offered training to other employees and that the plaintiff was denied that training under circumstances giving rise to an inference of discrimination." *Silva v. Peninsula Hotel,* 509 F.Supp.2d 364, 379 (**S.D.N.Y**.2007); *see also Ani v. IMI Sys., Inc.,* No. 98–CV–8430, 2002 **WL** 1888873, at *6–7 (**S.D.N.Y**. Aug.15, 2002) (holding that a plaintiff cannot establish a prima facie case of failure to train absent evidence which creates an inference of discriminatory treatment).

**\*12** Plaintiff fails to adduce any evidence to support her failure-to-train claim. In particular, Plaintiff has not produced evidence to support her allegation that another employee received career-advancing training because her bare allegations fail to identify any individuals of the opposite sex who received career-advancing training. The only employee whom Plaintiff alleges that Defendant offered such training was Ms. Hanslmaier—a woman. (Tr. 118.) On this record, there is no basis from which a jury could reasonably conclude that Plaintiff was denied training under circumstances giving rise to an inference of discrimination. *See Chan v. NYU Downtown Hosp.,* No. 03–CV–3003, 2006 **WL** 345853, at *5–6 (**S.D.N.Y**. Feb.14, 2006) (finding that plaintiff failed to establish a prima facie case of race discrimination when, inter alia, she did not "identify any similarly situated individuals *outside her protected class* who were treated preferentially" (emphasis added)); *see also Ani,* 2002 **WL** 1888873, at *4 (noting that a plaintiff may show an inference of discrimination using evidence "showing that similarly-situated employees, not within the plaintiff's protected class, were not subject to the complained-of adverse employment action"). Accordingly, Defendant's Motion for Summary Judgment on Plaintiffs failure to train claim is granted.

*b. Failure to Promote*
Plaintiff also claims that Defendant unlawfully failed to promote her. To establish a prima facie case on her Title VII failure to promote claim, Plaintiff must submit evidence to "demonstrate that ... she applied and was qualified for a job for which the employer was seeking applicants; ... she was rejected for the position; and ... the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atl.,* 385 F.3d 210, 226 (2d Cir.2004) (internal quotation marks omitted);

*see also Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F.Supp.2d 353, 368 (**S.D.N.Y.** 2008) (same). It is well settled in the Second Circuit that a "prima facie case cannot be established merely with evidence that a plaintiff generally requested promotion consideration." *Petrosino*, 385 F.3d at 227. "A specific application is required to ensure[ ] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." *Id.* (internal quotation marks omitted); *see also Wilson v. N.Y.C. Hous. Auth.*, No. **05**–CV–6538, 2007 **WL** 1032262, at *6 (**S.D.N.Y.** Apr.2, 2007) (noting that plaintiff's "failure to proffer evidence identifying any specific positions for which he applied ... means that he has not made out a prima facie case of discrimination").

Here, the only promotion that Plaintiff sought while employed by Defendant was for a position that was not vacant (Tr. 133–34.) When, in March 2003, Plaintiff requested that she be promoted to the position of Assistant Director of Food and Nutrition, that position belonged to an individual who only was on a leave of absence. (*Id.*) It is undisputed that Defendant never placed a new individual in that position because "[t]he individual holding the position returned from leave and ultimately there was no job vacancy." (Def.'s Mem. 16.) Indeed, as Plaintiff acknowledged in her deposition, she did not receive that promotion "because [the individual] came back" from his leave of absence and not because of her gender. (Tr. 135.) Other than this request in March 2003, it is undisputed that Plaintiff never applied for a specific promotion. (*Id.* at 133–35.) Accordingly, Plaintiff cannot establish a prima facie case of a failure to promote actionable under Title VII. *See Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F.Supp.2d 66, 84 (E.D.N.Y.2009) (finding that the plaintiff could not show that the denial of his request for reinstatement was retaliation in violation of Title VII when his former position was not vacant and no other similar positions were available); *Blake v. Bronx Lebanon Hosp. Ctr.*, No. 02–CV–3827, 2007 **WL** 2981465, at *8 (**S.D.N.Y.** Oct.10, 2007) (granting summary judgment on failure to promote claim when the position was eliminated, noting that when "no applicants are sought, no failure to promote claim exists"). Defendant's Motion for Summary Judgment on this claim is, therefore, granted.

### c. Discriminatory Termination

**\*13** Finally, Plaintiff claims that her termination violated Title VII. It is well-settled in the Second Circuit that termination of employment constitutes an adverse employment action. *See Sanders v. N. Y.C. Human Res.*

*Admin.*, 361 F.3d 749, 755 (2d Cir.2004) (determining that an adverse employment action includes "termination of employment"); *see also Steele–Hegg v. Computer Assocs. Int'l, Inc.*, No. 03–CV–5939, 2007 **WL** 1989434, at *10 (E.D.N.Y. July 9, 2007) ("[T]he case law within the Second Circuit is well-settled that termination of employment constitutes an adverse employment action ...."). Therefore, whether Plaintiff has established a prima facie case of discrimination based on her termination turns on whether she has presented sufficient evidence that the circumstances surrounding her termination give rise to an inference of discrimination.

"[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision...." *Vinokur v. Sovereign Bank*, 701 F.Supp.2d 276, 291 (E.D.N.Y.**2010**) (internal quotation marks omitted). "A plaintiff may support an inference of [ ] discrimination by demonstrating that similarly situated employees of a different" gender were not subjected to the same adverse treatment, *Debidat v. Marriott International, Inc.*, 580 F.Supp.2d 300, 305–06 (**S.D.N.Y.**2008), by showing that there were "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," *Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 91 (2d Cir.1996), or by showing that there were other "circumstances giving rise to an inference of discrimination on the basis of plaintiff's" gender, *Farias v. Instructional Systems*, 259 F.3d 91, 98 (2d Cir.2001). But, Plaintiff "must point to facts that suggest" that the adverse action was motivated, at least in part, by discriminatory animus. *Kalsi v. N.Y.C. Transit Auth.*, 62 F.Supp.2d 745, 753 (E.D.N.Y.1998), *aff'd*, 189 F.3d 461 (2d Cir.1999); *see also Vinokur*, 701 F.Supp.2d at 291 ("A plaintiff cannot sustain an action based on her conclusory allegations of discrimination." (internal quotation marks and brackets omitted)).

Plaintiff has not presented any admissible evidence that raises an inference of discrimination based on her gender. She has presented no evidence that similarly situated employees of a different gender were treated differently. Nor has she shown any other evidence that suggests an inference of gender discrimination. She contends that her supervisor, Mr. Chandler, displayed a general hostility toward women, alleging that he referred to female employees in "derogatory" terms (Am. Compl. Ex. 24, at 5), such as when he called two of her co-workers "fat ass" and "dumb as a door knob" behind their backs, (Pl.'s Stmt, ¶¶ 289, 302). She claims that

Chandler further demonstrated his disdain for women, and for her in particular, when he allegedly commented that Plaintiff reminded him of his mother, whom he said he did not like. (Am. Compl. Ex. 24, at 18.)

**\*14** Plaintiff provides no evidence to support her contention that these alleged comments were made because Plaintiff and her two co-workers were women. The "fat ass" and "dumb as a door knob" comments, though certainly rude, are gender neutral statements that do not indicate gender animus. *See Ford v. N.Y.C. Dep't of Health & Mental Hygiene,* 545 F.Supp.2d 377, 389 (**S.D.N.Y.**2008) (finding no inference of gender discrimination where woman was called "fat fish" and "stupid fish," as those comments, while "disrespectful and rude ... are not objectively indicative of gender animus"); *Wilson v. Family Dollar Stores of N.Y., Inc.,* No. 06–CV– 639, 2008 **WL** 4426957, at \*7–8 (E.D.N.Y. **Sept.** 25, 2008) (finding no inference of discrimination when the supervisor called the plaintiff "a liar" and "engaged in favoritism and displayed angry facial expressions" because although this "behavior may be rude and unprofessional, it merely indicate[d] personal enmity rather than discrimination"); *see also Bickerstaff v. Vassar Coll .,* 196 F.3d 435, 451 (2d Cir.1999) ("Title VII does not insulate an individual from criticism that is not based on an impermissible reason."). Moreover, Mr. Chandler's alleged comment regarding his mother, while disrespectful to Plaintiff (not to mention to his mother) and clearly indicative of Mr. Chandler's dislike for her, does not objectively indicate hostility on the basis of gender. *See Romano v. Stora Enso Corp.,* No. 07–CV– 4293, **2010 WL** 986535, at \*10, \*17 (E.D.N.Y. Feb. 12, **2010**) (granting summary judgment and finding that comments were gender-neutral when the plaintiff alleged, inter alia, that her supervisor told female employees that "she felt like their mother"), *adopted by* **2010 WL** 1005760 (E.D.N.Y. Mar.17, **2010**). This conclusion is strongly supported by the fact that Plaintiff's hiring and firing were recommended by Mr. Chandler within a relatively short time span. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) (noting, in the ADEA context, that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire"); *see also Woodard v. Monticello Cent. Sch. Dist.,* No. 06–CV– 13361, 2008 **WL** 5062125, at \*14 (**S.D.N.Y.** Dec. 1, 2008) (finding that the conclusion that the plaintiff's termination was not racial discrimination was "strongly supported by the fact that [her] hiring and firing were recommended by the same individual within a relatively short time span").

Plaintiff's only allegation that suggests an inference of discrimination based on gender is her allegation that Mr. Chandler commented to "numerous people"—but not to her personally—that he "wanted a man for the position." (Pl.'s Stmt. ¶ 292.) Yet this allegation is nowhere supported by admissible evidence. Plaintiffhas not presented an affidavit of a single individual who can verify that Mr. Chandler made this statement. Because Plaintiff cannot rely solely on this or any other hearsay allegation to survive summary judgment, Defendant's Motion for Summary Judgment on this claim is granted. *See* Fed.R.Civ.P. 56(e)(1) (requiring that affidavits supporting or opposing a Rule 56 motion "be made on personal knowledge"); *Velez v. SES Operating Corp.,* No. 07–CV–10946, 2009 **WL** 3817461, at \*10 (**S.D.N.Y.** Nov. 12, 2009) (finding that the plaintiff "fail[ed] to create a triable issue of material fact" because, inter alia, her evidence was hearsay); *see also Hill v. Rayboy–Brauestein,* 467 F.Supp.2d 336, 356 (**S.D.N.Y.**2006) ("Although the burden of meeting the prima facie case is 'de minimis,' [the p]laintiff must adduce some admissible evidence that would support her claims.").

### 2. Hostile Work Environment Claim

**\*15** Plaintiff claims that she was subject to a hostile work environment.[10] To establish a prima facie claim based on a hostile work environment under Title VII, Plaintiff must present evidence that she was subjected to harassment based on her gender. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). She must also demonstrate "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (internal quotation marks omitted); *see also Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 102 (2d Cir.**2010**) ("Generally, unless an incident of harassment is sufficiently severe, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (internal quotation marks omitted)). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano,* 294 F.3d at 374 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Here, Plaintiff's hostile

work environment claim centers around her allegations of mistreatment by her co-workers, inappropriate statements by Mr. Chandler, and Mr. Shoemaker's inappropriate conduct toward other employees.

*a. Allegations of Harassment by Co–Workers*
Plaintiff's complaints of disrespectful or uncivil behavior by her co-workers are not actionable under Title VII. Plaintiff's allegations that her co-workers "spoke rudely about" her (Pl.'s Stmt. ¶ 66), gossiped about her (*id.* ¶¶ 157, 161), cursed at her (*id.* ¶¶ 287, 321), threw items at her (*Id.* ¶ 7), and left "hand cream on [her] chair" (*id.* ¶ 380), do not state a claim for a hostile working environment under Title VII because there is no basis from which to conclude that this conduct was based on her gender. While her co-workers' alleged conduct may be obnoxious and sophomoric, Title VII is a " 'general civility code' for the American workplace." *Petrosino,* 385 F.3d at 223 (quoting *Oncale,* 523 U.S. at 81). Thus, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment," *id.,* particularly where, as here, there is no reason to conclude that the conduct was aimed at Plaintiff because of her gender. Accordingly, these claims are dismissed.

*b. Allegations of Harassment by Mr. Chandler*
Plaintiff also cannot withstand summary judgment on her claim that Mr. Chandler's alleged comments contributed to a hostile working environment. As discussed above, the comments that Mr. Chandler allegedly made to Plaintiff, while rude, did not convey gender-related hostility. Indeed, at her deposition, Plaintiff was clear that she viewed Mr. Chandler as a "harasser," not a sexual harasser. (Tr. 151.) The former is not governed by Title VII. Moreover, as already discussed, Plaintiff's allegation that Mr. Chandler told several of her coworkers that he "wanted a man for the position" (Pl.'s Stmt. ¶ 292) does not provide a basis to deny summary judgment, as Plaintiff has failed to present admissible evidence to support this allegation. *See Hill,* 467 F.Supp.2d at 356 ("Plaintiff must adduce some admissible evidence that would support her claims."); *see also Early v. Wyeth Pharm., Inc.,* 603 F.Supp.2d 556, 579 (**S.D.N.Y.**2009) (noting that the plaintiff could not rely on hearsay statements of other employees to support her hostile work environment claim). Although it is undisputed that Chandler did occasionally use inappropriate language in the workplace (Swedish Aff. ¶ 7; *id.* Ex. C), Plaintiff has produced no evidence to suggest that this language was used "because of [Plaintiff's] sex,"

*Oncale,* 523 U.S. at 80, or that his use of inappropriate language was "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment," *Rowe v. Jagdamba, Inc.,* 302 F. App'x 59, 62 (2d Cir.2008) (internal quotation marks omitted). Defendant's summary judgment motion on this issue, therefore, is granted.

*c. Allegations of Harassment by Mr. Shoemaker*
**\*16** Plaintiff's final hostile work environment claim is based upon Mr. Shoemaker's allegedly inappropriate statements and actions toward other women employed at CRMC, which Plaintiff did not actually witness. (Tr. 149.) Though it is not clear whether Defendant disputes the specific conduct alleged by Plaintiff, Plaintiff does not dispute that Defendant ultimately terminated Mr. Shoemaker for making inappropriate gestures and comments in the workplace. (Swedish Aff. ¶ 7.) Defendant argues that Plaintiff has failed to state a prima facie case of hostile working environment because a plaintiff may not "recover damages by pointing to alleged harassment against others." (Def.'s Mem. 18.) Contrary to Defendant's view, the Second Circuit has held that a plaintiff can have standing to sue under Title VII for "injury to her own work environment, which *she* experienced as hostile by reason of the alleged harassment of other women out of her presence." *Leibovitz v. N.Y.C. Transit Auth.,* 252 F.3d 179, 188 (2d Cir.2001). To establish such a claim, a plaintiff must demonstrate that, in addition to the standard elements, the "harassment adversely affected the terms and conditions of *her own* employment." *Id .* at 189 (emphasis added).

In *Leibovitz,* the Second Circuit reversed the district court and granted judgment as a matter of law to a defendant in a case in which "much of the alleged harassment did not occur in plaintiff's immediate vicinity and much of what she knew about the situation was second—or third-hand." *Id.* (internal quotation marks omitted). Although the Second Circuit recognized that a plaintiff could potentially recover in such a case if her own working environment was affected, it determined that the plaintiff could not recover because she "presented no evidence that her own working environment was hostile [ ] and failed to allege or prove that harassment of other women adversely affected the terms and conditions of her own employment." *Id.* at 190. Notably, the Second Circuit emphasized that "the women who were allegedly harassed were working in another part of the employer's premises, out of [the plaintiff's] sight ... were doing another job, and were allegedly subjected to harassment by a supervisor who supervised them but did not supervise [the plaintiff],"

and that "the experiences of those women came to [the plaintiff's] notice via hearsay." *Id.* at 189. District courts within the Second Circuit have been similarly reluctant to accept a prima facie case of a hostile work environment based on harassment experienced by a third party. *See, e.g., Byra–Grzegorczyk v. Bristol–Myers Squibb Co.,* 572 F.Supp.2d 233, 248 (D.Conn.2008) (noting that "harassing conduct directed at someone other than a plaintiff ... does not have the same impact as harassment suffered by a plaintiff herself." (internal quotation marks and brackets omitted)); *Pronin v. Raffi Custom Photo Lab, Inc.,* 383 F.Supp.2d 628, 635 (**S.D.N.Y.**2005) ( "[M]erely working in the same area as [the individual who was harassed] and witnessing" a harassing incident does not, without more, affect "the terms and conditions of [a plaintiffs] employment.").

**\*17** Here, Plaintiff vaguely claims that the hostile work environment created by Mr. Shoemaker's alleged conduct against other women affected her own work environment by "interfering with [her] ability to get [her] work done." (Pl.'s Stmt. ¶ 354.) For example, Plaintiff alleges that a female employee, Ms. Reeves, informed Plaintiff that she had overheard Mr. Shoemaker discussing "cucumber sex" (*id.* ¶¶ 338–40; Reeves Aff. ¶ 25), and that another female co-worker, Ms. Banks, reported to Plaintiff that Mr. Shoemaker had told her to "get on the table and be the dessert," (PL's Ex. E, at unnumbered page 72). However, as in *Leibovitz,* Plaintiff did not personally witness Mr. Shoemaker's allegedly harassing conduct (Tr. 149), instead learning of the conduct second—and third-hand from her co-workers (Pl.'s Stmt. ¶¶ 338–40, 352). Indeed, Plaintiff admitted in her deposition that Mr. Shoemaker's presence did not affect her (Tr. 149), and the only explanation for why his actions interfered with her work was that she was told about his conduct and did not "know what to do," (*id.* at 151). Likewise, Plaintiff has not produced evidence showing that the women who were allegedly harassed worked in the same area as Plaintiff and/or that Mr. Shoemaker, who was undisputedly one of Defendant's supervisors, actually supervised Plaintiff. Although it is undisputed that Mr. Shoemaker engaged in some conduct that was sufficiently inappropriate to justify his termination, Plaintiff has failed to produce statements from either Ms. Reeves or Ms. Banks confirming her allegations that they were harassed by Mr. Shoemaker, relying instead on Plaintiff's own conclusory hearsay. Because Plaintiff has not produced any other evidence to support her subjective belief that Mr. Shoemaker's conduct affected *her* work environment, Plaintiff's claim must fail. *See Hill,* 467 F.Supp.2d at 355 (noting that the plaintiff's subjective

belief that she was subjected to excess scrutiny on account of her race was insufficient to defeat summary judgment); *Boyd v. Presbyterian Hosp. in the City of N.Y.,* 160 F.Supp.2d 522, 540 (**S.D.N.Y.**2001) (noting that even if "the [p]laintiff may indeed [have] subjectively fe[lt] that the work environment under [her supervisor] was a hostile one, [p]laintiff's subjective belief [wa]s not enough"). Finally, Plaintiff's claim that she suffered injury in the form of management's inaction on her claim of sexual harassment is belied by the fact that Mr. Shoemaker was terminated for his inappropriate conduct. *See Pitts v. Onondaga Cnty. Sheriff's Dep't,* No. 04–CV–828, 2009 WL 3165551, at \*10 (N.D.N.Y. **Sept.** 29, 2009) (noting that when "a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses his actual or apparent authority to further the harassment," but "where a low-level supervisor does not rely on his supervisory authority to carry out the harassment ... an employer will generally not be liable unless the employer either [1] provided no reasonable avenue of complaint or [2] knew of the harassment but did nothing about it." (internal citations and quotation marks omitted)). Thus, there is insufficient evidence for a reasonable factfinder to conclude that Mr. Shoemaker engaged in conduct toward third-parties that "adversely affected the terms and conditions of [Plaintiff s] own employment." *Leibovitz,* 252 F.3d at 189. Accordingly, the Court grants summary judgment for Defendant on this claim.

### 3. Title VII Retaliation Claims

**\*18** Plaintiff alleges that Defendant further violated Title VII by disciplining and terminating her in retaliation for voicing complaints about racial and gender discrimination in the workplace. To prove a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: (1) that she participated in a protected activity; (2) that her employer was aware of that activity; (3) that materially adverse action occurred; and (4) that there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 552 (2d Cir.**2010**); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 205–06 (2d Cir.2006). Even if a plaintiff can state a prima facie case of retaliation, her claim is still subject to the *McDonnell Douglas* burden shifting framework. *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990).

### a. Complaints Regarding Alleged Sexual Harassment
Plaintiff alleges that she was disciplined and ultimately terminated because she reported Mr. Shoemaker's and

Mr. Chandler's alleged sexual harassment to management. Defendants do not dispute that Plaintiff's report of alleged sexual harassment was protected activity, that Defendant was aware of this activity, and that Plaintiff being disciplined and terminated were adverse employment actions. However, Defendant contests that Plaintiff can show causation when her protected activity occurred after the discipline had begun.

Proof of causation can be shown either: (1) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or (2) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). But, " 'where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.' " *Blanc v. Sagem Morpho, Inc.,* No. **07**–CV–3085, 2009 **WL** 1813236, at *15 (E.D.N.Y. June 25, 2009) (quoting *Slattery,* 248 F.3d at 95).

Here, Plaintiff first complained of Mr. Shoemaker's alleged sexual harassment of other employees in July 2003 (Tr. 145), and did not complain about any alleged sexual harassment by Mr. Chandler until **September** 23, 2003, (Swedish Aff. ¶¶ 3–4). Defendant has presented uncontested evidence that Mr. Chandler discussed his concerns about Plaintiff's performance "a number of times throughout her employment" (Chandler Aff. ¶ 11), and issued Plaintiff a warning letter regarding her problems managing employees and completing assignments in June 2003, before Plaintiff ever complained of sexual harassment by either Mr. Shoemaker or Mr. Chandler, (*id.; id.* Ex. G). Furthermore, the undisputed evidence shows that Mr. Chandler and Ms. Swedish had decided to issue the final warning letter to Plaintiff *before* she complained of any sexual harassment by Mr. Chandler. (*Id.* ¶ 13; *id.* Ex. H (showing that Mr. Chandler contacted Ms. Swedish on **September** 4, 2003 requesting edits on the draft final warning letter, and that Ms. Swedish responded on **September** 8, 2003 with suggested edits and advice on how to discuss the final warning letter with Plaintiff).) As a result, Plaintiff has failed to show causation when the record shows that the disciplinary action began prior to her protected activity. *See Vaughn v. City of New York,* No. 06–CV–6547, **2010** **WL** 2076926, at *15 (E.D.N.Y. May 24, **2010**) (granting summary judgment when, despite a gap of only a few months between the protected activity and the

alleged adverse action, the plaintiff failed to show causation because she was subject to reprimands and discipline before she engaged in any protected activity); *Blanc,* 2009 **WL** 1813236, at *15 (granting summary judgment and dismissing retaliation claim when the plaintiff was warned about his "performance deficiencies ... **five** months before [he] engaged in any protected activity").

**\*19** Moreover, even if Plaintiff can establish a prima facie case, Defendant has proffered a legitimate, non-discriminatory reason for the warning letters and termination by providing evidence that Plaintiff was challenging the decisions of her supervisor, not completing her work assignments, and having difficulties communicating and working with co-workers and other supervisors. (Chandler Aff. ¶¶ 7–10; *id.* Exs. B–F; Lutz Aff. ¶¶ 3–4); *see Harrison v. N. Shore Univ. Hosp.,* No. 04–CV–2033, 2008 **WL** 656674, at *9 (E.D.N.Y. Mar. 6, 2008) (noting that insubordination and an "inability to get along with supervisors and co-workers" are legitimate, non-discriminatory reasons for termination); *Lee v. Healthfirst, Inc.,* No. 04–CV–8787, 2007 **WL** 634445, at *24 (**S.D.N.Y.** Mar.1, 2007) (finding that the "[p]laintiff's insubordination and failure to fulfill her job responsibilities ... [we]re legitimate justifications for the withholding of her bonus and her discharge"). As a result, Plaintiff bears the burden of establishing pretext, which she has failed to do. First, Plaintiff admits that she disagreed with her supervisor about what areas and which employees were under her supervision (Tr. 75–80), and that she often challenged decisions made by Mr. Chandler or others, (*id.* at 197–99, 283–84; Lutz Aff. ¶ 5). Second, Plaintiff's deposition, and her own affidavit, make clear that Plaintiff was highly critical of her co-workers and other managers. (Tr. 94–96, 99, 203, 206–07; Pl.'s Stmt. ¶¶ 22, 43–46, 52–53, 67.) Moreover, after she received the first warning letter, Plaintiff did not attend the classes that the letter instructed her to attend (Tr. 183), and she continued to fight with other managers and co-workers, (Chandler Aff. ¶ 12). Tellingly, Mr. Chandler posted Plaintiff's job position on the internal website in early **September** (*Id.* ¶ 13), and Plaintiff admits that she saw the vacancy posting in **September** "about the time" when she complained about Mr. Chandler to management, (Tr. 255–57). As a result, summary judgment is warranted because Plaintiff has offered no evidence of pretext to rebut Defendant's legitimate reasons for the discipline and termination, especially considering that the time-line suggests that Plaintiff used the harassment complaints as a weapon after learning that her employment was potentially being terminated. *See Ford v. Consol. Edison Co. of N.Y.,* No. 03–

CV–9587, 2006 WL 538116, at *12 (S.D.N.Y. Mar.3, 2006) (granting summary judgment when the plaintiff's "conclusory allegations of pretext ... [we]re completely undermined by the largely undisputed evidence that [the p]laintiff [failed to perform his job and was insubordinate]"); *see also Lee,* 2007 WL 634445, at *24 ("Where an employee has been warned that her job performance is unsatisfactory and she continues the same conduct, she cannot shield herself from legitimate managerial prerogatives by threatening a discrimination complaint and then alleging unlawful retaliation.").

### b. Complaints About Alleged Racial Discrimination

**\*20** Plaintiff also alleges that she was retaliated against for "living the anti-discrimination laws" and reporting racial discrimination in March 2003, before the first warning letter was issued. (Pl.'s Stmt. ¶¶ 162, 172.) As an initial matter, the Court notes that many of Plaintiff's allegations of "retaliation" involve complaints she made about non-actionable "mismanagement" issues. (*Id.* ¶ 226.) In other words, Plaintiff appears to allege that she was retaliated against for reporting the mismanagement of others or for reporting incidents that she believed presented sanitation problems. (*id.* ¶¶ 198–99, 227, 240–45, 322, 324–25.) Similarly, Plaintiff alleges that she opposed the suspension of two African American employees for absenteeism because she believed it was unfair to suspend employees who had been sick or attending a funeral when absent, without alleging or providing evidence that she reported any racial discrimination related to the suspensions. (*Id.* ¶¶ 174–75; Tr. 197–98.) Because Title VII does not protect employees from retaliation for opposing misbehavior of co-workers or supervisors that is unrelated to discrimination on account of one of the protected classes, these claims lack merit. *See Santucci v. Veneman,* No. 01–CV–6644, 2002 WL 31255115, at *4 (S.D.N.Y. Oct.8, 2002) (granting motion to dismiss because the "[p]laintiff s retaliation claims d[id] not involve some sort of complaint about a type of discrimination that Title VII forbids;" instead the plaintiff "objected to the assignment/rotation system because of its relationship to an allegedly corrupt system of payoffs—*not* because defendant discriminated on the basis of race, color, religion, sex or national origin" (internal citation and quotation marks omitted)); *Manatu v. Bowery Residents Comm.,* No. 99–CV–722, 2000 WL 1159330, at *2 (E.D.N.Y. Aug. 11, 2000) (finding that the plaintiff failed to show that she engaged in protected activity when she "allege[d] that she was retaliated against [for][ ] report[ing] mismanagement ... to state auditors" because "Title VII does not protect whistleblowers who complain about mismanagement"); *Harper v. Hunter*

*Coll.,* No. 95–CV–10388, 1999 WL 147698, at *I, *3 (S.D.N.Y. Mar. 15, 1999) (dismissing retaliation claim based on the plaintiff's reporting "unsafe conditions" because " 'whistleblowing' activity of this nature is not protected under Title VII"). Additionally, Plaintiff proffers several incidents that she claims involved racial discrimination, such as Ms. Hanslmaier allegedly changing the work schedules of African American employees or once throwing coffee at an African American employee (Pl.'s Stmt. ¶¶ 177, 191–96), and an African American employee not receiving a promotion, (*Id.* ¶ 178). Plaintiff has failed to establish that she engaged in any protected activity related to these incidents as she does not allege, let alone provide evidence suggesting, that she reported these incidents to management or stated that they involved racial discrimination. That, in hindsight, she might have believed these incidents to have involved discrimination does not create a factual dispute about whether her conduct was protected by the law.

**\*21** Plaintiff also alleges that, sometime in 2003, she told Mr. Chandler that, based on what she had been told by others, Ms. Hanslmaier did not "like black people" and reported an incident involving Ms. McDonald, when Ms. Hanslmaier allegedly did not check on Ms. McDonald after water was splashed in her face and told her she could be fired for leaving the kitchen. (Tr. 410–11; Pl.'s Stmt. ¶¶ 166, 181–85.) Plaintiff further alleges that in March 2003, she told Mr. Chandler about hearing from another supervisor that an employee had reported hearing a kitchen worker use a racial slur against another kitchen worker. (Tr. 383–86.)[11]

Even construing all the facts in Plaintiff's favor, Plaintiff has failed to show that she engaged in protected activity within the meaning of Title VII. "[I]n order to establish that [she] engaged in protected activity, 'a plaintiff need not prove that the conditions against which [she] protested actually amounted to a violation of Title VII.' " *Dottolo v. Byrne Dairy, Inc.,* 08–CV–390, **2010** WL 2560551, at *6 (N.D.N.Y. June 22, **2010**) (quoting *Wimmer v. Suffolk Cnty. Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999)). "Rather, [a plaintiff] must demonstrate only that [s]he had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Wimmer,* 176 F.3d at 134 (internal quotation marks omitted); *see also Martin v. State Univ. of N.Y.,* 06–CV–2049, **2010** WL 1257782, at *17 (E.D.N.Y. Mar.26, **2010**) ("Whether [the plaintiff's] belief [that the defendant's actions were unlawful] was 'objectively reasonable,' and not merely subjective, is determined based on the facts and the record presented."); *Blanc,* 2009 WL 1813236, at *14 ("[A]

plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [she] ... can establish that [she] possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotation marks and brackets omitted)). "Whether a plaintiff's belief is reasonable must be 'assessed in light of the totality of the circumstances.' " *Id.* at *14 (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998)). However, "an employee's complaint to an employer about unfair treatment in general is insufficient to constitute protected activity." *Id.,* 2009 WL 1813236, at *13. Thus, even if an employee believes that another employee is a victim of discrimination, "an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity." *Aspilaire v. Wyeth Pharm., Inc.,* 612 F.Supp.2d 289, 309 (**S.D.N.Y.**2009).

Plaintiff's vague report to Mr. Chandler about Ms. Hanslmaier not liking black people and the incident involving Ms. McDonald does not show a reasonable belief that Ms. Hanslmaier engaged in discriminatory conduct. First, although Plaintiff alleges that she reported the Ms. McDonald incident, she presented no evidence explaining what she reported to Mr. Chandler or even that this report occurred prior to the warning letters. *See Sales v. YM & YWHA of Wash. Heights & Inwood,* Nos. 00–CV–8641, 01–CV–1796, 2003 WL 164276, at *8 (**S.D.N.Y**. Jan. 22, 2003) (finding that the plaintiff's ambiguous complaint to his supervisor about a "racially derogatory" term was not protected activity when the plaintiff did not explain the ambiguous term). Second, although Plaintiff appears to subjectively believe that Ms. Hanslmaier's actions constituted racial discrimination, she has presented no evidence suggesting that this belief was reasonable. For example, Plaintiff makes conclusory claims of racism, but admits that Ms. Hanslmaier did not make any racial comments during the incident with Ms. McDonald. (Tr. 411.) Furthermore, Plaintiff has not alleged that Ms. Hanslmaier treated any employees outside the protected class differently than she treated Ms. McDonald. *See Moore v. Transitional Servs. of N.Y.,* 96–CV–1193, 1998 WL 71824, at *5 (E.D.N.Y. Feb.2, 1998) (granting summary judgment on retaliation claim when the plaintiff had not presented sufficient evidence that she engaged in protected activity because she did not show that the conflict between herself and her co-worker was motivated by gender). Indeed, Plaintiff admits that her subjective belief regarding Ms. Hanslmaier's motivations is based on what others told her. (Tr. 410.) Such vague and conclusory allegations of racial discrimination do

not support a finding that Plaintiff's belief that Title VII was violated was reasonable. *See Pan zarino v. Deloitte & Touche LLP,* No. 05–CV–8502, 2009 WL 3539685, at *11 (**S.D.N.Y**. Oct.29, 2009) (finding that the plaintiff's reporting, among a host of issues, that a supervisor told another employee to work on an assignment because the prospective client was African American, was not protected activity when the plaintiff did not report that "she thought the practice was discriminatory"); *see also Blanc,* 2009 WL 1813236, at *13 (noting that "[c]areless and uncounseled accusations of discrimination ... are not necessarily protected" by Title VII (internal quotation marks omitted)); *Soliman v. Deutsche Bank AG,* 03–CV–104, 2004 WL 1124689, at *13 (**S.D.N.Y**. May 20, 2004) ("[W]here a plaintiff's complaint is vague or ambiguous and does not sufficiently articulate the nature of harassment, courts hold that a plaintiff has not engaged in a protected activity.").

**\*22** Plaintiff's allegation that, in March 2003, she reported the incident involving the kitchen worker's use of a racial slur is somewhat less vague; however, Plaintiff has not shown that her belief that Title VII was violated was objectively reasonable when she reported an isolated comment involving people who were not employees of Defendant, that was reported to her by another supervisor, who had told Plaintiff what she had heard from another employee. *See Abeln v. Ultra Life Batteries,* No. 07–CV–6113, 2009 WL 857497, at *3 (W.D.N.Y. Mar. 30, 2009) (finding that the "plaintiff [did] not have [ ] a reasonable belief that his complaint concerning [an] isolated, 'offensive utterance' constituted sexual harassment," when the comment "was not specifically directed toward [him]" and he did not allege that any other comments occurred); *see also Dottolo,* 2010 WL 2560551, at *7 (finding that allegation of reporting one sexual comment did not show that the plaintiff's belief that Title VII was violated was objectively reasonable); *Middleton v. Metro. Coll. of N.Y.,* 545 F.Supp.2d 369, 375 (**S.D.N.Y**.2008) (finding that the plaintiff's reporting of the isolated use of a sexual profanity was not protected activity when the comment was uttered by a co-worker, during a fight, in front of the plaintiff's supervisor, and when the conduct was not repeated); *Holmes v. Long Island R.R.,* No. 96–CV–6196, 2001 WL 797951, at *6 (E.D.N.Y. June 4, 2001) (granting summary judgment on retaliation claim because "[g]iven the isolated nature of the incidents complained of ... [the] plaintiff could not have had an objectively reasonable belief that Title VII had been violated"). Put another way, Plaintiff has not shown that her third-hand reporting of this one-time comment by another employer's employees put Defendant on

Kamrowski v. Morrison Management Specialist, Not Reported in F.Supp.2d (2010)

notice of potential discrimination, especially when another supervisor (who reported the comment to Plaintiff) had already expressed disapproval regarding the incident. *See Galdieri–Ambrosini,* 136 F.3d at 292 ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that plaintiffs opposition was directed at conduct prohibited by Title VII.").

Furthermore, even assuming that Plaintiff has sufficiently shown that she engaged in protected activity, Plaintiff cannot show causation based solely on temporal proximity when almost four months passed between her reporting of allegedly discriminatory incidents in March 2003 and Mr. Chandler's first warning letter on June 27, 2003. *See Barney v. Consol. Edison Co. of N.Y.,* No. 99–CV–823, 2009 **WL** 6551494, at *12 (E.D.N.Y. Oct. 1, 2009) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." (internal quotation marks omitted)); *see also Ruhling v. Tribune Co.,* No. 04–CV–2430, 2007 **WL** 28283, at *23 (E.D.N.Y. Jan. 3, 2007) (noting that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Nicastro v. Runyon,* 60 F.Supp.2d 181, 185 (**S.D.N.Y.**1999) ( "Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation."). In any event, even assuming that Plaintiff has satisfied her prima facie case, Defendant has, as already discussed, proffered a legitimate reason for the warning letters and termination. Plaintiff's extremely weak evidence of causation is insufficient to show pretext, especially when she admits that Mr. Chandler did not discipline her after she reported the incidents to him in March 2003. (Tr. 391); *see Ford,* 2006 **WL** 538116, at *11 (noting that "[a]t the pretext stage, the factual inquiry proceeds to a new level of specificity" (internal quotation marks omitted)); *Mathurin v. Skrivaneck,* No. 00–CV–1762, 2003 **WL** 23744279, at *13 (**S.D.N.Y.** June 10, 2003) ("Upon the proffer of [ ] a neutral reason, the burden returns to the plaintiff to prove that retaliation was a motivating factor in the employer's decision."). Considering the third-hand report of Plaintiff s complaint to Mr. Chandler and the undisputed evidence that Plaintiff was insubordinate and struggled as a manager, no reasonable juror could find that Defendant disciplined and terminated Plaintiff in retaliation for her complaints in March 2003.[12] *See Bynog v. SL Green Realty Corp.,* No. **05**–CV–305, 2007 **WL** 831740, at *9 (**S.D.N.Y.**

Mar.20, 2007) (granting summary judgment on retaliation claim when the defendants "advanced a legitimate non-discriminatory reason for [the plaintiff's] termination, and [the plaintiff] [could not] refute it as pretextual"); *Mathurin,* 2003 **WL** 23744279, at *13 (dismissing retaliation claim when the "defendant invok[ed] the perceived inadequacy of plaintiff's performance as a neutral reason for her supervisors' actions, and [she] fail [ed] to offer any evidence that this explanation [wa]s untrue").

*D. State Law Whistleblower Claims*
 ***23** Construed liberally, Plaintiff's Amended Complaint also arguably raises state law claims under New York Labor Law Section 741, which prohibits employers that "provide[ ] health care services" from retaliating against employees who "perform[ ] health care services" if those employees have "disclose[d] or threaten[ ] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care." N.Y. Lab. Law § 741; *see also* N.Y. Lab. Law § 740(4) (authorizing civil action for retaliatory personnel action). However, having dismissed all of Plaintiff s federal claims, the Court must determine whether to exercise supplemental jurisdiction over these state law claims.

"The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006) (internal citations and quotation marks omitted). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. **7**, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

The Court finds that nothing distinguishes the instant case from "the usual case." Plaintiffs federal claims are all dismissed prior to trial, and there is no reason to believe that judicial economy, convenience, or fairness would be served by this Court exercising supplemental jurisdiction over Plaintiff's state law claims, and to do so would be inconsistent with the principle of comity. Thus, Plaintiffs putative state

law whistleblower claims are dismissed without prejudice to refiling in state court.

### III. Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 35), grant judgment for Defendant, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3932354

### Footnotes

1  Plaintiff did not explicitly assert claims under the New York whistleblower statutes in either her original or Amended Complaint. However, Plaintiff's Amended Complaint alleges that she was subject to adverse employment actions for voicing various concerns about food sanitation and quality. Accordingly, construing Plaintiff's pro se complaint liberally, Plaintiff could be asserting claims of retaliation under sections 740 and 741 of the New York whistleblower statute. *See* N.Y. Labor Law §§ 740–41 (McKinney 2006). *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (explaining that a court must read a pro se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments that they suggest" (internal quotation marks omitted)); *see also Russek v. Dag Media Inc.,* 47 A.D.3d 457, 851 N.Y.S.2d 399, 400 (App.Div.2008) (considering a claim under Section 740 "[d]espite plaintiff's failure to reference the Labor Law in her complaint [because] the intent to bring a whistleblower action [was] clear"). Because the Court is granting Defendant's motion, it need not address the viability of Plaintiff s state law whistleblower claims.

2  Defendant's motion papers included a statement of undisputed facts, required under **S.D.N.Y.** Local Civil Rule 56.1. Plaintiff submitted the required response to Defendant's statement—styled as "Plaintiff's Rebuttal to Defendant's Statement of Undisputed Facts"—indicating those facts that she agrees are not in dispute. When citing to such facts, the Court will cite only to Defendant's 56.1 Statement.

3  The submission referred to herein as "Plaintiff's Statement" is the 77–page submission styled as "Plaintiff's Statement of Undisputed Facts." The Court does not construe the facts included in Plaintiff's Statement as undisputed, as Defendant has not submitted—and, indeed, was under no obligation to submit—a response to Plaintiff's Statement. Nevertheless, in light of Plaintiff s pro se status, the Court has thoroughly reviewed Plaintiff's Statement and construes it as a memorandum in opposition to Defendant's motion.

4  At the time of the relevant events, Ms. Pritchard was known by her maiden name, Barbara Lutz. Ms. Pritchard is referred to in the Parties' submissions as both Barbara Lutz and Barbara Pritchard.

5  Defendant submitted portions of the transcript of Plaintiff s deposition as Exhibit C of the Affidavit of Andrew Marks. At the Court's request, Defendant submitted the entire deposition transcript, which is referred to herein as "Tr."

6  Plaintiff appears to allege that Ms. Hanslmaier was responsible for the peaches incident, because she "had just enough education to be dangerous, but was bias [sic] enough to set [the employee] up with this hate crime." (Pl.'s Stmt. ¶ 199.)

7  Although somewhat unclear, Plaintiff appears to allege that Ms. Hanslmaier discriminated against Ms. McDonald because she did not immediately check on Ms. McDonald, stated that Ms. McDonald could be disciplined for leaving the kitchen, and because Ms. McDonald's hours were reduced. (Pl.'s Stmt. ¶¶ 182–85.)

8  Plaintiff has submitted two sets of exhibits, both of which are labeled Exhibits A–F, and neither of which show the date of submission. While the Court has reviewed both exhibit sets, the Court herein cites only to the lengthier set of exhibits.

9  Congress expressly superseded *Toyota Motor Mfg.* by statute in the ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 (2008) (stating that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act"). However, these changes did not take effect until January 1, 2009, well after this action was commenced. *Id.* As Congress did not express its intent for these revisions to apply retroactively, the reasoning of *Toyota Motor Mfg.* remains applicable to this case. *See Rogers v. City*

*of New York,* 359 F. App'x 201, 203 n. 1 (2d Cir.2009). Thus, the amendments do not impact the Court's analysis and the Court will apply the ADA law that existed at the time the conduct at issue occurred. *See Geoghan v. Long Island R.R.,* No. 06–CV–1435, 2009 WL 982451, at *9 (E.D.N.Y. Apr. 9, 2009) ("[T]he ADA Amendments do not apply retroactively and thus are inapplicable to the claims in this case. The Court will apply the statute as it existed before the amendments.").

10     The Court will consider Plaintiff's hostile working environment claim despite Defendant's argument that this claim should be dismissed for "failure to exhaust administrative remedies," because "Plaintiff did not allege harassment in her administrative complaint." (Def.'s Mem. 17.) "A district court ... has jurisdiction to hear Title VII claims that ... [are] 'reasonably related' to that alleged in the EEOC charge." *Butts v. N.Y. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993); *see also Francis v. City of New York,* 235 F.3d 763, 766 (2d Cir.2000) (holding that the "benefit of the *Butts* 'reasonably related' test is not limited to plaintiffs alleging post-charge conduct"). Under the "reasonably related" standard, courts may hear "claims not raised in the [EEOC] charge ... where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402 (internal quotation marks omitted). Here, Plaintiff's hostile work environment claim is reasonably related to her EEOC charge. Plaintiff's EEOC charge did not explicitly charge Defendant with fostering a hostile work environment in violation of Title VII, but she did include claims that she "encountered and complained" about, inter alia, "sexual harassment." (Marks Aff. Ex. D, at 1.) Indeed, the SDHR final investigation report, which was adopted by the EEOC, noted that Plaintiff complained to Defendant's Human Resources department about, inter alia, "harassment" and "sexual harassment," and that one person was "terminated for sexual harassment." (*Id.* Ex. E, at unnumbered page 2.)

11     Although Plaintiff stated in her deposition that she wrote a note to Mr. Chandler saying that another racial incident had occurred in the kitchen, Plaintiff could not recall if she was referring to the incident about the kitchen workers or a different incident. (Tr. 390.) Similarly, Plaintiff alleges that she was retaliated against for "voicing" an opinion that an African American worker should not have been terminated because she reacted to the kitchen worker's racial comment (Pl.'s Stmt. ¶ 167), but Plaintiff did not provide any evidence suggesting that she discussed the employee's termination with Mr. Chandler or other management officials. Because Plaintiff has presented no evidence to suggest that she presented any other complaints of discrimination to Mr. Chandler in March 2003, Plaintiff's vague and conclusory assertion that she reported other incidents cannot defeat summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (stating that "bald assertion[s], completely unsupported by evidence" cannot defeat summary judgment).

12     To the extent Plaintiff alleges that she was retaliated against for reporting racial discrimination to Ms. Swedish in her **September** 25, 2003 letter, Plaintiff has failed to show causation when, as already explained in relation to her sexual harassment complaints, Plaintiff was disciplined before she engaged in this protected activity.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 67 of 88
Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...
2008 Copr.L.Dec. P 29,642

2008 WL 4449412
United States District Court,
S.D. New York.

MEDICAL EDUCATION DEVELOPMENT
SERVICES, INC., Plaintiff,

v.

REED ELSEVIER GROUP, PLC, Elsevier,
Inc., and Linda Anne Silvestri, Defendants.

No. 05 Civ. 8665(GEL).
|
Sept. 30, 2008.

**Attorneys and Law Firms**

Mitchell J. Rotbert, The Rotbert Law Group, LLC, Bethesda, MD, for plaintiff.

William S. Strong, Amy C. Mainelli Burke, Kotin, Crabtree & Strong, LLP, Boston, MA, and David Rabinowitz, Moses & Singer LLP, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

**\*1** Plaintiff Medical Education Development Services, Inc. brings this action against Elsevier, Inc. and Linda Anne Silvestri,[1] alleging copyright infringement, unfair competition, and misappropriation arising from defendants' alleged copying of plaintiff's licensing exam prep books for student nurses. Defendants move for partial summary judgment, arguing that they are entitled to judgment as to those portions of their publications that do not infringe plaintiff's works, and that certain claims should be dismissed as time-barred or preempted. For the reasons discussed below, defendants' motion is granted in part and denied in part.

**BACKGROUND**

The following facts are either undisputed or construed in the light most favorable to the plaintiff.

**I. The Publications**

A. *Easy Steps*

Plaintiff Medical Education Development Services, Inc. ("MEDS") publishes books and other media designed to help aspiring nurses prepare for and pass two nationally-administered licensing examinations.[2] (P. 56.1 Stmt. ¶ 1; D. 56.1 Stmt. ¶ 1; Hoefler Decl. ¶ 3.) The exams, the National Council's Licensure Examination for Registered Nurses ("NCLEX-RN") and the National Council's Licensure Examination for Practical Nurses ("NCLEX-PN"), are substantially similar in most respects, although the NCLEX-RN tends to be more complex than the NCLEX-PN given the expectation that registered nurses will exercise more skill than practical nurses. (Hoefler Decl. ¶ 4.) In 1985, Patricia Hoefler, founder and president of MEDS, began to write a series of books intended to teach students and NCLEX candidates how to improve their reasoning skills in the practice of nursing. (P. 56.1 Stmt. ¶ 1; D. 56.1 Stmt. ¶ 1; Hoefler Decl. ¶¶ 1, 8-9.) All of these books were duly registered with the United States Copyright Office. (Hoefler Decl. ¶ 11.)

In 1991, Hoefler wrote such a book entitled *NCLEX-RN Exam: Easy Steps to Passing* ("*Easy Steps*").[3] (P. 56.1 Stmt. ¶ 1; D. 56.1 Stmt. ¶ 1; Hoefler Decl. ¶ 13.) The book, which was registered with the United States Copyright Office in 1991 and 1992, is designed to help the student nurse develop and enhance her capacity to comprehend and resolve the type of real-life nursing situations tested on the NCLEX. (Hoefler Decl. ¶¶ 13, 15; P. Mem. 2.) It proceeds in three parts. The first part sets forth various methods for comprehending and analyzing likely exam questions; the second part identifies useful test-taking strategies; and the third part discusses the relevance of nursing principles, theories, and processes to the NCLEX-RN. (Hoefler Decl. ¶ 13.) According to plaintiff, this three-part discussion contains an original organizational structure and uses original associations, key words, phrases, and sentences. (Hoefler Decl. ¶ 14.)

In 1994, several years after the release of *Easy Steps,* MEDS published *The Complete Q & A Book for the NCLEX/CAT-RN* ("*Complete Q & A*"), a work derived from, and intended to be sold with, *Easy Steps.* (Hoefler Decl ¶ 16.) MEDS registered *Complete Q & A* with the United States Copyright Office in 1994. (*Id.*)

B. *The Allegedly Infringing Works*
**\*2** Defendant Elsevier, Inc. also publishes books designed to help aspiring nurses prepare for and pass the NCLEX-RN

2008 Copr.L.Dec. P 29,642

and the NCLEX-PN. (P. 56.1 Stmt. ¶ 1; D. 56.1 Stmt. ¶ 1.) In 1999, Linda Silvestri wrote, and Elsevier published, several such books, including *Saunders Comprehensive Review for the NCLEX-RN Examination* ("*RN Review I*"), *Saunders Q & A Review for the NCLEX-RN Examination* ("*RN Q & A I*"), and *Saunders Q & A Review for the NCLEX-PN Examination* ("*PN Q & A I*"). (D. 56.1 Stmt. ¶¶ 1, 32-33; P. 56.1 Stmt. ¶¶ 1, 32-33; Hoefler Decl. ¶ 19; Silvestri Decl. ¶ 1; Rotbert Decl. Ex. B.) *RN Review I* was declared out of print on December 1, 2001, and no copies were sold after October 10, 2002, and *RN Q & A I* was declared out of print on February 3, 2002, and no copies were sold after October 10, 2002.[4] (D. 56.1 Stmt. ¶¶ 32-33; P. 56.1 Stmt. ¶¶ 32-33; O'Brien Decl. ¶¶ 3-4.) An additional title, *Saunders Comprehensive Review for the NCLEX-PN Examination* ("*PN Review I*"), was published in 2000. (P. 56.1 Stmt. ¶ 34; D. 56.1 Stmt. ¶ 34; Hoefler Decl. ¶ 20; O'Brien Decl. ¶ 5; Rotbert Decl. Ex. B.) Although not declared out of print until March 23, 2003, *PN Review I* suffered negative sales from October 11, 2002 until the date of its last sale.[5] (P. 56.1 Stmt. ¶ 34; D. 56.1 Stmt. ¶ 34; O'Brien Decl. ¶ 5.)

According to plaintiff, the foregoing titles (collectively, "the infringing works") are all competing texts that contain substantial similarities to MEDS publications, particularly the 1992 edition of *Easy Steps*. (P. 56.1 Stmt. ¶¶ 3-6, 8-27, 29; Hoefler Decl. ¶¶ 19-23, 27-29.) Although defendants dispute the extent to which the allegedly infringing works exhibit such similarities (D.Mem.4-5), they acknowledge that, like MEDS's publications, their titles propose that exam candidates employ a three-part test-taking strategy. (D. 56.1 Stmt. ¶ 8.) As described by defendants, this three-part strategy includes breaking the question down into its component parts to determine what the question is really asking, looking for certain clues as to what the answer is likely to be, and using basic nursing concepts to identify the answer when a question calls for prioritizing. (D. 56.1 Stmt. ¶ 8; Silvestri Decl. ¶ 11.)

Silvestri acknowledges that she relied upon various source materials in drafting the allegedly infringing works, but she avers that-with the exception of those used for titles assembled in 2004 or later-she has since disposed of all such materials. (P. 56.1 Stmt. ¶ 28; Silvestri Dep. 33-36, 82-86.) Nevertheless, defendants concede that Silvestri had access to *Easy Steps* and *Complete Q & A* in the mid-1990s.[6] (D. 56.1 Stmt. ¶ 28; D. Mem. at 4.) After contacting Hoefler by telephone on several occasions to discuss Hoefler's approach to nursing education and MEDS's publications, Silvestri purchased a variety of MEDS resources. (Hoefler Decl.

¶¶ 17-18.) On or about November 29, 1995, for example, Silvestri contacted MEDS and purchased numerous exam prep materials, including 50 copies of *Complete Q & A*. (Hoefler Decl. ¶ 18(a); *cf.* Silvestri Decl. ¶ 8.) In connection with this sale, MEDS provided Silvestri with a complimentary copy of the 1992 edition of *Easy Steps,* which is designed to be used in conjunction with *Complete Q & A*. (*Id.*) Several months later, on or about March 27, 1996, Silvestri again contacted MEDS, this time purchasing 250 copies of *Complete Q & A*. (Hoefler Decl. ¶ 18(b); *cf.* Silvestri Decl. ¶ 8.) As before, when filling Silvestri's order, MEDS provided Silvestri with a complimentary copy of the 1992 edition of *Easy Steps*.[7] (*Id.*)

**\*3** Not until June 2003 did plaintiff discover defendants' alleged infringement. (Hoefler Decl. ¶ 24.) At that time, plaintiff notified defendants in writing of its concern. (*Id.;* Strong Decl. ¶ 2[8]; Rotbert Decl. Ex. G.) According to plaintiff, in February 2004, defendants provided a substantive response, admitting, among other things, that their publications were substantially similar to MEDS's publications, but denying that Silvestri ever referred to MEDS materials when drafting the allegedly infringing works. (Hoefler Decl. ¶ 25; *cf.* Strong Decl. ¶ 8 & Ex. F.) Defendants also represented that they would rewrite any passages that were identical or nearly identical to passages appearing in *Easy Steps*. (Hoefler Decl. ¶ 26; *cf.* Strong Decl. ¶ 8 & Ex. F.) The same month, MEDS provided Elsevier with a list of the allegedly infringing passages. (Hoefler Decl. ¶ 26.) However, defendants made no further response, nor did they fulfill their promise to rewrite any identical or nearly identical passages.[9] (*Id.*)

## II. The Parties' Contentions

Defendants concede that there are some passages in its books that constitute copyrightable expression, and that bear sufficient similarity to *Easy Steps* for a jury to find copyright infringement. (D.Mem.4-5.) Consequently, defendants move for summary judgment only as to those claims that they contend are time-barred or preempted (D.Mem.5-6, 21-22), and those passages that they contend either are not copyrightable or lack sufficient similarity to support a finding of infringement. (*Id.* 6-21.) Plaintiff responds by arguing that there are genuine issues of material fact as to whether the written expression incorporated in *Easy Steps* can be accorded copyright protection and whether the statute of limitations should be equitably tolled. (P. Mem.10-12.)

2008 Copr.L.Dec. P 29,642

# DISCUSSION

## I. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As a general rule, courts "should be especially wary of granting summary judgment in cases alleging copyright infringement." *Leibovitz v. Paramount Pictures Corp.,* 948 F.Supp. 1214, 1217 (S.D.N.Y.1996); *see also Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.1980). However, summary judgment may be granted in such cases when "no reasonable trier of fact could find the works substantially similar," or when any alleged similarity pertains only to those elements of a plaintiff's work that are noncopyrightable. *Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir.1996), quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.1986) (internal quotation marks omitted).

On a motion for summary judgment, the movant bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). When moving against a party who will bear the ultimate burden of proof on an issue, however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317.323 (1986) (noting that a "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted).

**\*4** Once the moving party has satisfied its burden, the burden then shifts to the nonmoving party to come forward with affidavits, depositions, interrogatories or other sworn evidence sufficient to create a genuine issue of material fact for trial. *See* Fed.R.Civ.P. 56(e)(2); *see also Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). The nonmoving party may not satisfy this burden simply by "show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586; *see also Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186,

188 (2d Cir.1992) (holding that a nonmovant cannot defeat a motion for summary judgment "merely ... on the basis of conjecture or surmise"), quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (internal quotation marks omitted). Rather, the nonmovant must advance "enough evidence to support a jury verdict in its favor." *Trans Sport, Inc.,* 964 F.2d at 188.

In ruling on a motion for summary judgment, a court must construe all evidence in the light most favorable to the nonmoving party, including resolving all ambiguities and drawing all factual inferences in the nonmoving party's favor. *Rule,* 85 F.3d at 1011; *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Trans Sport, Inc.,* 964 F.2d at 188. A court must neither make judgments regarding credibility or conflicting versions of events, nor engage in any weighing of the evidence, as a court resolving a motion for summary judgment is tasked not with resolving disputed issues of fact, but instead with determining whether any genuine issues of material fact remain to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Rule,* 85 F.3d at 1011. For purposes of making this determination, an issue is material if it "might affect the outcome of the suit under the governing law." *Shade v. Housing Auth. of City of New Haven,* 251 F.3d 307, 314 (2d Cir.2001), quoting *Anderson,* 477 U.S. at 248 (internal quotation marks omitted).

## II. Copyright Infringement

The Copyright Act of 1976, 17 U.S.C. § 101 et seq., protects "original works of authorship fixed in any tangible medium of expression," including literary works,[10] and accords the authors of such works the exclusive rights of publication, copying, and distribution. *Id.* §§ 102, 106: *see also Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 546-47 (1985). To prove copyright infringement, a plaintiff must demonstrate ownership of a valid copyright and unauthorized copying of a work's original elements by the defendant. *See Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., Inc.,* 499 U.S. 340, 361 (1991); *Boisson v. Banian, Ltd.,* 273 F.3d 262, 267 (2d Cir.2001).

### A. Ownership of a Valid Copyright

Pursuant to Section 410 of the Copyright Act, a "certificate of [copyright] registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c); *see also Boisson,* 273 F.3d at 267. As plaintiff has demonstrated that it registered *Easy Steps* in 1991 and

Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...

2008 Copr.L.Dec. P 29,642

1992 (*see* Hoefler Decl. ¶¶ 13, 15), and that it has duly registered all other related publications (*see id.* ¶¶ 11, 16), the copyrights at issue are presumptively valid. While this presumption may be rebutted, *see Boisson,* 273 F.3d at 267, defendants have introduced no evidence tending to refute the copyrights' validity. Thus, for purposes of this motion, the validity of plaintiff's copyrights is undisputed.

B. *Actual Copying of Plaintiff's Work*

*\*5* Determining whether a defendant has engaged in unauthorized copying of the original elements of a copyrighted work involves two separate inquiries. *See P.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.,* No. 96 Civ. 7952, 1999 WL 47191, at \* 2 (S.D.N.Y. Feb. 2, 1999). The first is whether, as a factual matter, defendant actually copied portions of the plaintiff's work, and the second is whether any such "copying, as a legal matter, constitute[s] prohibited copyright infringement." *Id.* A plaintiff may establish the fact of copying by direct or indirect evidence. *See Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir.1992). Where a plaintiff cannot introduce direct evidence of copying, indirect evidence showing that the "defendant had access to the copyrighted work, and that the allegedly infringing material bears a substantial similarity to copyrightable elements of plaintiff's work" will suffice. *Id.*

Establishing that a defendant's "copying is unlawful and hence actionable" involves a narrower analysis, as "the critical question is whether there is so-called 'substantial similarity' between the defendant's work and *the protectable elements* of the plaintiff's work." *O.P. Solutions,* 1999 WL 47191, at \* 5 (emphasis added), quoting *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997). "Although the issue of substantial similarity often raises questions of fact not appropriately resolved on a motion for summary judgment, 'a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar.' " *Id.* (alteration in original), quoting *Productivity Software Int'l Inc. v. Healthcare Techs., Inc.,* No. 93 Civ. 6949, 1995 WL 437526, at \*2 (S.D.N.Y. July 25, 1995) (quotation omitted).

Here, defendants concede that Silvestri had access to *Easy Steps* in the mid-1990s. (*See* D. Mem. 4; D. 56.1 Stmt. ¶ 28; Silvestri Decl. ¶ 8.) While Silvestri denies that she had any version of the book in her possession at the time she wrote the allegedly infringing works (*see id.*), resolution of this

issue involves credibility determinations properly reserved for a jury.[11] Thus, defendants' motion can be granted only upon a showing that, as a matter of law, the only similarities between *Easy Steps* and the allegedly infringing works pertain to noncopyrightable elements or that, even acknowledging the protection accorded the original elements of *Easy Steps,* no reasonable jury could conclude that *Easy Steps* and the allegedly infringing works are substantially similar.

1. *The Scope of Copyright Protection*

Consonant with its aim "[t]o promote the Progress of Science and useful Arts," Art. I, § 8, cl. 8, copyright protects those elements of a work that are original to the author, *i.e.,* the author's original expression,[12] but the facts and ideas underlying such expression "are free for the taking." *Feist,* 499 U.S. at 349, quoting Jane C. Ginsburg, *Creation and Commercial Value: Copyright Protection of Works of Information,* 90 Colum. L.Rev. 1865, 1868 (1990); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Harper & Row,* 471 U.S. at 547. Subsequent authors may therefore draw on the facts and ideas exposed by earlier works so long as the authors' works "do[ ] not feature the same selection and arrangement" or copy 'the [prior author's] precise words." *Feist,* 499 U.S. at 348-49; *see also Branch v. Ogilvy & Mather, Inc.,* No. 89 Civ. 2440, 1990 WL 74540, at \*7 (S.D.N.Y. May 30, 1990) (noting that while "a plaintiff can protect neither his ideas nor his use of procedures and techniques to express th[ose] ideas, he can protect the creative arrangement and interaction of the techniques composing the expression").

*\*6* Here, defendants argue that plaintiff's test-taking strategies and techniques are not themselves copyrightable. (D.Mem.6-8.) Plaintiff, however, contends that defendants have appropriated the fundamental structure adopted by *Easy Steps,* including *Easy Steps'* topics and the order in which those topics are addressed, and that defendants have otherwise engaged in verbatim or near-verbatim copying of various aspects of plaintiff's original language. (P. Mem.5-7.) To the extent that defendants draw on the well-established rule that ideas cannot be copyrighted, their position is entirely sound. Their claims that plaintiff cannot seek protection of its particular selection or expression of those strategies and techniques (D.Mem.8-11), however, are less persuasive.

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 71 of 88
Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...
2008 Copr.L.Dec. P 29,642

Courts have held that although based on facts that are not themselves copyrightable, exam prep materials can constitute protectible expression. *See College Entrance Book Co., Inc. v. Amsco Book Co., Inc.,* 119 F.2d 874, 874-76 (2d Cir.1941) (according copyright protection to a book designed to prepare high school students for examinations given by the New York Board of Regents where there was evidence that a list of French words, which constituted only 15 percent of the printed matter in both plaintiff's and defendant's work, was copied by defendants); *DF Inst., Inc. v. Marketshare Eds,* No. 07 Civ. 1348, 2007 WL 1589525, at * 4, 7 (D. Minn. June 1, 2007) (finding some of plaintiff's exam prep materials copyrightable, particularly its practice questions and answers). Similarly, although a creator of standardized test questions, and-by logical extension-a creator of practice test questions, "cannot appropriate concepts such as rules of punctuation, analogies, vocabulary or other fundamental elements of English composition, it can, using its own resources, devise questions designed to test these concepts and secure valid copyrights on [such] questions." *Educ. Testing Servs. v. Katzman,* 793 F.2d 533, 540 (3d Cir.1986); *see also Educational Testing Service v. Simon,* 95 F.Supp.2d 1081, 1088 (C.D.Cal.1999) (finding defendants liable for copyright infringement because they "copied the creative 'heart' of each infringed [test] question"). This is particularly so where the test questions "reflect original expression in their wording, particularized facts, and answer choices." *See Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 458 F.Supp.2d 252, 259 (E.D.Pa.2006) While anyone may teach the principles and information tested by such questions, they may not "[d]o[ ] so using the same fact patterns, prompts, and answer-choice combinations found in [the protected test] questions." *Id.; cf. Simon,* 95 F.Supp.2d at 1090.

Applying these principles, defendants have not established, as a matter of law, that plaintiff's work cannot be accorded copyright protection merely because it addresses test preparation in the field of nursing. Their argument that plaintiff's expression of its strategies and techniques is dictated largely by the NCLEX and the science of nursing (D.Mem.8-9) does not change this fact. Addressing a similar argument, the court in *Association of American Medical Colleges v. Mikaelian,* 571 F.Supp. 144 (E.D.Pa.1983), wrote:

> *\*7* The defendants have contended that the MCAT test questions are not copyrightable in that they are merely statements of scientific fact, facts which are in the public domain. However, the MCAT questions are undoubtedly the result of original work performed by scientists and

scholars retained by AAMC and the Research Institute to create MCAT questions. Certainly, any valid MCAT science questions will invoke scientific fact in order to pose a problem which will test the scientific knowledge of the test taker. However, the mere fact that MCAT questions refer to scientific fact does not place these questions in the public domain.

*Id.* at 150. Because defendants have not shown that a reasonable jury would be precluded from finding any of plaintiff's expressions of its strategies and techniques protectible, their motion for summary judgment is denied in this respect.

### 2. *Merger Doctrine*

Under the merger doctrine, expression that would otherwise be copyrightable will not be accorded copyright protection "where there is only one or so few ways of expressing [the] idea that protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press,* 937 F.2d 700, 705 (2d Cir.1991). A court invoking this doctrine must exercise considerable caution, as applying the doctrine too liberally ignores "arguably available alternative forms of expression," while applying the doctrine too narrowly will accord protection to ideas. *Id.* In general, "[a]s long as selections of facts involve matters of taste and personal opinion, there is no serious risk that withholding the merger doctrine will extend protection to an idea." *Id.* at 707. Putting aside the question of how the idea expressed in plaintiff's works should be defined,[13] defendants have not shown that, as a matter of law, there are so few ways of expressing the idea that the idea and the expression should be considered one. Although defendants argue that the merger doctrine precludes this Court from finding copyright infringement with respect to certain sentences contained in plaintiff's work (*see* D. Mem. 17-19 & Ex. A), for reasons discussed below, the Court will not parse plaintiff's work at the level of sentences and passages for purposes of awarding defendants summary judgment as to specific portions of plaintiff's work.[14]

Moreover, because plaintiff has demonstrated that there are a variety of competing texts designed to prepare aspiring nurses for the NCLEX, and that these texts use neither its organizational structure nor its precise choice of words and phrases (*see* P. Mem. 11; Hoefler Decl. ¶ 30), there is a genuine issue of material fact as to whether there are so few ways of expressing plaintiff's idea that its expression of the idea, which otherwise would be copyrightable, cannot be not protected.[15] *See Mason v. Montgomery Data, Inc.,*

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 72 of 88

Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...
2008 Copr.L.Dec. P 29,642

967 F.2d 135, 138-39 (5th Cir.1992) (finding application of the merger doctrine inappropriate on summary judgment where the record "contains copies of maps created by [plaintiff's] competitors that prove beyond dispute that the idea embodied in [plaintiff's] maps is capable of a variety of expressions"); cf. *Consolidated Music Publishers, Inc. v. Hansen Publ'ns, Inc.,* 339 F.Supp. 1161, 1163 (S.D.N.Y.1972) (finding that differences in arrangement and presentation between plaintiff's instruction book for playing the rhythm guitar and other books addressing the same subject matter "demonstrate[ ] that there are various ways of presenting this type of instructional material and support[ ] the conclusion that plaintiff's work is indeed copyrightable"). Thus, insofar as it is based on application of the merger doctrine, defendants' motion for summary judgment is denied.

### 3. Substantial Similarity

**\*8** In determining substantial similarity, a court generally applies the ordinary observer test, asking "whether an average lay observer would overlook any dissimilarities between the works and would conclude that one was copied from the other." *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 70 (2d Cir.1999). Where a work contains both protectible and unprotectible elements, however, "the test must be 'more discerning.' " *Id.* (quotation omitted). In these situations, a court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the *protectible elements, standing alone,* are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir.1995) (emphasis in original); *see also Nihon,* 166 F.3d at 70; *Boyle v. Stephens, Inc.,* No. 97 Civ. 1351, 1998 WL 80175, at \* 3 (S.D.N.Y. Feb. 25, 1995). As the Second Circuit has explained:

> [A] plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea. The means of expression are the 'artistic' aspects of a work; the 'mechanical' or 'utilitarian' features are not protectible.

*Knitwaves,* 71 F.3d at 1002, quoting *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 123 (2d Cir.1994).

In applying the "more discerning ordinary observer test," a court should not make the inquiry "so mechanical and counterintuitive" that the inquiry requires the court to "dissect [works] into their separate components, and compare only those elements which are in themselves copyrightable." *Id.* at 1003. Instead, keeping in mind the distinction between a work's nonprotectible elements and its selection,

coordination, arrangement, and expression of those elements-which is protectible-a court must look to the protected work's and the allegedly infringing work's "total concept and feel." *Id.,* quoting *Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 500 (2d Cir.1982) (internal quotation marks omitted); *see also Branch,* 1990 WL 74540, at \* 8 (noting that defendants "will be liable only if the artistic expression of the advertisements, *as a whole,* is substantially similar to the artistic expression of [plaintiff's work], *as a whole* ") (emphasis added).

With these principles in mind, a court assessing substantial similarity must determine whether " 'the copying [at issue] is quantitatively and qualitatively sufficient' to support a finding of infringement." *Nihon,* 166 F.3d at 70, quoting *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 75 (2d Cir.1997) (internal quotation marks omitted). As compared to a work that is "wholly original," an infringed work containing both protectible and unprotectible elements must demonstrate "a higher quantity of copying ... to support a finding of substantial similarity." *Id.* at 71. However, "[i]t is not possible to determine infringement through a simple word count; the quantitative analysis of two works must always occur in the shadow of their qualitative nature." *Id.* For purposes of this inquiry, copying may present itself in one of two forms: (1) fragmented literal similarity, which exists where there has been "exact copying of a portion of a work," *Paramount Pictures Corp. v. Carol Publ'g Group,* II F.Supp.2d 329, 333 (S.D.N.Y.1998); *see also Ringgold,* 126 F.3d at 75 n. 3, or (2) comprehensive non-literal similarity, which exists "where there is no word-for-word or literal similarity but where defendant has nonetheless appropriated the 'fundamental essence or structure' of plaintiff's work," *Arica,* 970 F.2d at 1073 (citation omitted).

**\*9** Defendants provide an onslaught of arguments, which, taken together, are intended to demonstrate that the portions of their publications at issue in this motion bear no substantial similarity to the protectible aspects of plaintiff's work. (D. Mem. 11-13 (defendants' "rationales" are related to plaintiff's rationales only thematically and do not involve verbatim copying beyond individual words and phrases, which are noncopyrightable); *id.* 14-17 (organization of various chapters in defendants' works, while presenting some basic similarities, do not bear sufficient similarity to plaintiff's overall organization to support a finding of infringement).) The recitation of the law that accompanies defendants' arguments is, for the most part, spot on. At this juncture, however, it is inappropriate to reach these arguments,

2008 Copr.L.Dec. P 29,642

as defendants base the arguments on a methodologically unsound premise. While conceding that some of their sentences and passages contain copyrightable expression and bear such similarity to protected elements of plaintiff's work that they cannot be resolved on a motion for summary judgment, defendants nonetheless contend that they are entitled to summary judgment as to various other sentences and passages that do not meet this standard.

"It is entirely immaterial that in many respects plaintiff's and defendant[s'] works are dissimilar if in other respects similarity as to a substantial element of plaintiff's work can be shown." *Churchill Livingstone, Inc. v. Williams & Wilkins,* 949 F.Supp. 1045, 1055 (S.D.N.Y.1996) (alteration omitted), quoting 3 *Nimmer on Copyright* § 13.03[B] at 13-51. "As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.' " *Harper & Row,* 471 U.S. at 565, quoting *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.1936); *see also Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.1992) ("[N]o copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated."). That defendants can identify certain sentences or passages that bear no similarity to plaintiff's work says nothing of the nature or importance of those sentences and passages that do bear similarity to plaintiff's work and which defendants have conceded are inappropriate for resolution on this motion for summary judgment. *See Meredith Corp. v. Harper & Row Publishers, Inc.,* 413 F.Supp. 385, 386-87 (S.D.N.Y.1975) (flagging "the issue of whether an admitted substantial infringer is entitled to Court review of every corner of the infringing book for the purpose of excising the plagiarized portions from those which are not," and rejecting defendants' argument that plaintiff's rights did not extend to the 89% of the allegedly infringing work that was not plagiarized because the infringing work demonstrated an "extensive taking of the structure and topical sequence of [plaintiff's] book" and any copying affected the entire work, not just the 11% admittedly plagiarized); *see also Educ. Testing Servs.,* 793 F.2d at 542 (noting that where the record supported plaintiff's claim that certain test questions had been copied either verbatim or based on "recognizable paraphrases," "the fact that some questions referred to by [plaintiff] may not be infringing" did not diminish plaintiff's likelihood of success for purposes of a preliminary injunction).

**\*10** Indeed, by acknowledging that there are some portions of their works that contain copyrightable information that, when compared with plaintiff's work, may admit of a finding of substantial similarity, defendants all but concede that summary judgment is unwarranted. *See O.P. Solutions,* 1999 WL 47191, at \* 5 (summary judgment should be granted in a copyright infringement case only where "the similarity concerns only noncopyrightable elements of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially similar") (alteration in original), quoting *Productivity Software,* 1995 WL 437526, at \*2. Without having the totality of both the similar and dissimilar portions of the parties' works before the Court on this motion, there is no basis for concluding that a reasonable jury could not find substantial similarity. Additionally, it should be noted that accepting defendants' invitation to parse the parties' works in the manner advocated would ignore the principle that infringement should be determined by comparing the total concept and feel of the protected work to the total concept and feel of the allegedly infringing work. *See Knitwaves,* 71 F.3d. at 1003; *Branch,* 1990 WL 74540, at \* 8. Even from the similar portions that are before the Court-in the form of concededly similar portions or material defendants incorrectly argue is dissimilar-it is apparent that plaintiff's infringement claim possesses sufficient merit to require trial. For these reasons, and except as otherwise noted herein, defendants' motion for partial summary judgment is denied.

### C. Statute of Limitations

Defendants argue that plaintiff's action is time-barred with respect to any claims involving *RN Review I* and *RN Q & A I,* as these books were deemed out of print prior to October 2002 and garnered no sales during the three years preceding plaintiff's commencement of this action. (*See* D. Mem. 6.) Defendants also contend that they are entitled to summary judgment on any of plaintiff's claims involving *PN Review I,* because plaintiff has limited its requested relief to an accounting of profits and *PN Review I* had negative sales numbers during the relevant limitations period. (*See id.*)

Plaintiff, in turn, argues that defendants reaped profits from their early publications as late as 2002, and that such profits fall within the three-year statute of limitations defendants seek to apply. (*See* P. Mem. 11.) Plaintiff also argues that the statute of limitations should be equitably tolled on account of defendants' alleged spoliation of evidence, and in light of their promise to rewrite the allegedly infringing portions of their publications but subsequent failure to do so. (*Id.* 11-12.)

Under the Copyright Act, a copyright infringement action must be commenced within three years of its accrual. *See* 17 U.S.C. § 507(b); *see also Kregos v. Associated Press,* 3 F.3d

Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...

2008 Copr.L.Dec. P 29,642

656, 661 (2d Cir.1993). Courts have disagreed as to when such claims actually accrue. However, following the thorough analysis set forth in *Auscape International v. National Geographic Society,* 409 F.Supp.2d 235 (S.D.N.Y.2004), plaintiff's cause of action accrued on the date of infringement, not on the cite that it may have discovered such infringement. *See id.* at 247; *Chivalry Film Productions v. NBC Universal, Inc.,* No. 05 Civ. 5627, 2006 WL 89944, at * 1 (S.D.N.Y. Jan. 11, 2006).

**\*11** Because plaintiff commenced the present action on October 11, 2005, any claims for damages or profits from sales of the allegedly infringing works that pre-date October 11, 2002, are time-barred. For purposes of this motion, plaintiff has conceded that *RN Review I* and *RN Q & A I* went out of print on December 1, 2001, and February 3, 2002, respectively, and that neither book generated any sales after October 10, 2002. (*See* D. 56.1 Stmt. ¶¶ 32-33; P. 56.1 Stmt. ¶¶ 32-33.) Thus, defendants' motion for summary judgment is granted with respect to these two titles.

While defendants also seek dismissal of those claims involving *PN Review I,* this aspect of their motion is denied. Defendants claim that plaintiff is bound by its representation, set forth in its answer to Interrogatory No. 2, that it would not attempt to prove its actual damages. (*See* D. Mem. 6; D. 56.1 Stmt. ¶ 31 & Ex. C.) Although, in this Circuit, contention interrogatories[16] are treated as judicial admissions "that generally stop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses,"[17] *Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294, 1999 WL 672902, at * 2 (S.D.N.Y. Aug. 27, 1999), the Copyright Act classifies actual damages and infringer's profits as a single category of damages. *See* 17 U.S.C. § 504(a); *Latin American Music Co., Inc. v. Spanish Broadcasting Sys., Inc.,* 866 F.Supp. 780, 782 (S.D.N.Y.1994) ("A plaintiff in a copyright infringement action may elect to pursue either (i) actual damages plus infringer's profits or (ii) statutory damages, but not both."). Moreover, "a plaintiff in a copyright infringement case ... may choose the type of damages it will seek at any time until final judgment is rendered."[18] *Latin American Music,* 866 F.Supp. at 783; *see also* 17 U.S.C. § 504(c)(1); *N.A.S. Import, Corp. v. Chenson Enters., Inc.,* 968 F.2d 250, 252 (2d Cir.1992); *Rogers v. Koons,* 960 F .2d 301, 312-13 (2d Cir.1992) (noting that although plaintiff moved for infringing profits on summary judgment and appealed from the district court's denial of such profits pending trial on the issue of damages, plaintiff "remain[ed] at liberty to elect statutory damages in lieu

of an award of actual damages and apportioned profits"). Accordingly, this Court declines to hold that a plaintiff served contention interrogatories in a copyright action must make a binding election of damages prior to the time the controlling statutory scheme establishes for doing so. Thus, defendants' motion for summary judgment is denied with respect to those claims involving *PN Review I.*

Confronted with defendants' statute of limitations defenses, plaintiff argues that there is an issue of fact as to whether the limitations period should be equitably tolled, because defendants disposed of Silvestri's source materials after they were under an obligation to preserve all relevant evidence, and because defendants represented that they would rewrite the allegedly infringing portions of their works but ultimately failed to do so. (P. Mem.11-12.) These arguments are meritless. When a plaintiff is aware of the existence of a cause of action but delays in filing suit because of a defendant's misconduct, equitable estoppel may toll the limitations period. *See Barksdale v. Robinson,* 211 F.R.D. 240, 245 (S.D.N.Y.2002). Courts have held that this exception applies where "the defendant misrepresented the length of the limitations period or 'lulled the plaintiff into believing it was not necessary to commence the litigation.' " *Netzer v. Continuity Graphic Assocs., Inc.,* 963 F.Supp. 1308, 1316 (S.D.N.Y.1997), quoting *Cerbone v. Int'l Ladies' Garment Workers' Union,* 768 F.2d 45, 50 (2d Cir.1985). However, in seeking to apply this doctrine, a plaintiff must demonstrate that it has exercised due diligence. *See Netzer,* 963 F.Supp. at 1316. Where "[a] plaintiff ... unreasonably relies on the reassurances of a wrongdoer[, it] has not satisfied this obligation." *Id.*

**\*12** Plaintiff's argument that it delayed filing suit on account of defendants' representation that they would rewrite the allegedly infringing passages may very well give rise to an issue of fact as to whether defendants lulled plaintiff into believing that this action was unnecessary. However, plaintiff cannot demonstrate that it has exercised due diligence. Plaintiff asserts that defendants promised to rewrite the allegedly infringing passages in February 2004, and that it provided defendants with a list of the allegedly infringing passages the very same month. (*See* Hoefler Decl. ¶ 26; *cf.* Strong Decl. ¶ 8 & Ex. F.) Accepting these facts as true, plaintiff nonetheless delayed an additional year and a half before filing suit. Such delay cannot constitute due diligence.

As to plaintiff's spoliation claims, even assuming, *arguendo,* that there was spoliation of evidence, it is entirely

2008 Copr.L.Dec. P 29,642

unclear how any such spoliation of evidence, which could not have occurred or been discovered until after the litigation was begun, could have induced plaintiff's delay.[19] Accordingly, plaintiff's tolling arguments cannot defeat summary judgment.

### III. State Law Claims

In addition to alleging copyright infringement, plaintiff also alleges unfair competition and misappropriation under state law. (Compl.¶¶ 49-52.)[20] Defendants argue that these common law claims arise from the same facts as plaintiff's copyright infringement claim and are therefore preempted by Section 301(a) of the Copyright Act. (D.Mem.21-22.) Plaintiff, in response, contends that defendants cannot dispute the validity of its claim to copyright protection, on the one hand, while arguing, on the other hand, that its common law claims are preempted precisely because it has alleged such protection. (P. Mem.12.) Plaintiff further contends that because its common law claims are not premised solely on the copying of its protected expression, preemption is improper. (Id.)

Construing Section 301(a) of the Copyright Act, courts have held that state causes of action are preempted where "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected ty copyright law under 17 U.S.C. § 106." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 305 (2d Cir.2004). As previously discussed, plaintiff's works clearly fall within the category of works protected by the Copyright Act. Thus, the only remaining question is whether the second prong of the preemption test, commonly referred to as the general scope requirement, has been satisfied.

In applying the general scope requirement, a court will find a state law claim preempted where the claim "involve[s] acts of reproduction, adaptation, performance, distribution or display"-all of which would, "by [themselves], infringe one of the exclusive rights provided by federal copyright law"- and where "the state law claim [does] not include any extra elements that make it qualitatively different from a copyright infringement claim." *Id.* Accordingly, the Second Circuit has held that federal copyright law preempts "unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression." *Nat'l Basketball Ass'n*

*v. Motorola, Inc.,* 105 F.3d 841, 851 (2d Cir.1997); *see also Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986); *Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 247 (2d Cir.1983).

**\*13** Here, plaintiff claims that "[d]efendant[ ] Elsevier ha[s] misappropriated the results of [p]laintiff's skill and expenditures of time and labor in creating and publishing the MEDS' [sic] Nursing Exam Material, and otherwise ha[s] reaped where [p]laintiff has sown ." (Compl.¶ 51.) Because plaintiff alleges that this misappropriation arises from defendants' publication of the allegedly infringing works, however there is no qualitative difference between this claim and plaintiff's copyright infringement claim. While plaintiff does assert that "[d]efendants have, by and through their agents, including Si vestri, misappropriated MEDS' Nursing Exam Material, and unfairly competed against [p]laintiff, with malice, wanton, and/or with recklessness akin to malice or wanton that betokens improper motive or vindictiveness" (Compl.¶ 52), allegations of bad faith or ill-intent are insufficient *to* "transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch,* 373 F.3d at 306; *see also Atrium Group De Ediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.,* 565 F.Supp.2d 505, 510 (S.D.N.Y.2008); *Orange County Choppers, Inc v. Olaes Enters., Inc.,* 497 F.Supp.2d 541, 556 (S.D.N.Y.2007). As made clear by the Second Circuit, "[a]n action will not be saved from preemption by elements such as awareness or intent, which alter 'the action's scope but not its nature.' " *Nat'l Basketball Ass'n,* 105 F.3d at 851, quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 717 (2d Cir.1992) (internal quotation marks and citation omitted).

Even assuming, as argued by plaintiff, that plaintiff's unfair competition and misappropriation claims are premised, at least in part, on phone discussions between Hoefler and Silvestri in which Hoefler conveyed commercially valuable information to Silvestri, and Silvestri subsequently used that information, these allegations would-at most-give rise to a claim of unfair competition or misappropriation involving "reverse passing off," *i.e.,* defendants' attempts to "sell[ ] plaintiff's products as [their] own." *Colour & Design v. U.S. Vinyl Mfg. Corp.,* No. 04 Civ. 8332, 2005 WL 1337864, at * 6 (S.D.N.Y. June 3, 2005) (quotation omitted). Apart from the dearth of evidence in the record supporting such a claim, claims alleging reverse passing off are preempted because they are the functional equivalent of copyright infringement

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 76 of 88

Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...
2008 Copr.L.Dec. P 29,642

claims. *See id.* Accordingly, defendants' motion for summary judgment is granted as to plaintiff's state law claims.

**CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment is granted with respect to plaintiff's copyright claims relating to *Saunders Comprehensive Review for the NCLEX-RN, 1st Edition,* and *Saunders Q & A Review for the NCLEX-RN Examination, 1st Edition,* and with respect to plaintiff's claims for unfair competition and misappropriation under state law. Defendants' motion is denied in all other respects.

**\*14** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4449412, 2008 Copr.L.Dec. P 29,642

**Footnotes**

1    This action was originally brought against Reed Elsevier Group, PLC, Linda Anne Silvestri, Laurent W. Valliere, Professional Nursing Seminars, Inc., and Nursing Reviews, Inc. (Original Complaint, dated October 10, 2005.) On October 6, 2006, plaintiff filed an amended complaint, naming as defendants only Reed Elsevier Group, PLC, Elsevier, Inc., and Linda Anne Silvestri. (Amended Complaint, dated October 6, 2006.) On October 16, 2006, plaintiff voluntarily dismissed, without prejudice, its claims against Valliere, Professional Nursing Seminars, Inc., and Nursing Reviews Inc. On August 23, 2007, the Court approved a stipulation dismissing, with prejudice, plaintiff's claims against Reed Elsevier Group, PLC. Elsevier, Inc. and Linda Anne Silvestri are therefore the only remaining defendants in this action.

2    In addition to helping nurse candidates prepare for and pass these examinations, MEDS's materials are also intended as general curriculum resources. (Hoefler Decl. ¶ 3.)

3    Various editions of *Easy Steps* have since been published, including an edition in 1992. (Hoefler Decl. ¶ 13.) However, the material aspects of the book have changed little since its initial publication in 1991. (*Id.*)

4    Defendants do not mention publication of *PN Q & A I* in their statement of undisputed facts, nor do they otherwise provide any indication as to the dates on which it assumed out of print status and ceased being sold.

5    From 2001-2006, several other titles followed, including: *Saunders Comprehensive Review for the NCLEX-RN Examination, 2nd and 3rd Editions, Saunders Comprehensive Review for the NCLEX-PN Examination, 2nd and 3rd Editions, Saunders Q & A Review for the NCLEX-RN Examination, 2nd and 3rd Editions, Saunders Q & A Review for the NCLEX-PN Examination, 2nd and 3rd Editions, Saunders Strategies for Success for the NCLEX-RN Examination,* and *Saunders Strategies for Success for the NCLEX-PN Examination.* (Hoefler Decl. ¶¶ 21-23, 28-29; Silvestri Decl. ¶ 1; Rotbert Decl. Ex. B.) During this time, defendants also released several combination packages, which coupled for sale one or more of the allegedly infringing works and related software programs. (Hoefler Decl. ¶ 27; Rotbert Decl. Ex. B.)

6    Silvestri maintains that she neither possessed plaintiff's books at the time she wrote the allegedly infringing works, nor did she rely on them. (D. 56.1 Stmt. ¶ 28; Silvestri Decl. ¶ 8.) A factfinder at trial would not be required to accept this testimony.

7    Aside from these events, which demonstrate Silvestri's access to *Easy Steps* and *Complete Q & A,* Silvestri also had access to other MEDS information. In 1997, for example, Silvestri acquired a demonstration of MEDS test-taking software that contained outlines of a host of MEDS publications. (Hoefler Decl. ¶ 18(c).)

8    All references to the Strong Declaration are to the Second Declaration of William S. Strong, dated November 28, 2007.

9    Defendants intimate that there was no revision because, despite plaintiff's assertion to the contrary, plaintiff failed to provide them with a list of the passages to which it took issue. (Strong Decl. II ¶¶ 8-9.) Defendants also argue that whatever willingness they may have expressed to consider revising certain portions of their publications cannot be construed as a promise. (*Id.* ¶ 8.)

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 77 of 88

Medical Educ. Development Services, Inc. v. Reed Elsevier..., Not Reported in...

2008 Copr.L.Dec. P 29,642

10    The Copyright Act defines literary works as "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. § 101.

11    Even assuming Silvestri's testimony is credible in this respect, it would not-as a matter of law-preclude plaintiff from establishing unlawful copying, as even "[s]ubconscious copying stemming from having read the copyrighted work at some time in the past," *Arica Inst., Inc. v. Palmer,* 761 F.Supp. 1056, 1066 (S.D.N.Y.1991), is actionable.

12    This protection stands so long as the selection and arrangement is not "so mechanical or routine as to require no creativity whatsoever." *Feist,* 499 U.S. at 362.

13    A court's decision whether:o apply the merger doctrine turns, at least in part, on its definition of the author's idea. *See Sparaco v. Lawler, Matusky, Skelly Engineers LLP,* 60 F.Supp.2d 247, 252 (S.D.N.Y.1999); *see also Mason v. Montgomery Data, Inc.,* 967 F.2d 135, 138, 140 (5th Cir.1992). However, as noted by at least one court, "[s]urprisingly little has been said by courts or scholars about how:o determine the idea behind an expression." *Tensor Group, Inc. v. Global Web Sys., Inc.,* No. 96 Civ. 4606, 1998 WL 887081, at * 2 (N.D.Ill.Dec. 11, 1998). In light of what little case law does address the matter, it is clear that an idea must "be formulated on an abstract level." *Id.* at *3, quoting 4 *Nimmer on Copyright* § 13.03[B][3] n. 167. Otherwise, "a copyright defendant could always avoid liability merely by describing a plaintiff's work in great detail and then labeling that description the 'idea' of plaintiff's work. The 'idea' of any work could always be defined in such detail that the description of the expression would add nothing to the idea', thus allowing a defendant to engage in all but verbatim copying. Such a ploy cannot be allowed.... [Rather,] the description of the work for the purpose of identifying its idea must be a simple one." *Midway Mfg. Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 148 (D.N.J.1982), citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1168 (9th Cir.1977). In addition, courts construing an author's idea must bear in mind "the preservation of the balance between competition and protection reflected in the patent and copyright laws." *Mason,* 967 F.2d at 139, quoting *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971). Because neither party has sufficiently briefed this matter, which necessarily involves ad hoc determinations, *see Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960), and because defendants' arguments favoring application of the merger doctrine fail on other grounds, defining plaintiff's "idea" at this juncture is both unwise and unnecessary.

14    Relying on *Computer Associates International, Inc. v. Altai, Inc.,* 982 F.2d 693 (2d Cir.1992), and *Bateman v. Mnemonics, Inc .,* 79 F.3d 1532 (11th Cir.1996), defendants argue that it is entirely proper to apply merger analysis to specific parts of a work, as opposed to the work as a whole. (D. Reply Mem. 9.) Because *Computer Associates* and *Bateman* address the application of the merger doctrine to computer programs, which the Second Circuit has found are "the composite result of interacting subroutines," each of which "is itself a program, and thus, may be said to have its own 'idea,' " *Computer Assocs.,* 982 F.2d at 705, these cases are distinguishable on their facts.

15    Defendants argue that the existence of these competing texts is irrelevant because they do not adopt the strategic visions and methods advanced by plaintiff's and defendants' works. (*See* D. Reply Mem. 9.) While defendants may ultimately succeed on this argument, based on the current record, assessment of the various approaches taken by any competing works presents questions of fact for trial.

16    "Contention interrogatories issued pursuant to Rule 33 of the Federal Rules of Civil Procedure are one of many discovery tools designed to assist parties in narrowing and clarifying the disputed issues and reducing the possibility of surprise at trial." *Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294, 1999 WL 672902, at * 1 (S.D.N.Y. Aug. 27, 1999). These interrogatories are used to gather a variety of information, "including identification of a party's legal positions regarding a given issue and the evidence on which those contentions are based." *Id.*

17    *See also Guadagno v. Wallack Ader Levithan Assocs.,* 950 F.Supp. 1258, 1261 (S.D.N.Y.1997) (emphasizing the difference between judicial admissions, or "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them," and ordinary evidentiary admissions, which "may be controverted or explained by the party").

2008 Copr.L.Dec. P 29,642

18    This right is forfeited, however, where a plaintiff "fail[s] to produce any evidence of actual damages [during] discovery." *Latin American Music,* 866 F.Supp. at 783. In such situations, a plaintiff will be deemed to have elected statutory damages by default. *See id.* at 782-83.

19    Whether plaintiff is entitled to an adverse inference as a result of the alleged spoliation presents a different issue, which need not be resolved at this stage of the litigation.

20    All references to the complaint are to plaintiff's amended complaint, dated October 6, 2006.

---

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 79 of 88

Snider v. Wolfington Body Company, Inc., Not Reported in Fed. Supp. (2016)
2016 Wage & Hour Cas.2d (BNA) 344,903

2016 WL 6071359
United States District Court, **E.D. Pennsylvania.**

Reanne **SNIDER**, Plaintiff,

v.

**WOLFINGTON BODY** COMPANY, INC.;
Eagle **Wolfington** Leasing Corporation;
and Richard I. **Wolfington**, Jr., Defendants.

CIVIL ACTION No. 16-02843
|
Signed 10/17/2016

**Attorneys and Law Firms**

Justin F. Robinette, Post & Post LLC, Berwyn, PA, for Plaintiff.

George B. Randolph, David Lee Black, Riley Riper Hollin & Colagreco, Exton, PA, Frederick G. Sandstrom, Blank Rome LLP, Philadelphia, PA, for Defendants.

### MEMORANDUM

PAPPERT, District Judge

**\*1** Reanne **Snider** was in the early stages of her pregnancy at the time the Defendants hired her. When she took more than the allotted ten days of leave to have and care for her child, her employment was terminated. Her claims do not concern that termination. **Snider** contends instead that the Defendants subsequently refused to rehire her because of her prior pregnancy and the chance she might become pregnant again. She alleges violations of Title VII of the Civil Rights Act as amended by the Pregnancy Discrimination Act, the Family and Medical Leave Act and Pennsylvania common law. Before the Court is Defendants' September 14, **2016** Motion to Dismiss **Snider**'s Second Amended Complaint. For the reasons discussed below, the Court denies the motion with respect to Count I and grants the motion with respect to Counts II through VIII.

### I.

Defendants **Wolfington Body** Company, Eagle **Wolfington** Leasing Corporation and Richard **Wolfington** hired **Snider**

as a clerk in August 2014.[1] (2d Am. Compl. ¶ 4.) Richard **Wolfington** is the president, treasurer and vice president of both companies. (*Id.* ¶ 14.) When she was hired, **Snider** was two to three months pregnant, but not "showing." (*Id.* ¶ 15.) **Snider** alleges that when she began her employment she told Kelly Harper, Defendants' head of administration, that she was pregnant. Harper responded by saying "Oh, OK." (*Id.* ¶ 54.)

Around November or December 2014 **Snider** requested medical leave to give birth and care for her newborn, (*id.* ¶ 17), but Defendants told her that they did not have a maternity leave policy, (*id.* ¶ 18). **Snider** alleges that during the same time period Defendants also told her that her position was going to be eliminated. (*Id.* ¶ 19.) On December 3, 2014 **Snider** met with the executive assistant of human resources and assistant office manager who also told her Defendants did not have a maternity leave policy. (*Id.*) In December 2014 or January 2015 Defendants told **Snider** that she would be allowed to take up to ten days of leave. (*Id.* ¶ 21.)[2] **Snider** gave birth on January 27, 2015. (*Id.* ¶ 22.) She received a letter from Defendants dated that same day. (*Id.*) **Snider** alleges that this was a "termination letter" and that she was therefore fired on January 27, 2015. (*Id.* ¶ 22.)[3] **Snider** contends that she was let go because of her pregnancy, (*id.* ¶ 24), since Defendants allowed non-pregnant employees to take absences longer than ten days, (*id.* ¶ 25).[4]

**\*2** From February to June of 2015, **Snider** contends that she repeatedly sent requests to Defendants to be rehired to her position or an equivalent position within the company. (*Id.* ¶ 30.) **Snider** declares that "upon information and belief," all positions were filled by a "non-pregnant" employee. (*Id.* ¶¶ 30–37.) **Snider** claims that Defendants did not have a policy prohibiting discrimination on the basis of pregnancy, (*id.* ¶ 42), did not have an FMLA policy, (*id.* ¶ 45) and did not post or provide notice of FMLA rights, (*id.*). **Snider** alleges that her request for maternity leave was an "attempt to exercise her rights under the FMLA" and that she was fired in part for this action. (*Id.* ¶ 58.) **Snider** filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 30, **2016**. (*Id.* ¶ 39.)

**Snider** filed her first complaint in the Chester County Court of Common Pleas and Defendants removed the case on June 9, **2016**. (ECF No. 1.) Defendants' filed their first Motion to Dismiss on June 14, **2016**. (ECF No. 4.) In response, **Snider** filed her First Amended Complaint on June 28,

**2016**. (ECF No. 8.) Defendants filed their second Motion to Dismiss on July 29, **2016**. (ECF No. 13.) **Snider** filed her response and—instead of moving for leave to amend her complaint again—attached to her response a "Praecipe to Supplement and Attach." (ECF No. 16.) The "Praecipe" was another purported amended complaint. The Court allowed the Praecipe to constitute a Second Amended Complaint. (*Id.*)

**Snider** now brings eight claims: (1) individual disparate treatment, (2) systemic disparate treatment, (3) systemic disparate impact and (4) retaliation under Title VII and the PDA; (5) retaliation and (6) interference under the FMLA; and (7) negligent misrepresentation and (8) wrongful termination under Pennsylvania common law.

## II.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation omitted). While a complaint need not include detailed facts, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

*Twombly* and *Iqbal* require the Court to take three steps to determine whether the Second Amended Complaint will survive Defendants' motion to dismiss. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. **2016**). First, it must "take note of the elements the plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, where the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, ___ F.3d ____, No. 15-3491, **2016 WL** 5799656, at

*8 (3d Cir. **Oct.** 5, **2016**) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.* This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87).

**\*3** This plausibility standard, however, "does not impose a heightened pleading requirement" and does not require a plaintiff to plead specific facts. *Id.* In other words, "courts cannot inject evidentiary issues into the plausibility determination." *Id.* The Third Circuit has also made it clear that "at least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss" because a "prima facie case is an evidentiary standard, not a pleading requirement and hence is not proper measure of whether a complaint fails to state a claim." *Connelly*, 809 F.3d at 789 (internal quotations and citations omitted). Instead, a plaintiff should plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Id.* (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)).

## III.

**Snider**'s First Amended Complaint alleged that Defendants wrongfully terminated her in violation of Title VII and the PDA. Before a plaintiff seeks relief under Title VII, however, she must first exhaust her administrative remedies by filing a charge with the EEOC. **Snider** did not file a charge with the EEOC until March 30, **2016**, meaning any cause of action premised on acts occurring on or before June 4, 2015 are barred by statute.[5] *See* 42 U.S.C. § 2000e-5(e)(1) (claim must be filed with EEOC within 300 days of alleged unlawful employment practice); *see also Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). Thus, **Snider**'s claims relating to her termination, which occurred in January 2015, are time barred.

Recognizing this fact and prior to amending her complaint for the second time, **Snider** withdrew all claims premised on acts occurring on or before June 3, 2015. *See* (ECF No. 15, at 1–2; ECF No. 24, at 15). In their place, **Snider** now argues that Defendants *failed to rehire* her because of her prior pregnancy and that at least some of these failures to rehire occurred after June 3, 2015. This core allegation makes up four counts of her complaint: (1) individual disparate treatment on the basis

Snider v. Wolfington Body Company, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 344,903

of sex and pregnancy; (2) systemic disparate treatment on the basis of sex and pregnancy; (3) systemic disparate impact on the basis of sex and pregnancy; and (4) retaliation under Title VII.

To establish the elements of a pregnancy discrimination claim, a plaintiff must show that: "(1) she was pregnant and that her employer knew of the pregnancy; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there is a nexus between her pregnancy and the adverse employment action." *Laverty v. Drexel Univ.*, 14-5511, **2016** WL 245307, at *6 (**E.D. Pa.** Jan. 21, **2016**) (citing *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008)). A woman need not be physically pregnant at the time of the alleged discrimination to state such a claim. *See Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005) ("Whether one is or is not pregnant at the time she suffers discrimination one can allege discrimination under the [PDA].); *see also Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (finding that a jury could conclude there was a causal connection between pregnancy and termination despite a year gap between the two).

Generally a PDA plaintiff's membership in the protected class is "obvious" where the employee "suffered the adverse employment action during pregnancy, maternity leave, or shortly after returning to work." *Solomen v. Redwood Advisory Co.*, 183 F. Supp. 2d 748, 754 (**E.D. Pa.** 2002). While "some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions,' for the purposes of the PDA." *Id.* at 753 (quoting 42 U.S.C. § 2000e(k)).

**\*4** When "the employee is not pregnant at or around the time that she suffers the alleged adverse employment action, her membership in the protected class is less clear" and such a plaintiff "has some additional burden in making out a prima facie case." *Id.* "Such a showing might consist of evidence that harassment or discriminatory statements by plaintiff's supervisors began during her pregnancy or maternity leave and continued with some regularity until the adverse employment action occurred." *Id.* "[A] plaintiff who was not pregnant at or near the time she was terminated must demonstrate that the effects of her pregnancy continued to exist at the time she was terminated, either in actual fact or in the thoughts and actions of those responsible for firing her." *Id.*; *see also Saleski-Shingara v. VNA Health Systems*, No. 14-cv-00085, 2014 WL 5702928, at *8 (**E.D. Pa.** Nov. 5, 2014).

**A.**

Count I is an individual disparate treatment claim under Title VII. Title VII forbids employers from discriminating against any individual because of race, color, religion, sex or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). The PDA amended Title VII in 1978. "Rather than introducing new substantive provisions protecting the rights of pregnant women, the PDA brought discrimination on the basis of pregnancy within the existing statutory framework prohibiting sex-based discrimination." *Solomen*, 183 F. Supp. 2d at 752 (quoting *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312 (11th Cir. 1994)).

"A Title VII plaintiff may make a claim for discrimination under either the pretext theory set forth in [*McConnell*] or the mixed-motive theory set forth in [*Price Waterhouse*], under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." *Connelly*, 809 F.3d at 788 (internal quotations and citations omitted). At the motion to dismiss stage, however, a plaintiff need not specify which theory she is pursuing. Thus "for purposes of noting the elements [**Snider**] must plead to state a disparate treatment claim, [the Court] take[s] it as given that she may advance either a mixed-motive or a pretext theory." *Id.* Plaintiff should plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Id.*

Again, the adverse employment action of which **Snider** complains is *not* her termination (which was time barred), but is instead the alleged failures to hire (or rehire) her that occurred between June 2015 and March **2016**—that is, between four and thirteen months after **Snider** gave birth. Since **Snider** was not pregnant at any time when she alleges Defendants failed to rehire her, she must plead facts to establish that she was still affected by pregnancy, childbirth or related medical conditions or that the effects of her pregnancy continued to exist in the thoughts and actions of the Defendants.

When **Snider** was still working for the Defendants, she alleges that Richard **Wolfington** saw that she was pregnant and gestured to another employee while pointing to his stomach. (2d Am. Compl. ¶ 16.) The other employee responded, "that was from before she was interviewed." (*Id.*) **Snider** also alleges that Defendants only allowed her to take

ten days of leave for her pregnancy, whereas other non-pregnant employees were allowed to take longer leaves of absences. (*Id.* ¶ 25.) **Snider** contends that Defendants had discretion in their leave policy to allow her to take more time off. (*Id.* ¶ 27.) She was not offered this additional time, however, and her employment was terminated on the day she gave birth. (*Id.* ¶ 22.) She then claims that in March 2015, an employee of Defendants told another employee that there must have been "some issue" with **Snider** because "she was only given [two] weeks and was terminated." (*Id.* ¶ 29.) Additionally, **Snider** alleges that from February through July 2015 she called Defendants and sent requests to be rehired to her position, but her calls were not returned. (*Id.* ¶ 30.) She further contends that at some point between February and July 2015, Defendants informed her that they had filled the position. (*Id.* ¶ 32.) "Upon information and belief," **Snider** says Defendants filled the position with a non-pregnant employee. (*Id.*)

**\*5** At oral argument, **Snider**'s counsel conceded that plaintiff was not pregnant nor did she have a medically related condition at the time she was applying for rehire. (Tr. of Oral Arg. 65:14–65:23.) Counsel contended instead that Defendants failed to rehire **Snider** because they held her prior pregnancy against her. (*Id.* at 65:14–65:23; 65:25–66:5.) Much of **Snider**'s factual allegations seem to pertain more to her *termination*, than her *failure to rehire* claim. Under **Snider**'s theory, however, these allegations may be viewed as circumstantial evidence of Defendants' motive for their failure to rehire. **Snider** has plead, albeit barely, enough facts to raise a reasonable expectation that discovery will reveal the necessary elements of her claim and the motion to dismiss is denied as it pertains to Count I.

**B.**

Count II alleges systemic disparate treatment under Title VII. To present a claim of systemic disparate treatment, **Snider** must plead facts to suggest that Defendants intentionally had a formal policy of discrimination or a pattern or practice of discriminating against pregnant women. *See Wheeler v. Pa. Dep't Labor & Indus.*, 2012 **WL** 1057430, at \*6 (**E.D. Pa.** Mar. 29, 2012) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). A pattern or practice is "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [must] establish by a preponderance of the evidence that [pregnancy] discrimination was the

company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336.

**Snider** alleges that Defendants "refused to hire or rehire Plaintiff based on the belief that pregnancy and maternity leave are an inordinate drain on the workplace caused by female employees; that female employees will prioritize family over work; and/or that new mothers belong home with their newborn children." (*Id.* ¶ 41.) She also alleges that "there is widespread resistance to the idea that employees should ever become pregnant." (*Id.* ¶ 45.)

First of all, to the extent that this claim concerns events before June 4, 2015, it is time barred. Moreover, **Snider** has not pleaded any facts to support these conclusory allegations or to suggest that Defendants had a formal policy or a pattern or practice of discrimination against pregnant women. Instead, she only says that Defendants "refused to adopt a non-discrimination policy." (*Id.* ¶ 42.) This is not sufficient. **Snider** does not plead a pattern or practice of discrimination by pointing to any other pregnant women against whom Defendants discriminated. *See United States v. Pennsylvania*, 110 F. Supp. 3d 544, 550 (M.D. Pa. 2015) ("it appears well-settled, however, that a pattern or practice of discrimination could be either a pattern of disparate treatment of *a number of individuals*, or the wide-scale application of tests or other neutral factors having disparate impact, or both." (internal quotation omitted) (emphasis added)).

**C.**

Count III is a disparate impact claim under Title VII. "In order to establish a prima facie case of disparate impact discrimination, a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a discriminatory [ ] pattern." *Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792, 798 (3rd Cir. 1991); *see also EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3rd Cir. 1990) ("A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer."). "[T]he burden a Title VII plaintiff must meet to survive a motion to dismiss[ ] is much less onerous." *Ladd v. Boeing Co.*, 463 F. Supp. 2d 516, 523 (**E.D. Pa.** 2006) (quoting *Powell v. Ridge*, 189 F.3d 387, 394 (3d Cir. 1999), *overruled on other grounds by Alexander v. Sandoval*, 532 U.S. 275 (2001)).

Snider v. Wolfington Body Company, Inc., Not Reported in Fed. Supp. (2016)

Case 6:20-cv-06566-FPG-MWP Document 56-6 Filed 07/26/22 Page 83 of 88

2016 Wage & Hour Cas.2d (BNA) 344,903

"To survive a motion to dismiss, all that the plaintiff must do is plead that a facially neutral practice's adverse effects fall disproportionally on a group protected by Title VII." *Id.* (citing *Powell*, 189 F.3d at 394 (explaining that parties' burdens in a Title VI disparate impact case are the same for Title VII disparate impact case)). A disparate impact claim is subject to Title VII's timing requirements. *See* 42 U.S.C. § 2000e-5(e)(1); *Lewis v. City of Chicago*, 560 U.S. 205, 208 (2010). The time period can run either from the adoption of a policy or from the policy's application. *Lewis*, 560 U.S. at 212.

**\*6** **Snider** alleges that Defendants' leave policy, which allowed her to take only ten days off after the birth of her child, has a disparate impact upon pregnant female employees. She alleges nine specific problems with the policy. *See* (2d Am. Compl. ¶ 47). The policy, however, applied to **Snider**—at the latest—in January of 2015, when she received the alleged "termination letter." Thus, the Title VII limitations period began to run in January. *See Lewis*, 560 U.S. at 212. **Snider** concedes that any unlawful employment actions before June 3, 2015 are time barred.

**D.**

Count IV alleges retaliation in violation of Title VII. To establish a viable retaliation claim under Title VII, a plaintiff must allege facts to show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

**Snider** conclusorily alleges (for the first time) in paragraph 52 of her Second Amended Complaint that she "previously opposed the no-maternity-leave policy" and that, because of this opposition, Defendants fired her and failed to rehire her. The allegations related to her termination are time barred. Regarding her failure to rehire claim, **Snider** offers no facts to support her threadbare allegation. For example, she does not allege how she opposed this policy, to whom she expressed her opposition or whether the people to whom she expressed opposition were involved in the decision not to rehire her. The Court is not bound to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678.

**IV.**

**Snider** alleges two claims arising under the FMLA. Congress enacted the statute in 1993 to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1–2). The FMLA grants up to "12 workweeks of leave during any 12-month period" to individuals it deems "eligible employees" to allow such employees to leave work for one of several reasons, including the birth of a child. *See id.* § 2612(a). "The Act contains two relatively distinct types of provisions: a series of prescriptive substantive rights for eligible employees, often referred to as the 'entitlement' or 'interference' provisions which set floors for employer conduct, 29 U.S.C. §§ 2612, 2614(a)(1); and protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions, 29 U.S.C. § 2615(a)(1-2); 29 C.F.R. § 825.220(c)." *Sinacole v. iGate Capital*, No. 2:04cv0921, 2006 **WL** 3759744, at \*5 (W.D. Pa. Dec. 19, 2006), *aff'd*, 287 Fed.Appx. 993 (2009) (citing *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005))." **Snider** alleges both FMLA retaliation and interference claims.

**A.**

Count V is the retaliation claim. To survive a motion to dismiss, **Snider** must allege facts to show: (1) she invoked her FMLA right to leave; (2) she suffered an adverse employment decision; and (3) the adverse action was causally connected to her invoking her right to FMLA leave. *See Lichtenstein v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012). An employee need not expressly assert or even mention her rights under the FMLA to invoke her rights for the purposes of an FMLA retaliation claim. *Lichtenstein*, 691 F.3d at 303.

**Snider** and Defendants both agree that **Snider** was not an FMLA eligible employee because she failed to work at least 1,250 hours and was not employed by Defendants for at least 12 months. *See* 29 U.S.C. § 2611(2)(A); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 504 (3d Cir. 2009). **Snider** argues, however, that eligibility is not a prerequisite to bring a retaliation claim, and even if it is, the doctrine of equitable estoppel preserves her ability to bring FMLA related claims notwithstanding her ineligibility.

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 84 of 88

Snider v. Worthington Body Company, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 344,903

i.

*7 In contending that eligibility is not required to bring an FMLA retaliation claim, she relies primarily on dicta in *McArdle v. Town of Dracut*, 732 F.3d 29, 36 (1st Cir. 2013). (ECF No. 24, at 4). The First Circuit, however, expressly avoided deciding that issue because it concluded that the FMLA was irrelevant to the merits of its case. *McArdle*, 732 F.3d at 36.[6] Next, **Snider** relies on *Johnson v. Dollar General*, 880 F. Supp. 2d 967 (N.D. Iowa 2012). The *Johnson* court did in fact hold that an ineligible employee could state a claim for FMLA retaliation. *Id.* at 992. No circuit, however, has adopted the *Johnson* court's position though many have come to the opposite conclusion. *See Walker v. Elmore Cty. Bd. of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004) ("There can be no doubt that the request—made by an ineligible employee for leave that would begin when she would still have been ineligible—is not protected by the FMLA);[7] *see also Hill v. Walker*, 737 F.3d 1209, 1215 (8th Cir. 2013) (same); *Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) (relying on *Walker*, 379 F.3d at 1253); *Amsel v. Tex. Water Dev. Bd.*, 464 Fed.Appx. 395, 401 n.7 (5th Cir. 2012) (same). *But see McArdle*, 732 F.3d at 36 (declining to decide the issue); *Wilkins v. Packerware Corp.*, 260 Fed.Appx. 98, 102–103 (10th Cir. 2008) (describing the issue as "contestable" but not taking a position).[8]

Finally, **Snider** cites *Beffert v. Pa. Dept. of Public Welfare*, No. 05-43, 2005 **WL** 906362, at *3 (**E.D. Pa**. April 18, 2005) allowing a non-eligible employee to bring an FMLA retaliation claim. *Beffert*, however, addressed a narrower issue: whether non-FMLA-eligible "employees who give...notice of leave to commence once they become eligible employees" are protected from retaliation. *Id.* at *2. The court concluded that "[s]ince the FMLA contemplates notice of leave in advance of becoming an eligible employee, the statute necessarily must protect from retaliation those currently non-eligible employees who give such notice of leave to commence once they become eligible employees." *Id.* at *3. *Beffert* does not help **Snider** either; again, her maternity leave would have occurred *before* she became FMLA eligible.

The Third Circuit has not addressed this issue, but district courts in the circuit have agreed with *Walker. See, e.g., McDevitt v. Am. Expediting Co.*, No. 15-498, 2015 **WL** 4579024, *3 (**E.D. Pa**. July 30, 2015) ("Because the Act only confers rights on 'eligible employees,' only 'eligible employees' may ordinarily bring a cause of action for retaliation or interference under the Act. Consequently, in order to state a valid FMLA claim for either interference or retaliation, a complaint must plausibly allege that the plaintiff is an 'eligible employee' under the Act."); *Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 917 F. Supp. 2d 377, 390 (**E.D. Pa**. 2013) (dismissing FMLA retaliation claim because plaintiff failed to plead that he was an "eligible employee"); *Bowman v. St. Luke's Quakertown Hosp.*, No. 12-797, 2012 **WL** 6527402, *5 (**E.D. Pa**. Dec. 13, 2012) ("To state a claim under the FMLA, a complaint must at a minimum contain allegations that, within the meaning of the FMLA, the defendant is an 'employer' and the plaintiff employee is an eligible employee." (internal quotations omitted)). **Snider** is not an eligible employee.

ii.

*8 **Snider** next contends that even if she is not an eligible employee, the doctrine of equitable estoppel preserves her ability to assert a retaliation claim. The Third Circuit has endorsed the use of the equitable estoppel doctrine in the context of the FMLA—albeit in a one page, unpublished decision. *See Leese v. Adelphoi Vill., Inc.*, 516 Fed.Appx. 192, 193 (3d Cir. 2013) ("[T]he District Court correctly concluded that equitable estoppel is available in the FMLA context...."). To bring a claim of equitable estoppel under the FMLA, **Snider** must plead facts to establish: "(1) a misrepresentation by another party; (2) which she reasonably relied upon; (3) to her detriment." *Leese*, 516 Fed.Appx. at 194 (quoting *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987)). **Snider** has failed to plead facts sufficient to bring an equitable estoppel claim because she has failed to establish a misrepresentation by Defendants.

"The first element necessary to establish equitable estoppel requires a 'definite misrepresentation,' but need not entail the intent to deceive." *See Palan v. Inovio Pharm.*, No. 15-3327, **2016 WL** 3440448, at *3, n.8 (3d Cir. June 23, **2016**) (citing *Minard v. ITC Delacom Commc'ns, Inc.*, 447 F.3d 352, 358–59 (5th Cir. 2006)). To establish misrepresentation, "the party requesting the estoppel must show that the defendants have engaged in *affirmative conduct* ...that was designed to mislead or was unmistakably likely to mislead a plaintiff." *Id.* at *3 (quoting *Redman v. U.S. W. Bus. Res., Inc.*, 153 F.3d 691, 695 (8th Cir. 1998) (internal quotations omitted) (emphasis added)).

Snider v. Wellington Body Company, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 344,903

The Third Circuit recently analyzed the misrepresentation element of equitable estoppel in an FMLA case. *See Palan*, **2016 WL** 3440448, at \*3. In *Palan* an employee sued his employer alleging FMLA retaliation and interference. Doctors diagnosed Palan with diverticulitis and told him he urgently needed surgery. *Id.* at \*1. He met with his employer to take leave from work but the FMLA was never mentioned by either party. While on leave, Palan was fired. Palan was not an eligible employee under the FMLA because defendants employed fewer than the required number of employees. *See* 29 U.S.C. § 2611(2)(B)(ii). Palan argued that equitable estoppel applied because defendants had voluntarily implemented an FMLA policy since its employer handbook mentioned FMLA compliance. Additionally, defendants had "assured Palan that he should not worry and that his job would be there upon his return." *Id.* at \*3, n.8.

The Third Circuit held that Palan had established a misrepresentation because of the misleading employee handbook, but *not* because of defendant's reassuring statements. *Id.* These statements did not constitute a misrepresentation "because they d[id] not address Palan's FMLA eligibility." *Id.* The district court had made the same conclusion, reasoning that "[w]hile the statements may have, ultimately turned out to be untrue, they did not concern whether Palan was FMLA eligible." *Palan v. Inovio Pharm. Inc.*, No. 14-5054, 2015 **WL** 5042836, at \*3, n.2 (**E.D. Pa.** Aug. 26, 2015).

As an initial matter, Defendants' failure to advise **Snider** of her FMLA rights (or post FMLA information) does not satisfy the misrepresentation element of equitable estoppel because it is not affirmative conduct. *See Palan*, 2015 **WL** 5042836, at \*3; *see also Redman*, 153 F.3d at 695. The only thing **Snider** points to as a misrepresentation is Harper's response of "Oh, OK" after **Snider** told her she was pregnant. (*Id.* at 54.) At oral argument, **Snider**'s counsel contended that these two words could be interpreted to mean that **Snider** did not have to worry and that she would be able to take leave. (Tr. of Oral Arg. 74:7–74:19.) The issue is not how **Snider** could or could not have "translated" Harper's remarks; "Oh, OK" is not a misrepresentation of anything. Regardless, even if these two words could be interpreted in this context as counsel suggest, Harper's purported reassurance did not concern whether **Snider** was FMLA eligible. *See Palan*, 2015 **WL** 5042836, at \*3, n.8. It is not plausible that **Snider**, in the complete absence of any mention of the FMLA, could have reasonably interpreted Harper to be telling her she was FMLA eligible. Because the allegations in the complaint are

insufficient to allege misrepresentation, **Snider**'s equitable estoppel theory—and thus her FMLA retaliation claim—fails.

**B.**

\*9 Count VI purports to state a claim for FMLA interference. An employer may be held liable for interference under the FMLA for failing to provide proper notice in accordance with the Department of Labor's regulations. *See* 29 C.F.R. § 825.300(e). The notice requirements are meant to "ensure that employers allow their employees to make informed decisions about leave." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 144 (3d Cir. 2004). However, in order to successfully state a claim of interference based on the employer's noncompliance with the FMLA's notice requirements, an employee must show that he or she has suffered prejudice. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 82 (2002). "Prejudice occurs when the employer's failure to advise the plaintiff of his FMLA rights 'rendered him unable to exercise [the right to leave] in a meaningful way, thereby causing injury.' " *Lupyan v. Corinthian Coll. Inc.*, 761 F.3d 314, 318–19 (3d Cir. 2014) (quoting *Conoshenti*, 364 F.3d at 143). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Id.* at 120.

FMLA interference claims unquestionably require the employee to be eligible under the statute. The first prong of an interference claim requires an employee to show she was "*entitled to benefits under the FMLA.*" *Callison*, 430 F.3d at 119 (emphasis added). Moreover, the Third Circuit has reasoned, at least in the FMLA interference context, that the "FMLA does not provide a private right of action for any employee, but rather only for eligible employees." *Sinacole v. iGate Capital*, 287 Fed.Appx. 993, 996 (3d Cir. 2008). An ineligible employee is thus "precluded...from proffering facts sufficient to establish her interference claim." *Id.* **Snider** does not dispute this reasoning, but instead argues once more that equitable estoppel saves her claim. (Pl.'s Br. at 3.)

As discussed above, however, **Snider** has failed to state an equitable estoppel claim because she cannot show that the Defendants misrepresented anything. Additionally, in the context of her interference claim, **Snider** cannot show that she suffered a detriment. The Third Circuit rejected a similar argument in *Sinacole*. 287 Fed.Appx. at 993. In *Sinacole*, a former employee, who had requested FMLA leave

Snider v. Wilmington Body Company, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 344,903

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 86 of 88

for her pregnancy, brought an interference claim because defendants never responded to her request. *Id.* at 994. The plaintiff, however, was not eligible for FMLA leave. *Id.* Assuming arguendo that defendant's silence was sufficient misrepresentation, the Third Circuit concluded that the plaintiff still failed to show that she had suffered a detriment. *Id.* at 995–96. The court rejected plaintiff's argument that she could have delayed taking FMLA leave until a time when she was eligible, because it was not possible for her to become eligible before the birth of her child. *Id.* at 995. **Snider**'s claim fails for the same reasons.

## V.

**Snider**'s remaining counts allege violations of Pennsylvania common law. Count VII alleges negligent misrepresentation, (2d Am. Compl. ¶ 70), and Count VIII asserts a wrongful termination claim, (2d Am. Compl. ¶ 80). For the Court to exercise supplemental jurisdiction over these claims, the state and federal claims must "derive from a common nucleus of operative facts" and the claims must be "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Lyons v. Whisman*, 45 F.3d 758, 760 (3d Cir. 1995) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). The test to determine whether claims arise from a "common nucleus of operative facts" is "not self-evident" and is fact specific. *Id.* The Third Circuit has identified two extremes in the supplemental jurisdiction analysis: "district courts will exercise supplemental jurisdiction if the federal and state claims are merely alternative legal theories of recovery based on the same acts" and the courts "have refused to exercise supplemental jurisdiction over state claims totally unrelated to a cause of action under federal law." *Id.* at 761 (citations omitted). Here, **Snider**'s claims are alternative legal theories of recovery based on the same acts.

## A.

**\*10** "Negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and, (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999).

Common law negligent misrepresentation requires an actual misrepresentation on the part of the defendant. *Cooper v. Sirota*, 37 Fed.Appx. 46, 48 (3d Cir. 2002); *see Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co.*, 700 F. Supp. 2d 720, 734 (**E.D. Pa.** 2010) ("Negligent misrepresentation claim requires an actual misrepresentation as opposed to assumptions on the part of the recipient."); *see also State Coll. Area Sch. Dist. v. Royal Bank of Canada*, 825 F. Supp. 2d 573, 584 (M.D. Pa. 2011) (quoting *Partners Coffee Co.*, 700 F. Supp 2d at 734).

Omissions can be actionable under Pennsylvania law if there is a duty to disclose. *Brown v. Johnson & Johnson*, 64 F. Supp. 3d 717, 726 (**E.D. Pa.** 2014); *Partners Coffee*, 700 F. Supp. 2d at 734 ("[A] claim of negligent misrepresentation presumes a duty to disclose...."); *see also Weisblatt v. Minn. Mut. Life Ins. Co.*, 4 F. Supp. 2d 371, 380 (**E.D. Pa.** 1998). **Snider** alleges that Defendants should have disclosed her FMLA status to her at the time she was hired, when she told Defendants that she was pregnant. She argues that their failure to do so constitutes negligent misrepresentation. But there was no misrepresentation because, at the time she was hired, she was not requesting leave—she simply told them of her pregnancy. When she did request leave in November or December 2014, Defendants informed her that she was not eligible. The letter attached to **Snider**'s response makes this clear. *See* (ECF No. 24, Ex. A). There cannot be a negligent misrepresentation claim based on an omission on these facts.

Again, the only affirmative misrepresentation **Snider** alleges is Harper's statement "Oh, OK" in response to **Snider** informing her she was pregnant. There is no plausible way to construe this as a misrepresentation of a material fact.

## B.

Finally, **Snider** alleges a wrongful discharge claim in violation of Pennsylvania public policy. To establish a claim for wrongful discharge in the at-will employment context, **Snider** must show that her termination "threaten[ed] clear mandates of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009) (quoting *Clary v. Advanced Comp. Applications, Inc.*, 559 A.2d 917, 918 (Pa. 1989)). This exception is granted in "only the most limited of circumstances."[9] *Id.* at 562–63 (internal quotation and citation omitted). "Although the parameters of the public policy exception are not explicitly defined, the Pennsylvania courts generally have limited its application to situations in which

Snider v. Wolfington Body Company, Inc., Not Reported in Fed.Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 344,903

an employer: (1) requires an employee to commit a crime; (2) prevents an employee from complying with a statutorily imposed duty; and (3) discharges an employee when specifically prohibited from doing so by statute." *Brennan v. Cephalon, Inc.*, 298 Fed.Appx. 147, 150 (3d Cir. 2008) (citing *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)); *see also Spyridakis v. Riesling Group, Inc.*, 398 Fed.Appx. 793, 799 (3d Cir. 2010) (quoting *Hennessy*, 708 A.2d at 1273);*Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003) (same).

**\*11** Moreover, in order to "set forth a claim for wrongful discharge a Plaintiff must do more than show a possible violation of a federal statute that implicates only her own personal interest." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (Pa. 2000); *see also Howell v. PPL Servs. Corp.*, 232 Fed.Appx. 111, 113–14 (3d Cir. 2007). "[A] bald reference to a violation of a federal regulation, without any more articulation of how the public policy of this Commonwealth is implicated, is insufficient to overcome the strong presumption in favor of the at-will employment relation." *Id.* at 290; *see also Diehl v. Admin. Offices of Pa. Courts*, No. 4:10-CV-00071, 2010 **WL** 8939137, at \*12 (M.D. Pa. Sept. 13, 2010) (finding that FMLA violation did not qualify as public policy exception to Pennsylvania's at-will system). **Snider** claims that Defendants' supposed violations of the FMLA satisfy the public policy exception. They do not.

Under Federal Rule of Civil Procedure 15(a), "courts may grant...amendments 'when justice so requires.' " *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2004) (citing Fed. R. Civ. P. 15(a)). While Rule 15 states that "leave to amend should be 'freely given,' a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Id.*; *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178 (1962)). "When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006). The Third Circuit Court of Appeals has left the decision of whether to grant or deny a motion for leave to amend within the sound discretion of the district court. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001) (citations omitted).

**Snider** has had ample opportunity to amend her complaint and further amendment would be futile. The Court dismisses Counts II, III, IV, V, VI, VII, and VIII with prejudice. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6071359, 2016 Wage & Hour Cas.2d (BNA) 344,903

**VI.**

Footnotes

1   Defendants claim that only **Wolfington Body** Company was **Snider's** employer.

2   **Snider's** request for maternity leave went "all the way to" Richard **Wolfington**. (*Id.* ¶ 21.)

3   **Snider** did not attach this letter to any of her complaints. After Defendants pointed this out in their Motion to Dismiss, **Snider** attached the letter to her Response. *See* (ECF No. 24, Ex. A.) "In deciding motions under Rule 12(b)(6), courts may consider documents integral to or explicitly relied upon in the complaint or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. **2016**) (internal quotations and citations omitted). The letter is integral to **Snider's** allegations and she explicitly relied on it in her complaint. **Snider's** counsel acknowledged at oral argument that the letter is integral to the complaint. (Tr. of Oral Arg. 28:22–28:24.)

4   **Snider** also contradictorily alleges that she was on "maternity leave" from February 2015 until June/July 2015 and then again from June 2015 to August 2015 when she found another job. (*Id.* ¶ 28.) At oral argument, however, **Snider's** Counsel acknowledged that **Snider** was fired and not on maternity leave. (Tr. of Oral Arg. 44:22–48:10.)

Snider v. Washington Body Company, Inc., Not Reported in Fed. Supp. (2016)
2016 Wage & Hour Cas.2d (BNA) 344,903

Case 6:20-cv-06566-FPG-MWP   Document 56-6   Filed 07/26/22   Page 88 of 88

5       In her filings, **Snider** uses the date June 3, 2015 while Defendants use the date June 4, 2015. The difference is immaterial.

6       "In any event, in this case we need not decide whether an ineligible employee may never bring a retaliation claim under the FMLA if he is fired merely for asking if he is eligible. Here, the only reasonable reading of the record is that McArdle was not fired for asking to take FMLA leave." *McArdle*, 732 F.3d at 36.

7       After *Walker*, the Eleventh Circuit held that the FMLA does protect a "pre-eligibility request for post-eligibility maternity leave." *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012). This decision does not help **Snider** because she did not make such a request—her maternity leave would have occurred *before* she was FMLA eligible.

8       **Snider** also relies on *Potts v. Franklin Elec. Co.*, No. 05-433, 2006 WL 2474964 (E.D. Okla. Aug. 24, 2006). *Potts* took a similar position to *Johnson*, but cited to the district court's decision in *Walker* for the proposition that the "FMLA protects the attempt to exercise a right; thus [it] can protect someone who mistakenly asks for FMLA leave although they may be ineligible." *Id.* at *3. But the Eleventh Circuit in *Walker* expressly rejected this reasoning while only affirming the district court's ultimate outcome. *See Walker*, 379 F.3d 1249, 1252 ("Contrary to the district court, we hold that Walker's claim fails at the first step in this analysis because her request for leave was not protected by the FMLA."). Thus, the *Potts* court based its decision in part on an overruled district court decision.

9       *See, e.g., Field v. Phila. Elec. Co.*, 565 A.2d 1170 (Pa. Super. Ct. 1989) (plaintiff discharged after reporting nuclear safety violations); *Hunter v. Port Auth.*, 419 A.2d 631 (Pa. Super. Ct. 1980) (plaintiff denied public employment on the basis of a prior conviction for which he had been pardoned); *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119 (Pa. Super. Ct. 1978) (plaintiff discharged for fulfilling jury duty).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.